ORAL ARGUMENT NOT YET SCHEDULED
Case Nos. 22-1019 & No. 22-1020 (consolidated)

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

EAGLE COUNTY, COLORADO, *et al.*,
*Petitioners*,

v.

SURFACE TRANSPORTATION BOARD, *et al.*,
*Respondents*, and

SEVEN COUNTY INFRASTRUCTURE COALITION, *et al.*,
*Intervenors.*

ON PETITION FOR REVIEW OF ORDERS OF
THE SURFACE TRANSPORTATION BOARD

**PROOF BRIEF OF RESPONDENT
SURFACE TRANSPORTATION BOARD**

CRAIG M. KEATS
General Counsel

THEODORE L. HUNT
Associate General Counsel

BARBARA A. MILLER
Attorney
Surface Transportation Board
Washington, DC  20423-0001
(202) 245-0277

December 16, 2022

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**Parties and Amici.**  The parties in Case Nos. 22-1019 and No. 22-1020 are Petitioners the Center for Biological Diversity, Living Rivers, Sierra Club, Utah Physicians for a Healthy Environment, WildEarth Guardians, and Eagle County, Colorado (the County); Respondents Surface Transportation Board (the Board), the U.S. Fish and Wildlife Service, and the United States of America; Intervenors the Seven County Infrastructure Coalition and Uinta Basin Railway, LLC; and Amici Glenwood Springs, Town of Minturn, Town of Avon, Town of Red Cliff, Town of Vail, Routt County, Boulder County, Chaffee County, Lake County, and Pitkin County (Colorado Amici).  Additionally, the State of Utah has indicated it intends to file an amicus brief.

**Rulings Under Review.**  In Case No. 22-1019, the County seeks review of decisions served by the Board on January 5, 2021 and December 21, 2021 in STB docket FD 36284.  *Seven Cnty. Infrastructure Coal.—Rail Constr. & Operation Exemption—in Utah, Carbon, Duchesne, & Uintah Cntys., Utah*, FD 36284 (STB served Jan. 5, 2021); *Seven Cnty. Infrastructure Coal.—Rail Constr. & Operation Exemption—in Utah, Carbon, Duchesne, & Uintah Cntys., Utah (Approval Decision)*, FD 36284 (STB served Dec. 21, 2021).  In Case No. 22-1020, Center for Biological Diversity, *et al.*, seek review of the *Approval Decision* and the related U.S. Fish & Wildlife Service September 2021 Biological Opinion.

**Related Cases.**  The petitions for review in this case have not previously been before this Court or any other court.  There is currently pending in this Court a petition for review of a related Record of Decision issued by the U.S. Forest Service in July 2022.  *Center for Biological Diversity, et al. v. U.S. Forest Service, et al.*, Case No. 22-1237 (filed Sept. 2022).  There is a motion to dismiss pending in that proceeding.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................... iv

GLOSSARY ........................................................................................... xi

JURISDICTIONAL STATEMENT ............................................................1

ISSUES PRESENTED..............................................................................2

STATUTES AND REGULATIONS..........................................................2

STATEMENT OF THE CASE...................................................................3

I.    FEDERAL REGULATORY FRAMEWORK ......................................3

    A. Construction of Rail Lines..............................................................3

    B. NEPA and NHPA ..........................................................................5

II.   THE PROCEEDINGS BEFORE THE BOARD HERE .....................7

    A. The Petition for Exemption under § 10502 and Preliminary Decision on the Transportation Merits ...............................................................7

    B. The Board's Compliance with Environmental and Historic Review Requirements ...............................................................................10

      1. Draft Environmental Impact Statement ....................................10

      2. Final Environmental Impact Statement ....................................12

    C. The Board's Final Decision ...........................................................14

III.  PROCEEDINGS BEFORE THIS COURT ......................................16

SUMMARY OF ARGUMENT ...............................................................16

ARGUMENT .........................................................................................19

I.    THE BOARD COMPLIED WITH NEPA AND NHPA. ..................19

A. The Board's Analysis of Upstream and Downstream Impacts Complied With NEPA...................................................................................19

  1. The Board Thoroughly Analyzed Upstream and Downstream Impacts...........................................................................................20

  2. Petitioners' Misclassification Argument Fails ..........................27

    a. Petitioners' Argument is Immaterial..................................28

    b. Petitioners' Argument is Wrong. ......................................30

  3. Upstream and Downstream Impacts From Oil Development in the Uinta Basin Are Not Reasonably Foreseeable Impacts.............................35

B. The Board's Analysis of Impacts in the Downline Study Area Complied with NEPA and NHPA....................................................................39

  1. The Board Conducted a Complete Impacts Analysis of the Downline Study Area. ...................................................................40

    a. Critiques of the Assessment of Accident Risks in the Downline Study Area Are Unfounded.................................................43

    b. The County's Arguments Concerning the Wildfire Risk Assessment in the Downline Study Area Also Lack Merit. ..............45

    c. The County's Arguments Concerning Impacts on Biological Resources in the Downline Study Area Are Baseless.........................50

      i. The County Incorrectly Claims the Board Did Not Consider Impacts of a Spill on Special Status Species in the Downline Study Area. ...................................................................50

      ii. The Board Did Not Err in Relying on the Biological Opinion. ......52

      iii. The Board Was Not Required to Consider Impacts on Other Biological Resources in the Downline Study Area.........................54

    d. Impacts from Reactivation of the Tennessee Pass Line Are Not Reasonably Foreseeable ....................................................55

    e. The Board Did Not Violate Section 106 of NHPA.............................56

f.  The County's Arguments Concerning Noise & Vibration Are Unavailing. ...........................................................................61

g.  The Board Reasonably Explained Why It Could Not Impose Downline Mitigation. ..........................................................62

C.  The Board's Analysis of Geological Hazards Satisfied NEPA....................63

II.  THE BOARD'S DECISION WAS REASONABLE AND CONSISTENT WITH THE PROVISIONS OF 49 U.S.C. §§ 10502 AND 10901. ...............................68

A.  The Board's Preliminary Decision on the Transportation Merits Was Appropriate...................................................................................68

B.  The Board Reasonably Weighed the Appropriate Rail Transportation Policy Factors and the Environmental Issues in Reaching its Final Decision. ........................................................................................70

CONCLUSION ...................................................................................81

# TABLE OF AUTHORITIES

**Page(s)**

## CASES*

*Akron, Canton & Youngstown R.R. v. ICC*,
  611 F.2d 1162 (6th Cir. 1979) .............................................................32

*\*Alaska Survival v. Surface Transp. Bd.*,
  705 F.3d 1073 (9th Cir. 2013) ............................................. 3, 4, 5, 71, 77, 78, 80

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*,
  462 U.S. 87 (1983) ................................................................20

*\*Birkhead v. FERC*,
  923 F.3d 510 (D.C. Cir. 2019) .............................................37, 38, 39

*Center for Biological Diversity v. National Highway Traffic Safety
  Admin.*,
  538 F.3d 1172 (9th Cir. 2008) .............................................62

*Citizens Against Burlington, Inc. v. Busey*,
  938 F.2d 190 (D.C. Cir. 1991) .............................................5

*Citizens Against Rails-to-Trails v. Surface Transp. Bd.*,
  267 F.3d 1144 (D.C. Cir. 2001) .............................................6, 75

*City of Tacoma v. FERC*,
  460 F.3d 53 (D.C. Cir. 2006) .............................................2

*CMC Real Estate Corp. v. ICC*,
  807 F.2d 1025 (D.C. Cir. 1986) .............................................5

*Coalition of Concerned Citizens to Make Art Smart v. Fed. Transit
  Admin.*,
  843 F.3d 886 (10th Cir. 2016) .............................................58

*\*Delaware Riverkeeper Network v. FERC*,
  45 F.4th 104 (D.C. Cir. 2022) .............................................25, 34, 35, 37, 39

*Authorities upon which Repondents chiefly rely are marked with
asterisks.

iv

*Dep't of Transp. v. Pub. Citizen*,
　　541 U.S. 752 (2004)......................................................30, 31, 33, 34

*EarthReports, Inc. v. FERC*,
　　828 F.3d 949 (D.C. Cir. 2016).................................................20

*Fast Food Workers Comm. v. Nat'l Labor Relations Bd.*,
　　31 F.4th 807 (D.C. Cir. 2022)...............................................29

*\*Food & Water Watch v. FERC*,
　　28 F.4th 277 (D.C. Cir. 2022)............................... 29, 35, 37, 38, 39, 43

*Illinois Com. Comm'n v. ICC*,
　　848 F.2d 1246 (D.C. Cir. 1988)............................................69

*Illinois Com. Comm'n v. ICC*,
　　819 F.2d 311 (D.C. Cir. 1987)..............................................5

*Indian River Cty., Florida v. U.S. Dep't. of Transp.*,
　　348 F.Supp.3d 17 (D.D.C. 2018) *aff'd, Indian River Cty.*, 945 F.3d
　　515................................................................................65

*Indian River Cty., Florida v. U.S. Dep't. of Transp.*,
　　945 F.3d 515 (D.C. Cir. 2019)..............................................64

*Jones v. Nat'l Marine Fisheries Serv.*,
　　741 F.3d 989 (9th Cir. 2013)................................................56

*Kessler v. Surface Transp. Bd.*,
　　635 F.3d 1 (D.C. Cir. 2011)..................................................5

*Mayo v. Reynolds*,
　　875 F.3d 11 (D.C. Cir. 2017)................................................65

*Metro. Edison Co. v. People Against Nuclear Energy*,
　　460 U.S. 766 (1983)...........................................................30

*Mid States Coal. for Progress v. Surface Transp. Bd.*,
　　345 F.3d 520 (8th Cir. 2003).........................................3, 4, 39, 78, 80

*N. Plains Res. Council v. Surface Transp. Bd.*,
　　668 F.3d 1067 (9th Cir. 2011).........................................3, 4, 67, 80

v

*National Mining Ass'n v. Zinke*,
    877 F.3d 845 (9th Cir. 2017) .................................................................65

*\*Nevada v. Dep't of Energy*,
    457 F.3d 78 (D.C. Cir. 2006)........................ 29, 48, 49, 54, 59, 60, 61

*Oglala Sioux Tribe v. U.S. Nuclear Regulatory Comm'n*,
    45 F.4th 291 (D.C. Cir. 2022)..................................................29, 60

*Oregon Pub. Util. Comm'n v. ICC*,
    979 F.2d 778 (9th Cir. 1992) .............................................................71

*Pub. Emps. for Env'tl Responsibility v. Hopper*,
    827 F.3d 1077 (D.C. Cir. 2016) .......................................................67

*Pub. Serv. Comm'n v. Fed. Power Comm'n*,
    543 F.2d 757 (D.C. Cir. 1974) .........................................................29

*\*Pub. Util. Comm'n of California v. FERC*,
    900 F.2d 269 (D.C. Cir. 1990)....................................................65, 67, 69

*Riffin v. Surface Transp. Bd.*,
    733 F.3d 340 (D.C. Cir. 2013) .........................................................32

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989)......................................................................6

*Sierra Club v. Fed. Highway Admin.*,
    435 Fed.Appx. 368 (D.C. Cir. 2011) ...............................................65

*Sierra Club v. FERC (Freeport)*,
    827 F.3d 36 (D.C. Cir. 2016).....................................................6, 30, 33

*Sierra Club v. FERC (Sabal Trail)*,
    867 F.3d 1357 (D.C. Cir. 2017).......................................33, 34, 38, 39

*Simmons v. ICC*,
    716 F.2d 40 (D.C. Cir. 1983)...........................................................39

*Sims v. Apfel*,
    530 U.S. 103 (2000)........................................................................77

*Theodore Roosevelt Conservation P'ship v. Salazar,* 616 F.3d 497,
511 (D.C. Cir. 2010) ...................................................................45

*United States v. L.A. Tucker Truck Lines, Inc.,*
344 U.S. 33 (1952).............................................................75, 77

*Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council,*
435 U.S. 519 (1978)....................................................................76

*Vill. of Palestine v. ICC,*
936 F.2d 1335 (D.C. Cir. 1991)..........................................5, 71, 80

*WildEarth Guardians v. Jewell,*
738 F.3d 298 (D.C. Cir. 2013)....................................................20

*WildEarth Guardians v. Provencio,*
923 F.3d 655 (9th Cir. 2019) ......................................................60

### AGENCY DECISIONS**

*Alaska R.R.-Constr. & Operation Exemption-Rail Line Between
Eielson Air Force Base & Fort Greely, Alaska,* FD 34658
(STB served Oct. 4, 2007) ..........................................................68

*Colo., Midland & Pac. Ry.-Lease & Operation Exemption Containing
Interchange Commitment-Union Pac. R.R.,* FD 36471
(STB served Mar. 25, 2021) .........................................................55

*Seven Cnty. Infrastructure Coal.-Rail Constr. & Operation
Exemption-in Utah, Carbon, Duchesne, & Uintah Cntys., Utah
(Approval Decision),* FD 36284 (STB served Dec. 21, 2021)
.............. 1, 2, 14, 15, 16, 28, 29, 31, 32, 33, 55, 64, 72, 73, 74, 75, 77, 78, 79, 80

*Seven Cnty. Infrastructure Coal.-Rail Constr. & Operation
Exemption-in Utah, Carbon, Duchesne, & Uintah Cntys., Utah,*
FD 36284 (STB served June 17, 2020) ........................................76

**Agency decisions are available on Lexis and Westlaw, and Board
decisions after November 1, 1996, are also available at
www.stb.gov.

*Seven Cnty. Infrastructure Coal.-Rail Constr. & Operation*
*Exemption-in Utah, Carbon, Duchesne, & Uintah Cntys., Utah*
*(Preliminary Decision)*, FD 36284 (STB served Jan. 5, 2021)
................................................... 1, 8, 9, 10, 16, 68, 69, 72, 74, 75, 77, 78, 79, 80

*Seven Cnty. Infrastructure Coal.-Rail Constr. & Operation*
*Exemption-in Utah, Carbon, Duchesne, & Uintah Cntys., Utah*
*(Reconsideration_Decision)*, FD 36284 (STB served Sept. 30,
2021) ...................................................................10, 74, 75

*Tongue River Railroad Company-Construction and Operation-in*
*Custer, Powder River, and Rosebud Counties Mont.*, FD 30186,
Draft EIS_Chapter_17 (STB served April 17, 2015) .........................41

## STATUTES

28 U.S.C § 2321(a) ................................................................1

28 U.S.C § 2342 ...................................................................1

28 U.S.C § 2344 ................................................................1, 39

42 U.S.C. §§ 4321-4370m-11 ....................................................5, 29

42 U.S.C. § 4332(2)(C) ...........................................................5

49 U.S.C. § 1(18) ................................................................4

49 U.S.C. § 1322(c) ..............................................................9

49 U.S.C. § 10101 .............................................................4, 70

49 U.S.C. § 10101(1) ............................................................76

49 U.S.C. § 10101(2) .......................................................16, 72, 79

49 U.S.C. § 10101(4) ...................................................16, 68, 72, 78, 79

49 U.S.C. § 10101(5) ...................................................16, 68, 72, 78, 79

49 U.S.C. § 10101(7) .......................................................16, 68, 72, 79

49 U.S.C. § 10101(8) .......................................................72, 73, 74, 75, 76

49 U.S.C. § 10101(11) ................................................................72, 73, 74, 75

49 U.S.C. § 10101(14) ......................................................................75, 76, 77

49 U.S.C. § 10502 ................................................ 4, 5, 7, 8, 9, 70, 71, 72, 78

49 U.S.C. § 10502(a)(1) ................................................................................70

49 U.S.C. § 10502(a)(2) ................................................................................70

49 U.S.C. § 10901 ................................................ 1, 3, 4, 7, 8, 9, 70, 71, 72, 80

49 U.S.C. § 10901(c) ........................................................................3, 4, 73, 80

49 U.S.C. § 11101 ..........................................................................................36

49 U.S.C. § 11101(a) ........................................................................32, 34, 80

54 U.S.C. § 306108 ..........................................................................................6

## REGULATIONS

36 C.F.R § 800.2 ............................................................................................58

36 C.F.R. § 800.2(c)(3) ..................................................................................59

36 C.F.R § 800.3(e) ........................................................................................58

36 C.F.R § 800.3(f)(3) ....................................................................................58

36 C.F.R § 800.6(a)(4) ....................................................................................58

36 C.F.R § 800.16(d) ......................................................................................57

40 C.F.R. §§ 1500-1508 ............................................................................6, 29

40 C.F.R. § 1501.2 ..........................................................................................66

40 C.F.R. § 1502.22 (2019) ............................................................................65

40 C.F.R. § 1502.25 ........................................................................................56

40 C.F.R. § 1506.13 ..........................................................................................6

40 C.F.R. § 1508.1(g)(2) (2021) ....................................................................30

40 C.F.R. § 1508.7 (2019) .................................................................7, 33, 35

40 C.F.R. § 1508.8 (2019) ....................................................................6, 35

40 C.F.R. § 1508.25 (2019) .......................................................................6

49 C.F.R. § 1104.13 ...................................................................................76

49 C.F.R. § 1105.7(e)(4) ......................................................................40, 41

49 C.F.R. § 1105.7(e)(5) ......................................................................40, 41

49 C.F.R. § 1105.7(e)(6) ......................................................................40, 41

49 C.F.R. § 1105.7(e)(11)(v) ....................................................................40

49 C.F.R. § 1115.3 ...........................................................................9-10, 76

49 C.F.R. § 1115.3(c)................................................................................76

49 C.F.R. § 1121.4 .....................................................................................75

50 C.F.R. § 402.02 ....................................................................................53

## OTHER MATERIALS

H.R. Conf. Rep. No. 104-422, 104th Cong., 1st Sess. 168 (1995),
   *reprinted in* 1995 U.S.C.C.A.N. 850 .....................................................5

84 Fed. Reg. 68,274 (Dec. 13, 2019) .......................................................11

85 Fed. Reg. 43,304 (July 16, 2020) .........................................................6

87 Fed. Reg. 23,453 (Apr. 20, 2022) .........................................................6

87 Fed. Reg. 23,456 (Apr. 20, 2022) .........................................................6

# GLOSSARY

| | |
|---|---|
| Approval Decision | *Seven Cnty. Infrastructure Coal.—Rail Constr. & Operation Exemption—in Utah, Carbon, Duchesne, & Uintah Cntys., Utah*, FD 36284 (STB served Dec. 21, 2021) |
| EIS | Environmental Impact Statement |
| ICC | Interstate Commerce Commission |
| NEPA | National Environmental Policy Act |
| NHPA | National Historic Preservation Act |
| Preliminary Decision | *Seven Cnty. Infrastructure Coal.—Rail Constr. & Operation Exemption—in Utah, Carbon, Duchesne, & Uintah Cntys., Utah*, FD 36284 (STB served Jan. 5, 2021) |
| Reconsideration Decision | *Seven Cnty. Infrastructure Coal.—Rail Constr. & Operation Exemption—in Utah, Carbon, Duchesne, & Uintah Cntys., Utah*, FD 36284 (STB served Sept. 30, 2021) |

## JURISDICTIONAL STATEMENT

Respondent Surface Transportation Board (Board) has licensing authority over the construction and operation of railroad lines by rail carriers in the interstate rail system.  49 U.S.C. § 10901.  Here, in a two-step process, the Board authorized the Seven County Infrastructure Coalition (Coalition) to construct and operate an approximately 85-mile rail line in Utah.  *Seven Cnty. Infrastructure Coal.—Rail Constr. & Operation Exemption—in Utah, Carbon, Duchesne, & Uintah Cntys., Utah (Preliminary Decision)*, FD 36284 (STB served Jan. 5, 2021); *Seven Cnty. Infrastructure Coal.—Rail Constr. & Operation Exemption—in Utah, Carbon, Duchesne, & Uintah Cntys., Utah (Approval Decision)*, FD 36284 (STB served Dec. 21, 2021).

Under 28 U.S.C §§ 2321(a), 2342, and 2344, this Court has jurisdiction to review final orders of the Board when a petition for review is filed within 60 days of issuing the final decision.  Eagle County, Colorado (the County) and the Center for Biological Diversity, *et al.* (collectively the Center) both filed timely petitions for review (on February 10 and February 11, 2022, respectively) of the Board's decisions.  The County seeks review of the *Preliminary Decision* and *Approval Decision* and the Center seeks review of the *Approval Decision* and the U.S. Fish and Wildlife Service's September 2021 Biological Opinion.  The Fish and Wildlife Service issued the Biological Opinion before, and the Board incorporated it into,

1

the *Approval Decision*.  Therefore, this Court has jurisdiction to review the

Biological Opinion, and the U.S. Fish and Wildlife Service is a proper respondent.

*See City of Tacoma v. FERC*, 460 F.3d 53, 76 (D.C. Cir. 2006).

## ISSUES PRESENTED

1.  Whether the Board's thorough Environmental Impact Statement for a
    proposed rail line project adequately disclosed all significant environmental
    and historic impacts and otherwise complied with the National
    Environmental Policy Act and the National Historic Preservation Act.

2.  Whether the Board acted permissibly in making a preliminary finding,
    subject to further review after completion of the environmental and historic
    review process, that a proposed rail line project had transportation merit.

3.  Whether the Board's ultimate decision to authorize the transaction, after
    fully considering the transportation merits and the environmental and
    historic review concerns, was reasonable and not arbitrary and capricious.

## STATUTES AND REGULATIONS

The pertinent statutes and regulations are in the Addendum.

## STATEMENT OF THE CASE

## I.  FEDERAL REGULATORY FRAMEWORK

### A. Construction of Rail Lines

The Board has plenary and exclusive licensing authority over the construction and operation of railroad lines by rail carriers in the interstate rail system.  *Alaska Survival v. Surface Transp. Bd.*, 705 F.3d 1073, 1078 (9th Cir. 2013); *N. Plains Res. Council v. Surface Transp. Bd.*, 668 F.3d 1067, 1073 (9th Cir. 2011).  The Board's authorization of a new rail line may take one of two forms.

Under 49 U.S.C. § 10901, a railroad may file a full application for authority to construct and operate a new rail line.  Section 10901(c) directs the Board to grant the application "*unless* the Board finds that such activities are *inconsistent* with the public convenience and necessity."  (Emphasis added).  Thus, there is a presumption that rail construction projects are in the public interest and should be approved.  *N. Plains Res. Council*, 668 F.3d at 1091-92; *accord Mid States Coal. for Progress v. Surface Transp. Bd.*, 345 F.3d 520, 552 (8th Cir. 2003).

The statute's history reinforces that presumption.  Prior to 1980, the agency "could authorize construction of a rail line only if it found that 'the present or future public convenience and necessity *require or will be enhanced by* the construction . . . .'" *N. Plains Res. Council*, 668 F.3d at 1089 (quoting the 1976

3

version of 49 U.S.C. § 10901, which was codified at 49 U.S.C. § 1(18) (emphasis

added)).  The Staggers Rail Act of 1980 "subsequently relaxed this restrictive

policy by providing that the [agency] need only find that public convenience and

necessity '*permit*' the proposed construction."  *Mid States*, 345 F.3d at 552

(quoting 49 U.S.C. § 10901 (1982) (emphasis added).  In the ICC Termination Act,

Congress "relaxe[d] the standard even further," to its current language, which

"direct[s] that the Board 'shall issue' construction licenses, 'unless the Board finds

that such activities are *inconsistent* with the public convenience and necessity.'"

*Mid States*, 345 F.3d at 552 (quoting current 49 U.S.C. § 10901(c) (emphasis

added)); *see N. Plains Res. Council*, 668 F.3d at 1091-92.

Alternatively, a railroad may seek Board authorization through an

"exemption" under 49 U.S.C. § 10502.  A § 10502 exemption does not mean that

the transaction is unregulated.  Rather, § 10502 provides a more streamlined

process for authorization when the agency finds that a full proceeding under

§ 10901 "is not necessary to carry out the [rail] transportation policy" in 49 U.S.C.

§ 10101, and that the transaction is limited in scope or regulation "is not needed to

protect shippers from the abuse of market power."  49 U.S.C. § 10502.  Therefore,

the Board determines the "transportation merits" in a case brought under § 10502

by looking, not to the public convenience and necessity standard in § 10901, but

rather to the exemption criteria of § 10502.  *See Alaska Survival*, 705 F.3d at 1083.

4

Given Congress' purpose in enacting § 10502 in the 1980 Staggers Act and bolstering it in the ICC Termination Act of 1995—to remove unnecessary regulatory requirements and expedite review of transactions "to the maximum extent consistent with [the Interstate Commerce Act]"[1]—the agency many times has, with judicial approval, used the exemption process to review various forms of rail transactions.[2]

## B. NEPA and NHPA

The National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321-4370m-11, requires that federal agencies prepare a detailed Environmental Impact Statement (EIS) before undertaking any "major Federal action[] significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C); *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 194 (D.C. Cir. 1991).  "The twofold purpose of NEPA is 'to inject environmental considerations into the federal agency's decisionmaking process and to inform the public that the federal agency has considered environmental concerns in its decisionmaking process.'"

---

[1]  H.R. Conf. Rep. No. 104-422, 104th Cong., 1st Sess. 168 (1995), *reprinted in* 1995 U.S.C.C.A.N. 850, 853.

[2]  *See, e.g.*, *Kessler v. Surface Transp. Bd.*, 635 F.3d 1, 2-3 (D.C. Cir. 2011) (abandonment); *Vill. of Palestine v. ICC*, 936 F.2d 1335, 1337 (D.C. Cir. 1991) (line sale); *Illinois Com. Comm'n v. ICC*, 819 F.2d 311, 313, 316 (D.C. Cir. 1987) (trackage rights); *CMC Real Estate Corp. v. ICC*, 807 F.2d 1025, 1031 (D.C. Cir. 1986) (operations); *Alaska Survival*, 705 F.3d at 1081-84 (construction and operation).

*Citizens Against Rails-to-Trails v. Surface Transp. Bd.*, 267 F.3d 1144, 1151 (D.C.

Cir. 2001) (citation and quotation omitted).  However, it is "well settled that NEPA

itself does not mandate particular results, but simply prescribes the necessary

process."  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989);

*see Busey*, 938 F.2d at 193-94.  Therefore, an agency may decide to proceed with a

proposed action, even if there are adverse environmental impacts, as long as those

impacts are "adequately identified and evaluated."  *Robertson*, 490 U.S. at 349.

Like NEPA, Section 106 of the National Historic Preservation Act (NHPA) is a

procedural statute that requires a federal agency to consider the effect of a federal

undertaking on historic property before taking the action.  54 U.S.C. § 306108.

Under NEPA, an agency must examine the direct, indirect, and cumulative

effects of its proposed action.  40 C.F.R. § 1508.25 (2019)[3]; *see also Sierra Club v.*

*FERC (Freeport)*, 827 F.3d 36, 40 (D.C. Cir. 2016).  Direct effects "are caused by

the action and occur at the same time and place."  40 C.F.R. § 1508.8(a) (2019).

Indirect effects "are caused by the action and are later in time or farther removed in

distance, but are still reasonably foreseeable."  40 C.F.R. § 1508.8(b) (2019).

---

[3]  In 2020, the Council on Environmental Quality updated the NEPA regulations at
40 C.F.R. Parts 1500–1508.  85 Fed. Reg. 43,304 (July 16, 2020).  Recently, the
Council amended the 2020 rules to restore some pre-2020 provisions and is also
developing a more comprehensive rulemaking to amend the 2020 rules.  87 Fed.
Reg. 23,453 & 23,456 (Apr. 20, 2022).  Because its NEPA process started in 2019,
the Board chose to apply the pre-2020 regulations here.  FEIS_App.T_T-46; *see* 40
C.F.R. § 1506.13.

Cumulative impacts are "the incremental impact[s] of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency … or person undertakes such other actions."  40 C.F.R. § 1508.7 (2019).

## II. THE PROCEEDINGS BEFORE THE BOARD HERE

### A. <u>The Petition for Exemption under § 10502 and Preliminary Decision on the Transportation Merits</u>

In May 2020, the Coalition, through the exemption process, sought authorization to construct and operate an approximately 85-mile rail line connecting two termini in the Uinta Basin near South Myton Bench, Utah, and Leland Bench, Utah, to the national rail network at Kyune, Utah (the Line). *Coalition's Petition for Exemption* (*Petition*)_4.  The Coalition stated that the purpose of the proposed rail line would be to provide common carrier rail service connecting the Uinta Basin to the interstate rail network using a route that would provide shippers of oil and other commodities with a viable alternative to trucking. *Id.*_7-9.  Because it is surrounded by high mountains and plateaus with elevations up to 13,500 feet above sea level, the Uinta Basin has limited access to transportation modes.  *Id.*_12-13; *Final EIS* (or *FEIS*)_1-3.  Currently, all freight moving in and out of the Uinta Basin is transported by trucks on the area's limited road network.  *Petition*_12-13; *FEIS*_1-3.

In its Petition, the Coalition addressed the § 10502 exemption criteria, explaining that review of the proposal under § 10901 was not needed to carry out

7

the Rail Transportation Policy, that the project would promote several provisions of the Rail Transportation Policy, and that an application under § 10901 was not required to protect shippers from an abuse of market power. *Petition_*21-26. The Coalition asked that the Board use a two-step process for reviewing the exemption request. *Id._*26-28. Rather than rule in a single decision at the completion of the case on both the transportation merits and the environmental and historic issues, the Board would first address the non-environmental transportation merits in a non-final, non-binding preliminary decision.

After reviewing the Coalition's Petition and the comments received on it, in January 2021, the Board issued a preliminary decision finding that the matter could proceed under the § 10502 exemption process and that the proposed project had merit from a purely "transportation" perspective because it advanced the Rail Transportation Policy and satisfied other aspects of the exemption criteria. *Preliminary_Decision*. As to the preliminary nature of the decision, the 2-1 majority recognized that, since 2007, the Board's policy has been to issue such a preliminary decision in a construction case only upon a showing of unique or compelling circumstances. *Id._*8-9. But the majority found that standard was met here given the compelling economic conditions at the time, which were exacerbated by the global pandemic. *Id._*9.

8

Specifically as to the § 10502 exemption criteria, the Board held that a full application under § 10901 was unnecessary because adding a rail option where there was none before would not subject shippers to any abuse of market power. *Id.*_9-10. Consistent with the statutory presumption that rail construction projects be approved, the Board also reached its preliminary conclusion that the proposed transaction satisfied the transportation merits requirements for exemption under § 10502. *Id.*_1, 4, 9-11. The Board emphasized that the preliminary transportation merits decision did not affect the Board's environmental review process or prejudge whether to ultimately authorize construction after weighing the potential environmental impacts and the transportation merits in a future final decision on the proposed project. *Id.*_10. The Board also explained that construction of the Line could not begin until the Board issued its final decision. *Id*.

Petitioners filed petitions for reconsideration of the *Preliminary Decision*, claiming that (1) a newly filed proceeding before the Board to lease and operate a dormant rail line in Colorado known as the Tennessee Pass Line needed to be considered; (2) further inquiry into the transportation merits was needed; and (3) the arguments in the dissent provided a basis for reconsidering the decision. *County Reconsideration Petition; Center Reconsideration Petition*.

Applying the standard for granting reconsideration (material new evidence, substantially changed circumstances, or material error), 49 U.S.C. § 1322(c); 49

9

C.F.R. § 1115.3, the Board denied the petitions in a 4-1 decision.  *Seven Cnty.*

*Infrastructure Coal.—Rail Constr. & Operation Exemption—in Utah, Carbon,*

*Duchesne, & Uintah Cntys., Utah (Reconsideration_Decision)*, FD 36284 (STB

served Sept. 30, 2021).  The Board held that the filing of a request to operate the

Tennessee Pass Line was not a changed circumstance because that line remained

out of service, and there was nothing to suggest either that it would be reactivated

or that trains carrying oil from the Uinta Basin would be carried on the line if it

were reactivated.  *Reconsideration_Decision_*5-6.  The Board also explained how

it had properly considered the Rail Transportation Policy factors in the *Preliminary*

*Decision*, and it pointed out that simply alluding to arguments in a dissenting

opinion that the Board majority had already rejected did not warrant

reconsideration.  *Reconsideration_Decision_*6-7

## B. <u>The Board's Compliance with Environmental and Historic Review Requirements</u>

### 1. *Draft Environmental Impact Statement*

The Board, through its Office of Environmental Analysis,[4] began its

environmental and historic review process under NEPA and NHPA by conducting

a thorough scoping process and issuing a Final Scope of Study for the EIS in the

---

[4]  The EIS was completed by the Office of Environmental Analysis on behalf of the Board.  Hereafter, this brief will use "Board" to include the Office of Environmental Analysis.

Federal Register in December 2019.  84 Fed. Reg. 68,274 (Dec. 13, 2019); *see* FEIS_S-4.  After identifying and analyzing the environmental and historic impacts, the Board issued a comprehensive Draft EIS (or DEIS) in October 2020.  The Board developed the Draft EIS with consultation and input from six federal and state cooperating agencies and after government-to-government consultation with the Ute Indian Tribe.  FEIS_S-5, 1-4-1-6.

Based on its analysis, the Board determined that there were three reasonable Action Alternatives (the Indian Canyon Alternative, Wells Draw Alternative, Whitmore Park Alternative), with the Whitmore Park Alternative identified as the Preferred Alternative.  *See* DEIS_2-20-2-27.  The EIS considered but rejected 22 conceptual route alternatives as not reasonable.  *Id._*2-5-2-19.

The Draft EIS rigorously analyzed the three Action alternatives, as well as the No-Action Alternative, and found that there would be some significant environmental and historic impacts if any of the three Action Alternatives was authorized.  DEIS_S-5-S-22.  The Draft EIS explained that, with each of the Action Alternatives, there would be unavoidable significant impacts on water resources, certain endangered and threatened species, land use and recreation, and areas of tribal concern, as well as significant noise and socioeconomic impacts.  *Id.* The Draft EIS also concluded that the remaining resource areas would experience only minor impacts if the project was authorized.  *Id.*  In addition, the Draft EIS

11

concluded that the Whitmore Park Alternative would result in the fewest significant environmental impacts.  *Id.*  Finally, the Draft EIS included 129 recommended mitigation measures to lessen or eliminate the identified impacts. DEIS_Chapter_4.

The public comment period for the Draft EIS continued until February 12, 2021.  During that comment period, the Board held six public online meetings and received 1,934 comments on the Draft EIS.  FEIS_S-5, App.T.

### 2. *Final Environmental Impact Statement*

After reviewing and considering all of the comments received, the Board issued the Final EIS in August 2021.[5]  The Final EIS included revisions and additional analysis performed in response to the comments.  The Final EIS, like the Draft EIS, concluded that all three Action Alternatives would lead to some significant environmental impacts.  FEIS_S-8-S-13.  The significant impacts identified in the Final EIS related to water resources, special status species (which includes listed species and the greater sage grouse), wayside noise during rail operations, land use and recreation, socioeconomic issues, and issues of concern to the Ute Indian Tribe, including impacts on cultural resources.  *Id.*  The Final EIS included 146 mitigation measures (including the original mitigation conditions

---

[5]  The Final EIS (along with the Draft EIS and other key environmental documents) have been available to the public online since they were published. *See* http://www.uintabasinrailwayeis.com/DocumentsAndLinks.aspx

from the DEIS, with some minor modifications) to help lessen or eliminate impacts.  FEIS_Chapter_4.

The Final EIS also discussed the broad scientific consensus that humans are causing climate change through fossil fuel combustion.  FEIS_3.15-35-3.15-36. The Board noted that the climate was warming, human influence has been the dominant cause, and the average global temperature was predicted to rise enough by 2100 to have "massive deleterious impacts on the natural and human environments."  FEIS_3.15-35, 3.7-10-3.7-11.  The Final EIS acknowledged that all three Action Alternatives would contribute incrementally to climate change by increasing greenhouse gas emissions.  FEIS_3.15-32.  And the Final EIS presented the Board's best estimates, given available information, of: (1) upstream emissions, i.e., emissions resulting from oil and gas development in the Uinta Basin, (2) direct emissions from construction and operation of the proposed rail line, and (3) downstream emissions, i.e., emissions from combusting crude oil transported on the Line.  FEIS_3.15-32-3.15-41.

The Final EIS determined that of the three Action Alternatives, the Whitmore Park Alternative would result in the fewest impacts and was therefore the environmentally-preferred alternative.  Specifically, the Final EIS concluded that the Whitmore Park Alternative would affect the smallest area of water

13

resources, would minimize impacts on greater sage grouse leks and brood raising habitat, and would avoid impacts on subdivided residential areas. FEIS_2-48.

Following issuance of the Final EIS, the Board received statements by both the Ute Indian Tribe and the State of Utah expressing support for the proposed project. The Board also received additional comments from the Center and other parties on the Final EIS.

## C. **The Board's Final Decision**

In December 2021, after reviewing and analyzing the full record, including the Draft EIS and the Final EIS, the Board issued its decision authorizing construction and operation of the Whitmore Park Alternative subject to extensive environmental mitigation conditions. *Approval_Decision_2*. Because rail construction projects can involve significant environmental and historic impacts, the *Approval Decision* (5-23) focused largely on those issues. In particular, the Board detailed the environmental review process and its analysis and conclusions, including the fact that the Whitmore Alternative had fewer environmental impacts than the other alternatives the Board studied. The Board also noted that, since issuing the Final EIS, the Utah Division of Wildlife Resources, Utah's Public Lands Policy Coordinating Office, the Coalition, and the Uinta Basin Railway had entered into an agreement that requires significant additional measures to mitigate, minimize, and avoid impacts to the greater sage-grouse. *Id._9*.

Responding to the Center's comment that the Final EIS had insufficiently

considered the impacts of increased oil and gas production in the Uinta Basin that

could occur as a result of the project, the Board explained that it fully and correctly

considered those upstream and downstream effects of potential oil and gas

development under the rubric of cumulative impacts.  *Id.*_18.  The Board also

indicated that its analysis of those impacts would have been the same had it

classified the impacts as indirect rather than cumulative.  *Id.*_18n.15.

In addition, the Board reviewed and relied on the Biological Opinion issued

by the Fish and Wildlife Service in September 2021.  *Id.*_10.  The Board noted that

the Fish and Wildlife Service concluded in the Biological Opinion that the

proposed project was not likely to jeopardize the continued existence of protected

species (Barneby ridgecress, Ute ladies'-tresses, the Uinta Basin hookless cactus,

and Pariette cactus), nor was it likely to jeopardize the continued existence of

Colorado River fishes or result in destruction or adverse modification of designated

critical habitat.  *Id.*_10.

The Board was satisfied that imposition of the recommended mitigation

measures (with minor modifications) would minimize the potential environmental

impacts of the proposed project.  *Id.*_23.  The Board then weighed those impacts

with the transportation merits, considering the substantial transportation and

economic benefits of the proposed project.  The Board concluded that, by

15

providing an alternative, more cost-effective method of transportation for shippers that are currently limited to shipping by truck, the project would eliminate longstanding transportation constraints, allow entry into new markets, and help diversify local economies and create more jobs, all of which would advance the Rail Transportation Policy. *Id._*23-25; *see*, *e.g.*, 49 U.S.C. § 10101(2), (4), (5) & (7). The Board also noted the Ute Tribe's support of the proposed project and the benefits that rail service would provide to the Tribe. *Id._*24. Based on this analysis, the Board concluded that, with the conditions to mitigate the environmental impacts, the requested exemption should be granted. *Id._*23-25.

## III. PROCEEDINGS BEFORE THIS COURT

On February 10, 2022, the County filed a petition for review of the Board's *Preliminary Decision* and *Approval Decision*. On February 11, 2022, the Center filed a petition for review of the *Approval Decision* and Fish and Wildlife Service's September 2021 Biological Opinion. On February 11, 2022, the Court issued an order consolidating the two petitions for review.

## SUMMARY OF ARGUMENT

Although Petitioners challenge the transportation merits analysis in this case, the primary issues are environmental in nature. The Board here conducted a comprehensive environmental and historic review in full compliance with NEPA and NHPA. After balancing the likely environmental effects with the

16

transportation benefits associated with the project, the Board acted reasonably in authorizing the Coalition to construct and operate the new rail line, subject to substantial mitigation conditions.  Petitioners throw a multitude of claims of error at the Board's review documents and decisions—but none stick.  Neither the Board's approval nor its process was arbitrary or capricious.  Petitioners simply do not agree with the well-considered and well-reasoned outcome, and they challenge the Board's extensive and complete environmental and historic review process with factually inaccurate and meritless arguments that are refuted by the record.

Petitioners' challenge to the Board's consideration of environmental impacts of upstream and downstream greenhouse gas emissions rests on a mischaracterization of the EIS and the Board's decision.  Not only did the EIS fully consider those impacts as cumulative, but the Board also clarified that its environmental analysis, and, thus, its decision, would have been exactly the same were the impacts classified as "indirect effects" of the project approval.  Petitioner's attack on the Board's classification of those impacts is therefore ineffectual, and it lacks merit in any event.  And any suggestion that the Board failed to analyze reasonably foreseeable effects (of whatever stripe) from greenhouse gas emissions is unsupported by the record.

The Board likewise fully examined the relevant impacts in the downline study area that could occur along the *existing* rail line between Kyune, Utah and

17

Denver due to increased rail traffic originating from or terminating on the *new* Line, including, but not limited to, potential impacts from accidents and wildfires and on biological resources.  Petitioners may not agree with the Board's conclusions on those issues, but NEPA does not dictate particular outcomes, and Petitioners' challenges simply amount to improper fly-specking of the EIS.

Petitioners' assertion that the two-step process used here did not follow Board precedent is incorrect, as the Board explained why the compelling circumstances here warranted its approach.  In any event, the determination to address the transportation merits in a preliminary, non-final decision before completing the environmental and historic review had no impact on the final outcome.

Finally, consistent with the statutory presumption that rail constructions should be approved, the Board acted appropriately in authorizing this transaction. The Board weighed the environmental and historic issues, including the extensive conditions it imposed to mitigate environmental harm, with its finding that the project advanced important transportation benefits.  Its decision, which reflected a reasonable balancing of the environmental concerns and the transportation benefits, should be affirmed.

## ARGUMENT

## I.    THE BOARD COMPLIED WITH NEPA AND NHPA.

### A. The Board's Analysis of Upstream and Downstream Impacts Complied With NEPA.

Contrary to the Center's assertions, Center Br. 14-34, the Board reasonably and correctly analyzed the upstream and downstream impacts of the Line.  Despite its claim before the agency that there would be insufficient oil reserves and market for that oil to justify building the Line,  *see* Center Reply_2 (July 7, 2020), the Center now argues the opposite: that there would be so much development and rail traffic as to cause severe environmental impacts, effects that the Board failed to consider.  In particular, the Center asserts that the Final EIS failed to analyze the upstream impacts of increased oil development in the Uinta Basin and downstream greenhouse gas emissions caused by the burning of the oil that could be transported on the Line, and that it "arbitrarily limited its analysis to only the impacts of Railway construction and operations."  Center Br. 13-14.

The Center, though, acknowledges that the Final EIS *did in fact analyze these upstream and downstream impacts*.  Center Br. 18-24.  The Center's real argument is that the Final EIS incorrectly *categorized* these impacts as cumulative impacts instead of indirect impacts—a position the Center also asserted before the Board during the NEPA process.  Center Br. 18-28.  Although the Board considered the Center's position and reasonably disagreed, given the circumstances

19

of this case, the Board indicated that it made no difference to the result here. Thus, any claimed error by the Board in labeling upstream and downstream greenhouse gas emissions as cumulative impacts versus indirect impacts cannot have prejudiced Petitioners and cannot support their argument that the decision was unlawful. Petitioners' alternative argument that there were some significant impacts from upstream and downstream greenhouse gas emissions not disclosed at all by the Board fails on the record.

### 1. The Board Thoroughly Analyzed Upstream and Downstream Impacts.

NEPA requires agencies "to consider and report on the environmental effect of their proposed actions" so the agency can engage in "'fully informed and well-considered' decisionmaking." *WildEarth Guardians v. Jewell*, 738 F.3d 298, 302 (D.C. Cir. 2013) (cleaned up) (quotation omitted). Thus, this Court's "[r]eview is intended to ensure that the agency 't[ook] a 'hard look' at the environmental consequences before taking a major action[,]' and 'adequately considered and disclosed the environmental impact of its actions. . . .'" *EarthReports, Inc. v. FERC*, 828 F.3d 949, 954 (D.C. Cir. 2016) (quoting *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 97-98 (1983)). Given the limited information available, the Board conducted a reasonable yet "hard look" analysis of upstream impacts and downstream greenhouse gas emissions that clearly informed the public and the Board's decision concerning these potential impacts. The Center's

20

assertion that the Board did not examine the relevant upstream and downstream impacts from the proposed rail line is simply wrong, as even the Center itself acknowledges.  Center Br. 14, 18-28.

*Upstream impacts*:  The Final EIS examined upstream impacts from potential oil development in the Uinta Basin on each relevant resource area. FEIS_3.15-3-3.15-35, 3.15-37-3.15-59, App.T_T-45-T-46.  First, because the actual volume of oil transported on the Line will depend on numerous independent variables and factors (such as domestic and global economic conditions, commodity pricing, strategic and capital investment decisions of oil producers and their customers), the Board developed "low production" and "high production" scenarios for future oil and gas development that could occur if the Line were built and operated.  FEIS_3.15-3-3.15-8.  Under the low oil production scenario, total oil production in the Uinta Basin would increase by an average of 130,000 barrels per day compared to historical production levels.  *Id.*  Under the high production scenario, total oil production would increase by an average of 350,000 barrels per day.  *Id.*  These scenarios are based on the Coalition's estimates of potential rail traffic on the Line.  *Id.*  They are not based on any specific oil development proposals because none exist at this early point in time.

The Board assumed that all oil transported on the Line would come from new production that would involve well drilling and construction and operation of

21

related facilities in the Uinta Basin. *Id.,* FEIS_App.T_T-45-T-46. This conservative assumption likely overstates upstream impacts because the proposed rail line might displace truck transportation for at least some existing oil production. FEIS_3.15-3-3.15-8, App.T_T-45-T-46.

The Board then estimated the number of oil wells that would need to be constructed and operated to satisfy the expected increased oil production in the low and high production scenarios. FEIS_3.15-3-3.15-8. Based on information from a review of past oil development proposals and in consultation with other agencies with expertise on trends in oil production techniques in the Uinta Basin, the Board approximated the annual production rate of an average well in each year of its lifetime and the number of wells that would need to be constructed each year to meet the oil production volume expected in the respective scenarios. *Id.*

In addition, the Board assumed that oil producers would construct and operate any needed ancillary facilities, such as access roads, electric power distribution lines, well pads, surface or subsurface pipelines, and storage tanks to support oil field development. *Id.* The Board further assumed that private sector terminal developers would construct any rail terminal facilities at the terminus points to transfer commodities between trucks and rail cars. *Id.* In calculating emissions, the agency considered that once a well is producing, emissions occur from operations and maintenance activities, which generate truck trips to the well

22

site, and from trucks that transport the oil to the rail terminals.  FEIS_3.15-34-3.15-35.  Emissions estimates also included emissions from venting, flaring, equipment leaks, and engine exhaust from equipment located at operating wells.  *Id.*  In short, the Board's examination of the possible sources of upstream impacts, though estimated, was commensurate with the information available.

To assess impacts on air quality and greenhouse gases, the Board added the estimated emissions from construction and operation of the Line to estimated emissions from other reasonably foreseeable projects, including the upstream oil development and the operation of the rail terminals.  FEIS_3.15-34(Table_3.15-11); *see also* FEIS_3.15-37-3.15-41.  The exact locations of new oil development in the Uinta Basin will depend on many factors, including domestic and global demand and future decisions by private, state, tribal, and federal owners of mineral rights in the Uinta Basin.  FEIS_3.15-4.  Thus, specific location and localized emissions information was unknowable.  The Board, however, was able to estimate regional emissions of greenhouse gases from well construction, well operation, and terminal operation under both the low production and high production scenarios within the entire Uinta Basin region.  FEIS_3.15-31-3.15-35, 3.15-37-3.15-41, 3.15-34(Table_3.5-11).

The EIS then took a hard look at the potential impacts of oil development in the Uinta Basin on each relevant resource area.  *See* FEIS_3.15-10-3.15-59.  The

resource areas examined included impacts on air quality, water resources, wildlife, fish, vegetation (including wildfire risk), special status species (including the sage grouse), energy, vehicle safety and delay caused by increased truck trips, geology and soils, noise and vibration, cultural resources, paleontological resources, land use and recreation, visual resources, and environmental justice. *Id.* Contrary to the Center's assertions, Center Br. 18, 22-23, 27-28, 31-34, the EIS did not omit any relevant resource areas. The Board's analysis of upstream impacts from oil production in the Uinta Basin satisfies NEPA.

Moreover, because the EIS clearly considered the upstream impacts of oil and gas development in the Uinta Basin, FEIS_3.15-3-41, the Center's claim that the EIS improperly considered the economic *benefits* of potential increased oil and gas development if the proposed project is approved, while not considering related environmental impacts, Center Br. 31-34, is without merit. The Board's analysis of energy development was consistent as to benefits and harms.

*Downstream impacts*: The Board likewise reasonably analyzed the downstream greenhouse gas emissions from the combustion of oil from the Uinta Basin, based on the limited information available. FEIS_3.15-36-3.15-37, App.C. The Board again used a conservative approach and assumed that all the oil transported on the Line would be later combusted and would not displace other fuels from the market—a so-called "full-burn analysis." FEIS_3.15-36; *see*

24

*Delaware Riverkeeper Network v. FERC*, 45 F.4th 104, 109-11 (D.C. Cir. 2022). Indeed, the Board's downstream greenhouse gas emissions estimates are more appropriately characterized as an upper boundary on possible emissions. And contrary to Petitioners' claims that the EIS understated adverse impacts, in fact, the assumption in the Board's estimates that no oil from the Uinta Basin would displace oil from other sources likely *overstated* greenhouse gas emissions. EI-30874_9-11; FEIS_3.15-37, App.T_T-392. Indeed, Uinta Basin oil has qualities that make it particularly useful for uses other than fuel, such as producing lubricants, which would not result in combustion emissions. *Id.*

Using this conservative approach and applying the same low and high production scenarios used for upstream emissions analysis, the Board estimated that the greenhouse gas emissions from the combustion of oil transported on the proposed Line under the low production scenario would represent about 0.3% of nationwide greenhouse gas emissions and 0.04% of global greenhouse gas emissions, while under the high production scenario the same percentages would be 0.8% and 0.1% respectively. FEIS_3.15-36-3.15-37. While these emissions would occur as a result of independent actors and factors, contrary to the Center's claim (Center Br. 20), the Board's EIS does not state that all these emissions would occur independent of the proposed Line.

In analyzing downstream greenhouse gas emissions, the Board also considered the many potential destinations for Uinta Basin oil, including destinations beyond those considered by the Coalition, and the multitude of practical routes to reach those destinations. FEIS_App.T_T-37-T-38, App.C. Final destinations for Uinta Basin oil would be determined by many factors, including (1) refinery capacity; (2) capability and willingness of specific refineries to receive and process the waxy type of crude found in the Uinta Basin; (3) pricing in the future; and (4) future contractual agreements. FEIS_App.C_C-2, C-3. Because it is impossible to identify the specific refineries that would receive shipments of oil from the Uinta Basin, the Board identified the geographic refining market areas that could receive Uinta Basin oil if it were shipped today. FEIS_App.C, App.T_T-37. Based on the existing refining capacity in those geographic areas and data trends in crude oil movements, the Board estimated that about 50% of the oil transported on the proposed rail line likely would move to the Houston/Port Arthur area, 35% to the Louisiana Gulf Coast, 10% to the Puget Sound South, and 5% to Petroleum Administration for Defense District 2 refineries in the Midwest (referred to as PADD in the EIS). FEIS_App.C, App.T_T-37. With all the unknowns and uncertainties, the Board could not predict destinations with any more specificity than the general regions most likely to receive oil from the Uinta Basin. But the Board estimated the number of trains from the Uinta

Basin that would travel to these geographic areas, with the highest number under the high production scenario being an estimate of 5.26 trains per day to the Houston/Port Arthur area and 3.68 to the Louisiana Gulf Coast.  FEIS_App.C_C-4(Table_C-2).

The Board's reasonable analysis of the potential greenhouse gas emissions from any increase in oil development in the Uinta Basin and from combustion of the newly extracted oil was based on the best available information and clearly provides the information necessary to inform the public and the agency's decision-makers as required by NEPA.

## 2.  *Petitioners' Misclassification Argument Fails*

Petitioners argue, first and foremost, that the EIS should have classified the foregoing impacts of greenhouse gas emissions as "indirect effects" of the project approval as opposed to "cumulative impacts" from the incremental effects of the approval when coupled with other reasonably foreseeable federal and non-federal actions.  Center Br. 19-24.  That argument fails for multiple reasons.  The first and most straightforward is that the Board's decision rendered any error in this regard immaterial, and thus nonprejudicial, by clarifying that the discussion of the impacts and, thus, the Board's decision, would have been the same even were impacts reclassified as Petitioners had proposed.  Petitioners' argument also falters on the merits, as the Board had discretion under NEPA and contemporaneous

27

implementing regulations not to treat these upstream and downstream greenhouse gas emissions as effects of the Board's own decision.  Finally, the argument fails because the D.C. Circuit has recently held that, in circumstances like those presented here, these types of impacts are not reasonably foreseeable and, thus, need not be analyzed under NEPA.

### a. Petitioners' Argument is Immaterial.

In its *Approval Decision*, the Board thoroughly considered and discussed the upstream and downstream emissions impacts as analyzed in the EIS. *Approval_Decision_*16-20.  While the Board did so by classifying them as cumulative impacts, it noted that its analysis of these impacts would be the same whether they were labeled cumulative or indirect.  *Id._*18n.15.  In other words, the Board focused on the impacts themselves, not on their label and, thus, its determination—the approval action of which Petitioners now seek review—would have been the same had these impacts been classified as indirect effects rather than cumulative impacts.  *Id*.

Contrary to the Center's claims, Center Br. 14-23, nothing in the Board's extensive discussion about upstream and downstream emissions supports an assertion that the Board failed to carefully consider these impacts or gave them any less weight than it did to impacts labelled as indirect.  *See generally Approval_Decision*.  And any language the Center references from the dissent in

28

the *Approval Decision* about the weight given, Center Br. 21, is irrelevant because it is the Board's decision, not the dissent, that has legal significance. *See Fast Food Workers Comm. v. Nat'l Labor Relations Bd.*, 31 F.4th 807, 815 (D.C. Cir. 2022); *Pub. Serv. Comm'n v. Fed. Power Comm'n*, 543 F.2d 757, 776 (D.C. Cir. 1974). Nothing in the *Approval Decision* supports a claim that the Board majority gave these impacts lesser weight. *Approval_Decision_*16-19. Moreover, nothing in NEPA or its implementing regulations indicates that indirect and cumulative impacts should be considered or weighed differently. *See* 42 U.S.C. §§ 4321-4370m-11 4321; 40 C.F.R. §§ 1500-1508.

Thus, any perceived error (and there was none) in treating these impacts as cumulative rather than indirect impacts would be irrelevant to this Court's disposition of this petition. *See Oglala Sioux Tribe v. U.S. Nuclear Regulatory Comm'n*, 45 F.4th 291, 300 (D.C. Cir. 2022); *Nevada v. Dep't of Energy*, 457 F.3d 78, 90-91 (D.C. Cir. 2006). When the statutory goals are still accomplished, an error that is not prejudicial is harmless, and thus not reversible. *See Nevada*, 457 F.3d at 90-91; *Oglala Sioux Tribe*, 45 F.4th at 300. The purpose of NEPA is to ensure informed decision making on the part of the agency and adequate disclosure of the impacts to the public. *See Food & Water Watch v. FERC*, 28 F.4th 277, 285 (D.C. Cir. 2022). The Board reasonably analyzed and weighed the impacts of upstream and downstream greenhouse gas emissions as best it could, given the

29

limited information available, and fully disclosed the same information to the

public that it would have disclosed had it classified the impacts as indirect.[6]  *See*

FEIS_3.15-3-3.15-8, 3.15-31-3.15-41, App.C, App.T_T-36-T-38, T-45-T-46.  The

Board fulfilled NEPA's objectives.  To hold that the label placed on these impacts

renders the entire analysis that the Board conducted insufficient under NEPA

would elevate form over substance and serve no purpose under NEPA.

### b.  *Petitioners' Argument is Wrong.*

As the Supreme Court has explained, indirect effects under NEPA "require[]

'a reasonably close causal relationship' between the environmental effect and the

alleged cause," analogous to "proximate cause from tort law."  *Dep't of Transp. v.

Pub. Citizen*, 541 U.S. 752, 767 (2004) (quoting *Metro. Edison Co. v. People

Against Nuclear Energy*, 460 U.S. 766, 774 (1983)); *see* 40 C.F.R. § 1508.1(g)(2)

(2021).  A "'but for' causal relationship is insufficient to make an agency

responsible for a particular effect under NEPA and the relevant regulations."

*Public Citizen*, 541 U.S., 752, 767 (2004)*; see also Freeport*, 827 F.3d at 46-47.

---

[6]  Any claim by the Center that the Board did not consider various other impacts
from oil development unrelated to greenhouse gas emissions (such as to air quality,
water resources, wildlife and vegetation habitat, wildfire risk, increase in truck
trips, protected species and plants and the greater sage grouse) because they were
discussed as cumulative impacts and not indirect impacts, Center Br. 18, 22-23,
27-28, is similarly without merit because there is no evidence to suggest that these
impacts were not given equal weight.

30

And "inherent in NEPA and its implementing regulations is a 'rule of reason,'

which ensures that agencies determine whether and to what extent to prepare an

EIS based on the usefulness of any new potential information to the

decisionmaking process." *Public Citizen*, 541 U.S. at 767 (cleaned up).  Consistent

with that rule of reason, the Board rationally explained its judgment that the

potential environmental impacts from upstream oil and gas development projects

and downstream combustion were properly identified as cumulative impacts, rather

than indirect effects of the proposed rail line.  FEIS_App.T_T-36-T-38, T-41-T-46;

*Approval_Decision_18-19*.

As discussed above, *supra* at 21-23, any oil development in the Uinta Basin

would proceed as part of as-yet unplanned independent projects by as-yet unknown

entities over which the Board has no jurisdiction.  FEIS_App.T_T-44.  Oil

development in the Uinta Basin is well-established and will continue whether or

not the Line is constructed, so it is impossible to determine what portion of future

oil development would occur only because the Line is built.  *Id*.  Moreover, the

Board has no authority or jurisdiction over this potential unknown future

development of oil in the Uinta Basin nor any authority to control or mitigate the

impacts of any such development.  FEIS_App.T_T-41-T-42; *Approval

Decision_*18.  Indeed, Congress has instructed the Board to enforce the "common

carrier obligation," 49 U.S.C. § 11101(a), which, as this Court has recognized,

requires railroads to carry all commodities upon reasonable request—including hazardous and other environmentally-unfriendly materials. *Riffin v. Surface Transp. Bd*., 733 F.3d 340, 345-47 (D.C. Cir. 2013); *accord Akron, Canton & Youngstown R.R. v. ICC*, 611 F.2d 1162, 1166-68 (6th Cir. 1979) (common carrier railroad must carry nuclear waste).

Similarly, with respect to downstream emissions from combusting Uinta Basin oil, the Board does not have jurisdiction over the unknown the entities that will be involved (and which will determine uses and destinations). *See* FEIS_3.15-36, App.T_T-36-T-37. The Board has no authority or jurisdiction over the destination or the processing of any oil, or other products, transported on the Line. The destinations of any oil will ultimately be determined by many factors, including oil developers, market forces, refinery capacity, oil type and use, and the various common carriers that will control the routing to the various multitude of destinations. *See* FEIS_App.C, App.T_T-36.

While oil development in the Uinta Basin will continue regardless of whether the Line is constructed, the Board acknowledged that because of the current constraints on transport of oil from the Uinta Basin, at least some future oil development in the Uinta Basin and combustion of that oil likely would not occur "but for" the Board's authorization of the rail line construction. *Approval_Decision_*18. However, given the limited information it had, the

32

Board's judgment was that "but for" causation was insufficient to make all emissions from potential future oil and gas development a reasonably foreseeable indirect effect of approving the proposed rail line. *Id.* The many independent intervening actors and factors involved before these emissions could occur add up to a lengthy causal chain that makes them more appropriately categorized as cumulative impacts. *See Freeport*, 827 F.3d at 46-47, 48. Indeed, cumulative impacts are specifically defined as those impacts that result from the addition of past, present, and future actions of *other* parties. 40 C.F.R. § 1508.7 (2019). Here, because the upstream and downstream effects result from the actions of independent actors that will control oil development, routing, and consumption, not the Board or even the railroad, the Board reasonably labelled them cumulative impacts. *Approval_Decision_*18, 19; FEIS_3.15-36-3.15-37, App.C, App.T_T-38, T-41-T-46.

The Center argues that under *Public Citizen* and *Sierra Club v. FERC (Sabal Trail)*, 867 F.3d 1357, 1372 (D.C. Cir. 2017), the Board must consider upstream and downstream greenhouse gas emissions as indirect impacts because Board action denying authorization to construct the Line would prevent those emissions from occurring. Center Br. 28-31. But that is nothing more than "but for" causation. Indeed, neither of those cases holds that the causal inquiry is at an end if the relevant agency has the authority to deny a project that could ultimately

33

prevent the effects. *See Pub. Citizen*, 541 U.S. at 767-68, 770-72; *Sabal Trail*, 867 F.3d at 1372. Such an interpretation ignores *Public Citizen's* holding that a closer causal connection is needed. The Center never addresses the causal connection (or lack thereof) here beyond asserting "but for" causation. *See* Center Br. 14-33. And *Sabal Trail* simply stands for the proposition that, if the agency is the legally relevant cause for the effect, it must "gather or consider environmental information" on that effect. *Sabal Trail*, 867 F.3d at 1372. The Board clearly did that here. Finally, even assuming "but for" causation was sufficient, it would necessarily rest on the assumption that the Board could deny construction authority based on the commodity carried on the proposed line, an approach that would undercut the common carrier obligation that the Board must enforce. *See* 49 U.S.C. § 11101(a).

In sum, even if another agency might, in following NEPA's rule of reason, exercise its discretion and categorize similar impacts differently, the Board's choice is reasonable in light of (1) the deference owed to the Board's technical judgments, (2) the limited information available here, and (3) the common carrier obligation that must be protected in the Board's decisions. *See Delaware Riverkeeper*, 45 F.4th at 111.

### 3. *Upstream and Downstream Impacts From Oil Development in the Uinta Basin Are Not Reasonably Foreseeable Impacts.*

An agency is only required to assess impacts—regardless of whether they are considered indirect or cumulative—when they are reasonably foreseeable. 40 C.F.R. § 1508.8 (2019); 40 C.F.R. § 1508.7 (2019). As this Court recently explained, upstream and downstream greenhouse gas emissions "are not, 'as a categorical matter', always a reasonably foreseeable indirect effect" of an agency authorization of a project that will transport fossil fuels, such as oil. *See Delaware Riverkeeper*, 45 F.4th at 109-11(addressing upstream and downstream emissions from gas transported by a pipeline); *Food & Water Watch*, 28 F.4th at 287-88 (same). For such upstream and downstream greenhouse gas emissions to be reasonably foreseeable under NEPA, specific key information related to the emissions—such as well numbers and locations, transport destinations, and intended uses for the oil—must be known and available. *See Food & Water Watch*, 28 F.4th at 287-88; *Delaware Riverkeeper*, 45 F.4th at 109-11. Here, however, the information required for the effects of both upstream oil development and downstream combustion to be reasonably foreseeable was unknowable and, thus, unavailable to the Board.

*Upstream Emissions:* The Coalition – the entity before the Board seeking authorization for a rail line – will not be developing new oil wells or extracting any oil in the Uinta Basin. FEIS, App.T_T-41. Rather, any oil development in the

35

Uinta Basin occurring as a result of the Line will be done in the future as part of as
yet unknown and unplanned independent projects that would occur on as yet
unidentified private, state, tribal, or federal land.  FEIS_App.T_T-44.  These
potential new wells, which could range from a single vertical well to a lease with
many horizontal wells, would be developed by as yet unknown entities and
licensed or permitted by other federal agencies, state and local governments, or the
Ute Tribe, depending on the location of the development.  FEIS_3.15-3-3.15-4,
App.T_T-42, T-44.  At this stage, there is no way to know or predict which of
these entities will be involved and which, if any, potential projects would proceed.[7]
FEIS, App.T at T-44.  Moreover, the Board, as a transportation agency, does not
have any control over the number, type, or location of any oil wells.

While the Board offered estimates as to the possible number of upstream
wells based on estimates of the amount of oil anticipated to be transported on the
Line submitted by the Coalition, those numbers are just that – estimates.  The
actual number of wells that will be proposed, financed, licensed, and then drilled is
simply unknown and unknowable.  Thus, while the Board undertook as much
analysis of upstream greenhouse gas emissions as possible here based on the

---

[7]  Because the Coalition would have no involvement in oil development in the
Uinta Basin and would simply carry any and all commodities for which it received
a reasonable service request, 49 U.S.C. § 11101, the Board did not seek additional
information from the Coalition regarding development as such a request would
have been futile.

limited information available, the myriad uncertainties and unknowns render these upstream emissions not reasonably foreseeable. *See Delaware Riverkeeper*, 45 F.4th at 109; *Food & Water Watch*, 28 F.4th at 287; *accord Birkhead v. FERC*, 923 F.3d 510, 517-18 (D.C. Cir. 2019).

*Downstream Emissions:* Likewise, specific information about destinations and combustion of Uinta Basin oil is unknown and unknowable at this stage. *See* FEIS_3.15-36-3.15-37, App.C, App.T_T-36-T-38. The Board has no authority or jurisdiction over the oil transported on the Line or over the destination or the processing of any oil transported on trains originating in the Uinta Basin. The destinations of any oil will ultimately be determined by many factors, including oil developers, market forces, refinery capacity, oil type and use, and the various oil producers and common carriers who will control the routing to the various multitude of destinations. *See* FEIS_App.C. Here, it is not possible to identify the refineries to which any oil originating in the Uinta Basin would be shipped. FEIS_App.C, App.T_T-37-T-38.

The Board conducted what analysis it could. It considered the wide range of potential destinations and identified regional areas that could receive oil that originated in the Uinta Basin, then analyzed current refining capacities and general trends in crude oil, making approximate predictions about the geographic areas where the oil could be shipped to be refined. FEIS_App.T_T-37. Ultimately, the

Board identified five general geographic regions where the oil could go to be refined.  FEIS_App.T_T-37-T-38, App._C.  However, identifying a general geographic region as a destination for oil—let alone five—is insufficiently specific to qualify as reasonably foreseeable.  *Birkhead*, 925 F.3d at 518-19; *Food & Water Watch*, 28 F.4th at 288-89.

Because downstream greenhouse gas emissions are not reasonably foreseeable, neither are impacts from those emissions on downstream environmental justice communities located near refineries in the Houston/Fort Worth area and on the Louisiana Gulf Coast.  Center Br. 24-26.  The Board identified 15 refineries within the Houston/Fort Worth region and 16 in the Louisiana Gulf Coast region that currently have the ability and capacity to refine Uinta Basin oil.  FEIS_App.C.  There is no way to predict which of these 31 refineries, if any, would receive Uinta Basin oil and, thus, there is no way to predict or assess impacts to specific nearby communities from refining that oil.  *Id.* Thus, "forecasting [] is not meaningfully possible" for any specific refinery or community that could ultimately be the destination for Uinta Basin oil.  *See Food & Water Watch*, 28 F.4th at 285.

Contrary to the Center's contention, Center Br. 16, 26, this Court's decision in *Sabal Trail*, 867 F.3d at1372, does not alter the conclusion that downstream emissions are not reasonably foreseeable here.  In *Sabal Trail*, the specific route

38

and destination were fixed by the pipeline itself and there were contracts already in place determining the end use of the majority of gas to be transported over the pipeline to previously identified power plants.  867 F.3d at 1372; *see Food & Water Watch*, 28 F.4th at 288-89 (noting these distinctions when discussing the difference in outcomes in *Sabal Trail* and *Birkhead*); *Delaware Riverkeeper*, 45 F.4th at 109-11 (noting the same distinctions).  Similarly, *Mid States Coalition for Progress v. Surface Transportation Board*, 345 F.3d 520, 550 (8th Cir. 2003), holds that the Board may not "ignore" emissions impacts, which the Board did not do here.

## B.  <u>The Board's Analysis of Impacts in the Downline Study Area Complied with NEPA and NHPA.</u>

In addition to their arguments about upstream and downstream impacts, Petitioners and Colorado Amici (should their brief be considered)[8] erroneously allege that the Board failed to adequately consider multiple types of impacts in the

---

[8]  Colorado Amici's introduction of new arguments in an amicus brief could be viewed as an improper end-run around the Hobbs Act, 28 U.S.C. § 2344.  Unlike other judicial review statutes, § 2344 provides (emphasis added) that "*[a]ny party aggrieved* by the final order [of the STB] may, within 60 days after its entry, file a petition [for] review."  Certain of the amici (Chaffee and Lake Counties) participated in the Board's proceedings, but they failed to file a petition for review within 60 days, so their participation could be viewed as untimely.  The remainder could have raised their downline impact concerns before the Board, as Petitioner Eagle County did, but they did not do so and, therefore, are not "aggrieved parties."  *Simmons v. ICC*, 716 F.2d 40, 42-46 (D.C. Cir. 1983).

downline study area in the EIS.  Petitioners are trying to dress up their real

complaint—that they simply disagree with the conclusions reached—as inaccurate

allegations of failure to assess the downline impacts altogether.  A review of the

EIS shows that the Board not only conducted a thorough analysis of all impacts in

the downline study area required to be analyzed under NEPA and NHPA, but in

fact expressly considered the vast majority of the very impacts Petitioners list.  The

remaining claims fail because they were never raised before the agency and lack

merit.

### 1. *The Board Conducted a Complete Impacts Analysis of the Downline Study Area.*

Downline impacts are impacts that could occur along *existing* rail lines as a

result of increased rail traffic originating or terminating on the line to be

constructed.  FEIS_App.T_T-36.  The Board's regulations require examination of

the "indirect or down-line impacts" in rail construction projects and establish

thresholds for environmental review of such impacts.  *See* 49 C.F.R.

§ 1105.7(e)(11)(v) (categorizing such impacts as "indirect or down-line impacts"

and referring to thresholds listed in 49 C.F.R. § 1105.7(e)(4), (5) & (6)).[9]  The

---

[9]  Thus, pursuant to the regulations and contrary to Colorado Amici's claim, the impacts in the downline study area were properly treated as indirect effects. Amicus Br. 11-15.  Moreover, there is nothing in the EIS or the Board's decision that indicates these downline impacts were weighed any differently than other impacts.  And, as the Colorado Amici acknowledge, the Board did examine the

threshold for analysis of potential air quality impacts at 49 C.F.R. § 1105.7(e)(5) is

generally an increase of at least eight trains per day in areas designated as in

"attainment" under the Clean Air Act, or three trains per day in "nonattainment"

areas.  And the threshold for analysis of potential noise impacts at 49 C.F.R.

§ 1105.7(e)(6) is generally an increase of at least eight trains per day combined

with an incremental increase in certain noise levels.  The Board has determined,

based on its experience applying the thresholds for air and noise on freight rail

construction and operation projects, that these thresholds should also apply to

freight rail safety and grade-crossing safety and delay, and it has regularly applied

these thresholds to define downline study areas for rail line construction and

operation proposals.  *See* FEIS_App.C; *Tongue River Railroad Company—

Construction and Operation—in Custer, Powder River, and Rosebud Counties

Mont.*, FD 30186, Draft EIS_Chapter_17 (STB served April 17, 2015).[10]

    Applying these thresholds here, the Board first determined the likely

destinations of project-related trains and then used a widely accepted rail traffic

modeling program called PC Rail Miler to determine the most practical routing to

reach these destinations and estimate rail traffic distribution.  FEIS_App.C.  Based

---

risks of accidents, spills, and wildfires on the downline Union Pacific Railroad
Company line, and not just air, noise, and road safety impacts.  *Id*. 16-25.

[10]  The thresholds at 49 C.F.R. § 1105.7(e)(4), concerning diversions of freight
from rail to truck, were not relevant to this project.

41

on this data, the Board concluded that most trains originating or terminating on the Line would travel on the Union Pacific Railroad Company (Union Pacific) mainline heading east to Denver and, thus, the project-related rail traffic could exceed the thresholds on this existing rail line between Kyune (where the Line connects to the Union Pacific mainline) and Denver. FEIS_App.C, App.T_T-37-T-38. There are three potential routes through the Denver area, and it was unclear what the distribution of traffic among these three routes would be. FEIS_App.T_T-37-T-38. But the Board conservatively elected to treat all three routes as if they would exceed the thresholds, and included them in the downline impacts study area. FEIS_App.C_C-5. Because of the many potential destinations and the routes available to reach them, the EIS concluded that the new rail traffic outside of the downline study area would be dispersed and that no individual rail lines outside that area could reasonably be expected to exceed thresholds. FEIS_App.T_T-36-T-38. The Board estimated that the existing rail lines in the downline study area could experience an increase of 0.4 to 9.5 trains per day under the low and high oil production scenarios respectively and that, depending on future market conditions, the Union Pacific mainline specifically could experience an increase of anywhere from 3.3 to 9.5 trains per day. FEIS_3.1-3-3.1-4, 3.1-12.

Based on those determinations, the EIS then conducted substantial analysis of the relevant downline study area impacts. Petitioners and Colorado Amici raise

a host of challenges to the analysis, but their attempts to fly-speck the Board's

analysis of these impacts should be rejected.  *See Food & Water Watch,* 28 F.4th at

285.

> a.  *Critiques of the Assessment of Accident Risks in the Downline Study Area Are Unfounded.*

In looking at rail operations safety, the EIS analyzed the potential for

project-related accidents and estimated the likelihood and volume of possible oil

spills.  FEIS_3.2-2-3.2-7, App.E.  Half the trains on the Union Pacific mainline

would be unloaded and, thus, would clearly not present a risk of an oil spill in the

event of an accident.  FEIS_3.2-6(Table_3.2-2) (stating the estimated accident

numbers for both loaded and unloaded trains).  The risk of accidents for *loaded*

trains was estimated to be 0.31 to 0.89 accidents per year.  *Id*.  For those accidents

involving loaded trains, most would result in the derailment of only a few cars, and

only one in four of those would be expected to involve any release of oil, meaning

the risk of an accident resulting in a spill is much lower at 0.0775 per year under

what the Final EIS called the "low production scenario" and 0.25 per year under

the "high production scenario" (or between approximately once every 4 years and

once every 12 years).  FEIS_3.2-5, App.T_T-235.  Moreover, only a small fraction

of accidents involving an oil spill would involve the risk of a spill of any

significance.  FEIS_App.E.  The EIS also discussed the factors that would

determine the outcome and consequences of an accident involving a loaded train

(*i.e.* force of the crash, number of cars, location, etc.) and why "the greater the potential damage of an accident, the lower the likelihood that would occur because more concurrent factors (such as the spill being larger, ignition occurring, and the accident involving a sensitive area) would have to be involved."  FEIS_3.2-5.

Thus, the EIS clearly analyzed the risk of accidents on the Union Pacific line as a result of project-related rail traffic.  Indeed, the County admits as much.  *See* Cty. Br. 29, 30.  But the County takes this analysis and its risk of 0.31 to 0.89 accidents per year involving loaded trains under the low production and high production scenarios respectively (FEIS_3.2-4-3.2-7, App.E) and assumes the high-production scenario would automatically occur while also equating every single potential accident as one resulting in not just a spill, but a large oil spill and fire.  *See e.g.* Cty. Br. 28-29, 30, 32.  This hyperbole grossly overstates the risk of a large oil spill and the possibility of resulting catastrophic environmental impacts on the Union Pacific line.  Ultimately, the County never addresses the *actual* risk of an accident that could foreseeably result in significant impacts from an oil spill.  Instead, it cherry-picks statements about rail accidents and risks in a way that distorts the data, the accident rates, and the Board's rational analysis.  *See* Cty. Br. 28-33.

The County and the Colorado Amici claim that, instead of using national accident-rate data for its analysis, the Board should have used accident-rate data

44

accounting for different factors, such as the terrain, and whether trains were loaded or unloaded.  Cty. Br. 39-40; Amicus Br. 16-18.  As the Board explained, however, that data simply does not exist.  Here, in using national accident data in combination with consideration of relevant factors (*e.g.,* number of trains, route length, track class) and examining other instances of rail accidents involving crude oil or other hazardous materials, the Board used the best information available. FEIS_App.E, App.T_T-108; *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 511 (D.C. Cir. 2010) (agency not required to use the best methodology).  While the Colorado Amici cite to two articles stating that factors such as train length and weight are likely to affect train accident rates, Amicus Br. 17, neither proposes a method for accounting for these factors in determining accident risk and, in fact, there is no existing data incorporating these factors that the Board could have used in its analysis.

### b.  *The County's Arguments Concerning the Wildfire Risk Assessment in the Downline Study Area Also Lack Merit.*

The County's and Colorado Amici's claims about wildfire risk follow a similar pattern of mischaracterizations and overstatement.  *See* Cty. Br. 34-37; Amicus Br. 20-25.  The EIS reasonably examined wildfire risk for the downline study area, relying in part on the U.S. Forest Service's Wildfire Hazard Potential map.  FEIS_3.4-14-3.4-17, 3.4-37(Table_3.4-9).  The EIS concluded that 88% of the combined downline segments study areas was associated with very low, low,

45

nonburnable, and water classes in the Wildfire Hazard Potential map and that only 5% fell within high and very high hazard classes. FEIS_3.4-16. And, given that all of these trains would be subject to federal regulations related to fire safety and transportation of oil by rail, the risk of fire would be diminished. FEIS_3.4-43. Moreover, the data shows that changes in brake design have lessened the incidence of one of the two primary ignition sources from rail traffic. FEIS_3.4-42. For these reasons, the Board reasonably concluded that the downline study area wildfire impact would not be significant. FEIS_3.4-43.

The County faults the Board's conclusion that the risk of downline wildfires would be low, simplistically arguing that more trains means more ignition sources. Cty. Br. 34. But even a conclusion that project-related traffic presents a slightly increased risk of a wildfire does not mean that the risk is not still very low. The County's argument ignores many facts detailed in the EIS, including that the vast majority of the downline study area is comprised of areas with low/no risk of wildfire and the overall incidence of wildfires caused by trains is extremely low. FEIS_3.4-16, 3.4-17(Table_3.4-9), 3.4-42. The data shows that, over 24 years of wildfire records, about 1.8% of wildfires in the United States and 0.5% of the wildfires in Utah were caused by railroads. FEIS_3.4-15. Thus, the EIS rightly concluded that adding, at most, around ten trains on the downline segments would not present a significant risk of wildfires caused by project-related traffic.

46

Both the County and the Colorado Amici mischaracterize the EIS by suggesting it concluded that the risk of wildfire is low because project-related trains do not present a new ignition source. Cty. Br. 34; Amicus Br. 20. The EIS did no such thing. Rather, the EIS merely noted the rather obvious fact that, since there were already trains on the downline segments, this *type* of potential ignition source already existed on the Union Pacific line. FEIS_3.4-43. The EIS' conclusions regarding the low risk of a wildfire caused by project-related traffic in the downline study area, however, were based on myriad factors and data, as noted above. The County and the Colorado Amici cannot legitimately claim that these conclusions did not account for the fact that an increase in the number of trains would increase the potential to ignite a wildfire. *See* FEIS_3.4-14-3.4-16, 3.4-42-3.4-43.[11]

The County also faults the EIS for using the Forest Service's Wildfire Hazard Potential map as part of its analysis, misleadingly claiming that these maps are not intended to be used for the purpose of evaluating wildfire risk. Cty. Br at 36. First, the County waived this argument by not raising it before the Board. *See*

---

[11] The Colorado Amici note, Amicus Br. 22-23, that a fire in Colorado unrelated to rail traffic (the Grizzly Fire) caused significant damage to the area. But that does not affect the assessment of the very low level of risk that an increase in rail traffic will cause a large wildfire. Moreover, because that risk is so low, contrary to the Colorado Amici's claims, the Board was not required to analyze the potential economic impacts of a large wildfire. Amicus Br. 24-25.

47

*Nevada*, 457 F.3d at 88 (NEPA argument waived if not raised at the administrative level).

But the claim lacks merit in any event, because the Forest Service's statement,[12] when read in its entirety, *supports* the use of the map to help evaluate wildfire risk.  The Forest Service statement explains that the map "can help to inform evaluations of wildfire hazard or prioritization of fuels management needs across very large landscapes" and that the "specific objective with the [Wildfire Hazard Potential] map is to depict the relative potential for wildfire that would be difficult for suppression resources to contain."  https://firelab.org/project/wildfire-hazard-potential.  As the County points out (Cty. Br. 36), the Forest Service statement recognizes that the Wildfire Hazard Potential map has limits.  But the full text, with the County's omitted language italicized, says only that "*[o]n its own*, [the Wildfire Hazard Potential map] is not an explicit map of wildfire threat or risk."[13]  In fact, the Board used the map not "on its own" but as part of the data it used to inform its analysis.  The Board's analysis also examined, among other things, ignition sources, how technological improvements have affected the risk, and the extent of adverse impacts that could occur in the event of a wildfire. FEIS_3.4-42-3.4-43.  The Forest Service was a consulting party in the NEPA

---

[12]  *See* https://firelab.org/project/wildfire-hazard-potential

[13]  *Id.*

review and raised no concerns about the use of its map.  Furthermore, the County

points to no other data that it claims that the Board should have used.  *See* Cty. Br.

34-37.  The County's claims about the map are meritless, and the Board's use of

the map was completely consistent with its purpose.

The Colorado Amici's inclusion of a map that they claim shows that the

Board underestimated the fire risk along the Union Pacific line is procedurally

barred and does not support their claims anyway.  Amicus Br. 23.  First, not only

was this map never presented to the Board despite the participation of two

Colorado Amici before the agency, but the claim that there were other wildfire risk

maps that the EIS should have included in its analysis was never raised and is,

therefore, waived.  *See Nevada,* 457 F.3d at 88.  Additionally, while this map

indicates areas of moderate-to-highest fire risk in areas of Garfield County,

Colorado, it also confirms that the majority of the land immediately adjacent to the

Union Pacific rail line is classified as "lowest" or "low" risk and, thus, it

affirmatively supports the Board's findings and the Forest Service map it used.

Amicus Br. 23 (map shows that most of the I-70 corridor to be lowest or low fire

risk).[14]

---

[14]  Furthermore, the original source for this map is the Colorado State Forest
Service.  https://co-pub.coloradoforestatlas.org/.  The version of the map in the
Amicus Brief (which is from the Garfield County wildfire protection plan)
modifies that original map, such that it misrepresents the predicted fire risk in the
area near the Union Pacific rail line.  In particular, the Colorado Amici's version

The County also incorrectly asserts that the EIS failed to account for the risk of fire caused by a rail accident, including a purported failure to address a 2014 Pipeline and Hazardous Materials Safety Administration study on the risk of transporting flammable liquids by rail.  Cty. Br. 34-35.  But the EIS clearly considered the risk of fires caused by an accident involving project-related rail traffic.[15]  *See* FEIS_3.2-5-3.2-7, App.E.  Moreover, the EIS cites the 2014 study multiple times and explains that any trains carrying Uinta Basin oil would need to comply with the new tank car regulations developed in response to that study.  *See e.g.* FEIS_App.T_T-111, T-123, App.E.

     c.  *The County's Arguments Concerning Impacts on Biological Resources in the Downline Study Area Are Baseless.*

        i.  <u>The County Incorrectly Claims the Board Did Not Consider Impacts of a Spill on Special Status Species in the Downline Study Area</u>.

The County's claims about impacts on habitat, protected fish, and the greater sage-grouse in the downline study area from an oil spill are unsupported by the

---

completely omits the "non-burnable" designation in the key from the original map. Had the Colorado Amici included the non-burnable category on their map, it would have illustrated that much of the area near the Union Pacific rail line is not only at low risk for wildfires but is at essentially zero risk.  This is consistent with the Board's findings reported in the EIS.  FEIS_3.4-16-3.4-17.

[15]  The EIS discussion of the potential for, and consequences of, a fire resulting from a rail accident applies to both the Line and the downline study area, as the data is the same.  FEIS_3.2-5-3.2-6, App.T_T-235-T-236.

record, and the County references no other protected species that should have been

considered. Cty. Br. 31-32. In examining spill risk in the downline study area, the

EIS did consider the impact of a possible spill on protected species and their

habitat. FEIS_3.4-46-3.4-47. The Union Pacific mainline from Kyune to Denver

crosses critical habitat for the Colorado pikeminnow and razorback sucker in the

Green River and closely parallels habitat for those species, along with the

humpback chub and bonytail in the Colorado River. FEIS_3.4-47. The EIS noted

that, as this is an existing and active rail line, the project-related trains would not

introduce a new source of pollution. It also noted, first, that, while a large spill in

or near the fish's critical habitat would have impacts, the risk of a large spill is so

low as to not be reasonably foreseeable; and second, that adding the project-related

trains would not substantially change the severity of impacts that already exist. *Id*.

In addition, the EIS did discuss the minor leaks and drips that could result from rail

operations and explained that these impacts were already occurring. *Id.*; *cf.* Center

Br. 43.

Contrary to the County's suggestion (Cty. Br. 31), as part of its discussion of

potential impacts on water resources, the EIS did consider the impacts on the

Colorado River, including the potential effects of a spill. The EIS analyzed the

impacts of a spill and other releases on all water resources and, while it did not

explicitly say so, that analysis applied equally to water resources adjacent to the

51

Line as well as operations in the downline study area, as the impacts are the same and apply to both.  FEIS_3.3-28-3.3-30, 3.3-33, 3.3-36, 3.3-38.  Further, because Uinta Basin oil is waxy and does not flow at normal temperatures, a spill into water would tend to form semisolid globules that would not disperse and would lead to an easier clean up and fewer impacts than those normally occurring in the event of an oil spill.  FEIS_3.3-30.

Also contrary to the County's claims (Cty. Br. 27), the Board considered the impacts on greater sage-grouse in the downline study area.  FEIS_3.4-48_3.4-49.  The primary impact from rail traffic on the greater sage-grouse is noise, particularly near leks during breeding season.  *Id.*  Because the downline segments have had existing train traffic for many years, the EIS reasonably concluded that any greater sage-grouse using habitat along those lines would have already become habituated to intermittent train noise due to their years of regular exposure.  FEIS_3.4-48, App.T_T-213.[16]

ii.  The Board Did Not Err in Relying on the Biological Opinion.

The Center incorrectly contends that the Board erred when it relied on an allegedly flawed Biological Opinion that failed to consider impacts of a spill and

---

[16]  The County's professed confusion about what downline impacts on biological resources were considered, *see* Cty. Br. 32, is curious, as the biological resources that were considered are expressly discussed in the Final EIS (as discussed above).

leaks on the special status fish and their habitat in the downline study area.  Center

Br. 40-44.  The Center asserts that under 50 C.F.R. § 402.02, these downline

impacts are effects caused by the Line and that the Service should have considered

them in the Biological Opinion.  Center Br. 40-41.

The Center is wrong.  In response to comments on the Draft EIS, the Board

explicitly considered the impacts of a spill and leaks on special status species and

their habitat along the Union Pacific mainline between Kyune and Denver.  It

concluded that the risk of a large spill is so low as to not be reasonably foreseeable

and that adding project-related trains would not substantially change the severity of

impacts that already exist.  FEIS_3.4-47.  Under § 402.02, the regulation that the

Center relies on, an effect must be "reasonably certain to occur" to be an effect of

the proposed action.  The Center may disagree with the conclusion, but the Board

found that downline impacts on the special status fish and their habitat were not

reasonably certain to occur.  FEIS_3.4-47.  Thus, these alleged downline impacts

did not need to be included in the Biological Opinion, and neither the Board nor

the Fish and Wildlife Service erred when they defined the project action area for

the Biological Opinion as the entire construction project footprint, a buffer around

the footprint, and the area of the Upper Colorado River Basin affected by water

depletions.  Biological_Opinion_13.  For this reason and those discussed in the

Fish and Wildlife Service's brief, the Biological Opinion was not flawed and the Board reasonably relied upon it.

> ### iii. The Board Was Not Required to Consider Impacts on Other Biological Resources in the Downline Study Area.

Any claim the County is making that the EIS should have included impacts on other biological resources (other wildlife and wildlife habitat) in the downline study area, Cty. Br. 32, was not raised before the Board and thus is waived. *See Nevada,* 457 F.3d at 88. Moreover, even if not waived, this claim lacks merit because impacts on those resources in these downline areas are not reasonably foreseeable. As the EIS notes, downline impacts would occur within the existing rail right-of-way, which does not provide habitat for vegetation, wildlife, or fish, or in immediately adjacent areas, where any animals or plants typically have become accustomed to rail operations through long-term exposure. FEIS_App.T_T-225-T-226. Thus, the Board does not typically assess those types of impacts and correctly did not do so here.[17]

---

[17] The County also erroneously claims that the Board should have analyzed impacts on downline land use and recreation because it analyzed such impacts along the Line. Cty. Br. 31, 32-33. First, the County waived this argument. *See Nevada,* 457 F.3d at 88. Second, the County fails even to suggest what reasonably foreseeable impacts to land use and recreation could occur on the existing and operating downline segments. While impacts in the areas of construction are reasonably foreseeable, such impacts downline where there is already rail traffic on a line that has been operational for many years are not.

       *d.  Impacts from Reactivation of the Tennessee Pass Line Are Not*
         *Reasonably Foreseeable*

The County incorrectly asserts that the Board should have considered impacts from the possible reactivation of the Tennessee Pass Line.  Cty. Br. 37-39. But in both the EIS and the *Approval Decision*, the Board explained that neither reactivation nor use of the Tennessee Pass Line for trains transporting Uinta Basin oil is reasonably foreseeable.  *See* FEIS_App.T_T-47; *Approval_Decision_*20-21.

The Tennessee Pass Line is an approximately 163-mile Union Pacific rail line in Colorado that has been out of service for many years.  FEIS_App.T_T-47. On the last day of 2020, an entity calling itself the Colorado, Midland & Pacific Railway Company requested authority from the Board to lease and operate the Tennessee Pass Line.  The Board denied the request in March 2021, for reasons unrelated to the Uinta proceeding, and no further requests relating to reactivation of this line have been filed.  *See* FEIS_App.T_T-47; *Colo., Midland & Pac. Ry.— Lease & Operation Exemption Containing Interchange Commitment—Union Pac. R.R.*, FD 36471, slip op. at 1, 4-5 (STB served Mar. 25, 2021).  As there are no pending or reasonably foreseeable requests to reactivate the Tennessee Pass Line, any impacts from reactivation are not reasonably foreseeable.

Moreover, even if the Tennessee Pass Line were reactivated, trains from the Line here carrying Uinta Basin oil would be unlikely to traverse it.  *See* FEIS_App.T_T-47; *Approval_Decision_*20-21.  First, the Board's rail traffic

model did not forecast any such trains travelling over the Tennessee Pass Line.

FEIS_App.T_T-47, App.C_C-6.  In addition, the Tennessee Pass Line has grades

up to or in excess of three percent, which make this line an impractical and

unlikely route for Uinta Basin trains.  FEIS_App.T_T-47.  And the Coalition

submitted a verified statement explaining that the planned operators of the Line

have no plans to transport Uinta Basin oil on the Tennessee Pass Line and that it

would not be practical or economical to do so.  *Id.*; *see Jones v. Nat'l Marine

Fisheries Serv.*, 741 F.3d 989, 1000-01 (9th Cir. 2013) (where there are significant

logistical hurdles and no actual plan or proposal for a project, no analysis

required).

> ### e.  The Board Did Not Violate Section 106 of NHPA.

The County argues that the Board violated Section 106 of NHPA because it

did not consult with the County concerning, and failed to consider, impacts on

historic resources in the downline study area.  Cty. Br. 42-45.  Not only are these

arguments waived, but they also lack merit.

As provided for under the applicable regulations, the Board used the EIS

process to address both environmental impacts under NEPA and impacts on

historic resources under NHPA.  40 C.F.R. § 1502.25; *see also generally* DEIS &

FEIS_Sec.3.9.  As part of that combined process, the Board invited numerous

Colorado entities to participate in the EIS as consulting parties both under NEPA and NHPA.[18]

As part of the Section 106 process, the Board defined the area of potential effects under NHPA to include the Line footprint, the temporary construction footprint, and adjacent parcels, and addressed potential impacts on historic resources in that area.[19] FEIS_3.9-1-3.9-2. Yet no party, including the County, suggested including any downline existing rail lines in the area of potential effects or otherwise asserted that there would be downline impacts on historic resources. The County filed lengthy comments on the Draft EIS, devoting much of its comments to the issue of downline environmental impacts. *See* EI-30611. But nowhere in any of its filings did the County provide any comments relating to

---

[18] Included among those identified as potential consulting parties under NEPA were: the Colorado Department of Public Health & Environment; the Colorado Department of Transportation; the Colorado Governor's Office; Colorado Parks and Wildlife; the Colorado State Historic Preservation Office; the Colorado State Land Board; Moffat County, Co.; and Rio Blanco County, Co. FEIS_5-5-5-6. Included among those identified as potential consulting parties under the NHPA were: the Colorado State Historic Preservation Office; the Colorado Preservation Inc.; the Colorado Plateau Arch Alliance; and Moffat and Rio Blanco Counties in Colorado. FEIS_App.S_S-9-S-12(Table_S-3), App.S_unnumbered_pages_1008, 978, 996, 990, 869. The Colorado Plateau Alliance is the only one of these that accepted consulting party status under Section 106.

[19] Rather than "study area," Section 106 uses the phrase "area of potential effects," which is defined as the "geographic area or areas within which an undertaking may directly or indirectly cause alterations in the character and use of historic properties." 36 C.F.R. § 800.16(d).

historic review issues under NHPA, express concerns about downline impacts on

historic resources, or otherwise indicate that it was interested in participating in the

Section 106 process.  *Id.*  The Board further notes that the Utah State Historical

Preservation Officer (SHPO) concurred with the area of potential effects

determination, while the Colorado SHPO was invited to participate but ultimately

did not do so.  *See Coalition of Concerned Citizens to Make Art Smart v. Fed.*

*Transit Admin.,* 843 F.3d 886, 907 (10th Cir. 2016) (SHPO's concurrence with the

area of potential effects carries weight on review).

While NHPA's regulations include a process by which the lead agency

identifies and invites potential consulting parties to participate in the historic

review process, it also provides that the agency give the public the opportunity to

participate in the process and that an individual or entity may request to be a

consulting party.  36 C.F.R §§ 800.2, 800.3(e), 800.3(f)(3), 800.6(a)(4).  The

County participated in the combined environmental and historic EIS process here.

Indeed, the County was not invited to participate as a consulting party under

NEPA, and yet it participated and commented extensively on environmental issues

during the EIS process.  The County offers no reason why it could not also have

commented on historic issues under the NHPA Section 106 review, of which it was

well aware.  *See* Cty. Br. 42-45.  Nor does the County offer any reason why, as a

participant in the combined review process, it could not have requested to be a

consulting party under Section 106, nor does the County offer one. *Id.* By failing to raise any of these issues with the Board, the County has waived them in this Court. *Nevada,* 457 F.3d at 88.

Moreover, even if not waived, the County's historic review claims are unavailing. While the Board had to identify potential consulting parties and invite them to participate, the County does not qualify. NHPA regulations include as consulting parties "a local government with jurisdiction over the area in which the effects of an undertaking may occur," 36 C.F.R. § 800.2(c)(3). But it is not likely or reasonably foreseeable that the authorization of construction and operation of the new rail line in Utah, *i.e.* the undertaking, will alter the character or use of historic properties near an existing downline rail line in Colorado over which significant rail traffic already traverses. Because the Union Pacific line is an existing, active rail line, any historic resources near the line already experience noise, vibration, visual and other impacts from rail traffic, and have for many years. Thus, when the Board defined the area of potential effects in consultation with consulting parties and the public, it properly excluded downline rail segments because impacts from an increase in the number of trains on existing lines would not alter the character or use of historic resources.

The County for the first time in its brief lists some potentially historic resources in Eagle County, but never explains how additional trains traveling near

59

those resources could alter their character or use. *See* Cty. Br. 41-45. In fact, the

vast majority of the resources listed are hundreds of feet away from the Union

Pacific line. *See* Cty. Br., Ex. B. For the few that are closer,[20] the County provides

no rationale for how they could be adversely impacted by an increase in the

number of trains already traveling on the existing rail line, nor is any apparent.

Even if the failure to formally invite the County to be a consulting party

under NHPA could be considered an error, it would be harmless for two reasons.

First, the County participated extensively in the NEPA process and could have

raised any historic resource concerns at any point. Second, there is no reason to

believe that any historic resources in the County would, in fact, be adversely

impacted because any increase in rail traffic on this existing, active rail line would

not introduce noise, vibration, visual or other impacts on the character of a historic

resource not already present. *See WildEarth Guardians v. Provencio,* 923 F.3d

655, 678 (9th Cir. 2019) (applying harmless error in the context of NHPA

compliance); *see also Oglala Sioux Tribe*, 45 F.4th at 300 (when no prejudice and

NEPA objective met, error is harmless); *Nevada,* 457 F.3d at 09-91(requiring

revision of EIS when error not prejudicial "would be a 'meaningless gesture'").

---

[20] The County lists a section of the Union Pacific line itself, and two roadways that
are close to or cross the Union Pacific line. Cty. Br., Exh. B. It also lists a bridge
and the remains of a historic cabin, which are 150 and 100 feet from the line. *Id*.

    *f.*   *The County's Arguments Concerning Noise & Vibration Are*
        *Unavailing.*

The County incorrectly claims that the Board's analysis of downline noise

and vibration was insufficient.  Cty. Br. 33.  First, the County waived this claim by

failing to present it to the Board.  *Nevada,* 457 F.3d at 88.  But even if the

argument were not waived, the County is mischaracterizing the Board's analysis.

The County asserts that the EIS "'estimate[ed] noise levels for the downline

study area' and nothing more."  Cty. Br. 33.  But predicted changes in noise levels,

measured in decibels, are widely used to characterize noise impacts.  And the

Board did more than that in the EIS—it explained how noise levels and changes in

those levels are generally interpreted as a subjective auditory experience, such as

how significant a change is necessary to affect the average person.  FEIS_3.6-6,

3.6-11, App.L_L-9.  The noise impacts analysis considered the volume,

composition, routes, and speed of project-related trains on the downline segments,

as well as the volumes, composition, and speed of existing passenger and freight

trains on those segments.  FEIS_3.6-11, App.L_L-9-L-16.  Based on this

information, the EIS concluded that the noise in the downline study area could

increase anywhere from 0.4 decibels to 6 decibels depending on the mentioned

factors.  FEIS_3.6-11, App.L.  As for vibration, the EIS explained that project-

related trains would not change vibration levels along downline segments because

vibration is a function of train speed, which would be the same for project-related

61

trains as for the trains that currently use those segments.  FEIS_3.6-11.  Notably, the County does not suggest any alternative methods that the Board could have used to characterize noise and vibration impacts.  *See* Cty. Br. 33.

The County incorrectly cites *Center for Biological Diversity v. National Highway Traffic Safety Admin.*, 538 F.3d 1172, 1216 (9th Cir. 2008), for the proposition that the EIS should have identified the "actual environmental effects" and not just "how loud trains would be or the amount of land negatively impacted." Cty. Br. 33.  That case held that an Environmental Assessment was flawed because it quantified air emissions but did not consider the impacts from those emissions. Here, however, the noise levels *are* the "actual" impact, so quantifying predicted noise in decibels and areas affected was appropriate.

### g. The Board Reasonably Explained Why It Could Not Impose Downline Mitigation.

The County claims that the failure to include mitigation measures that applied to downline operations somehow "skewed the Board's conclusions regarding the Line's benefits and the impacts."  Cty. Br. 30-31, 46.  In addition to failing to explain this claim, the County fails to mention that the Board repeatedly explained that it could not impose mitigation measures on downline operations. *See e.g.* FEIS_App.T_T-36, T-87-T-88.  The Board can only impose mitigation on the party that is appearing before it—here the Coalition—and it cannot impose conditions on rail operators who are not before the Board in the present

62

proceeding, such as operators of downline segments.  FEIS_App._T_T-36, T-87-T-88.[21]

C. __The Board's Analysis of Geological Hazards Satisfied NEPA.__

Contrary to the Center's suggestions (Center Br. 34-39), the EIS reasonably examined geological and seismic conditions, including landslide potential, in the project area.  The EIS first determined the baseline geological and seismic characteristics of the study area and identified potential causes and triggers for landslides.  FEIS_3.5-5-3.5-8, 3.5-20, 3.5-22-3.5-26.  The EIS then analyzed the areas of unstable geological units for each alternative and the correlating risk of mass movement and provided descriptions and maps of areas at risk for landslides.  FEIS_3.5-26-3.5-28.  The EIS determined that construction of any of the three Action Alternatives could increase the risk of landslides, slumping, debris flows, rockslide, but that with the mitigation measures imposed, the impacts would not be significant.  FEIS_3.5-28.  This analysis was based on preliminary engineering provided by the Coalition and available information regarding the geologic conditions of the study area.  FEIS_App.T_T-241.

---

[21]  Importantly, the Board does not actively regulate the volumes or routing of traffic on existing rail lines.  Downline carriers and operators can increase the traffic traveling on these existing lines for any reason and at any time without seeking authority from, or even notifying, the Board.

As a result of this analysis, the Board imposed multiple mitigation measures that would address geological and seismic risks, including landslides and other mass movement. *Approval_Decision*, App.B, GEO-MM-2, GEO-MM-3, GEO-MM-5, GEO-MM-7, GEO-MM-8. These mitigation measures require the Coalition to conduct detailed geotechnical investigations during the final engineering and design phase for the Line and to implement appropriate site-specific measures to address geologic hazards identified during the geotechnical investigations. *See* FEIS_3.5-28, GEO-MM-2, GEO-MM-3, GEO-MM 4, GEO-MM-5, GEO-MM-7, GEO-MM-8. Preconstruction geotechnical investigations necessarily will occur during the final engineering and design phase because the precise locations of engineering features and site-specific construction methods are not known before that phase. FEIS_App.T_T-241, T-244.

The Center erroneously argues that, because the EIS did not require final design and site-specific landslide assessment during the EIS process, the Board failed to take the required hard look at landslide risks under NEPA. Center Br. 34-39. But "inherent in NEPA and its implementing regulations is a 'rule of reason.'" *Indian River Cty., Florida v. U.S. Dep't. of Transp.*, 945 F.3d 515, 533 (D.C. Cir. 2019) (cleaned up). An agency complies with NEPA when it analyzes an impact by examining the available information, discloses that there is information that is not available, and determines that the information that is unavailable is not

necessary to effectively compare alternatives.  *See* 40 C.F.R. § 1502.22 (2019);

*National Mining Ass'n v. Zinke*, 877 F.3d 845, 875-76 (9th Cir. 2017); *Indian*

*River Cty., Florida v. U.S. Dep't. of Transp.*, 348 F.Supp.3d 17, 44 (D.D.C. 2018)

*aff'd, Indian River Cty.*, 945 F.3d 515.  And when information is not available,

"deferral of decision on specific mitigation steps until the start of construction,

when a more detailed right-of-way would be known, [is] both eminently

reasonable and embraced in the procedures promulgated under NEPA."  *Pub. Util.*

*Comm'n of California v. FERC*, 900 F.2d 269, 282-83 (D.C. Cir. 1990).[22]

Here, while the EIS included analysis of the available geological

information,[23] it acknowledged that one of the mapping datasets (from the Utah

Geological Survey) was incomplete and likely understated the areas affected by

mass movement and that there could be unmapped abandoned mines.  FEIS_3.5-7,

3.5-20-3.5-28.  However, the Board's landslide analysis was also based on review

---

[22]  "'NEPA does *not* impose a duty on agencies to include in every EIS a detailed explanation of specific measures which will be employed to mitigate the adverse impacts of a proposed action.'"  *Indian River Cty.*, 945 F.3d at 533 (quoting *Mayo v. Reynolds*, 875 F.3d 11, 16 (D.C. Cir. 2017)).  *See also Sierra Club v. Fed. Highway Admin.*, 435 Fed.Appx. 368, 378 (D.C. Cir. 2011) (approving alternatives that would determine extent of bridges during final design stages because NEPA "does not require that a full mitigation plan be formulated in the FEIS").

[23]  This data included the available data from federal, state and local agencies; geological mapping for the study area; physiography of the study area; information regarding geological hazards from the Utah Geological Survey; mapping for oil fields, wells and mines; and soil data.  FEIS_3.5-2-3.5-3

of other data sets that were complete, such as reviews of maps of unstable

geological units and maps of areas with steep slopes which present higher landslide

risk.  FEIS_3.5-2-3.5-7, 3.5-26.  Based on its analysis of all this data (and not just

the landslide maps), the Board concluded that the available information was

sufficient to compare the Action Alternatives and assess the potential impacts of

each.  FEIS_App.T_T-241.  Thus, contrary to the Center's claims, the Board did

not solely rely upon an incomplete data set.[24]

The Center suggests that the Board was required to wait until final design

and engineering details are determined before it could complete its EIS.  Center Br.

34-37.  However, agencies are required to conduct the EIS process at the "earliest

reasonable time," 40 C.F.R. § 1501.2, and because of the nature of long, linear

projects such as rail lines, environmental reviews must be conducted before details

concerning localized geological conditions, precise rights of way, and final

engineering designs can be determined.  *See* FEIS_3.5-16, 3.5-20-3.5-21,

App.T_T-74, T-241, T-244.  Because such details cannot be finalized before a new

line is considered, the Board complied with NEPA and took the "eminently

reasonable" step of deferring determination "on specific mitigation steps until the

---

[24]  The Center claims that geological risks could conceivably be serious enough
that they could not be mitigated.  Center Br. 8.  However, the EIS did not identify
any significant risks associated with geological hazards that could not be addressed
through mitigation during final engineering and design.  FEIS_3.5-28.

start of construction, when a more detailed right-of-way would be known." *Pub. Util. Comm'n of California*, 900 F.2d at 282-83.  Indeed, the Board similarly analyzed potential impacts to certain other resources, such as protected vegetation, water resources (wetlands and water crossings), and paleontology, even though final right-of-way and engineering information was not available – and the Center offers no challenge to those analyses.  *See e.g.* FEIS_App.T_T-137-T-138, T-148-T-149, T-165-T-166, T-187-T-188, T-302.

The cases the Center cites do not lead to a contrary conclusion.  Center Br. 36-38.  In *Public Employees for Environmental Responsibility v. Hopper*, 827 F.3d 1077, 1082-84 (D.C. Cir. 2016) the agency itself "roundly criticized" the sufficiency of the geological information relied on, acknowledged that it can be "appropriate for an impact study to provide ongoing monitoring in order to gather more data," and did not halt the project but simply required that the data be collected before construction began.  And in *Northern Plains Resource Council v. Surface Transportation Board*, 668 F.3d 1067, 1083-85 (9th Cir. 2011), there was no baseline data collected at all regarding the species of concern.

## IV.    THE BOARD'S DECISION WAS REASONABLE AND CONSISTENT WITH THE PROVISIONS OF 49 U.S.C. §§ 10502 AND 10901.

### A. The Board's Preliminary Decision on the Transportation Merits Was Appropriate.

The County incorrectly argues that the Board's preliminary decision on the transportation merits was inconsistent with Board precedent.  Cty. Br. 16-19.  The County does not challenge the Board's authority to use a two-step approach in construction cases, a practice the Board has used many times to "help ensure the development and continuation of a sound rail transportation system, foster sound economic conditions in transportation, and reduce barriers to entry.  *See* 49 U.S.C. § 10101(4), (5) (7)."  *Preliminary_Decision_*8-9.  The County is correct that the agency stated in 2007 that it would issue preliminary decisions addressing the transportation merits of a construction petition prior to completing its environmental review only upon a showing of unique or compelling circumstances.[25]  Here, that is exactly what the Board did in responding to the Coalition's request.

The County questions the Board's rationale – that a preliminary decision was warranted because "the economic circumstances, exacerbated by the current pandemic, are compelling," *Preliminary_Decision_*9 – but the compelling nature

---

[25] *See Preliminary_Decision_*8; *Alaska R.R.—Constr. & Operation Exemption— Rail Line Between Eielson Air Force Base & Fort Greely, Alaska*, FD 34658, slip op. at 2 (STB served Oct. 4, 2007).

of the global pandemic and the resulting economic downturn were well-known and hardly needed explanation.  As noted in the *Preliminary Decision* and the *Petition*, a preliminary decision on the transportation merits could help the Coalition obtain financing, expedite the regulatory process and, as the project moves forward, provide economic stimulation that could aid in recovery from the downturn in the region.  *See Preliminary_Decision_*8-9; *Petition_*26-27.  Thus, the County's claim that the Board did not explain its decision is unfounded.

The County's passing suggestion that the preliminary decision on the transportation merits risked prejudging the project and violating NEPA (Cty. Br. 17-18) lacks merit as well.  The *Preliminary Decision* was permissible because it clearly explained that: (1) it was a preliminary determination only on the transportation merits; (2) any decision authorizing construction would only be made after the environmental review was completed and its findings weighed with the transportation merits; (3) construction could not begin until a final decision was issued; and (4) it would not affect the environmental review process or its consideration in the final decision.  *Preliminary_Decision_*10-11.  *See Pub. Util. Comm'n of California*, 900 F.2d at 282 (agency did not violate NEPA when it issued a preliminary decision that would not become effective until after the environmental hearing); *Illinois Com. Comm'n v. ICC*, 848 F.2d 1246, 1259 (D.C. Cir. 1988) (publication of notice of abandonment prior to completion of the

69

environmental process does not violate NEPA because the notice did not become effective for another 30 days so there was no irretrievable commitment of resources).

B. **The Board Reasonably Weighed the Appropriate Rail Transportation Policy Factors and the Environmental Issues in Reaching its Final Decision.**

Consistent with Board precedent, the Coalition brought this rail construction case not under the application procedures of 49 U.S.C. § 10901, but rather under the more streamlined exemption procedures of 49 U.S.C. § 10502. Section 10502(a), as pertinent here, provides that the Board shall authorize a transaction (including a rail construction proposal) through an exemption if two criteria are met: (1) application of the statutory provision from which exemption is sought (here, § 10901) "is not necessary to carry out" the Rail Transportation Policy factors listed in 49 U.S.C. § 10101; and (2) application of the statutory provision (again, § 10901) is not "needed to protect shippers from the abuse of market power." 49 U.S.C. §§ 10502(a)(1) & (2). As the agency and numerous reviewing courts have noted (s*upra.* at 3-5), in its regulation, including its regulation of rail transactions, the Board is to apply this exemption provision to "the maximum extent consistent with" the Interstate Commerce Act. 49 U.S.C. § 10502(a)(1).

Section 10502(a)(1) does not specify which of the 15 (sometimes contradictory) Rail Transportation Policy provisions in § 10101 should be

70

examined in addressing particular exemption requests.  However, this Court has held that the Board need only examine those Rail Transportation Policy provisions that are "implement[ed]" by the statutory provision from which exemption is sought.  *Vill. of Palestine v. ICC*, 936 F.2d 1335, 1338-39 (D.C. Cir. 1991) ("Put differently, if a provision does not implement a particular goal set forth in the rail transportation policy, it follows in the language of [§ 10502(a)] that application of the provision is not necessary to carry out that goal."); *see Oregon Pub. Util. Comm'n v. ICC*, 979 F.2d 778, 781 (9th Cir. 1992) (following *Vill. of Palestine*). Indeed, "the [Board] does not have a duty to make 'findings about each aspect of the rail transportation policy possibly affected' by its grant of the exemption." *Alaska Survival*, 705 F.3d at 1083 (quoting *Vill. of Palestine*, 936 F.2d at 1339). Requiring such an analysis would make the exemption process "broader and possibly more onerous than the proceeding from which exemption was sought." *Vill. of Palestine*, 936 F.2d at 1339.  The Board has "wide deference" in determining which policy factors apply in a given case.  *Alaska Survival*, 705 F.3d at 1083-84.

Here, the Board reasonably identified and weighed the Rail Transportation Policy factors implemented by § 10901, the rail construction and operation provision for which the § 10502 exemption was sought.  Specifically, the Board found that the proposed rail line would "enhance competition" and "foster sound

71

economic conditions in transportation," in furtherance of §§ 10101(4) & (5), by providing "an alternative, more cost-effective method of transportation for shippers that are currently limited to shipping by truck." *Preliminary_Decision_*9; *see also Approval_Decision_*5, 24.  The Board also reasonably concluded that use of the streamlined exemption procedures instead of the more cumbersome application process would also be consistent with §§ 10101(2) & (7), as it would "minimize the need for federal regulatory control over the rail transportation system and reduce regulatory barriers to entry." *Preliminary_Decision_*9; *Approval_Decision_*5, 24.

In addition, in response to comments submitted on the transportation merits specifically concerning potential safety risks related to wildfires and increased truck traffic, the Board weighed impacts to public health and safety and safe working conditions, per §§ 10101(8) & (11).  *Preliminary_Decision_*9-10; *Approval_Decision_*5, 24-25.  After thoroughly examining and weighing these issues in its environmental review and its *Approval Decision*, the Board reasonably concluded that the increased wildfire and truck traffic risks were low. *Approval_Decision_*5, 10-14, 24-25.

Ultimately, in granting the exemption under § 10502, the Board weighed the project's transportation merits and its potential impacts and concluded that the project could produce "substantial transportation and economic benefits."  *Id._*23-

25.  Citing to Congressional, state, and tribal support, the Board explained that the Line "will bring rail service to an area of Utah that does not currently have service, provide shippers that must now rely on trucks another shipping option, and create jobs." *Id*._24.  The Board also noted that the line "could also support the diversification of local economies in the Basin, which could support additional employment and expand the regional economy." *Id*.  The Board recognized that, "as with most other rail construction projects, the construction and operation of this Line is likely to produce unavoidable environmental impacts." *Id*._23.  However, given the extensive environmental mitigation measures imposed (146 in total), the transportation merits of the line, and the statutory presumption from § 10901(c) that rail construction projects should be approved, the Board reasonably concluded that the exemption should be granted. *Id*._23-25.  No part of the Board's decision-making was arbitrary or capricious.

Petitioners raise numerous arguments concerning the Board's weighing of the pertinent Rail Transportation Policy factors and its decision ultimately to grant the exemption.  None have merit.

First, the County erroneously asserts that the Board did not adequately discuss § 10101(8) (public health and safety) & § 10101(11) (safe working conditions).  Cty. Br. 20.  But in its *Preliminary Decision*, the Board in fact responded to one party that raised these two policy factors in comments on the

exemption, specifically asserting that the proposed rail line might increase safety risks related to wildfires and truck traffic. *Preliminary_Decision_*9-10. The Board noted that it takes such concerns seriously and, because such issues are inherently intertwined with the safety and vehicular traffic issues that would be examined during the environmental review, it would revisit these issues in the Board's final decision after it had completed that review. *Id.*; *see Reconsideration_Decision_*7. And the Board did just that. The EIS included extensive examination of potential increases in safety risks related to wildfires and increased vehicular traffic, including in upstream and downline areas. FEIS_3.1-1-3.1-19, 3.4-14-3.4-16, , 3.4-42-3.4-43. Informed by this additional information, the Board did not just provide a summary conclusion on these issues, Cty. Br. 24, but rather extensively addressed both wildfire risks and safety issues concerning increased vehicular traffic in its final decision. *Approval_Decision_*10-12. The Board then reasonably found that §§ 10101(8) & (11) did not warrant denying the exemption, as the increased wildfire and truck traffic risks were small and would be lessened by Board-imposed mitigation. *Id._*24-25.

The County summarily asserts that the Board's environmental review could not "cure" the Board's allegedly inadequate consideration of the Rail Transportation Policy factors. Cty. Br. 23-24. This assertion is unsupported and illogical. The 15 broad Rail Transportation Policy factors clearly overlap with

74

environmental issues, in particular §§ 10101(8) (public health and safety) and 10101(11) (safe working conditions).  The Board explained in its *Preliminary Decision* that these two Policy factors would be further examined during the environmental review and revisited in the Board's final decision. *Preliminary_Decision_*9-10.  This is entirely consistent with NEPA's purpose. Indeed, while NEPA does not mandate particular results, the analysis done under NEPA is specifically intended to inform an agency's decision-making. *Citizens Against Rails-to-Trails*, 267 F.3d at 1151.  Thus, it is entirely logical and reasonable to consider and weigh the information collected during the NEPA process to inform an agency's decision.  *See Reconsideration_Decision_*7 (and Board decisions cited therein).  Nothing about the Board's analysis of §§ 10101(8) & (11) was arbitrary or capricious.

The County's assertion that the Board needed to directly address § 10101(14) (concerning energy conservation) should also be rejected.  Cty. Br. 20-22.  At the outset, the County waived this argument by not presenting it to the Board during the exemption proceeding.  *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952) (holding objections not presented to the agency at the appropriate time under the agency's practice are waived).  While the Board's exemption process can be "informal" and not require public comments, *see* 49 C.F.R. § 1121.4, the Board here set a specific deadline for reply comments on the

petition for exemption, pursuant to its general filing regulations, 49 C.F.R.

§ 1104.13.  *Seven Cnty. Infrastructure Coal.—Rail Constr. & Operation Exemption—in Utah, Carbon, Duchesne, & Uintah Cntys., Utah*, FD 36284 (STB served June 17, 2020).  Several parties submitted formal filings on the record challenging the transportation merits – the County did not.

In addition, the County subsequently filed a formal Petition for Reconsideration, under 49 C.F.R. § 1115.3, challenging the Board's initial decision on the transportation merits – but it was devoid of any reference to § 10101(14). *County Pet. for Recon.*_4-6.  While the County discussed § 10101(1) and § 10101(8), it made no mention of § 10101(14), despite the Board's requirement that reconsideration petitions "state in detail the nature of and reasons for" the reconsideration request.  *Id.*; 49 C.F.R. § 1115.3(c).  The County's only mention of § 10101(14) was a vague, passing reference in its later-filed environmental comments.  EI-30611_28.  By refusing to forcefully present any arguments concerning § 10101(14) to the Board, and only obscurely mentioning it in passing in its environmental comments, the County has forfeited any arguments related to § 10101(14) here on appeal.  *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council*, 435 U.S. 519, 553-54 (1978) (arguments to agency must be

more than "cryptic and obscure" and should be "forcefully presented"); *L.A. Tucker Truck*, 344 U.S. at 37.[26]

In any event, the County's new argument related to § 10101(14), were it to be entertained, should be rejected. Section 10101(14) concerns energy conservation. In its decisions, the Board addressed numerous energy-related issues throughout, including providing cost-effective transportation, decreases and increases in truck traffic, potential upstream oil production in the Uinta Basin, and potential oil consumption downstream. *Preliminary_Decision_*9-10; *Approval_Decision_*12, 16-18, 23-25. The Board clearly considered all the potential issues related to energy, along with the other pertinent policy factors, when it reasonably determined to grant the exemption.

Next, the County mistakenly suggests that the Board did not adequately address comments concerning the rail line's financial viability and only offered a "not my problem" response. Cty. Br. 25-26. To the contrary, the Board provided an expansive, multipage discussion explaining the Board's judicially-affirmed

---

[26] In *Alaska Survival*, the Ninth Circuit found that the petitioner had not waived certain arguments related to Rail Transportation Policy factors primarily because the Board did not set a deadline for comments in the "informal" exemption proceeding in that case. *See* 705 F.3d at 1080-81. Here, however, the Board did set a deadline for comments on the petition for exemption and numerous parties filed comments on the record. This was clearly an adjudicatory proceeding to which the issue exhaustion requirement of *Sims v. Apfel*, 530 U.S. 103, 107-10 (2000), applies.

position that the authority it may grant is merely permissive – it does not require that a new rail line be constructed or operated – and that it is up to the financial markets to determine if such a project should proceed. *Preliminary_Decision*_4-8 (*citing, inter alia, Mid-States*, 345 F.3d at 552); *see also Alaska Survival*, 705 F.3d at 1082 ("[N]either § 10502, nor the Board's implementing regulations indicate that an exemption proceeding is improper when the project's financial viability is questioned."). Moreover, while the County notes that the Board received additional comments on financial viability after it issued its *Preliminary Decision*, Cty. Br. 26, it never explains how the substance of any comments required the Board to revisit or even restate its well-reasoned approach. *See Approval_Decision*_24 (referencing the Board's explanation of financial viability issues in its *Preliminary Decision*). The Board's discussion and conclusions concerning financial viability issues more than satisfied the Administrative Procedure Act.

The County's challenges to the Board's conclusions relating to §§ 10101(4) & (5) (ensuring "effective competition" between rail carriers and "other modes" of transportation) likewise lack merit. Cty. Br. 26-27. The County simply ignores the Board's well-reasoned explanation that providing a rail line into the Uinta Basin would allow shippers to access new markets because the only transportation option at present (trucking) did not allow for the cost-effective movement of goods and

78

resources outside the local Utah area. *Preliminary_Decision_*2, 9-10;

*Approval_Decision_*24-25. Per §§ 10101(4) & (5), the proposed rail line would

clearly promote "effective competition" between rail and "other modes" of

transportation. The County's focus on competition between or among

commodities, Cty. Br. 27, is misplaced and simply ignores the clear statutory

language promoting competition between "other modes" of transportation.

The Board also rightfully relied upon §§ 10101(2) & (7) (minimizing the

need for federal regulation and reducing regulatory barriers to entry).

*Preliminary_Decision_*9; *Approval_Decision_*24. Granting an exemption would

be consistent with these policy provisions "by minimizing the time and

administrative expense associated with the construction and commencement of

operations." *Preliminary_Decision_*9. The County's apparent claim, Cty. Br. 27,

that the agency should not consider pertinent policy goals just because they are

obviously met by a particular exemption makes no sense.

The Center's arguments concerning the Board's weighing of Rail

Transportation Policy factors along with the potential environmental impacts

similarly lack merit. Contrary to the Center's erroneous suggestion (Center Br. 44-

45), the Board did consider the alleged environmental impacts from the rail line

itself and from upstream and downstream activities, including potential upstream

oil development and downstream consumption, not just in its EIS but also in its

final decision.  *Approval_Decision_*5-25.  Moreover, the Center simply ignores the extensive environmental conditions that the Board imposed to mitigate the environmental impacts.  Center Br. 39-61.

Ultimately, Petitioners simply disagree with the Board's decision to grant the exemption for the Line.  But in expressing their discontent, Petitioners continually ignore Congress' instruction that rail construction projects are presumed to be in the public interest and should be approved. *Preliminary_Decision_*4; *Approval_Decision_*5, 25; 49 U.S.C. § 10901(c); *N. Plains Res. Council,* 668 F.3d at 1091-92; *Mid-States*, 345 F.3d at 552; *see also Vill. of Palestine*, 936 F.2d at 1339 (exemption process cannot be more onerous than the proceeding from which exemption is sought); *Alaska Survival*, 705 F.3d at 1082 (same).

At bottom, Petitioners' case amounts to a claim that the Board can and should deny approval of a rail project based upon the commodities to be carried on the Line – in this case, primarily oil.  But Congress has commanded that the Board enforce the common carrier obligation, 49 U.S.C. § 11101(a), and as this Court has recognized, that obligation requires railroads to carry all commodities upon reasonable request – including hazardous and other environmentally-unfriendly materials.  *See supra* at 31-32.  Section 10901, which favors new rail line construction "*unless* the Board finds that such activities are *inconsistent* with the

80

public convenience and necessity," contains no reference to which commodities will be handled, and the Board cannot be faulted for declining to engraft onto its process a requirement that is not found in the statute.

## **CONCLUSION**

For the foregoing reasons, the Court should deny both Petitions for Review.

Respectfully submitted,

CRAIG M. KEATS
General Counsel

THEODORE L. HUNT
Associate General Counsel

/s/ Barbara A. Miller
BARBARA A. MILLER
Attorney
Surface Transportation Board
395 E Street SW
Washington, D.C.  20423-0001
(202) 245-0277
Barbara.Miller@stb.gov

December 16, 2022

## CERTIFICATE OF COMPLIANCE

## WITH TYPE-COLUME LIMIT

I, Barbara A. Miller, hereby certify the following:

1. This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B)(i) because it contains 18,625 words, excluding the parts exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1).

2. This reply complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

/s/ Barbara A. Miller
Barbara A. Miller
Attorney
Surface Transportation Board

# ADDENDUM

## <u>TABLE OF CONTENTS</u>

**Page**

42 U.S.C. § 4332(c) ................................................................................. 1

49 U.S.C. § 10101 .................................................................................... 3

49 U.S.C. § 10502 .................................................................................... 4

49 U.S.C. § 10901 .................................................................................... 6

49 U.S.C. § 11101 .................................................................................... 7

54 U.S.C. § 306108 .................................................................................. 9

36 C.F.R. § 800.2 ................................................................................... 10

36 C.F.R. § 800.3 ................................................................................... 15

40 C.F.R. § 1501.2 ................................................................................. 18

40 C.F.R. § 1502.22 (2019) .................................................................... 19

40 C.F.R. § 1508.7 (2019) ...................................................................... 20

40 C.F.R. § 1508.8 (2019) ...................................................................... 21

40 C.F.R. § 1508.25 (2019) .................................................................... 22

49 C.F.R. §1105.7 .................................................................................. 23

50 C.F.R. § 402.02 ................................................................................. 29

**42 U.S.C. § 4332.          Cooperation of agencies; reports; availability of information; recommendations; international and national coordination of efforts**

The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—

(A) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment;

(B) identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by subchapter II of this chapter, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—
(i) the environmental impact of the proposed action,
(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
(iii) alternatives to the proposed action,
(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of title 5, and shall accompany the proposal through the existing agency review processes;

(D) Any detailed statement required under subparagraph (C) after January 1, 1970, for any major Federal action funded under a program of grants to States shall not be deemed to be legally insufficient solely by reason of having been prepared by a State agency or official, if:

    (i) the State agency or official has statewide jurisdiction and has the responsibility for such action,

    (ii) the responsible Federal official furnishes guidance and participates in such preparation,

    (iii) the responsible Federal official independently evaluates such statement prior to its approval and adoption, and

    (iv) after January 1, 1976, the responsible Federal official provides early notification to, and solicits the views of, any other State or any Federal land management entity of any action or any alternative thereto which may have significant impacts upon such State or affected Federal land management entity and, if there is any disagreement on such impacts, prepares a written assessment of such impacts and views for incorporation into such detailed statement.

The procedures in this subparagraph shall not relieve the Federal official of his responsibilities for the scope, objectivity, and content of the entire statement or of any other responsibility under this chapter; and further, this subparagraph does not affect the legal sufficiency of statements prepared by State agencies with less than statewide jurisdiction.[1]

(E) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;

(F) recognize the worldwide and long-range character of environmental problems and, where consistent with the foreign policy of the United States, lend appropriate support to initiatives, resolutions, and programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of mankind's world environment;

(G) make available to States, counties, municipalities, institutions, and individuals, advice and information useful in restoring, maintaining, and enhancing the quality of the environment;

(H) initiate and utilize ecological information in the planning and development of resource-oriented projects; and

(I) assist the Council on Environmental Quality established by subchapter II of this chapter.

**49 U.S.C. § 10101.        Rail transportation policy**

In regulating the railroad industry, it is the policy of the United States Government—

(1) to allow, to the maximum extent possible, competition and the demand for services to establish reasonable rates for transportation by rail;

(2) to minimize the need for Federal regulatory control over the rail transportation system and to require fair and expeditious regulatory decisions when regulation is required;

(3) to promote a safe and efficient rail transportation system by allowing rail carriers to earn adequate revenues, as determined by the Board;

(4) to ensure the development and continuation of a sound rail transportation system with effective competition among rail carriers and with other modes, to meet the needs of the public and the national defense;

(5) to foster sound economic conditions in transportation and to ensure effective competition and coordination between rail carriers and other modes;

(6) to maintain reasonable rates where there is an absence of effective competition and where rail rates provide revenues which exceed the amount necessary to maintain the rail system and to attract capital;

(7) to reduce regulatory barriers to entry into and exit from the industry;

(8) to operate transportation facilities and equipment without detriment to the public health and safety;

(9) to encourage honest and efficient management of railroads;

(10) to require rail carriers, to the maximum extent practicable, to rely on individual rate increases, and to limit the use of increases of general applicability;

(11) to encourage fair wages and safe and suitable working conditions in the railroad industry;

(12) to prohibit predatory pricing and practices, to avoid undue concentrations of market power, and to prohibit unlawful discrimination;

(13) to ensure the availability of accurate cost information in regulatory proceedings, while minimizing the burden on rail carriers of developing and maintaining the capability of providing such information;

(14) to encourage and promote energy conservation; and

(15) to provide for the expeditious handling and resolution of all proceedings required or permitted to be brought under this part.

**49 U.S.C. § 10502.          Authority to exempt rail carrier transportation**

(a) In a matter related to a rail carrier providing transportation subject to the jurisdiction of the Board under this part, the Board, to the maximum extent consistent with this part, shall exempt a person, class of persons, or a transaction or service whenever the Board finds that the application in whole or in part of a provision of this part—

(1) is not necessary to carry out the transportation policy of section 10101 of this title; and

(2) either—
(A) the transaction or service is of limited scope; or
(B) the application in whole or in part of the provision is not needed to protect shippers from the abuse of market power.

(b) The Board may, where appropriate, begin a proceeding under this section on its own initiative or on application by the Secretary of Transportation or an interested party. The Board shall, within 90 days after receipt of any such application, determine whether to begin an appropriate proceeding. If the Board decides not to begin a class exemption proceeding, the reasons for the decision shall be published in the Federal Register. Any proceeding begun as a result of an application under this subsection shall be completed within 9 months after it is begun.

(c) The Board may specify the period of time during which an exemption granted under this section is effective.

(d) The Board may revoke an exemption, to the extent it specifies, when it finds that application in whole or in part of a provision of this part to the person, class, or transportation is necessary to carry out the transportation policy of section 10101 of this title. The Board shall, within 90 days after receipt of a request for revocation under this subsection, determine whether to begin an appropriate proceeding. If the Board decides not to begin a proceeding to revoke a class exemption, the reasons for the decision shall be published in the Federal Register. Any proceeding begun as a result of a request under this subsection shall be completed within 9 months after it is begun.

(e) No exemption order issued pursuant to this section shall operate to relieve any rail carrier from an obligation to provide contractual terms for liability and claims which are consistent with the provisions of section 11706 of this title. Nothing in this subsection or section 11706 of this title shall prevent rail carriers

from offering alternative terms nor give the Board the authority to require any specific level of rates or services based upon the provisions of section 11706 of this title.

   (f) The Board may exercise its authority under this section to exempt transportation that is provided by a rail carrier as part of a continuous intermodal movement.

   (g) The Board may not exercise its authority under this section to relieve a rail carrier of its obligation to protect the interests of employees as required by this part.

**49 U.S.C. § 10901.      Authorizing construction and operation of railroad lines**

(a) A person may—

   (1) construct an extension to any of its railroad lines;

   (2) construct an additional railroad line;

   (3) provide transportation over, or by means of, an extended or additional railroad line; or

   (4) in the case of a person other than a rail carrier, acquire a railroad line or acquire or operate an extended or additional railroad line,

only if the Board issues a certificate authorizing such activity under subsection (c).

(b) A proceeding to grant authority under subsection (a) of this section begins when an application is filed. On receiving the application, the Board shall give reasonable public notice, including notice to the Governor of any affected State, of the beginning of such proceeding.

(c) The Board shall issue a certificate authorizing activities for which such authority is requested in an application filed under subsection (b) unless the Board finds that such activities are inconsistent with the public convenience and necessity. Such certificate may approve the application as filed, or with modifications, and may require compliance with conditions (other than labor protection conditions) the Board finds necessary in the public interest.

(d)(1) When a certificate has been issued by the Board under this section authorizing the construction or extension of a railroad line, no other rail carrier may block any construction or extension authorized by such certificate by refusing to permit the carrier to cross its property if—

   (A) the construction does not unreasonably interfere with the operation of the crossed line;

   (B) the operation does not materially interfere with the operation of the crossed line; and

   (C) the owner of the crossing line compensates the owner of the crossed line.

(2) If the parties are unable to agree on the terms of operation or the amount of payment for purposes of paragraph (1) of this subsection, either party may submit the matters in dispute to the Board for determination. The Board shall make a determination under this paragraph within 120 days after the dispute is submitted for determination.

**49 U.S.C. § 11101.**       **Common carrier transportation, service, and rates**

(a) A rail carrier providing transportation or service subject to the jurisdiction of the Board under this part shall provide the transportation or service on reasonable request. A rail carrier shall not be found to have violated this section because it fulfills its reasonable commitments under contracts authorized under section 10709 of this title before responding to reasonable requests for service. Commitments which deprive a carrier of its ability to respond to reasonable requests for common carrier service are not reasonable.

(b) A rail carrier shall also provide to any person, on request, the carrier's rates and other service terms. The response by a rail carrier to a request for the carrier's rates and other service terms shall be—
   (1) in writing and forwarded to the requesting person promptly after receipt of the request; or
   (2) promptly made available in electronic form.

(c) A rail carrier may not increase any common carrier rates or change any common carrier service terms unless 20 days have expired after written or electronic notice is provided to any person who, within the previous 12 months—
   (1) has requested such rates or terms under subsection (b); or
   (2) has made arrangements with the carrier for a shipment that would be subject to such increased rates or changed terms.

(d) With respect to transportation of agricultural products, in addition to the requirements of subsections (a), (b), and (c), a rail carrier shall publish, make available, and retain for public inspection its common carrier rates, schedules of rates, and other service terms, and any proposed and actual changes to such rates and service terms. For purposes of this subsection, agricultural products shall include grain as defined in section 3 of the United States Grain Standards Act (7 U.S.C. 75) and all products thereof, and fertilizer.

(e) A rail carrier shall provide transportation or service in accordance with the rates and service terms, and any changes thereto, as published or otherwise made available under subsection (b), (c), or (d).

(f) The Board shall, by regulation, establish rules to implement this section. The regulations shall provide for immediate disclosure and dissemination of rates and service terms, including classifications, rules, and practices, and their effective

dates. Final regulations shall be adopted by the Board not later than 180 days after January 1, 1996.

**54 U.S.C. § 306108.**      **Effect of undertaking on historic property**

The head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any State and the head of any Federal department or independent agency having authority to license any undertaking, prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license, shall take into account the effect of the undertaking on any historic property. The head of the Federal agency shall afford the Council a reasonable opportunity to comment with regard to the undertaking.

**36 C.F.R. § 800.2          Participants in the Section 106 process.**

(a) *Agency official*. It is the statutory obligation of the Federal agency to fulfill the requirements of section 106 and to ensure that an agency official with jurisdiction over an undertaking takes legal and financial responsibility for section 106 compliance in accordance with subpart B of this part. The agency official has approval authority for the undertaking and can commit the Federal agency to take appropriate action for a specific undertaking as a result of section 106 compliance. For the purposes of subpart C of this part, the agency official has the authority to commit the Federal agency to any obligation it may assume in the implementation of a program alternative. The agency official may be a State, local, or tribal government official who has been delegated legal responsibility for compliance with section 106 in accordance with Federal law.

(1) *Professional standards*. Section 112(a)(1)(A) of the act requires each Federal agency responsible for the protection of historic resources, including archeological resources, to ensure that all actions taken by employees or contractors of the agency shall meet professional standards under regulations developed by the Secretary.

(2) *Lead Federal agency*. If more than one Federal agency is involved in an undertaking, some or all the agencies may designate a lead Federal agency, which shall identify the appropriate official to serve as the agency official who shall act on their behalf, fulfilling their collective responsibilities under section 106. Those Federal agencies that do not designate a lead Federal agency remain individually responsible for their compliance with this part.

(3) *Use of contractors*. Consistent with applicable conflict of interest laws, the agency official may use the services of applicants, consultants, or designees to prepare information, analyses and recommendations under this part. The agency official remains legally responsible for all required findings and determinations. If a document or study is prepared by a non-Federal party, the agency official is responsible for ensuring that its content meets applicable standards and guidelines.

(4) *Consultation*. The agency official shall involve the consulting parties described in paragraph (c) of this section in findings and determinations made during the section 106 process. The agency official should plan consultations appropriate to the scale of the undertaking and the scope of Federal involvement and coordinated with other requirements of other statutes, as applicable, such as the National Environmental Policy Act, the Native American Graves Protection and Repatriation Act, the American Indian Religious Freedom Act, the

10

Archeological Resources Protection Act, and agency-specific legislation. The Council encourages the agency official to use to the extent possible existing agency procedures and mechanisms to fulfill the consultation requirements of this part.

(b) *Council*. The Council issues regulations to implement section 106, provides guidance and advice on the application of the procedures in this part, and generally oversees the operation of the section 106 process. The Council also consults with and comments to agency officials on individual undertakings and programs that affect historic properties.

(1) *Council entry into the section 106 process*. When the Council determines that its involvement is necessary to ensure that the purposes of section 106 and the act are met, the Council may enter the section 106 process. Criteria guiding Council decisions to enter the section 106 process are found in appendix A to this part. The Council will document that the criteria have been met and notify the parties to the section 106 process as required by this part.

(2) *Council assistance*. Participants in the section 106 process may seek advice, guidance and assistance from the Council on the application of this part to specific undertakings, including the resolution of disagreements, whether or not the Council is formally involved in the review of the undertaking. If questions arise regarding the conduct of the section 106 process, participants are encouraged to obtain the Council's advice on completing the process.

(c) *Consulting parties*. The following parties have consultative roles in the section 106 process.

(1*) State historic preservation officer*. (i) The State historic preservation officer (SHPO) reflects the interests of the State and its citizens in the preservation of their cultural heritage. In accordance with section 101(b)(3) of the act, the SHPO advises and assists Federal agencies in carrying out their section 106 responsibilities and cooperates with such agencies, local governments and organizations and individuals to ensure that historic properties are taking into consideration at all levels of planning and development.

(ii) If an Indian tribe has assumed the functions of the SHPO in the section 106 process for undertakings on tribal lands, the SHPO shall participate as a consulting party if the undertaking takes place on tribal lands but affects historic properties off tribal lands, if requested in accordance with § 800.3(c)(1), or if the Indian tribe agrees to include the SHPO pursuant to § 800.3(f)(3).

11

(2) *Indian tribes and Native Hawaiian organizations. (i) Consultation on tribal lands. (A) Tribal historic preservation officer*. For a tribe that has assumed the responsibilities of the SHPO for section 106 on tribal lands under section 101(d)(2) of the act, the tribal historic preservation officer (THPO) appointed or designated in accordance with the act is the official representative for the purposes of section 106. The agency official shall consult with the THPO in lieu of the SHPO regarding undertakings occurring on or affecting historic properties on tribal lands.

(B) *Tribes that have not assumed SHPO functions*. When an Indian tribe has not assumed the responsibilities of the SHPO for section 106 on tribal lands under section 101(d)(2) of the act, the agency official shall consult with a representative designated by such Indian tribe in addition to the SHPO regarding undertakings occurring on or affecting historic properties on its tribal lands. Such Indian tribes have the same rights of consultation and concurrence that the THPOs are given throughout subpart B of this part, except that such consultations shall be in addition to and on the same basis as consultation with the SHPO.

(ii) *Consultation on historic properties of significance to Indian tribes and Native Hawaiian organizations*. Section 101(d)(6)(B) of the act requires the agency official to consult with any Indian tribe or Native Hawaiian organization that attaches religious and cultural significance to historic properties that may be affected by an undertaking. This requirement applies regardless of the location of the historic property. Such Indian tribe or Native Hawaiian organization shall be a consulting party.

(A) The agency official shall ensure that consultation in the section 106 process provides the Indian tribe or Native Hawaiian organization a reasonable opportunity to identify its concerns about historic properties, advise on the identification and evaluation of historic properties, including those of traditional religious and cultural importance, articulate its views on the undertaking's effects on such properties, and participate in the resolution of adverse effects. It is the responsibility of the agency official to make a reasonable and good faith effort to identify Indian tribes and Native Hawaiian organizations that shall be consulted in the section 106 process. Consultation should commence early in the planning process, in order to identify and discuss relevant preservation issues and resolve concerns about the confidentiality of information on historic properties.

(B) The Federal Government has a unique legal relationship with Indian tribes set forth in the Constitution of the United States, treaties, statutes, and court decisions. Consultation with Indian tribes should be conducted in a sensitive manner respectful of tribal sovereignty. Nothing in this part alters, amends, repeals,

12

interprets, or modifies tribal sovereignty, any treaty rights, or other rights of an Indian tribe, or preempts, modifies, or limits the exercise of any such rights.

(C) Consultation with an Indian tribe must recognize the government-to-government relationship between the Federal Government and Indian tribes. The agency official shall consult with representatives designated or identified by the tribal government or the governing body of a Native Hawaiian organization. Consultation with Indian tribes and Native Hawaiian organizations should be conducted in a manner sensitive to the concerns and needs of the Indian tribe or Native Hawaiian organization.

(D) When Indian tribes and Native Hawaiian organizations attach religious and cultural significance to historic properties off tribal lands, section 101(d)(6)(B) of the act requires Federal agencies to consult with such Indian tribes and Native Hawaiian organizations in the section 106 process. Federal agencies should be aware that frequently historic properties of religious and cultural significance are located on ancestral, aboriginal, or ceded lands of Indian tribes and Native Hawaiian organizations and should consider that when complying with the procedures in this part.

(E) An Indian tribe or a Native Hawaiian organization may enter into an agreement with an agency official that specifies how they will carry out responsibilities under this part, including concerns over the confidentiality of information. An agreement may cover all aspects of tribal participation in the section 106 process, provided that no modification may be made in the roles of other parties to the section 106 process without their consent. An agreement may grant the Indian tribe or Native Hawaiian organization additional rights to participate or concur in agency decisions in the section 106 process beyond those specified in subpart B of this part. The agency official shall provide a copy of any such agreement to the Council and the appropriate SHPOs.

(F) An Indian tribe that has not assumed the responsibilities of the SHPO for section 106 on tribal lands under section 101(d)(2) of the act may notify the agency official in writing that it is waiving its rights under § 800.6(c)(1) to execute a memorandum of agreement.

(3) *Representatives of local governments*. A representative of a local government with jurisdiction over the area in which the effects of an undertaking may occur is entitled to participate as a consulting party. Under other provisions of Federal law, the local government may be authorized to act as the agency official for purposes of section 106.

13

(4) *Applicants for Federal assistance, permits, licenses, and other approvals*. An applicant for Federal assistance or for a Federal permit, license, or other approval is entitled to participate as a consulting party as defined in this part. The agency official may authorize an applicant or group of applicants to initiate consultation with the SHPO/THPO and others, but remains legally responsible for all findings and determinations charged to the agency official. The agency official shall notify the SHPO/THPO when an applicant or group of applicants is so authorized. A Federal agency may authorize all applicants in a specific program pursuant to this section by providing notice to all SHPO/THPOs. Federal agencies that provide authorizations to applicants remain responsible for their government-to-government relationships with Indian tribes.

5) *Additional consulting parties*. Certain individuals and organizations with a demonstrated interest in the undertaking may participate as consulting parties due to the nature of their legal or economic relation to the undertaking or affected properties, or their concern with the undertaking's effects on historic properties.

(d) *The public —(1) Nature of involvement*. The views of the public are essential to informed Federal decisionmaking in the section 106 process. The agency official shall seek and consider the views of the public in a manner that reflects the nature and complexity of the undertaking and its effects on historic properties, the likely interest of the public in the effects on historic properties, confidentiality concerns of private individuals and businesses, and the relationship of the Federal involvement to the undertaking.

(2) *Providing notice and information*. The agency official must, except where appropriate to protect confidentiality concerns of affected parties, provide the public with information about an undertaking and its effects on historic properties and seek public comment and input. Members of the public may also provide views on their own initiative for the agency official to consider in decisionmaking.

(3) *Use of agency procedures*. The agency official may use the agency's procedures for public involvement under the National Environmental Policy Act or other program requirements in lieu of public involvement requirements in subpart B of this part, if they provide adequate opportunities for public involvement consistent with this subpart.

**36 C.F.R. § 800.3**          **Initiation of the section 106 process.**

(a) *Establish undertaking*. The agency official shall determine whether the proposed Federal action is an undertaking as defined in § 800.16(y) and, if so, whether it is a type of activity that has the potential to cause effects on historic properties.

(1) *No potential to cause effects*. If the undertaking is a type of activity that does not have the potential to cause effects on historic properties, assuming such historic properties were present, the agency official has no further obligations under section 106 or this part.

(2) *Program alternatives*. If the review of the undertaking is governed by a Federal agency program alternative established under § 800.14 or a programmatic agreement in existence before January 11, 2001, the agency official shall follow the program alternative.

(b) *Coordinate with other reviews*. The agency official should coordinate the steps of the section 106 process, as appropriate, with the overall planning schedule for the undertaking and with any reviews required under other authorities such as the National Environmental Policy Act, the Native American Graves Protection and Repatriation Act, the American Indian Religious Freedom Act, the Archeological Resources Protection Act, and agency-specific legislation, such as section 4(f) of the Department of Transportation Act. Where consistent with the procedures in this subpart, the agency official may use information developed for other reviews under Federal, State, or tribal law to meet the requirements of section 106.

(c) *Identify the appropriate SHPO and/or THPO*. As part of its initial planning, the agency official shall determine the appropriate SHPO or SHPOs to be involved in the section 106 process. The agency official shall also determine whether the undertaking may occur on or affect historic properties on any tribal lands and, if so, whether a THPO has assumed the duties of the SHPO. The agency official shall then initiate consultation with the appropriate officer or officers.

(1) *Tribal assumption of SHPO responsibilities*. Where an Indian tribe has assumed the section 106 responsibilities of the SHPO on tribal lands pursuant to section 101(d)(2) of the act, consultation for undertakings occurring on tribal land or for effects on tribal land is with the THPO for the Indian tribe in lieu of the SHPO. Section 101(d)(2)(D)(iii) of the act authorizes owners of properties on tribal lands which are neither owned by a member of the tribe nor held in trust by

the Secretary for the benefit of the tribe to request the SHPO to participate in the section 106 process in addition to the THPO.

(2) *Undertakings involving more than one State*. If more than one State is involved in an undertaking, the involved SHPOs may agree to designate a lead SHPO to act on their behalf in the section 106 process, including taking actions that would conclude the section 106 process under this subpart.

(3) *Conducting consultation*. The agency official should consult with the SHPO/THPO in a manner appropriate to the agency planning process for the undertaking and to the nature of the undertaking and its effects on historic properties.

(4) *Failure of the SHPO/THPO to respond*. If the SHPO/THPO fails to respond within 30 days of receipt of a request for review of a finding or determination, the agency official may either proceed to the next step in the process based on the finding or determination or consult with the Council in lieu of the SHPO/THPO. If the SHPO/THPO re-enters the Section 106 process, the agency official shall continue the consultation without being required to reconsider previous findings or determinations.

(d) *Consultation on tribal lands*. Where the Indian tribe has not assumed the responsibilities of the SHPO on tribal lands, consultation with the Indian tribe regarding undertakings occurring on such tribe's lands or effects on such tribal lands shall be in addition to and on the same basis as consultation with the SHPO. If the SHPO has withdrawn from the process, the agency official may complete the section 106 process with the Indian tribe and the Council, as appropriate. An Indian tribe may enter into an agreement with a SHPO or SHPOs specifying the SHPO's participation in the section 106 process for undertakings occurring on or affecting historic properties on tribal lands.

(e) *Plan to involve the public*. In consultation with the SHPO/THPO, the agency official shall plan for involving the public in the section 106 process. The agency official shall identify the appropriate points for seeking public input and for notifying the public of proposed actions, consistent with § 800.2(d).

(f) *Identify other consulting parties*. In consultation with the SHPO/THPO, the agency official shall identify any other parties entitled to be consulting parties and invite them to participate as such in the section 106 process. The agency official may invite others to participate as consulting parties as the section 106 process moves forward.

16

(1) *Involving local governments and applicants*. The agency official shall invite any local governments or applicants that are entitled to be consulting parties under § 800.2(c).

(2) *Involving Indian tribes and Native Hawaiian organizations*. The agency official shall make a reasonable and good faith effort to identify any Indian tribes or Native Hawaiian organizations that might attach religious and cultural significance to historic properties in the area of potential effects and invite them to be consulting parties. Such Indian tribe or Native Hawaiian organization that requests in writing to be a consulting party shall be one.

(3) *Requests to be consulting parties*. The agency official shall consider all written requests of individuals and organizations to participate as consulting parties and, in consultation with the SHPO/THPO and any Indian tribe upon whose tribal lands an undertaking occurs or affects historic properties, determine which should be consulting parties.

(g) *Expediting consultation*. A consultation by the agency official with the SHPO/THPO and other consulting parties may address multiple steps in §§ 800.3 through 800.6 where the agency official and the SHPO/THPO agree it is appropriate as long as the consulting parties and the public have an adequate opportunity to express their views as provided in § 800.2(d).

**40 C.F.R. § 1501.2       Apply NEPA early in the process.**

(a) Agencies should integrate the NEPA process with other planning and authorization processes at the earliest reasonable time to ensure that agencies consider environmental impacts in their planning and decisions, to avoid delays later in the process, and to head off potential conflicts.

(b) Each agency shall:

(1) Comply with the mandate of section 102(2)(A) of NEPA to utilize a systematic, interdisciplinary approach which will ensure the integrated use of the natural and social sciences and the environmental design arts in planning and in decision making which may have an impact on man's environment, as specified by § 1507.2(a) of this chapter.

(2) Identify environmental effects and values in adequate detail so the decision maker can appropriately consider such effects and values alongside economic and technical analyses. Whenever practicable, agencies shall review and publish environmental documents and appropriate analyses at the same time as other planning documents.

(3) Study, develop, and describe appropriate alternatives to recommended courses of action in any proposal that involves unresolved conflicts concerning alternative uses of available resources as provided by section 102(2)(E) of NEPA.

(4) Provide for actions subject to NEPA that are planned by private applicants or other non-Federal entities before Federal involvement so that:

(i) Policies or designated staff are available to advise potential applicants of studies or other information foreseeably required for later Federal action.

(ii) The Federal agency consults early with appropriate State, Tribal, and local governments and with interested private persons and organizations when their involvement is reasonably foreseeable.

(iii) The Federal agency commences its NEPA process at the earliest reasonable time (§§ 1501.5(d) and 1502.5(b) of this chapter).

**40 C.F.R. § 1502.22 (2019)    Incomplete or unavailable information.**

When an agency is evaluating reasonably foreseeable significant adverse effects on the human environment in an environmental impact statement and there is incomplete or unavailable information, the agency shall always make clear that such information is lacking.

(a) If the incomplete information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives and the overall costs of obtaining it are not exorbitant, the agency shall include the information in the environmental impact statement.

(b) If the information relevant to reasonably foreseeable significant adverse impacts cannot be obtained because the overall costs of obtaining it are exorbitant or the means to obtain it are not known, the agency shall include within the environmental impact statement:

(1) A statement that such information is incomplete or unavailable; (2) a statement of the relevance of the incomplete or unavailable information to evaluating reasonably foreseeable significant adverse impacts on the human environment; (3) a summary of existing credible scientific evidence which is relevant to evaluating the reasonably foreseeable significant adverse impacts on the human environment, and (4) the agency's evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community. For the purposes of this section, "reasonably foreseeable" includes impacts which have catastrophic consequences, even if their probability of occurrence is low, provided that the analysis of the impacts is supported by credible scientific evidence, is not based on pure conjecture, and is within the rule of reason.

(c) The amended regulation will be applicable to all environmental impact statements for which a Notice of Intent (40 CFR 1508.22) is published in the Federal Register on or after May 27, 1986. For environmental impact statements in progress, agencies may choose to comply with the requirements of either the original or amended regulation.

**40 C.F.R. § 1508.7 (2019)        Cumulative impact.**

*Cumulative impact* is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

**40 C.F.R. § 1508.8 (2019)        Effects.**

*Effects* include:

(a) Direct effects, which are caused by the action and occur at the same time and place.

(b) Indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.

Effects and impacts as used in these regulations are synonymous. Effects includes ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative. Effects may also include those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial.

**40 C.F.R. § 1508.25 (2019)     Scope.**

*Scope* consists of the range of actions, alternatives, and impacts to be considered in an environmental impact statement. The scope of an individual statement may depend on its relationships to other statements (§§ 1502.20 and 1508.28). To determine the scope of environmental impact statements, agencies shall consider 3 types of actions, 3 types of alternatives, and 3 types of impacts. They include:

(a) Actions (other than unconnected single actions) which may be:

(1) Connected actions, which means that they are closely related and therefore should be discussed in the same impact statement. Actions are connected if they:

(i) Automatically trigger other actions which may require environmental impact statements.

(ii) Cannot or will not proceed unless other actions are taken previously or simultaneously.

(iii) Are interdependent parts of a larger action and depend on the larger action for their justification.

(2) Cumulative actions, which when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same impact statement.

(3) Similar actions, which when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for evaluating their environmental consequences together, such as common timing or geography. An agency may wish to analyze these actions in the same impact statement. It should do so when the best way to assess adequately the combined impacts of similar actions or reasonable alternatives to such actions is to treat them in a single impact statement.

(b) Alternatives, which include:

(1) No action alternative.

(2) Other reasonable courses of actions.

(3) Mitigation measures (not in the proposed action).

(c) Impacts, which may be: (1) Direct; (2) indirect; (3) cumulative.

22

**49 C.F.R. § 1105.7**        **Environmental reports.**

(a) *Filing*. An applicant for an action identified in § 1105.6 (a) or (b) must submit to the Board (with or prior to its application, petition or notice of exemption) except as provided in paragraph (b) for abandonments and discontinuances) an Environmental Report on the proposed action containing the information set forth in paragraph (e) of this section. The Environmental Report may be filed with the Board electronically.

(b) At least 20 days prior to the filing with the Board of a notice of exemption, petition for exemption, or an application for abandonment or discontinuance, the applicant must serve copies of the Environmental Report on:

(1) The State Clearinghouse of each State involved (or other State equivalent agency if the State has no clearinghouse);

(2) The State Environmental Protection Agency of each State involved;

(3) The State Coastal Zone Management Agency for any state where the proposed activity would affect land or water uses within that State's coastal zone;

(4) The head of each county (or comparable political entity including any Indian reservation) through which the line goes;

(5) The appropriate regional offices of the Environmental Protection Agency;

(6) The U.S. Fish and Wildlife Service;

(7) The U.S. Army Corps of Engineers;

(8) The National Park Service;

(9) The Natural Resources Conservation Service;

(10) The National Geodetic Survey (formerly known as the Coast and Geodetic Survey) as designated agent for the National Geodetic Survey and the U.S. Geological Survey; and

(11) Any other agencies that have been consulted in preparing the report.

(c) *Certification*. In its Environmental Report, the applicant must certify that it has sent copies of the Environmental Report to the agencies listed and within the

23

time period specified in paragraph (b) of this section and that it has consulted with all appropriate agencies in preparing the report. These consultations should be made far enough in advance to afford those agencies a reasonable opportunity to provide meaningful input. Finally, in every abandonment exemption case, applicant shall certify that it has published in a newspaper of general circulation in each county through which the line passes a notice that alerts the public to the proposed abandonment, to available reuse alternatives, and to how it may participate in the STB proceeding.

(d) *Documentation*. Any written responses received from agencies that were contacted in preparing the Environmental Report shall be attached to the report. Oral responses from such agencies shall be briefly summarized in the report and the names, titles, and telephone numbers of the persons contacted shall be supplied. A copy of, or appropriate citation to, any reference materials relied upon also shall be provided.

(e) *Content*. The Environmental Report shall include all of the information specified in this paragraph, except to the extent that applicant explains why any portion(s) are inapplicable. If an historic report is required under § 1105.8, the Environmental Report should also include the Historic Report required by that section.

(1) *Proposed action and alternatives*. Describe the proposed action, including commodities transported, the planned disposition (if any) of any rail line and other structures that may be involved, and any possible changes in current operations or maintenance practices. Also describe any reasonable alternatives to the proposed action. Include a readable, detailed map and drawings clearly delineating the project.

(2) *Transportation system*. Describe the effects of the proposed action on regional or local transportation systems and patterns. Estimate the amount of traffic (passenger or freight) that will be diverted to other transportation systems or modes as a result of the proposed action.

(3) *Land use*. (i) Based on consultation with local and/or regional planning agencies and/or a review of the official planning documents prepared by such agencies, state whether the proposed action is consistent with existing land use plans. Describe any inconsistencies.

(ii) Based on consultation with the U.S. Soil Conservation Service, state the effect of the proposed action on any prime agricultural land.

24

(iii) If the action affects land or water uses within a designated coastal zone, include the coastal zone information required by § 1105.9.

(iv) If the proposed action is an abandonment, state whether or not the right-of-way is suitable for alternative public use under 49 U.S.C. 10905 and explain why.

(4) *Energy*. (i) Describe the effect of the proposed action on transportation of energy resources.

(ii) Describe the effect of the proposed action on recyclable commodities.

(iii) State whether the proposed action will result in an increase or decrease in overall energy efficiency and explain why.

(iv) If the proposed action will cause diversions from rail to motor carriage of more than:

(A) 1,000 rail carloads a year; or

(B) An average of 50 rail carloads per mile per year for any part of the affected line, quantify the resulting net change in energy consumption and show the data and methodology used to arrive at the figure given. To minimize the production of repetitive data, the information on overall energy efficiency in § 1105.7(e)(4)(iii) need not be supplied if the more detailed information in § 1105.7(e)(4)(iv) is required.

(5) *Air*. (i) If the proposed action will result in either:

(A) An increase in rail traffic of at least 100 percent (measured in gross ton miles annually) or an increase of at least eight trains a day on any segment of rail line affected by the proposal, or

(B) An increase in rail yard activity of at least 100 percent (measured by carload activity), or

(C) An average increase in truck traffic of more than 10 percent of the average daily traffic or 50 vehicles a day on any affected road segment, quantify the anticipated effect on air emissions. For a proposal under 49 U.S.C. 10901 (or 10502) to construct a new line or reinstitute service over a previously abandoned line, only the eight train a day provision in subsection (5)(i)(A) will apply.

25

(ii) If the proposed action affects a class I or nonattainment area under the Clean Air Act, and will result in either:

(A) An increase in rail traffic of at least 50 percent (measured in gross ton miles annually) or an increase of at least three trains a day on any segment of rail line,

(B) An increase in rail yard activity of at least 20 percent (measured by carload activity), or

(C) An average increase in truck traffic of more than 10 percent of the average daily traffic or 50 vehicles a day on a given road segment, then state whether any expected increased emissions are within the parameters established by the State Implementation Plan. However, for a rail construction under 49 U.S.C. 10901 (or 49 U.S.C. 10502), or a case involving the reinstitution of service over a previously abandoned line, only the three train a day threshold in this item shall apply.

(iii) If transportation of ozone depleting materials (such as nitrogen oxide and freon) is contemplated, identify: the materials and quantity; the frequency of service; safety practices (including any speed restrictions); the applicant's safety record (to the extent available) on derailments, accidents and spills; contingency plans to deal with accidental spills; and the likelihood of an accidental release of ozone depleting materials in the event of a collision or derailment.

(6) *Noise.* If any of the thresholds identified in item (5)(i) of this section are surpassed, state whether the proposed action will cause:

(i) An incremental increase in noise levels of three decibels Ldn or more; or

(ii) An increase to a noise level of 65 decibels Ldn or greater. If so, identify sensitive receptors ( e.g., schools, libraries, hospitals, residences, retirement communities, and nursing homes) in the project area, and quantify the noise increase for these receptors if the thresholds are surpassed.

(7) *Safety.* (i) Describe any effects of the proposed action on public health and safety (including vehicle delay time at railroad grade crossings).

(ii) If hazardous materials are expected to be transported, identify: the materials and quantity; the frequency of service; whether chemicals are being transported that, if mixed, could react to form more hazardous compounds; safety practices (including any speed restrictions); the applicant's safety record (to the

26

extent available) on derailments, accidents and hazardous spills; the contingency plans to deal with accidental spills; and the likelihood of an accidental release of hazardous materials.

(iii) If there are any known hazardous waste sites or sites where there have been known hazardous materials spills on the right-of-way, identify the location of those sites and the types of hazardous materials involved.

(8) *Biological resources*. (i) Based on consultation with the U.S. Fish and Wildlife Service, state whether the proposed action is likely to adversely affect endangered or threatened species or areas designated as a critical habitat, and if so, describe the effects.

(ii) State whether wildlife sanctuaries or refuges, National or State parks or forests will be affected, and describe any effects.

(9) *Water*. (i) Based on consultation with State water quality officials, state whether the proposed action is consistent with applicable Federal, State or local water quality standards. Describe any inconsistencies.

(ii) Based on consultation with the U.S. Army Corps of Engineers, state whether permits under section 404 of the Clean Water Act (33 U.S.C. 1344) are required for the proposed action and whether any designated wetlands or 100-year flood plains will be affected. Describe the effects.

(iii) State whether permits under section 402 of the Clean Water Act (33 U.S.C. 1342) are required for the proposed action. (Applicants should contact the U.S. Environmental Protection Agency or the state environmental protection or equivalent agency if they are unsure whether such permits are required.)

(10) *Proposed Mitigation*. Describe any actions that are proposed to mitigate adverse environmental impacts, indicating why the proposed mitigation is appropriate.

(11) *Additional Information for Rail Constructions*. The following additional information should be included for rail construction proposals (including connecting track construction):

(i) Describe the proposed route(s) by State, county, and subdivision, including a plan view, at a scale not to exceed 1:24,000 (7 1/2 minute U.S.G.S. quadrangle map), clearly showing the relationship to the existing transportation network

27

(including the location of all highway and road crossings) and the right-of-way according to ownership and land use requirements.

(ii) Describe any alternative routes considered, and a no-build alternative (or why this would not be applicable), and explain why they were not selected.

(iii) Describe the construction plans, including the effect on the human environment, labor force requirements, the location of borrow pits, if any, and earthwork estimates.

(iv) Describe in detail the rail operations to be conducted upon the line, including estimates of freight (carloads and tonnage) to be transported, the anticipated daily and annual number of train movements, number of cars per train, types of cars, motive power requirements, proposed speeds, labor force, and proposed maintenance-of-way practices.

(v) Describe the effects, including indirect or down-line impacts, of the new or diverted traffic over the line if the thresholds governing energy, noise and air impacts in §§ 1105.7(e)(4), (5), or (6) are met.

(vi) Describe the effects, including impacts on essential public services (e.g., fire, police, ambulance, neighborhood schools), public roads, and adjoining properties, in communities to be traversed by the line.

(vii) Discuss societal impacts, including expected change in employment during and after construction.

(f) *Additional information*. The Board may require applicants to submit additional information regarding the environmental or energy effects of the proposed action.

(g) *Waivers*. The Board may waive or modify, in whole or in part, the provisions of this section where a railroad applicant shows that the information requested is not necessary for the Board to evaluate the environmental impacts of the proposed action.

**50 C.F.R. § 402.02        Definitions.**

*Act* means the Endangered Species Act of 1973, as amended, 16 U.S.C. 1531 et seq.

*Action* means all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas. Examples include, but are not limited to:

   (a) actions intended to conserve listed species or their habitat;

   (b) the promulgation of regulations;

   (c) the granting of licenses, contracts, leases, easements, rights-of-way, permits, or grants-in-aid; or

   (d) actions directly or indirectly causing modifications to the land, water, or air.

*Action area* means all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action.

*Applicant* refers to any person, as defined in section 3(13) of the Act, who requires formal approval or authorization from a Federal agency as a prerequisite to conducting the action.

*Biological assessment* refers to the information prepared by or under the direction of the Federal agency concerning listed and proposed species and designated and proposed critical habitat that may be present in the action area and the evaluation potential effects of the action on such species and habitat.

*Biological opinion* is the document that states the opinion of the Service as to whether or not the Federal action is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat.

*Conference* is a process which involves informal discussions between a Federal agency and the Service under section 7(a)(4) of the Act regarding the impact of an action on proposed species or proposed critical habitat and recommendations to minimize or avoid the adverse effects.

*Conservation recommendations* are suggestions of the Service regarding discretionary measures to minimize or avoid adverse effects of a proposed action on listed species or critical habitat or regarding the development of information.

*Critical habitat* refers to an area designated as critical habitat listed in 50 CFR parts 17 or 226.

29

*Cumulative effects* are those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation.

*Designated non-Federal representative* refers to a person designated by the Federal agency as its representative to conduct informal consultation and/or to prepare any biological assessment.

*Destruction or adverse modification* means a direct or indirect alteration that appreciably diminishes the value of critical habitat as a whole for the conservation of a listed species. Director refers to the Assistant Administrator for Fisheries for the National Marine Fisheries Service, or his or her authorized representative; or the Director of the U.S. Fish and Wildlife Service, or his or her authorized representative.

*Early consultation* is a process requested by a Federal agency on behalf of a prospective applicant under section 7(a)(3) of the Act.

*Effects of the action* are all consequences to listed species or critical habitat that are caused by the proposed action, including the consequences of other activities that are caused by the proposed action. A consequence is caused by the proposed action if it would not occur but for the proposed action and it is reasonably certain to occur. Effects of the action may occur later in time and may include consequences occurring outside the immediate area involved in the action. (See § 402.17).

*Environmental baseline* refers to the condition of the listed species or its designated critical habitat in the action area, without the consequences to the listed species or designated critical habitat caused by the proposed action. The environmental baseline includes the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process. The consequences to listed species or designated critical habitat from ongoing agency activities or existing agency facilities that are not within the agency's discretion to modify are part of the environmental baseline.

*Formal consultation* is a process between the Service and the Federal agency that commences with the Federal agency's written request for consultation under section 7(a)(2) of the Act and concludes with the Service's issuance of the biological opinion under section 7(b)(3) of the Act.

*Framework programmatic action* means, for purposes of an incidental take statement, a Federal action that approves a framework for the development of future action(s) that are authorized, funded, or carried out at a later time, and any take of a listed species would not occur unless and until those future action(s) are authorized, funded, or carried out and subject to further section 7 consultation.

*Incidental take* refers to takings that result from, but are not the purpose of, carrying out an otherwise lawful activity conducted by the Federal agency or applicant.

*Informal consultation* is an optional process that includes all discussions, correspondence, etc., between the Service and the Federal agency or the designated non-Federal representative prior to formal consultation, if required.

*Jeopardize the continued existence of* means to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species.

*Listed species* means any species of fish, wildlife, or plant which has been determined to be endangered or threatened under section 4 of the Act. Listed species are found in 50 CFR 17.11-17.12.

*Major construction activity* is a construction project (or other undertaking having similar physical impacts) which is a major Federal action significantly affecting the quality of the human environment as referred to in the National Environmental Policy Act [NEPA, 42 U.S.C. 4332(2)(C)].

*Mixed programmatic action* means, for purposes of an incidental take statement, a Federal action that approves action(s) that will not be subject to further section 7 consultation, and also approves a framework for the development of future action(s) that are authorized, funded, or carried out at a later time and any take of a listed species would not occur unless and until those future action(s) are authorized, funded, or carried out and subject to further section 7 consultation.

*Preliminary biological opinion* refers to an opinion issued as a result of early consultation.

*Programmatic consultation* is a consultation addressing an agency's multiple actions on a program, region, or other basis. Programmatic consultations allow the Services to consult on the effects of programmatic actions such as:

(1) Multiple similar, frequently occurring, or routine actions expected to be implemented in particular geographic areas; and

31

(2) A proposed program, plan, policy, or regulation providing a framework for future proposed actions.

*Proposed critical habitat* means habitat proposed in the Federal Register to be designated or revised as critical habitat under section 4 of the Act for any listed or proposed species.

*Proposed species* means any species of fish, wildlife, or plant that is proposed in the Federal Register to be listed under section 4 of the Act.

*Reasonable and prudent alternatives* refer to alternative actions identified during formal consultation that can be implemented in a manner consistent with the intended purpose of the action, that can be implemented consistent with the scope of the Federal agency's legal authority and jurisdiction, that is economically and technologically feasible, and that the Director believes would avoid the likelihood of jeopardizing the continued existence of listed species or resulting in the destruction or adverse modification of critical habitat.

*Reasonable and prudent measures* refer to those actions the Director believes necessary or appropriate to minimize the impacts, i.e., amount or extent, of incidental take.

*Recovery* means improvement in the status of listed species to the point at which listing is no longer appropriate under the criteria set out in section 4(a)(1) of the Act.

*Service* means the U.S. Fish and Wildlife Service or the National Marine Fisheries Service, as appropriate.