NOT YET SCHEDULED FOR ORAL ARGUMENT

No. 22-1019 (consolidated with No. 22-1020)

———————————————

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————————

EAGLE COUNTY, COLORADO, et al.,
*Petitioners*,

v.

SURFACE TRANSPORTATION BOARD, et al.,
*Respondents*, and

SEVEN COUNTY INFRASTRUCTURE COALITION, et al.,
*Respondent-Intervenors*.

———————————————

On Petition For Review of Orders of
the Surface Transportation Board

———————————————

**PROOF BRIEF FOR RESPONDENTS
U.S. FISH AND WILDLIFE SERVICE AND
UNITED STATES OF AMERICA**

———————————————

                              TODD KIM
                              *Assistant Attorney General*

                              ANDREW M. BERNIE
                              JUSTIN D. HEMINGER
Of Counsel:                   *Attorneys*
                              Environment and Natural Resources Division
C. ANDRES RUEDAS              U.S. Department of Justice
SARA COPE                     Post Office Box 7415
*Attorneys*                   Washington, D.C. 20044
Office of the Solicitor       (202) 514-5442
U.S. Department of the Interior   justin.heminger@usdoj.gov

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.     Parties and Amici

All parties, intervenors, and amici appearing in this Court are listed in the

Brief for Petitioners Center for Biological Diversity, et al. (the Center) except for

the parties that filed an amicus brief on October 28, 2022:

> City of Glenwood Springs, Colorado; Town of Minturn, Colorado;
> Town of Avon, Colorado; Town of Red Cliff, Colorado; Town of
> Vail, Colorado; Routt County, Colorado; Boulder County, Colorado;
> Chaffee County, Colorado; Lake County, Colorado; and Pitkin
> County, Colorado

### B.     Rulings Under Review

The three rulings at issue in these consolidated petitions for review are:

- The Surface Transportation Board's January 5, 2021 order, JA____-
  ____, challenged by Petitioner Eagle County, Colorado in No. 22-1019
  (the County);

- The Surface Transportation Board's December 15, 2021 order, JA____-
  ____, challenged both by the County in No. 22-1019, and by Petitioners
  Center for Biological Diversity, et al. (collectively, the Center) in No.
  22-1020; and

- The U.S. Fish and Wildlife Service's September 20, 2021 Biological
  Opinion for the Seven County Infrastructure Coalition—Uinta Basin
  Railway project proposal, FWS_1795-1869, challenged by the Center in
  No. 22-1020.

## C.  Related Cases

Petitioner Center for Biological Diversity (the Center) has petitioned for review of an independent decision by the U.S. Forest Service granting a special use permit, authorizing a right-of-way through the Ashley National Forest for the construction, operation, and maintenance of the Uinta Basin Railway. *See Center for Biological Diversity, et al. v. U.S. Forest Service & United States of America*, No. 22-1237 (D.C. Cir.) (the Forest Service Case). The Center designated the Forest Service Case as related to these consolidated petitions for review under Circuit Rule 28(a)(1)(C). Respondents' position is that this Court lacks statutory subject matter jurisdiction over the Forest Service Case. *See* U.S. Forest Service's Response in Support of Intervenors' Motion to Dismiss, *Center for Biological Diversity v. U.S. Forest Service*, No. 22-1237, Doc. 1973550 (D.C. Cir. Nov. 14, 2022).

/s/ *Justin D. Heminger*
JUSTIN D. HEMINGER

Counsel for Respondents U.S. Fish and Wildlife Service and United States of America

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED
    CASES ................................................................................................ i

TABLE OF AUTHORITIES ............................................................... iv

GLOSSARY ......................................................................................... vi

INTRODUCTION .................................................................................. 1

STATEMENT OF JURISDICTION ...................................................... 1

STATEMENT OF THE ISSUES ........................................................... 2

PERTINENT STATUTES AND REGULATIONS ................................ 2

STATEMENT OF THE CASE ............................................................... 2

    A.    The Endangered Species Act ................................................. 2

    B.    Factual background ................................................................. 4

SUMMARY OF ARGUMENT .............................................................. 5

ARGUMENT .......................................................................................... 5

I.    The Center lacks standing to challenge the Biological Opinion .................... 5

II.    The Service reasonably examined the effects of the proposed
    project on listed species and designated critical habitat. ................................ 8

CONCLUSION ..................................................................................... 15

CERTIFICATE OF COMPLIANCE .................................................... 16

ADDENDUM ......................................................................................... 1

# TABLE OF AUTHORITIES

## Cases

*American Wildlands v. Kempthorne,*
    530 F.3d 991 (D.C. Cir. 2008)..........................................................................8

*City of Tacoma v. FERC,*
    460 F.3d 53 (D.C. Cir. 2006)......................................................................2, 8

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.,*
    698 F.3d 1101 (9th Cir. 2012).......................................................................13

*DaimlerChrysler v. Cuno,*
    547 U.S. 332 (2006)........................................................................................6

*Defenders of Wildlife v. Jewell,*
    815 F.3d 1 (D.C. Cir. 2016)............................................................................8

*Defs. of Wildlife v. U.S. Dep't of Navy,*
    733 F.3d 1106 (11th Cir. 2013).....................................................................13

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,*
    528 U.S. 167 (2000)........................................................................................6

*Friends of the Wild Swan v. Weber,*
    767 F.3d 936 (9th Cir. 2014)...............................................................9, 11, 13

*Grocery Mfrs. Ass'n v. EPA,*
    693 F.3d 169 (D.C. Cir. 2012)........................................................................7

*Nat'l Fam. Farm Coal. v. EPA,*
    966 F.3d 893 (9th Cir. 2020)....................................................................9, 11

*In re Operation of Mo. River Sys. Litig.,*
    421 F.3d 618 (8th Cir. 2005).........................................................................14

*In re Polar Bear Endangered Species Act Listing and Section 4(d)*
    *Rule Litigation,*
    709 F.3d 1 (D.C. Cir. 2013)..........................................................................15

*Pub. Citizen, Inc. v. NHTSA*,
    513 F.3d 234 (D.C. Cir. 2008)....................................................................7

*San Luis & Delta-Mendota Water Authority v. Jewell*,
    747 F.3d 581 (9th Cir. 2014) ...................................................................14

*Summers v. Earth Island Inst.*
    555 U.S. 488 (2009)....................................................................................6

## Statutes

Endangered Species Act
    16 U.S.C. § 1533.........................................................................................2

    16 U.S.C. § 1536(a)(2) ..........................................................................3, 15

## Federal Regulations

50 C.F.R. § 17.11 ............................................................................................3

50 C.F.R. § 402.01(b) .....................................................................................3

50 C.F.R. § 402.02 .......................................................................................3, 9

50 C.F.R. § 402.13(a).......................................................................................3

50 C.F.R. § 402.14(b)(1) .................................................................................3

50 C.F.R. § 402.14(g)(1)................................................................................14

50 C.F.R. § 402.14(g)(2)-(3)...........................................................................3

50 C.F.R. § 402.14(g)(4)..................................................................................3

50 C.F.R. § 402.14(h)(1)(iv)(A) ......................................................................3

# GLOSSARY

APA                    Administrative Procedure Act

EIS                     Environmental Impact Statement

ESA                    Endangered Species Act

NEPA                National Environmental Policy Act

## INTRODUCTION

Petitioners in Case No. 22-1020 (collectively, the Center) challenge the Biological Opinion issued by Respondent U.S. Fish and Wildlife Service (the Service) for a new proposed railroad in Utah. The Center lacks standing for that challenge. Even if the Center had standing, its lone objection to the Biological Opinion should be rejected because the Service fully complied with the Endangered Species Act (ESA). The Service properly examined the effects of the proposed project on four ESA-listed fish species in affected areas of the Upper Colorado River Basin—the Colorado pikeminnow, razorback sucker, humpback chub, and bonytail (the Colorado River fishes). The Biological Opinion is reasonable and supported by the record, and the Service's expert judgments are entitled to deference.[1]

## STATEMENT OF JURISDICTION

The Court directed the parties to address whether it has jurisdiction to directly review and grant relief as to the Biological Opinion. Order (July 8, 2022). This Court has statutory subject-matter jurisdiction to directly review the Biological Opinion, and the Service is a proper respondent, because the Surface Transportation Board (the Board) relied on the Biological Opinion and

---

[1] Respondents U.S. Fish and Wildlife Service and United States of America take no position on the issues presented by the petitions for review of the Surface Transportation Board's decisions.

1

incorporated it into its final Order, and this Court has exclusive jurisdiction to review that Order. *See City of Tacoma v. FERC*, 460 F.3d 53, 76 (D.C. Cir. 2006) (biological opinion relied on by FERC subject to exclusive review in the court of appeals). But the Center lacks Article III standing to challenge the Biological Opinion. *See* Argument Point I.

## STATEMENT OF THE ISSUES

1.     Whether the Center lacks associational standing to challenge the Biological Opinion, when its members raise only vague concerns about future third-party oil development and oil-spill risks that are remote and unconnected to their asserted interest in the Colorado River fishes.

2.     Whether the Service adequately examined the direct and indirect effects of the proposed action on the Colorado River fishes, when downline rail traffic on the existing Union Pacific Line would have no reasonably foreseeable impacts on those fishes.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are in the Addendum.

## STATEMENT OF THE CASE

### A.     The Endangered Species Act

The ESA provides for the listing of species as "threatened" or "endangered" and for designating critical habitat for listed species. *See* 16 U.S.C. § 1533. The

Secretary of the Interior is responsible for listing freshwater species and for designating their critical habitat, responsibilities that she discharges through the Service. 50 C.F.R. §§ 17.11, 402.01(b).

Each federal agency, in consultation with the Service, must "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of" a listed species or "result in the destruction or adverse modification" of designated critical habitat. 16 U.S.C. § 1536(a)(2). The agency proposing to act (the action agency) must first determine whether its action "may affect" a listed species or critical habitat, either in a biological assessment or through informal consultation with the Service. 50 C.F.R. § 402.14. Formal consultation is required when either the action agency or the Service concludes that the proposed action is "likely to adversely affect any listed species or critical habitat." *Id*. §§ 402.14(b)(1), 402.13(a).

After formal consultation, the Service issues a biological opinion addressing whether the action is "likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat." *Id*. §§ 402.14(g)(4), (h)(1)(iv)(A). The opinion evaluates the "status of the species" and the "effects of the action" that will be added to the "environmental baseline." *Id*. §§ 402.14(g)(2)-(3), 402.02. The Service must use "the best scientific and commercial data available" to formulate its opinion. 16 U.S.C. § 1536(a)(2).

## B.    Factual background

The proposed project is an 85-mile-long rail line in Utah that would create a

new rail connection between the Uinta Basin in northeastern Utah and the existing

interstate freight rail network near Kyune, Utah. FWS1798.

For more than two years, the federal government thoroughly studied the

proposed project's effects on federally listed species. FWS1797-98. In March

2021, the Board finalized the Biological Assessment and sought formal

consultation with the Service on the three action alternatives studied in the

National Environmental Policy Act (NEPA) process. FWS1798; FWS531-644.

The Board identified an action area for the Colorado fishes that covered areas of

the Upper Colorado River Basin that would be affected by water depletions.

FWS560-61, FWS597. Meanwhile, during preparation of the Environmental

Impact Statement (EIS) under NEPA, the Board considered comments from the

Center and other interested parties about biological resources. FWS1229-30. Those

comments led the Board to conduct more analysis of the potential impacts on the

Colorado River fishes from rail traffic "downline" on the existing Union Pacific

Line. FWS1161. After more analysis and consultation between the Service and the

Board, the Service issued the Biological Opinion in September 2021. FWS1795-

1869.

## SUMMARY OF ARGUMENT

1.    The Center lacks standing to challenge the Biological Opinion. Its member declarations that discuss the Colorado River fishes raise speculative assertions about the risk of future oil spills that fail to show that a member of the Center will suffer any concrete and imminent injury.

2.    In any event, the Center's lone objection to the Biological Opinion lacks merit. The Center asserts that the Service and the Board should have examined potential impacts to the Colorado River fishes from trains operating downline on the existing Union Pacific Line. But the agencies rationally defined the action area for fish to cover construction and operation of the proposed project. The Board explained why the expansive downline analysis sought by the Center was unnecessary. In any event, the Board did analyze the potential impacts of downline operations on the fish and reasonably concluded that they were not a concern. The Service rationally relied on the Board's analysis and conclusion when issuing the Biological Opinion.

## ARGUMENT

## I.    The Center lacks standing to challenge the Biological Opinion.

The Center asserts only associational standing, so it must show that at least one of its members will suffer an injury in fact that is "concrete and particularized" and "actual or imminent," is "fairly traceable to the challenged action," and is

likely to be redressed by a favorable court decision. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000). Where, as here, the Center is not "the object of the government action," standing is "ordinarily substantially more difficult to establish." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (cleaned up). The Center must show standing for each claim it pleads, including for its separate ESA claim challenging the Service's Biological Opinion. *DaimlerChrysler v. Cuno*, 547 U.S. 332, 352 (2006).

The Center has not shown standing for its ESA claim challenging the Service's decision. The Center's claim is that the Service should have included downline impacts in the action area for the Colorado River fishes, focusing on the risk of oil spills into the rivers these fish inhabit. Center Br. 40-44. Yet none of the Center's standing declarations shows how a member is likely to suffer an imminent and concrete injury connected to the fishes—for example, by diminishing aesthetic enjoyment of those fishes. *See* Center Br. 3-4; Center Addendum 27-129, Standing Declarations.

On that score, no declaration asserts that construction and operation of the 85-mile rail line approved by the Board will inflict an imminent and concrete injury on a member's ability to enjoy the Colorado River fishes. Instead, several declarations briefly discuss the risk of a future oil spill on the existing Union Pacific Line that might harm the fishes if it reached the Colorado River. Henley

Decl. ¶¶ 17-19; Nichols ¶¶ 15, 18-19; Weisheit ¶¶ 20-22, 27-30. But these assertions fail to satisfy this Court's standard for showing an increased risk of future harm, which requires both (i) a "substantially increased risk of harm," and (ii) a "substantial probability of harm with that increase taken into account." *Pub. Citizen, Inc. v. NHTSA*, 513 F.3d 234, 237 (D.C. Cir. 2008) (cleaned up). For example, one declarant enjoys viewing the Colorado River fishes, but offers only vague assertions that more trains downline will "increase the risk of spills" that purportedly would endanger those fish. Weisheit ¶ 27; *id.* ¶ 30 ("I feel spiritual harm when I see dead fish on the water, and worry these incidents will increase with the railway, because the conditions that are killing them are also endangering us humans."). Another declarant fails to connect a potential risk of harm to the fishes to a concrete and imminent injury to the declarant. Nichols Decl. ¶ 19 ("I value the existence of these fish species and the healthy streams they need to survive."); *see also* Henley Decl. ¶¶ 17-19 (hypothesizing that a train accident "could cause tank cars and oil to reach the River").

Likewise, the risk that a future oil spill on the existing Union Pacific Line could adversely affect the Colorado River fishes depends on third parties taking a string of theoretical future actions. *See Grocery Mfrs. Ass'n v. EPA*, 693 F.3d 169, 176 (D.C. Cir. 2012) (petitioners failed to "drag their claims across the causation threshold" where the injury "depend[ed] upon the acts of third parties not before

the court"). The Center has not shown a "substantial probability," *id*., that the Service's Biological Opinion will cause third-party conduct that inflicts a concrete, imminent injury on the Center's members. In sum, the Center's ESA claim challenging the Biological Opinion should be dismissed for lack of standing.

## II.    The Service reasonably examined the effects of the proposed project on listed species and designated critical habitat.

If the Center has standing, this Court should uphold the Biological Opinion. Review of the Service's decisions under the Administrative Procedure Act (APA) is "highly deferential and presumes agency action to be valid." *Defenders of Wildlife v. Jewell*, 815 F.3d 1, 9 (D.C. Cir. 2016). Under the APA, the Biological Opinion "must be upheld as long as" the Service "considered the relevant factors and articulated a rational connection between the facts found and the choice made." *City of Tacoma*, 460 F.3d at 140. This Court defers to the Service's expert judgment when it is "evaluating scientific data within its technical expertise." *American Wildlands v. Kempthorne*, 530 F.3d 991, 1000-01 (D.C. Cir. 2008).

The Service prepared a detailed Biological Opinion for the Board's action on the proposed project. FWS1795-1869. As to the four federally listed fish species in the affected area of the Upper Colorado River Basin, the Service concluded that the proposed project is not likely to jeopardize the continued existence of the species or result in destruction or adverse modification of designated critical habitat. FWS1843. The Center raises no challenge to the Service's analysis and

conclusions for any species, including the Colorado River fishes, within the project action area that the Service studied. Center Br. 40-44.

The Center's single objection to the Biological Opinion is that the Service should have more broadly defined the action area to include the portion of the existing Union Pacific Line between Kyune, Utah, and Denver, Colorado because of the alleged increase in spills and leaks that may be caused by trains operating downline. Center Br. 40-44. That objection lacks merit for three reasons.

*First*, courts "accord deference" to agencies "in the way" they choose "to define the action area." *Nat'l Fam. Farm Coal. v. EPA*, 966 F.3d 893, 927 (9th Cir. 2020); *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 950 (9th Cir. 2014) (The choice of "appropriate action areas requires application of scientific methodology and, as such, is within the agency's discretion."). The Board and the Service reasonably defined the action area for the proposed project, properly capturing the direct and indirect effects of the proposed project on the Colorado River fishes. FWS560; FWS1807. The ESA regulations define "action area" to mean "all areas to be affected directly or indirectly *by the Federal action* and not merely the immediate area involved in the action." 50 C.F.R. § 402.02 (emphasis added). The *Federal action* here is the Board's approval of the proposed rail line. Thus, in its Biological Assessment, the Board rationally defined the action area to include the "project footprint plus all areas surrounding the project footprint where

construction or operations activities could potentially affect the environment, either directly, indirectly, or through interrelated or interdependent actions." FWS560. Then the Board more precisely described distinct action areas for plant, fish, and wildlife species. FWS560-561.

The Board's normal practice is to examine an action area for fish that includes streams and other surface waters in the project footprint and a limited distance upstream and downstream of the proposed rail line where potential water quality and hydrology impacts from construction and operations would affect fish and fish habitat. FWS561. Here, though, the Board adhered to the Service's consultation guidance by defining the action area for the four federally listed species (the Colorado River fishes) to be the areas of the Upper Colorado River Basin affected by water depletion. FWS560-61, FWS597. Defining this particular action area for fish to cover the affected area of the Basin ensured that the Board captured surface and groundwater depletions from the Basin that could affect the fishes. FWS561.

After evaluating the Board's proposed action area, the Service agreed with that delineation, identifying a similar action area in the Biological Opinion. FWS1807. The Service first defined the proposed *action* to include both construction and operation of the railroad. FWS1798-1802. Then the Service rationally defined the action area for plant and fish species to capture the potential

10

direct and indirect effects from the railroad's construction and operation. FWS1807. The Service defined the action area as: (1) the entire project footprint, (2) a 300-foot buffer around the project footprint, and (3) the area of the Upper Colorado River Basin affected by water depletions. FWS1807. Given the deferential lens through which this Court reviews an agency's definition of the action area, the Service's expert judgment should be upheld. *See Nat'l Family Farm*, 966 F.3d at 927; *Weber*, 767 F.3d at 950.

The Center inaccurately asserts that the Service limited its effects analysis for the Colorado River fishes to "construction-related water depletion impacts." Center Br. 40. The Service did much more than that in the Biological Opinion. The Service (1) described the status of the fishes, (2) identified the environmental baseline, (3) discussed factors affecting the fishes, (4) analyzed the direct and indirect effects of construction and operation of the proposed rail line on the fishes, and (5) examined cumulative effects on the fishes. FWS1818-1820; FWS1823-1827; FWS1830-32; FWS1838-1839; FWS1840-41. After fully evaluating both construction and operation impacts within the action area, the Service rationally concluded that the proposed project was not likely to jeopardize the fishes or result in destruction or adverse modification of designated critical habitat. FWS1843.

*Second*, the Board fully addressed the Center's position that the Board should have examined potential downline impacts on the Colorado River fishes.

11

FWS1161, FWS1229-30. Responding to the Center's comments on the draft EIS, the Board gave six reasons why it usually would *not* assess impacts to biological resources that could occur along existing rail lines downline of the proposed rail. FWS1229-30. That explanation is rational and sufficient by itself to dismiss the Center's argument, for the reasons just explained. Yet the Board went the extra step of actually analyzing potential impacts from operations downline on the existing rail line to confirm there would not be impacts on ESA-listed species. FWS1161.

The Board first noted that the existing Union Pacific Line already crosses and closely parallels critical habitat for the fish. FWS1161. Then the Board observed that this Line is an active rail line, in operation for many years, so impacts from rail operations on fish "have occurred and would continue to occur." *Id*. The Board found that adding up to 9.5 more trains per day on the Line "would not substantially change the severity of those impacts" and would not introduce a new pollution source. *Id*. The Board also recognized that if a large release of oil occurred on a downline segment crossing or next to critical habitat for ESA-listed fish species, then adverse impacts on the fish would occur. *Id*. But the Board relied on its safety analysis to find that the probability of a large spill is "very low and such an outcome is not reasonably foreseeable." *Id*. Finally, the Board noted that it could not impose any mitigation on the Coalition to address potential downline

impacts. *Id*. At the same time, trains operating on downline segments would be subject to federal regulations applicable to transporting oil, which would minimize potential impacts on listed fish species and critical habitat. *Id*.

In short, even if the Board had misidentified the action area in its original analysis, the Board rationally analyzed potential downline impacts from the Union Pacific Line and concluded they were unlikely to impact the fishes. That is all the ESA requires. *See Weber*, 767 F.3d at 950 (rejecting plaintiff's argument that the action area was too narrowly defined when the Forest Service included the relevant portions of the channel and "gave reasons for selecting the upper and lower limits of the river that are not arbitrary or capricious").

*Third*, the Service reasonably relied on the Board's analysis when issuing the Biological Opinion. FWS1795, FWS1161, FWS1229-30. While the Biological Opinion does not repeat the analysis the Board already conducted, it "makes no difference" to the Court's review that "some of the data supporting" the Biological Opinion "appears in" the Board's "final EIS and biological assessment rather than in the biological opinion itself." *Defs. of Wildlife v. U.S. Dep't of Navy*, 733 F.3d 1106, 1120 n.6 (11th Cir. 2013); *see Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1120 (9th Cir. 2012) (action agency's biological assessment and final EIS were relevant and available for the Service to consider). Indeed, the ESA regulations *required* the Service to evaluate all relevant

13

information from the Board as part of the formal consultation process, including the final EIS. 50 C.F.R. § 402.14(g)(1) (describing the Service's responsibilities during formal consultation to include reviewing "all relevant information provided by the Federal agency or otherwise available").

The Board's analysis is expressly included in the Service's record. FWS1161, FWS1229-30. There is "no requirement that every detail of the agency's decision be stated expressly" in the Biological Opinion. *In re Operation of Mo. River Sys. Litig.*, 421 F.3d 618, 634 (8th Cir. 2005) (cleaned up). "The rationale is present in the administrative record underlying the document, and this is all that is required." *Id*. At the very least, this Court will "uphold a decision of less than ideal clarity" when, as here, the Service's "path may reasonably be discerned" from that record. *San Luis & Delta-Mendota Water Authority v. Jewell*, 747 F.3d 581, 616 (9th Cir. 2014) (cleaned up). Clarity is not lacking here. But if it were, that standard is easily met.

Notwithstanding the Service's reliance on the Board's analysis and the well-established rule that not every detail need be restated in the Biological Opinion, the Center ignores the Board's analysis. Center Br. 40-44. In fact, the Center pretends claims that both agencies disregarded the downline impacts on the Colorado River fishes while failing to acknowledge what the Board actually said (and thus, the Service actually considered) about those impacts. *Id*. At bottom, the Center's

objections boil down to "competing views about policy and science"—views that

the Board rebutted before the Service issued the Biological Opinion. *In re Polar*

*Bear Endangered Species Act Listing and Section 4(d) Rule Litigation*, 709 F.3d 1,

3 (D.C. Cir. 2013). Given the Board's reasonable analysis, the Service complied

with Section 1536(a)(2) of the ESA when it determined that the proposed project

would not jeopardize the Colorado River fishes nor result in destruction or adverse

modification of designated critical habitat for those fishes. FWS1843; *see* 16

U.S.C. § 1536(a)(2).

## CONCLUSION

For all these reasons, the Center's petition for review of the Biological

Opinion should be dismissed for lack of standing or denied on the merits.

Respectfully submitted,

/s/ Justin D. Heminger
TODD KIM
*Assistant Attorney General*

ANDREW M. BERNIE
Of Counsel:                          JUSTIN D. HEMINGER
                                     *Attorneys*
C. ANDRES RUEDAS                     Environment and Natural Resources Division
SARA COPE                            U.S. Department of Justice
*Attorneys*                          Post Office Box 7415
Office of the Solicitor              Washington, D.C. 20044
U.S. Department of the Interior      (202) 514-5442
                                     justin.heminger@usdoj.gov

December 16, 2022
DJ 90-13-4-16537

15

## CERTIFICATE OF COMPLIANCE

1.      This document complies with the type-volume limit of the Court's

order of July 8, 2022 because, excluding the parts of the document exempted by

Federal Rule of Appellate Procedure 32(f) this document contains 3,365 words.

2.      This document complies with the typeface requirements of Federal

Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal

Rule of Appellate Procedure 32(a)(6) because this document has been prepared in

a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times

New Roman font.

/s/ *Justin D. Heminger*
JUSTIN D. HEMINGER

Counsel for Respondents U.S. Fish and
Wildlife Service and United States of
America

# ADDENDUM

Endangered Species Act
     16 U.S.C. § 1536..................................................................................1a

ESA Regulations for Interagency Cooperation
     50 C.F.R. § 402.02..............................................................................2a

**Endangered Species Act**
**16 U.S.C. § 1536**

(a) Federal agency actions and consultations

\*\*\*

(2) Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an "agency action") is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with affected States, to be critical, unless such agency has been granted an exemption for such action by the Committee pursuant to subsection (h) of this section. In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available.

\*\*\*

**Endangered Species Act**
**Regulations for Interagency Cooperation**
**50 C.F.R. § 402.02 – Definitions**

\*\*\*

Action area means all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action.

\*\*\*