**ORAL ARGUMENT NOT YET SCHEDULED**

Nos. 22-1019, 22-1020 (consolidated)

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

EAGLE COUNTY, COLORADO,
Petitioner

v.

SURFACE TRANSPORTATION BOARD, et al.,
Respondents,

and

SEVEN COUNTY INFRASTRUCTURE COALITION, et al.,
Intervenor-Respondents.

———————————

On petition for review of final action
of the Surface Transportation Board

———————————

**INTERVENOR-RESPONDENTS SEVEN COUNTY
INFRASTRCUTRE COALITION AND UINTA
BASIN RAILWAY, LLC'S RESPONSE BRIEF**

———————————

Kathryn Kusske Floyd
Jay C. Johnson
Venable LLP
600 Massachusetts Ave., NW
Washington, DC 20001
(202) 344-4000
jcjohnson@venable.com

Counsel for Intervenor-Respondents Seven County Infrastructure
Coalition and Uinta Basin Railway, LLC

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**Parties.** Petitioners filed two cases, which this Court consolidated. Petitioner in Case No. 22-1019 is Eagle County, Colorado. Petitioners in Case No. 22-1020 are the Center for Biological Diversity, Living Rivers, Sierra Club, Utah Physicians for a Healthy Environment, and WildEarth Guardians. Respondents in the consolidated cases are the Surface Transportation Board, the United States of America, and the U.S. Fish and Wildlife Service. Seven County Infrastructure Coalition and Uinta Basin Railway, LLC have intervened as respondents.

This brief refers to Intervenor-Respondent Seven County Infrastructure Coalition as "Seven County," for short. Seven County was the applicant before the Surface Transportation Board. Intervenor-Respondent Uinta Basin Railway, LLC is the proposed operator of the rail line.

Amici curiae in support of Petitioners are a group of Colorado municipalities: City of Glenwood Springs, Town of Minturn, Town of Avon, Town of Red Cliff, Town of Vail, Routt County, Boulder County, Chaffee County, Lake County, and Pitkin County.

The state of Utah has said that it intends to file an amicus curiae brief in support of Respondents.

i

**Rulings Under Review.** Petitioners seek review of three rulings: (1) the Surface Transportation Board's January 4, 2021 decision preliminarily concluding, subject to the then-ongoing environmental review, that the proposed Uinta Basin Railway met the statutory standards for an exemption under 49 U.S.C. § 10502 (ID-50412); (2) the Surface Transportation Board's December 15, 2021 final decision authorizing construction and operation of the Uinta Basin Railway (ID-51032), and (3) the U.S. Fish and Wildlife Service's September 20, 2021 Biological Opinion (EI-31295), which was prepared in connection with the Surface Transportation Board's final decision.[*]

**Related Cases.** These consolidated cases have not been before another court. Some of the petitioners in Case No. 22-1020 have filed a separate petition in this Court challenging the U.S. Forest Service's decision to grant a right-of-way for the Uinta Basin Railway. *See* Case No. 22-1237. Intervenor-Respondents have moved to dismiss that case for lack of jurisdiction.

---

[*] ID, EI, and EO numbers refer to the Board's March 28, 2022 Record Index.

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND
RELATED CASES ........................................................................... i

TABLE OF CONTENTS ............................................................... iii

TABLE OF AUTHORITIES .......................................................... v

JURISDICTIONAL STATEMENT ............................................... 1

STATEMENT OF ISSUES ............................................................ 2

PERTINENT STATUTES AND RULES ...................................... 3

INTRODUCTION ......................................................................... 4

STATEMENT OF THE CASE ...................................................... 5

    A.    The Seven County Infrastructure Coalition serves the
Uinta Basin. .................................................................... 5

    B.    The Uinta Basin is rich in resources. ............................. 6

    C.    The Uinta Basin Railway creates new access to the
basin. ................................................................................ 7

    D.    The Board approves the project. .................................... 8

SUMMARY OF ARGUMENT .................................................... 10

ARGUMENT ............................................................................... 12

I.    Because Seven County's project promotes rail transportation
policy, it qualifies for an exemption. .................................... 12

    A.    This project will enhance competition, create
opportunity, and remove regulatory barriers. ............ 13

    B.    The Board balanced the project's transportation merits
against its potential environmental harms. ............... 15

iii

C.    The prevailing economic conditions justified the Board's transportation merits opinion. ....................... 20

II.    The Board properly considered both upstream and downstream environmental effects. ..................................... 21

    A.    The Board sought and received information about possible upstream and downstream effects. ............... 22

    B.    Neither new wells nor refinery emissions are reasonably foreseeable effects of the project.............. 23

        1.    New oil wells are too unpredictable to be an indirect effect of the project............................... 24

        2.    Refinery emissions are too uncertain to be an indirect effect of the project............................... 27

    C.    The Board weighed potential new wells and refinery emissions as cumulative effects. .................................. 29

    D.    The Board's decision accounted for the possibility of landslides during construction. ................................... 31

III.    The Board identified and analyzed downline effects. ........................................................................ 33

    A.    The Board calculated downline traffic and disclosed its potential environmental effects.................................. 34

    B.    The Board's downline analysis satisfied the Endangered Species Act. ............................................. 39

    C.    The Board's downline analysis satisfied the National Historic Preservation Act. ........................................... 42

CONCLUSION ............................................................................ 44

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alaska Survival v. Surface Transp. Bd.*,
  705 F.3d 1073 (9th Cir. 2013) ............................................15, 20

*Birckhead v. FERC*,
  925 F.3d 510 (D.C. Cir. 2019)....................... 11, 22, 23, 25, 26, 31

*Cal. High-Speed Rail Auth.—Constr. Exemption—In Fresno, Kings, Tulare & Kern Counties, Cal.*, Dkt. No. FD 35724, 2014 WL 3973120 (STB Aug. 11, 2014)............................................................ 16

*Cal. High-Speed Rail Auth.—Constr. Exemption— Merced, Madera & Fresno Counties, Cal.*, Dkt. No. FD 35724, 2013 WL 3053064 (STB June 13, 2013) ............................................................ 19

*City of Tacoma v. FERC*,
  460 F.3d 53 (D.C. Cir. 2006) ...................................................... 1

*Defenders of Wildlife v. U.S. Dep't of Navy*,
  733 F.3d 1106 (11th Cir. 2013) ................................................ 41

*Del. Riverkeeper Network v. FERC*,
  45 F.4th 104 (D.C. Cir. 2022) ...........................10, 25, 27, 28, 29

*Food & Water Watch v. FERC*,
  28 F.4th 277 (D.C. Cir. 2022)............................................23, 27

*Gateway W. Ry. Co.—Constr. Exemption—St. Clair Cnty., Ill.*, Fin. Dkt. No. 32158, 1993 WL 158814 (ICC April 26, 1993) .................................................. 15

*Ill. Com. Comm'n v. ICC*,
  787 F.2d 616 (D.C. Cir. 1986)................................................. 14

*Mid-States Coal. for Progress v. Surface Transp. Bd.*,
    345 F.3d 520 (8th Cir. 2003) .........................................10, 12, 17

*Nat'l Ass'n of Regul. Util. Comm'rs v. FERC*,
    475 F.3d 1277 (D.C. Cir. 2007).................................................. 15

*Nevada v. Dept. of Energy*,
    457 F.3d 78 (D.C. Cir. 2006) ...............................................18, 42

*New York v. Nuclear Regul. Comm'n*,
    681 F.3d 471 (D.C. Cir. 2012)........................................11, 35, 38

*Pub. Citizen, Inc. v. NHTSA*,
    513 F.3d 234 (D.C. Cir. 2008).................................................. 40

*Public Employees for Environmental Responsibility v.
    Hopper*,
    827 F.3d 1077 (D.C. Cir. 2016).................................................. 32

*Riverview Trenton R.R. Co.—Petition for Exemption*,
    Fin. Dkt. No. 34040, 2003 WL 21108179 (STB May
    9, 2003) .................................................................................. 19

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989) .................................................................. 36

*Sierra Club v. FERC*,
    827 F.3d 36 (D.C. Cir. 2016) .................................................... 37

*Sierra Club v. FERC (Sabal Trail)*,
    867 F.3d 1357 (D.C. Cir. 2017)................................21, 22, 27, 28

*Theodore Roosevelt Conservation Partnership v.
    Salazar*,
    616 F.3d 497 (D.C. Cir. 2010).................................................. 33

*Vill. of Palestine v. ICC*,
    936 F.2d 1335 (D.C. Cir. 1991)......................................13, 14, 15

vi

**Statutes**

28 U.S.C. § 2321(a) .......................................................................... 1

28 U.S.C. § 2342(5) .......................................................................... 1

49 U.S.C. § 10101...................................................................10, 13

49 U.S.C. § 10101(8) ...................................................................... 17

49 U.S.C. § 10101(11) .................................................................... 17

49 U.S.C. § 10502(a) ...................................................................... 13

49 U.S.C. § 10502(a)(2) .................................................................. 13

49 U.S.C. § 10901............................................................................ 13

**Regulations**

40 C.F.R. § 1508.8 (2019).............................................................. 10

40 C.F.R. § 1508.8(b)...................................................................... 24

49 C.F.R. § 1105.7(e)(5) ................................................................. 34

49 C.F.R. § 1105.7(e)(6) ................................................................. 34

49 C.F.R. § 1105.7(e)(11)(v) .......................................................... 34

50 C.F.R. § 402.02 (2019)........................................................40, 41

84 Fed. Reg. 28611 (June 19, 2019)................................................ 8

**Other Authorities**

Union Pac. R.R. Co., *Denver & Rio Grande Western
    Colors Again Ride the Rails* (June 19, 2006),
    https://www.uprr.com/newsinfo/releases/heritage_an
    d_steam/2006/0619_drgw.shtml ............................................... 43

## JURISDICTIONAL STATEMENT

Intervenor-Respondents do not contest the Court's jurisdiction over these petitions. *See* 28 U.S.C. §§ 2342(5), 2321(a) (granting the courts of appeals jurisdiction over challenges to Surface Transportation Board orders); *City of Tacoma v. FERC*, 460 F.3d 53, 140 (D.C. Cir. 2006) (assuming jurisdiction over a challenge to a Biological Opinion that was "prepared in the course of" a proceeding properly filed in the court of appeals). But Intervenor-Respondents agree with the U.S. Fish and Wildlife Service that Petitioners lack standing to challenge the Service's Biological Opinion. *See infra* at 40 & n.11; USFWS Br. at 5-8.

## STATEMENT OF ISSUES

1.     The ICC Termination Act creates a presumption in favor of rail construction. Here, after reviewing both the transportation merits and the environmental effects of a new rail line proposed by Intervenor-Respondent Seven County Infrastructure Coalition, the Surface Transportation Board authorized its construction and operation. Under the Administrative Procedure Act, was the Board's decision arbitrary and capricious?

2.     An agency's environmental review under the National Environmental Policy Act must consider the reasonably foreseeable effects of a project. For a transportation project like this proposed rail line, that means effects must be predictable, not speculative. Applying this standard, are new oil wells in the Uinta Basin and oil refining along the Gulf Coast reasonably foreseeable?

3.     When defined traffic thresholds are exceeded, the Surface Transportation Board addresses rail traffic effects on lines beyond the one being built. This downline traffic, Petitioners say, increases environmental risks. Do the Board's rules, the Endangered Species Act, or the National Historic Preservation Act require the Board to study such risks, even if any potential effects are neither significant nor reasonably certain to occur?

2

## PERTINENT STATUTES AND RULES

All applicable statutes and rules appear in the addendums filed with the Petitioners' briefs.

## INTRODUCTION

The Uinta Basin is an isolated empire. It is surrounded, as its name suggests, by mountain ranges and plateaus. No freeways go in or out, just two-lane roads that were not built for freight. But the basin is rich in resources, including phosphate, natural asphalt, and aggregate, as well as natural gas, coal, and oil. The soil is rich too, supporting alfalfa, corn, and cattle ranching.

The Uinta Basin Railway aims to end the basin's isolation and let the empire's economy grow. While railroads of the past diverted around the basin's terrain, the Uinta Basin Railway will link the basin's communities to the national rail network. Oil producers, farmers, ranchers, and miners will all have more opportunities. The goal is a more robust, more diverse economy for local communities in the basin.

That goal fits with the national rail transportation policy, which encourages new rail lines that create competition and strengthen the transportation system. So, after thoroughly reviewing its environmental effects, the Surface Transportation Board approved the Uinta Basin Railway. That approval does not guarantee economic growth. But it does offer better access, and that is all the basin's communities ask.

## STATEMENT OF THE CASE

Infrastructure is perpetually in the news, for good reason. Without strong infrastructure—highways, train tracks, transmission lines, water lines, and much more—the whole economy slows. This case involves a new piece of infrastructure in a part of Utah that has long lacked it: the Uinta Basin.

### A.    The Seven County Infrastructure Coalition serves the Uinta Basin.

The Seven County Infrastructure Coalition is a political subdivision of Utah that finds and develops infrastructure projects for its members: Carbon, Daggett, Duchesne, Emery, San Juan, Sevier, and Uintah Counties. ID-300676 at 5 (Seven County Petition for Exemption). These seven counties occupy some of Utah's most remote areas. They joined forces to bring new infrastructure to those areas—infrastructure that will help the counties use their natural resources to benefit their citizens without sacrificing environmental protections. *Id.*

The seven-county area is also home to the Ute Indian Tribe of the Uintah and Ouray Reservation. The Ute Tribe will benefit from any infrastructure that Seven County builds, and it plans to sign a Memorandum of Agreement specific to the Uinta Basin Railway

project. *Id.* at 6. The tribe also wrote the Surface Transportation Board to support the project. *See* ID-303060, EI-31257.

Seven County will not operate the railway. It has instead found a private developer to finance, commercialize, and operate the line. ID-300676 at 37 (Verified Statement of Michael J. McKee); ID-50896 at 2-1 (FEIS).[1] That developer, Uinta Basin Railway LLC, is also an Intervenor here.

### B.    The Uinta Basin is rich in resources.

The Uinta Basin is 12,000-square mile area in northeast Utah and northwest Colorado. ID-300676 at 32 (McKee V.S.). It is isolated among the mountain ranges and plateaus of the western Rocky Mountains. *Id*. The only access is over two-lane roads that cross high mountain passes. FEIS at 1-3; ID-300676 at 33-34 (McKee V.S.). This inaccessibility makes it hard for the people living in the basin to participate in the broader economy.

The Uinta Basin has plentiful resources, including valuable minerals, crude oil, natural gas, oil shale, oil sands, natural asphalt, and low-sulfur coal. *Id*. at 33. Farmers in the basin produce

---

[1] The complete Final Environmental Impact Statement appears on the Board's Record Index at ID-50896.

alfalfa, corn, and other field crops. *Id*. There are cattle ranchers in the basin too. *Id*.

Marketing these resources requires transportation infrastructure. *Id*. at 33. The basin's farmers and ranchers want to ship their agricultural goods around the country. *Id*. Its oil and gas producers need to bring in fracking sand and steel and ship out their products. *Id*. Today, the only way to do those things is to send trucks on two-lane roads through mountain passes, sometimes in hazardous conditions. *Id*. at 33-34.

### C. The Uinta Basin Railway creates new access to the basin.

The two-lane roads in and out of the basin are not the only obstacle that its residents face. The trucks that travel those roads have their own limits. Trucks are best for short hauls; they are not cost-effective for moving heavy or bulk commodities on long trips. *Id*. at 34. But the farmers, ranchers, and miners who live in the Uinta Basin need long-haul movements if they want to sell their commodities in the national market—long hauls that only trains can provide. *Id*. Even the basin's oil producers, who can and do sell to nearby refineries in Salt Lake City, cannot afford to reach national oil markets. *Id*.

7

The Uinta Basin Railway will change all of that. It will bridge the transportation gap that stops farmers, ranchers, miners, and oil producers from selling to national markets. *Id*. at 34-35. It will carry agricultural products, building products, bulk commodities and—primarily—crude oil to the rest of the country. *Id*. at 36. It will, through these shipments, make the basin's farmers, ranchers, miners, and oil producers more competitive. *Id*. at 38-39. It will create local jobs and income. *Id*. at 39.

That, at least, is what Seven County wants. But it knows that nothing is guaranteed. As the verified statement Seven County filed with its application put it, "many factors beyond access to rail would determine the level of oil production in the [Uinta] Basin . . . ." *Id*. The same is true for the basin's other products: The proposed railway clears a path to economic development, but broader economic conditions will decide who travels it. *Id*. The Surface Transportation Board knew this, and that knowledge guided its environmental review. ID-51032 at 17 (Final Decision).

### D.    The Board approves the project.

The Board began its environmental review of the Uinta Basin Railway in June 2019, when its Office of Environmental Analysis noticed an intent to prepare an impact statement. *See* 84 Fed. Reg.

8

28611 (June 19, 2019). Nearly a year later, Seven County petitioned the Board for an exemption that would approve the project. ID-300676 (Petition for Exemption). Given the covid-19 pandemic that had started in the meantime, Seven County's petition asked the Board to rule first on the project's transportation merits, recognizing that final approval would depend on the results of the environmental review. *Id.* at 26-28. The Board agreed to do so, and in January 2021 it conditionally found that the project met the relevant criteria. ID-50412 (Jan. 4, 2021 Decision). Some Petitioners sought reconsideration of this decision, but the Board declined. ID-50728 (Sep. 30, 2021 Decision).

Meanwhile, the Board's environmental review—which included a draft environmental impact statement, six online public meetings, nearly 2,000 public comments, and dozens of mitigation measures—resulted in an August 2021 Final Environmental Impact Statement. ID-50896. After reviewing that Statement, the public's comments, and the Office of Environmental Analysis's response to those comments, the Board granted Seven County's request to construct and operate the Uinta Basin Railway. ID-51032 (Final Decision).

Petitioners timely appealed.

## SUMMARY OF ARGUMENT

The statute that governs Surface Transportation Board approval of new rail construction presumes that such projects are in the public interest. *See Mid-States Coal. for Progress v. Surface Transp. Bd.*, 345 F.3d 520, 552 (8th Cir. 2003). When the Board approved the Uinta Basin Railway, it applied that presumption and the rail transportation policy in 49 U.S.C. § 10101 to exempt the project from the full application process. In so doing, the Board balanced the project's improvement to competition and transportation conditions—including better economic opportunities for Uinta Basin communities—against its potential environmental effects. Under the Administrative Procedure Act, the result of that balancing is not arbitrary and capricious.

In considering the Uinta Basin Railway's environmental effects, the Board was required to consider only those effects that were reasonably foreseeable. *See* 40 C.F.R. § 1508.8 (2019). New upstream oil wells, which remain unproposed and unplanned, and which may be drilled regardless of the new rail line, did not qualify. *See Del. Riverkeeper Network v. FERC*, 45 F.4th 104, 109 (D.C. Cir. 2022). Neither did downstream refinery effects, in large part because it was impossible to know which refineries would receive shipments from the new rail line. *See id.* at 110. Still, the Board

10

discussed the possibility of new oil wells and greenhouse gas emissions from refined oil as part of its cumulative effects analysis. That discussion went beyond the Board's duties under the National Environmental Policy Act. *See Birckhead v. FERC*, 925 F.3d 510, 515 (D.C. Cir. 2019).

The Board also studied potential environmental effects from "downline" traffic—i.e., traffic that starts on the new Uinta Basin Railway, but later travels on existing rail lines in other places. The Board saw that more downline traffic would raise the risk of downline accidents. But because accidents are rare, only a quarter of accidents lead to spills, and few of those spills would harm the environment, the Board rightly found that downline accidents would not be a significant effect of the new rail line. *See New York v. Nuclear Regul. Comm'n*, 681 F.3d 471, 478-79 (D.C. Cir. 2012). For similar reasons, potential downline accidents will violate neither the Endangered Species Act nor the National Historic Preservation Act.

The Uinta Basin Railway offers new economic opportunity to the people living in an isolated part of Utah. The Board's decision to approve it, which relied on a careful environmental review, was not arbitrary and capricious.

## ARGUMENT

This case attacks the Surface Transportation Board's discretion. Indeed, Petitioners admit that under the Administrative Procedure Act, they must show that the Board acted arbitrarily and capriciously. CBD Br. at 13; Eagle Cnty. Br. at 16. They point to three main ways they think it did: (1) by using its exemption procedures to authorize Seven County's new rail line; (2) by not labeling increased oil production and refining as an indirect effect of the new line; and (3) by not addressing the alleged effects of new traffic on other rail lines. But on each of these fronts, Petitioners' arguments demand that the Board speculate about environmental effects, rather than study what is reasonably foreseeable. The Board's approach was careful, not arbitrary, and its decision should be affirmed.

## I.    Because Seven County's project promotes rail transportation policy, it qualifies for an exemption.

By statute, the Surface Transportation Board presumes that new rail construction is in the public interest. *See Mid-States Coal. for Progress v. Surface Transp. Bd.*, 345 F.3d 520, 552 (8th Cir. 2003). Without addressing that presumption, Petitioners argue that the Board misapplied rail transportation policy when it approved Seven County's proposed new rail construction. *See* Eagle

Cnty. Br. at 19-27. They add that the Board erred in conditionally approving that new construction before it had finished its environmental review. *See id*. at 16-19. But the record shows that neither of these Board decisions was arbitrary and capricious.

### A.    This project will enhance competition, create opportunity, and remove regulatory barriers.

The ICC Termination Act offers two paths to approval of new rail construction.[2] The first is a formal proceeding under 49 U.S.C. § 10901, which the Board uses to decide whether the new line is "inconsistent with the public convenience and necessity." The second—the one the Board used here—lets the Board exempt a transaction from section 10901's formal procedures if it finds that those procedures are neither "necessary to carry out the transportation policy of [49 U.S.C. § 10101]" nor "needed to protect shippers from the abuse of market power." 49 U.S.C. § 10502(a).[3]

That exemption process "does not ask whether the 'transaction' implements the rail transportation policy." *Vill. of Palestine v.*

---

[2] *See* ICC Termination Act of 1995, Pub. L. No. 104-88, 109 Stat. 803.

[3] The Board may also exempt transactions when formal procedures are unnecessary to carry out section 10101's rail transportation policy and the transaction is "of limited scope," but that variation is irrelevant here. *See* 49 U.S.C. § 10502(a)(2).

13

*ICC*, 936 F.2d 1335, 1338 (D.C. Cir. 1991). "It focuses" instead "on the need for regulation." *Id*. To that end, the Board considers only those "aspects of the policy bearing on the propriety of the exemption." *Ill. Com. Comm'n v. ICC*, 787 F.2d 616, 627 (D.C. Cir. 1986). It can ignore aspects of the policy that are "unrelated." *Id*.

The Board found in its January 2021 decision that Seven County's project "would enhance competition by providing shippers in the area with a freight rail option that does not currently exist and foster sound economic conditions in transportation," thus meeting the policy goals of sections 10101(4) and (5). ID-50412 at 9 (Jan. 4, 2021 Decision). That finding fit the evidence: Seven County showed that the Uinta Basin's farmers, miners, and oil producers needed a connection to the national rail network. ID-300676 at 32-40 (McKee V.S.); *see* EI-31264 at 4 (describing the need for rail service); EI-26841 at 9 (identifying commodities that would move on the new rail line, including "bulk refined and unrefined commodities" and farm products). The Board added that "an exemption will minimize the need for federal regulatory control . . . and reduce regulatory barriers to entry," furthering the policies identified in sections 10101(2) and (7). ID-50412 at 9 (Jan. 4, 2021 Decision).

14

Looking at section 10101's pastiche of 15 policies, numbers (2), (4), (5), and (7) stand out as especially relevant to "the need for regulation" of a proposed new rail line. *Vill. of Palestine*, 936 F.2d at 1338. The Board was right to focus on them. Indeed, the Ninth Circuit held in a similar new rail construction case that "the [Board's] decision to consider only factors (2), (4), (5), and (7) was reasonable." *Alaska Survival v. Surface Transp. Bd.*, 705 F.3d 1073, 1083-84 (9th Cir. 2013). More broadly, the Board's own precedent holds that "the rail transportation policy favors the construction of new rail lines." *Gateway W. Ry. Co.—Constr. Exemption—St. Clair Cnty., Ill.*, Fin. Dkt. No. 32158, 1993 WL 158814, at *3 (ICC April 26, 1993).[4] In that context, the Board's findings were not arbitrary and capricious.

## B.   The Board balanced the project's transportation merits against its potential environmental harms.

Despite the Ninth Circuit's holding in *Alaska Survival* and the Board's precedent, Petitioners claim that the Board misapplied rail transportation policies (2), (4), (5), and (7). *See* Eagle Cnty. Br. at 24-28; CBD Br. at 44-48. As they see it, the Board "put a thumb

---

[4] This Court "defer[s] to an agency's reasonable application of its own precedents . . . ." *Nat'l Ass'n of Regul. Util. Comm'rs v. FERC*, 475 F.3d 1277, 1284 (D.C. Cir. 2007).

on the scale for the project" by counting its "economic benefits" while downplaying "associated" environmental harms. CBD Br. at 44. But the Board's decision did not turn on the project's economic benefits. Instead, the Board found that the Uinta Basin Railway would "enhance competition" and "foster sound economic conditions in transportation" by giving shippers "a freight rail option that does not currently exist." ID-50412 at 9 (Jan. 4, 2021 Decision). Those findings—not the project's estimated economic value—are why Seven County's project advances transportation policies (4) and (5). *Id.*; *see* ID-51032 at 24 (Final Decision) (noting that the project "could . . . expand the regional economy").

The Board's conclusion that an exemption "would minimize the need for federal regulatory control . . . and reduce regulatory barriers to entry" was likewise unrelated to economic benefits. *Id.* at 5. Whether the new line provides economic benefits is "in the hands of [Seven County] and the marketplace, not the Board." *Id.* at 24. In fact, "the Board has repeatedly recognized that the decision to go forward with an approved project ultimately is in the hands of the applicant and its potential investors . . . ." *Cal. High-Speed Rail Auth.—Constr. Exemption—In Fresno, Kings, Tulare & Kern Counties, Cal.*, Dkt. No. FD 35724, 2014 WL 3973120, at *8

16

(STB Aug. 11, 2014). As the Eighth Circuit put it, "the ultimate test of financial fitness will come when the railroad seeks financing." *Mid-States*, 345 F.3d at 552.

Setting aside the policies that the Board applied, Petitioners argue that the Board should have placed more weight on other policies—especially public health and safety, safe working conditions, and energy conservation. *See* Eagle Cnty. Br. at 19-26. Again, they misstate what the Board did.

The Board did not "summarily" dismiss public health and safety or safe working conditions, which are codified as factors (8) and (11) in section 10101's rail transportation policy. Eagle Cnty. Br. at 20; *see* 49 U.S.C. § 10101(8), (11). To the contrary, those concerns framed the Board's whole discussion of environmental effects. *See* ID-51032 at 5 (Final Decision) ("[A]s discussed below and in the Final EIS, nothing in the environmental record raises significant concerns regarding § 10101(8) and (11)."). The Board had no concerns about public health and safety or safe working conditions—including "accidents, oil spills, and wildfires"[5]—because its environmental review showed that Seven County's project would not have

---

[5] Eagle Cnty. Br. at 23.

significant effects in those areas. *Id.* at 10-11, 12-15; *see* FEIS at 3.2-4–3.2-8 (accidents and spills); 3.4-14–3.4-17 (wildfires).

As for energy conservation, no one participating in the Board's process explicitly raised it as a rail policy. That issue is thus waived. *Nevada v. Dept. of Energy*, 457 F.3d 78, 88 (D.C. Cir. 2006) ("[P]ersons challenging an agency's compliance with NEPA must structure their participation so that it alerts the agency to the parties' position and contentions, in order to allow the agency to give the issue meaningful consideration.") (brackets, ellipsis, and internal quotation marks omitted). Even so, the Board's findings and the Final Environmental Impact Statement show how Seven County's rail line would save energy by displacing truck traffic. ID-51032 at 16 (Final Decision); FEIS at 3.8-7 (conservatively estimating that the project would displace over 17,000 tanker trucks per year). And while Petitioners say that the project will not promote "energy conservation" because it could lead to increased fossil-fuel consumption, the Final EIS estimated worst-case greenhouse gas emissions from the oil that could be carried on the new line, and the Board weighed those effects against the project's potential benefits. ID-51032 at 17-18 (Final Decision). That weighing fulfilled the Board's role under the rail transportation policies.

Against all this analysis, Petitioners argue that the Board's environmental review cannot substitute for its consideration of rail transportation policies. Eagle Cnty. Br. at 23. That claim—made without case citation—is inefficient and illogical. The Board often uses the analysis in its environmental reviews to draw conclusions about relevant rail policies. *See, e.g.*, *Cal. High-Speed Rail Auth.— Constr. Exemption—Merced, Madera & Fresno Counties, Cal.*, Dkt. No. FD 35724, 2013 WL 3053064, at *16 (STB June 13, 2013) ("[T]he potential health and safety impacts related to this proposal were fully analyzed during the environmental review process . . . ."); *Riverview Trenton R.R. Co.—Petition for Exemption*, Fin. Dkt. No. 34040, 2003 WL 21108179, at *8 (STB May 9, 2003) (relying on the environmental review to find compliance with rail policy (8)). It took the same approach here. *See* ID-51032 at 5 (Final Decision) (explaining that rail policies (8) and (11) were "examined as part of" the EIS and "further examined by the Board in its final decision"). That the environmental and rail policy analyses are required by different statues does not mean that evidence gathered for the former is irrelevant to the latter.

19

### C.   The prevailing economic conditions justified the Board's transportation merits opinion.

Petitioners also argue that the Board erred in finding, before its environmental review was done, that Seven County's project should be approved on the "transportation merits." Eagle Cnty. Br. at 16-19. Their argument turns on the Board's policy of making such a preliminary decision only in "unique or compelling circumstances." *Id.* at 16 (quoting *Alaska R.R. Corp.—Constr. & Operation Exemption—Rail Line Between Eielson Air Force Base & Fort Greely, Alaska*, No. FD 34658, 2007 WL 2875687, at *1 (Oct. 2, 2007)). Here, they say, the Board's finding of unique or compelling circumstances was unjustified. Eagle Cnty. Br. at 18-19.

The Board's preliminary transportation merits decision both acknowledged and applied the unique or compelling circumstances test. ID-50412 at 8-9 (Jan. 4, 2021 Decision). Seven County asked for a preliminary decision in late May, 2020—the early days of the covid-19 pandemic. ID-300676 at 26-28 (Petition for Exemption). Just a few days before, the Federal Reserve Chairman had said that the pandemic's economic effects would be "worse than any recession since World War II." *Id.* at 26. Seven County thus sought conditional approval of its project to stimulate the state and local

20

economies and noted that such approval would align with a recent executive order on regulatory relief. *Id*. at 27.

The Board agreed with Seven County. Its transportation merits decision said that "the economic circumstances, exacerbated by the current pandemic, are compelling." ID-50412 at 9 (Jan. 4, 2021 Decision). It also pointed to the project's "strong support from state and local entities." *Id*. In short, the Board's conclusion that the covid-19 pandemic presented "unique or compelling circumstances" was not arbitrary and capricious.

## II.    The Board properly considered both upstream and downstream environmental effects.

Petitioners' critique of the Surface Transportation Board's decision goes past the transportation merits. They also claim that the Board violated the National Environmental Policy Act—commonly known as NEPA—by failing to disclose the project's indirect environmental effects upstream and downstream of the proposed new rail line. *See* CBD Br. at 13-34. To prevail on such a claim, Petitioners must show that any flaws in the Board's environmental review "are significant enough to undermine informed public comment and informed decisionmaking." *Sierra Club v. FERC (Sabal Trail)*, 867

21

F.3d 1357, 1368 (D.C. Cir. 2017).[6] Under NEPA, the Court's "role is not to flyspeck an agency's environmental analysis, looking for any deficiency no matter how minor . . . ." *Birckhead v. FERC*, 925 F.3d 510, 515 (D.C. Cir. 2019) (internal quotation marks omitted). As long as "the agency has adequately considered and disclosed the environmental impact of its actions," and "its decision is not arbitrary and capricious," NEPA is satisfied. *Id.* (internal quotation marks omitted).

### A.   The Board sought and received information about possible upstream and downstream effects.

Petitioners claim that the "purpose and predicted effect" of Seven County's rail line "is to dramatically expand oil production in the Basin . . . ." CBD Br. at 14. That expansion, they say, will mean more oil wells upstream of the rail line and more greenhouse gas emissions downstream of it. *Id.* They claim that these effects were undisclosed in the Board's environmental review and that the Board disregarded them. *See id.* at 14-34.

Before tackling the merits of Petitioners' claims, it is important to see that the Board's ability to predict upstream and

---

[6] This Court has decided several cases captioned *Sierra Club v. FERC*. This one is commonly called *Sabal Trail* after the pipeline there at issue.

downstream effects turns on the information available to it. In at least two cases involving pipelines, this Court has flagged the value of gathering such information. *Food & Water Watch v. FERC*, 28 F.4th 277, 286 (D.C. Cir. 2022); *Birckhead*, 925 F.3d at 517-18. Here, the Board did. It asked Seven County about the potential for new wells upstream and about the possible destinations for oil shipped downstream. EO-3209 at 2; EO-3217 at 8. The Board then used that information in its environmental review. ID-51032 at 16 (Final Decision).

But Seven County is not like the pipeline operators in *Food & Water Watch* and *Birckhead*; it does not have specific information on—much less contracts with—customers or shippers. It is building this project as a public entity, to foster economic development. ID-300676 at 38-39 (McKee V.S.). Speculation about the source and destination of oil that might be shipped on the new line is thus unavoidable. The Board did its job when it sought information from Seven County and used what it received in its environmental review.

## B.  Neither new wells nor refinery emissions are reasonably foreseeable effects of the project.

The crux of Petitioners' indirect environmental effects argument is this: If the new rail line is to carry the number of oil trains

discussed in the Environmental Impact Statement, it would mean drilling many new oil wells upstream and refining far more oil downstream. *See* CBD Br. at 17-19. And since Petitioners see such new oil production as the project's "entire purpose," they believe that these upstream and downstream effects are reasonably foreseeable. *Id*. at 19. But Petitioners misunderstand the nature of Seven County's project. Its proposed new rail line is not like a new pipeline with known customers on both ends; it is an economic development project. When this distinction is drawn, it shows why Petitioners are wrong about the foreseeability of the project's upstream and downstream effects.

### 1. New oil wells are too unpredictable to be an indirect effect of the project.

Everyone agrees that a project can have indirect effects that occur "later in time or farther removed in distance," as long as they are "still reasonably foreseeable." 40 C.F.R. § 1508.8(b); CBD Br. at 20. The key question here is whether upstream oil drilling and downstream oil refining are "still reasonably foreseeable" given the available information. A review of the record shows that they are not.

Start with upstream oil wells. Petitioners say that the Environmental Impact Statement should have considered things like

24

new wells' effects on vegetation, "including the spread of noxious weeds and increased wildfire risk," and harm to special-status species that live "within existing oil fields." CBD Br. at 27. But studying those kinds of harm would require more information than the Board had. This Court has held that without evidence that would let the agency "predict the number and location of any additional wells that would be drilled," or proof that extraction depends on the project, specific upstream effects are not reasonably foreseeable. *Del. Riverkeeper Network v. FERC*, 45 F.4th 104, 109 (D.C. Cir. 2022) (quoting *Birckhead*, 925 F.3d at 517). In part because Seven County is a government agency engaged in an economic development project, not an oil-well developer, specific predictions about upstream oil wells are impossible.

As the Board explained in response to comments on the Draft Environmental Impact Statement, Seven County itself "does not propose to undertake any oil and gas development projects." FEIS at T-41. Rather, any new development would take the form of "many separate and independent projects that have not yet been proposed or planned." *Id*. at T-44. These projects "could occur on private, state, tribal, or federal land and could range in scale from a single vertical oil well to a large lease involving many horizontal

25

wells." *Id*. They could be undertaken by "privately owned companies, tribal interests, oil producers from outside of the Basin, or other parties." *Id*. As a result, the Board explained, "it would not be possible to determine which of these as yet unproposed, unplanned, and unsponsored projects would or would not proceed" if the line is built. *Id*. In fact, "[i]f the rail line were not built, oil production in the Basin would continue and could increase in the future, depending on market conditions, including local, regional, national, and global demand for crude oil." *Id*. And "[w]hile there are currently limitations on" the transport and refining of crude oil from the Basin, those limits could change in response to market conditions. *Id*.

These findings—which Petitioners never mention, much less challenge—show that the alleged upstream effects of Seven County's project fit in the same category as the upstream effects in *Delaware Riverkeeper* and *Birckhead*: too uncertain and unpredictable to qualify as reasonably foreseeable. If no one could reasonably predict where or whether new oil wells would be built, the Environmental Impact Statement did not need to discuss things like "the spread of noxious weeds" from those wells.

### 2.   Refinery emissions are too uncertain to be an indirect effect of the project.

Petitioners similarly allege that the Board "failed to disclose the downstream environmental impacts of increased crude oil refining along the Gulf Coast." CBD Br. at 24. They talk about how increased refining in these areas could release "toxic air pollutants," worsening air quality and other "pollution burdens." *Id*. at 24-25. And they cite *Sabal Trail* as precedent for the idea that such downstream effects are reasonably foreseeable. *Id*. at 26.

In *Sabal Trail*, the agency knew that the natural gas shipped on the pipeline was "specifically" going to "power plants in Florida" that would "burn the gas." 867 F.3d at 1371; *see also Food & Water Watch*, 28 F.4th at 288 (explaining that the agency "knew, with a good deal of specificity," both "where the gas in question would be going" and "how it would be used"). With that knowledge, the Court explained, the carbon emissions from "burning natural gas" at the power plants were reasonably foreseeable. *Sabal Trail*, 867 F.3d at 1372. Contrast that holding with the one in *Delaware Riverkeeper*, where downstream emissions were not reasonably foreseeable because the agency "was unable to identify the end users . . . ." 45 F.4th at 110.

This case is more like *Delaware Riverkeeper* than *Sabal Trail*. The Board here found that "[t]here are many different potential destinations for Uinta Basin oil" and that "it is not possible to identify specific refineries that would receive shipments" of that oil. ID-51032 at 19 (Final Decision). The best it could do was to identify "likely regional destinations." *Id.* It also noted that "actual volumes of crude oil" depended on "various independent variables and influences, including general domestic and global economic conditions, commodity pricing, the strategic and capital investment decisions of oil producers, and future market demand for crude oil from the Basin . . . ." *Id.* at 17. Beyond all that, the Board noted that oil from the Basin "could be refined into products other than fuel" that do not release greenhouse gases. *Id.*; *see* EI-30874 (Seven County comments) ("[T]he highest use for Uinta Basin waxy crude oil is as feedstock for the manufacture of synthetic lube oil base oils.").

From Seven County's perspective, any oil on the new rail line will travel hundreds—even thousands—of miles before it reaches a refinery. And neither Seven County nor the Board has any control over where the oil goes. Instead, the origin and destination of any future shipments will be determined by third parties—customers of or shippers on the new rail line. As in *Delaware Riverkeeper*, this

28

amounts to shipping the oil "to an unknown destination and for an unknown end use." 45 F.4th at 110. Thus, as in *Delaware River-keeper*, the downstream effects of refining are not reasonably foreseeable.

### C.    The Board weighed potential new wells and refinery emissions as cumulative effects.

Even though neither upstream wells nor downstream refining were reasonably foreseeable indirect effects of the new rail line, the Board's Environmental Impact Statement still discussed both in detail. Those discussions—including high and low estimates of new oil wells and infrastructure, and greenhouse-gas emission calculations—were framed as discussions of cumulative effects. FEIS at 3.15-3, 3.15-34. Petitioners try to turn these disclosures against the Board, arguing that the cumulative effects label "marginalize[d]" the effects, allowing the Board to unfairly favor the project. CBD Br. at 20-24. But that is not what happened.

For all the reasons just discussed, upstream oil wells and downstream oil refining are too uncertain to count as reasonably foreseeable indirect effects of the new rail line. Still, the Board did not ignore the possibility of new wells and greenhouse gases; it explicitly "considered" them as cumulative effects. ID-51032 at 18 (Final Decision). In so doing, it noted that the "high oil production

scenario" in the EIS could "result in 3,330 wells over the first 15 years." *Id*. at 16. It also considered potential effects on vehicle traffic and air emissions, recognizing that it lacked information on where new wells would be drilled. *Id*. at 17. And it calculated the amount of greenhouse gas emissions that would occur if all oil transported under the high-production scenario were "refined into fuels that would be combusted to produce energy . . . ." *Id*.

Petitioners, adopting the view of the dissenting Board member, argue that the Board weighed only the incremental harm from these effects. CBD Br. at 23; *see* ID-51032 at 31-32 (dissent). But the Board's decision does not talk about incremental harm. To the contrary, it says that the Board's analysis "would be the same no matter which label is used." ID-51032 at 18 n.15 (Final Decision). So even if Petitioners were right that upstream wells and downstream refining should have been called indirect effects, that mislabeling would not invalidate the Board's decision. The Board collected information about upstream and downstream effects from Seven County, "conducted a full and appropriate analysis" of it, and then considered that analysis when it decided whether to approve Seven County's project. ID-51032 at 18 (Final Decision). In other words, the Board "adequately considered and disclosed the

30

environmental impact of its actions . . . ." *Birckhead*, 925 F.3d at 515. That is all NEPA required it to do. *Id*.

### D.  The Board's decision accounted for the possibility of landslides during construction.

Besides claiming that the Board ignored upstream and downstream effects, Petitioners say that the Board deferred a geotechnical analysis that was necessary to its decision. *See* CBD Br. at 34-39. In particular, they say that building the proposed rail line risks triggering landslides and that the Board should not have allowed the study of those risks to occur after the project was approved. *See id*. at 35-36. But a review of the EIS shows that Petitioners misstate the Board's analysis and that the Board acted reasonably.

Petitioners' argument rests on what they see as a concession: language in the Environmental Impact Statement confirming that not all landslide risks in Utah have been mapped. CBD Br. at 35 (citing FEIS at 3.5-7). But that is not what the Statement is saying. The Statement is clear that the primary landslide risks in the project area are "in the southwestern portion of the study area underlain by the Green River Formation." FEIS at 3.5-7. Whether those risks are specifically mapped does not change the Board's analysis. The Statement recognized that risks extended beyond what was

31

mapped, but it concluded that those risks could be mitigated by engineering controls. FEIS at 3.5-21.

It is true that this Court found a lack of adequate geotechnical data in *Public Employees for Environmental Responsibility v. Hopper*, 827 F.3d 1077, 1082-83 (D.C. Cir. 2016). There, the agency had concluded—without adequate data, and in the face of sharp internal dissent—that the seafloor beneath Nantucket Sound would support installation of the first offshore wind turbines in the United States. *Id*. But neither the agency nor the applicant had performed the geological surveys needed to reach that conclusion. *Id*. at 1083. If it turned out that the seafloor was more unstable than the agency hoped, mitigation was not an option; the project would fail. *See id*. at 1083-84. By contrast, the landslide risks acknowledged in this case are everyday issues for infrastructure projects. *See* FEIS at 3.5-7. As such, they can be addressed with standard engineering controls. FEIS at 3.5-20–3.5-21, 4-14 (GEO-MM-2) (requiring "engineering controls to avoid mass movement or slumping").

Nor does it matter that the mitigation will be implemented as the project is built. As even the Court in *Public Employees* said, "[i]n some cases it may be appropriate for an impact statement to provide for ongoing monitoring in order to gather more data." 827 F.3d

at 1083. The Court in *Theodore Roosevelt Conservation Partnership v. Salazar* explained that such adaptive management plans do not violate NEPA. 616 F.3d 497, 517 (D.C. Cir. 2010). Indeed, "allowing adaptable mitigation measures is a responsible decision in light of the inherent uncertainty of environmental impacts . . . ." *Id.* Because landslide mitigation is unavoidably a site-specific engineering exercise, the Board did not err in relying on mitigation here.

## III.   The Board identified and analyzed downline effects.

The Surface Transportation Board's consideration of possible downstream effects was not limited to greenhouse gas emissions from refined Uinta Basin oil. Using information the Board collected from Seven County, the Environmental Impact Statement also discussed "downline impacts": potential traffic effects on rail lines other than the proposed new line. *See* FEIS at S-13. But Petitioners are not satisfied. They claim that the Board violated NEPA by failing to take a hard look at potential downline impacts beyond traffic. *See* Eagle Cnty. Br. at 28-46; CBD Br. at 40-48. Those claims rest on false premises, which lead Petitioners to faulty conclusions.

33

**A.    The Board calculated downline traffic and dis-
closed its potential environmental effects.**

The first step in understanding the Board's downline effects

analysis is knowing what the Board's rules require. Most relevant

to this project, those rules set traffic thresholds for the Board's en-

vironmental review. *See* 49 C.F.R. § 1105.7(e)(5), (6). If proposed

new construction could cause traffic on existing rail lines to exceed

the thresholds, the Board includes that downline traffic in its envi-

ronmental review. *See id.* § 1105.7(e)(11)(v).

Seven County's proposed new rail line can send traffic onto

existing rail lines operated by two different Class I carriers. FEIS

at 3.1-2. To understand whether those lines might exceed its down-

line traffic thresholds, the Board analyzed the likely destinations

for oil trains coming out of the Uinta Basin. FEIS at C-1–C-4. That

analysis led it to conclude that a 500-mile segment of Union Pacific

line between the end of the proposed new line and the Denver, Col-

orado metro area should be reviewed. FEIS at 3.1-1, App.C-5, C-6

(map).

Petitioners agree with the Board's decision to study downline

traffic on the Union Pacific line. Their complaint is that the Envi-

ronmental Impact Statement omitted downline effects that they

consider reasonably foreseeable. They stress the lack of downline

impacts in the Statement's discussions of water resources, biological resources, and land use and recreation. Eagle Cnty. Br. at 31-33. They also say that where the Statement did consider downline impacts, it failed to take a hard look at them, including especially the risk of wildfires. *Id.* at 36-37. And they claim that the Board should have considered impacts from the reactivation of a dormant line. *Id.* at 37-39.

Most of these complaints share the same core: It was not enough, Petitioners say, for the Board to estimate downline traffic and calculate the potential for accidents and spills. They emphasize that increased downline traffic would double the risk of accidents and argue that the Board should have discussed the effects of those accidents on the most sensitive downline environmental resources. Eagle Cnty. Br. at 31-33. But an increased risk is not the same thing as a significant environmental impact. Rather, "if the combination of probability and harm is sufficiently minimal," then the agency "may find no significant impact." *New York v. Nuclear Regul. Comm'n*, 681 F.3d 471, 478-79 (D.C. Cir. 2012). Applying that calculus here gives at least four reasons that the impact of downline accidents was not significant.

First, the Environmental Impact Statement found that only a quarter of loaded-train accidents cause a spill. FEIS at 3.4-33. So even if there were one accident every year, as Petitioners fear, a spill would happen only once every four years.[7] Second, the accident and spill rates that Petitioners cite apply to the entire 500-mile downline study area, only part of which worries Petitioners. FEIS at 3.2-6–3.2-7. The Statement could not discuss effects on specific downline resources because it is impossible to know which resources—if any—might be affected, and NEPA does not require worst-case scenario analysis. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 354-55 (1989). Third, Uinta Basin oil is waxy—"it does not flow at room temperature" and "if spilled onto land," it "tends not to disperse." FEIS at 3.3-29–3.3-30. That trait lowers the environmental risk from spills because any oil that escapes will not go far. *Id.* at 3.3-30. Finally, because downline impacts are not on the proposed new line, the Board lacks jurisdiction over them. ID-51032 at 20 (Final Decision). The downline railroad's power to make an "independent decision" about its traffic "breaks the NEPA causal chain" and allows the Board to omit from its

---

[7] The Environmental Impact Statement showed that not all of these spills would be significant. *See* FEIS App. E.

review effects that it "could not act on." *Sierra Club v. FERC*, 827 F.3d 36, 47-48 (D.C. Cir. 2016) (internal quotation marks and citation omitted).[8] On all these grounds, the Statement's disclosures were reasonable.

As for wildfires, the Board expressly "considered impacts from rail operations along existing rail line segments downline of the proposed" new line. ID-51032 at 11 (Final Decision). Relying on an independent measure of wildfire risk, it found that "the probability that a train would trigger a wildfire is very low . . . ." *Id*.; *see* FEIS at 3.4-15, T-122, T-235 (addressing wildfire impacts)). The Biological Opinion similarly explained that "improvements in locomotive technology" and the observed "fact that trains make up a small percentage of fire starts" meant that the chance of a train-caused wildfire is "very low." EI-31295 at 41 (Biological Opinion). Again, the question for NEPA purposes is not whether wildfire risk will increase, but whether that risk, combined with the potential harm, is

---

[8] Amici claim that unit oil trains like the ones that would be shipped out of the Uinta Basin are more prone to accidents, and that the Board therefore underestimated the risk of downline accidents. *See* Amici Br. at 16-19. The Board considered and rejected that argument, noting that there was "[i]nsufficient data" to estimate specific accident rates for such trains. FEIS at T-40. Given that lack of data, the Board's use of national accident rates was not arbitrary and capricious.

significant. *New York*, 681 F.3d at 478-79. And if the risk is "so low as to be remote and speculative," the potential harm is irrelevant. *Id*. at 478 (internal quotation marks omitted).

The Board did say that the new downline rail traffic was not a "new ignition source." ID-51032 at 11 (Final Decision); *see* Amici Br. at 20-21. But in context, that language meant only that there were already trains operating downline. *See* ID-51032 at 11 (Final Decision) (explaining that "those existing rail lines are active rail lines that have been in operation for many years"). The point was that trains are not a new category of ignition source; the Board knew that more trains increased the risk of wildfires. FEIS at 3.4-42 ("Trains can contribute to wildfires by providing an ignition source."). But because that risk remained "very low," the Board found that "the downline wildfire impact of the proposed rail line would not be significant." ID-51032 at 11 (Final Decision). That finding was not arbitrary and capricious.

The Board was also right to reject Petitioners' claim that re-activation of the dormant Tennessee Pass line was reasonably fore-seeable. There is a separate Board proceeding that seeks to reacti-vate the line, but Seven County sent the Board a verified statement from the line's owner confirming that (1) there are no plans to use

the line for oil traffic from the Uinta Basin, and (2) the line was ill-suited for that use. *See* EI-27080 at 2. If the Tennessee Pass line were ever reopened, it would be as a commuter and tourist rail. *Id.* The Board reasonably accepted these statements and found that the movement of oil trains on the Tennessee Pass line was "speculative at best." ID-50728 at 6 (Sept. 30, 2021 Decision). That finding also was not arbitrary and capricious.

## B.  The Board's downline analysis satisfied the Endangered Species Act.

The Board's reasons for not considering the effects of unlikely spills on specific resources are the same as the U.S. Fish and Wildlife Service's reasons for not considering "the potential impact of oil train spills and leaks" on critical habitat under the Endangered Species Act. CBD Br. at 40. Petitioners say that because the risk of accidents and spills will increase, the Service had to assume that such accidents would affect listed species or their critical habitat. CBD Br. at 42-43. Those arguments fail to appreciate just how small—and hard to pinpoint—the risk of spills is.

Similar to the NEPA rules that govern indirect effects, the applicable Endangered Species Act rules require agencies to consider harms to listed species that are "caused by the proposed action" and

39

"reasonably certain to occur." 50 C.F.R. § 402.02 (2019).[9] Petitioners claim that this requirement obliged the Fish and Wildlife Service to study the potential effects on listed species of increased downline accidents and spills. CBD Br. at 42-44. But for the same reasons downline traffic will not cause significant environmental effects, it is not "reasonably certain" to harm listed species: Accidents are unlikely, spills even less so, and spills that could harm species are unlikelier still.[10] *See supra* at 35-37. What is more, the downline rail lines already carry trains operated by other carriers and filled with other goods; the project is simply projected to add volume, which "would not substantially change the severity of" existing effects. FEIS at 3.4-47. The Board thus had no reason to ask the Service about downline harms to listed species. *See* EO-3558 (concurrence request).

---

[9] Petitioners acknowledge that the rules in place when the Service prepared its Biological Opinion have since changed, but that both sets of rules require effects to be "reasonably certain." CBD Br. at 41 n.5.

[10] Because constitutional standing requires "a substantial probability of harm," Intervenor-Respondents agree with the government that Petitioners lack standing to sue under the Endangered Species Act. *Pub. Citizen, Inc. v. NHTSA*, 513 F.3d 234, 237 (D.C. Cir. 2008); *see* USFWS Br. at 5-8.

In any case, the Board's environmental review did address the potential for downline effects on special-status species and their critical habitat. *See Defenders of Wildlife v. U.S. Dep't of Navy*, 733 F.3d 1106, 1120 n.6 (11th Cir. 2013) (noting that information supporting the Endangered Species Act analysis may appear in the Environmental Impact Statement). It noted, in that regard, that "if a large release of crude were to occur on a downline segment that crosses or is immediately adjacent to critical habitat," adverse effects "would occur." FEIS at 3.4-47. But because the chances of such a large spill are "very low," the Board's review concluded that downline harm to species or critical habitat "is not reasonably foreseeable." *Id*. That finding is bolstered by the Environmental Impact Statement's separate discussion of the properties of Uinta Basin waxy crude. Since it must be heated to flow, any waxy crude spill into water "tends to form globules of semisolid material that lock it in place," making it easy to clean up. FEIS at 3.3-30. So not only is the risk of a spill in critical habitat "very low," the environmental risk from such a spill is also low. The upshot is that harm to protected species or their habitat is not "reasonably certain to occur" in downline areas. *See* 50 C.F.R. § 402.02.

41

### C.     The Board's downline analysis satisfied the National Historic Preservation Act.

Petitioners also claim, for similar reasons, that the Board's analysis under section 106 of the National Historic Preservation Act failed to address downline effects. Eagle Cnty. Br. at 42-46. Like their NEPA and Endangered Species Act arguments, this claim rests on the idea that increased downline traffic will cause more noise and vibration, which Petitioners say will affect historic properties near the line. Eagle Cnty. Br. at 42. Those properties, they contend, should have been identified in consultation with local governments. Eagle Cnty. Br. at 42, 45.

Eagle County failed to make this argument before the Board. Thus, it has been waived. *See Nevada*, 457 F.3d at 88. Indeed, by submitting a declaration in this Court that purports to identify potentially affected historic properties, the county underscores the newness of its claim. *See* Eagle Cnty. Br. at 45 (citing Decl. of Jeff Scholl ¶¶ 23-24).

In any case, it makes little sense to study downline effects on historic properties. The Environmental Impact Statement did estimate downline noise levels. FEIS at L-9–L-16. But the Board has no power to regulate traffic on existing rail lines. ID-51032 at 20 (Final Decision). Downline rail traffic can change—and no doubt

42

has changed—based on economic conditions, without Board approval. So any historic properties along the downline tracks have been experiencing variable traffic levels for a century.[11] Given those facts, the Board reasonably concluded that the historic setting along the tracks included changing traffic levels. *Id*. Any new traffic from Seven County's project would thus not affect any historic properties along the line.

---

[11] *See* Union Pac. R.R. Co., *Denver & Rio Grande Western Colors Again Ride the Rails*, (June 19, 2006), https://www.uprr.com/news-info/releases/heritage_and_steam/2006/0619_drgw.shtml (stating that the progenitor of the downline rail began operating in the late 19th century).

43

# CONCLUSION

The petitions for review should be denied.

Respectfully submitted,

/s/ Jay C. Johnson

Kathryn K. Floyd
Jay C. Johnson
VENABLE LLP
600 Massachusetts Ave, NW
Washington, DC 20001
(202) 344-4000
jcjohnson@venable.com

*Counsel for Seven County
Infrastructure Coalition and
Uinta Basin Railway, LLC*

Dated: December 21, 2022

## CERTIFICATE OF COMPLIANCE

This response brief complies with the word limits of D.C. Circuit Rule 32(e) and this Court's July 8, 2022 order setting the briefing schedule. Excluding the items listed in the relevant rules it contains 8479 words, as calculated by Microsoft Word's word-count function.

This brief also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) because it was prepared in a proportionally spaced typeface using Microsoft Word's 14-point Century Schoolbook font. The brief is double-spaced because the line spacing is exactly 28-point.

/s/ Jay C. Johnson
Jay C. Johnson

# CERTIFICATE OF SERVICE

I hereby certify that on December 21, 2022, I served a true and correct copy of this response brief by electronic mail on all counsel of record via the Court's electronic filing system.

/s/ Jay C. Johnson
Jay C. Johnson