Case Nos. 22-1019 & 22-1020 (consolidated)

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

EAGLE COUNTY, COLORADO, *et al*.,
*Petitioners*,

v.

SURFACE TRANSPORTATION BOARD, *et al*.,
*Respondents*, and

SEVEN COUNTY INFRASTRUCTURE COALITION, *et al*.,
*Intervenors*.

ON PETITION FOR REVIEW OF ORDERS OF
THE SURFACE TRANSPORTATION BOARD

**UNITED STATES' AND U.S. FISH AND WILDLIFE SERVICE'S
OPPOSITION TO PETITION FOR REHEARING EN BANC**

TODD KIM
*Assistant Attorney General*
ANDREW M. BERNIE
JUSTIN D. HEMINGER
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 514-4010
andrew.m.bernie@usdoj.gov

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ ii

INTRODUCTION ..................................................................................1

STATEMENT ......................................................................................2

ARGUMENT ......................................................................................8

I.    The NEPA issue Intervenors raise does not present a clear
      conflict that merits rehearing en banc. ...........................................9

II.   Intervenors' arguments concerning a statutory presumption in
      favor of construction do not justify further review. .......................13

III.  The petition does not present a question of exceptional
      importance. .......................................................................16

CONCLUSION .................................................................................17

# TABLE OF AUTHORITIES

## Cases

*Alaska Survival v. Surface Transportation Board*,
  705 F.3d 1073 (9th Cir. 2013) ..................................................................2

*Center for Biological Diversity v. FERC*,
  67 F.4th 1176 (D.C. Cir. 2023) ............................................... 8, 11, 12

*City of Tacoma v. FERC*,
  460 F.3d 53 (D.C. Cir. 2006)..................................................................6

*Communities Against Runway Expansion, Inc. v. FAA*,
  355 F.3d 678 (D.C. Cir. 2004)................................................................3

*Delaware Riverkeeper Network v. FERC*,
  45 F.4th 104 (D.C. Cir. 2022) ....................................... 8, 9, 10, 11, 13

*Mid States Coalition for Progress v. Surface Transportation Board*,
  345 F.3d 520 (8th Cir. 2003) .................................................... 8, 14, 15

*Northern Plains Resource Council v. Surface Transportation Board*,
  668 F.3d 1067 (9th Cir. 2011) ......................................................... 8, 14

*Seven County Infrastructure Coalition—Rail Construction & Operation
  Exemption—in Utah, Carbon, Duchesne, & Uintah* Counties,
  2021 WL 41926 (STB served Jan. 5, 2021) ................................. 3, 4, 14

*Seven County Infrastructure Coalition—Rail Construction & Operation
  Exemption—in Utah, Carbon, Duchesne, & Uintah Counties*,
  2021 WL 5960905 (STB served Dec. 15, 2021)................................5, 6

*Sierra Club v. Department of Energy*,
  *(Freeport)*, 867 F.3d 189 (D.C. Cir. 2017)...........................................9

*Sierra Club v. FERC,*
  *(Sabal Trail)*, 867 F.3d 1357 (D.C. Cir. 2017)....................................9

**Statutes and Rule**

42 U.S.C. § 4332(2)(C) ................................................................................3

49 U.S.C. § 10101 ................................................................................ 3, 14

49 U.S.C. § 10502 ...............................................................................2, 3

49 U.S.C. § 10901(c) ..............................................................................2

Fed. R. App. P. 35(a) ..............................................................................8

## INTRODUCTION

In these consolidated cases, Petitioners—a Colorado county and several environmental organizations—challenge a decision of the Surface Transportation Board (Board) authorizing Intervenor-Respondents Seven County Infrastructure Coalition (Coalition) and Uinta Basin Railway, LLC (collectively, Intervenors) to construct and operate an approximately 85-mile rail line in Utah. Petitioners also challenge a biological opinion prepared by the U.S. Fish and Wildlife Service (Service) that the Board relied on and incorporated into its final order.

The panel held that the Board did not comply with the National Environmental Policy Act (NEPA) and the ICC Termination Act (Termination Act) in multiple respects, while rejecting or not reaching several of Petitioners' other arguments. The United States did not address those issues in its merits brief. On the issues that the United States did address, the panel concluded that the Service's biological opinion was flawed insofar as it adopted the Board's too-narrow definition of the action area for considering the expected impact of the project on protected species and critical habitat.

While the United States disagrees with the panel's holding that Petitioners established standing to challenge the biological opinion and with the panel's merits conclusions concerning the biological opinion, the United States has not sought

rehearing, and Intervenors' petition for rehearing does not raise the panel's rulings on the biological opinion.

Intervenors seek en banc review on two issues (one related to NEPA, the other related to the Termination Act) as to which the panel ruled against the Board. Because the petition identifies no clear conflicts with this Court's precedent or the precedent of other courts of appeals, and no questions of exceptional importance, the petition should be denied.

## STATEMENT

1.      The "Board has exclusive licensing authority for the construction and operation of new railroad lines." *Alaska Survival v. Surface Transportation Board*, 705 F.3d 1073, 1078 (9th Cir. 2013).  The Board's authorization of a new line may take one of two forms.

First, the Board may require a full application, which the Board must grant "unless the Board finds that such activities are inconsistent with the public convenience and necessity."  49 U.S.C. § 10901(c).  Second, a railroad may seek Board authorization through an "exemption" under 49 U.S.C. § 10502.  The exemption process applies when the agency finds that a full proceeding under section 10901 "is not necessary to carry out the [rail] transportation policy" in section 10101, and either that (1) the transaction is limited in scope, or (2) application of the policy in section 10101 "is not needed to protect shippers from the abuse of market power."

49 U.S.C. § 10502. In an exemption proceeding, the Board determines the transportation merits of a project by looking to the exemption criteria of section 10502, which in turn requires the Board to analyze the relevant rail transportation policies in 49 U.S.C. § 10101.

2.      NEPA requires agencies to take a "hard look" at the environmental consequences of a proposed major federal action. *See, e.g.*, *Communities Against Runway Expansion, Inc. v. FAA*, 355 F.3d 678, 685 (D.C. Cir. 2004). When an agency determines that a particular major federal action will have potentially significant environmental impacts, it must prepare an Environmental Impact Statement (EIS). 42 U.S.C. § 4332(2)(C).

3.      At issue here is an 85-mile-long rail line (Railway) in Utah that would create a new rail connection between the Uinta Basin in northeastern Utah and the existing interstate freight rail network near Kyune, Utah. *Seven County Infrastructure Coalition—Rail Construction & Operation Exemption—in Utah, Carbon, Duchesne, & Uintah Counties*, 2021 WL 41926, at *1 (STB served Jan. 5, 2021) (Preliminary Exemption Order). In May 2020, the Coalition, through the exemption process, sought authorization to construct and operate the Railway. *Id.* Currently, all freight moving in and out of the Uinta Basin is transported by trucks on the area's limited road network. The purpose of the Railway would be to connect

3

the Basin to the interstate rail network to provide shippers of oil and other commodities with an alternative to trucking. *Id.*

The Board issued an initial decision in January 2021 assessing the "transportation merits" of the Railway. The Board preliminarily concluded, subject to completion of environmental reviews, that the proposed Railway met the statutory standards for an exemption under section 10502.

The Board issued a Draft EIS in October 2020, which analyzed three Action alternatives (with the Whitmore Park Alternative identified as the Preferred Alternative), as well as the No-Action Alternative. Following a public comment period, the Board issued the Final EIS, adopting the Whitmore Park Alternative, in August 2021. J.A. 874.

In March 2021, the Board finalized a biological assessment and sought formal consultation with the Service on the three action alternatives. The Board identified an action area for listed fishes in the affected area that covered the project footprint, a 300-foot buffer around it, and certain areas of the Upper Colorado River Basin. J.A. 1660. The Service issued the biological opinion in September 2021. The Service adopted the action area identified by the Board, and concluded that the proposed project is not likely to jeopardize the continued existence of the four federally listed fish species in the affected area or result in destruction or adverse modification of designated critical habitat. J.A. 1696.

In December 2021, the Board issued its final decision authorizing construction and operation of the Whitmore Park Alternative, subject to environmental mitigation conditions. *See Seven County Infrastructure Coalition—Rail Construction & Operation Exemption—in Utah, Carbon, Duchesne, & Uintah Counties*, 2021 WL 5960905 (STB served Dec. 15, 2021) (Final Exemption Order). The Final Exemption Order relied on and incorporated the Service's biological opinion, which had incorporated the Board's defined action area in the biological assessment.

4.    Petitioners filed two petitions—which this Court consolidated— challenging the Board's Preliminary and Final Exemption Orders, as well as the Service's biological opinion, under a variety of statutes including NEPA, the Termination Act, the National Historic Preservation Act, and the Endangered Species Act. The United States filed a merits brief defending the Service's biological opinion without taking a position on the various challenges to the Board's decision. On August 18, 2023, the panel issued a decision that granted in part and denied in part the petitions.

a.    The panel concluded that Petitioners had standing to challenge both the Board's decisions and the Service's biological opinion. Op. 13-20. The panel also held that it had subject-matter jurisdiction to review the Board's decision under the Hobbs Act. Op. 20-22. And the panel held it had jurisdiction to review the biological opinion because the Board had relied on and incorporated the opinion into

5

its Final Exemption Order, and the Board's decisions are subject to exclusive review in the courts of appeals. Op. 22 (discussing, inter alia, *City of Tacoma v. FERC*, 460 F.3d 53, 76 (D.C. Cir. 2006)).

b. The panel reached two conclusions directly relevant to the petition. First, the panel held that the upstream impacts of increased oil drilling and the downstream impacts of refining that oil were both reasonably foreseeable impacts of approving the project that the Board should have studied further in its EIS. Op. 28-35; *see also infra* pp. 9-11. Second, the panel held that the Board had failed to adequately explain and weigh the rail transportation policy factors before approving the new line. The panel found the Board's conclusion—that "the construction and operation of [the Railway] will have substantial transportation and economic benefits" that outweigh the environmental impacts, Final Exemption Order, 2021 WL 5960905, at *23—arbitrary and capricious in two basic respects. Op. 58-65. The panel held that the Board (1) improperly ignored evidence calling into question the financial viability of the project, and (2) insufficiently analyzed the Railway's environmental effects. *Id.*; *see also infra* pp. 14-15.

The panel reached multiple other conclusions not directly relevant to the petition. The panel held that the Board failed to take a hard look at the increased risk of rail accidents downline, Op. 37-39, the risk and impacts of wildfires, *id.* at 40-42, and the impacts of the railway on water resources on the Colorado River, *id.*

at 42-43.  As to the biological opinion, the panel held that the Board had too narrowly defined the action area and failed to offer a reasoned explanation, given the record evidence, for not considering impacts on Colorado River fishes from leaks and spills when the oil trains left the new rail line and ran on an existing rail line parallel to the Colorado River.  *Id*. at 49-50.  Because the Service adopted the Board's too-narrow action area, the biological opinion was also flawed.  *Id.* at 50-51.

The panel rejected or declined to reach other claims.  It rejected Petitioners' argument based on the Board's assertedly improper classification of greenhouse gas emissions attributable to the Railway as cumulative rather than indirect impacts, holding that Petitioners were not prejudiced by any alleged mischaracterization.  *Id.* at 27.  The panel also rejected Petitioners' contention that the Board failed to take a hard look at the geological risk of landslides attributable to the Railway, *id.* at 45, and improperly failed to consider the cumulative impacts associated with the reactivation of the Tennessee Pass Line and the Railway, *id.* at 35-36.  The panel held that a National Historic Preservation Act claim that the Board had failed to consult with the County failed, because the County could have raised its concerns in the NEPA process and failed to preserve challenges about specific historic resources. *Id.* at 51-54.  Similarly, Petitioners' other arguments concerning downline impacts on biological resources, land use and recreation, and noise-related disturbance failed because they were not properly raised before the Board.  *Id.* at 44-45.

The panel vacated the Final Exemption Order, and vacated in part the EIS and biological opinion. *Id.* at 66.

## ARGUMENT

This case does not meet the demanding standard for rehearing en banc. *See* Fed. R. App. P. 35(a). The petition contends that: (1) the panel's conclusion that certain upstream and downstream impacts were reasonably foreseeable contradicts this Court's recent decisions in *Delaware Riverkeeper Network v. FERC*, 45 F.4th 104 (D.C. Cir. 2022), and *Center for Biological Diversity v. FERC*, 67 F.4th 1176 (D.C. Cir. 2023); and (2) the panel's conclusion that the Board did not properly weigh the rail transportation factors conflicts with *Mid States Coalition for Progress v. Surface Transportation Board*, 345 F.3d 520 (8th Cir. 2003), and *Northern Plains Resource Council v. Surface Transportation Board*, 668 F.3d 1067 (9th Cir. 2011), because the panel failed to apply a presumption favoring rail construction.

Neither contention justifies review by the full Court. The panel's analysis of the NEPA issue raised in the petition was tied to the evidence in the Board's administrative record, and the panel reasonably distinguished on narrow grounds the cases on which Intervenors rely. As to the Termination Act, the panel found the Board's Final Exemption Order arbitrary and capricious because, in its view, the Board did not adequately address the comments questioning the financial viability of the Railway and the Railway's environmental effects. The opinion does not

8

address whether there is a statutory presumption favoring construction, leaving that question for a future case.  En banc review is not warranted.

## I.    The NEPA issue Intervenors raise does not present a clear conflict that merits rehearing en banc.

Intervenors assert that the panel departed from this Court's precedents in holding that NEPA required the Board to further study the upstream and downstream impacts from oil development occurring as an indirect result of the Railway.  Pet. 9-13.  Regardless of whether the panel correctly decided this issue on the record evidence in this case, its analysis does not warrant the full Court's attention because the panel did not clearly depart from this Court's decisions.

"In determining what effects are 'reasonably foreseeable,' an agency must engage in 'reasonable forecasting and speculation,' with *reasonable* being the operative word."  *Sierra Club v. Department of Energy (Freeport)*, 867 F.3d 189, 198 (D.C. Cir. 2017) (citation omitted).  The panel attempted to reconcile two decisions from this Court addressing record-bound issues of reasonableness.  In *Sierra Club v. FERC* (*Sabal Trail*), 867 F.3d 1357 (D.C. Cir. 2017), on which Petitioners relied, this Court held that greenhouse gas emissions indirectly resulting from a gas pipeline project were reasonably foreseeable and needed to be analyzed where the project developers had identified the specific power plants that would receive the gas, *id.* at 1372, and "FERC ha[d] already estimated how much gas the pipelines [would] transport," *id.* at 1374.  And in *Delaware Riverkeeper Network v.*

*FERC*, 45 F.4th 104 (D.C. Cir. 2022), on which the Board and Intervenors relied, this Court held that indirect effects of Alaska-bound gas were not reasonably foreseeable where "natural gas would be delivered for further transportation on the interstate grid to an unknown destination and for an unknown end use." *Id.* at 110. The panel acknowledged that neither of these two decisions was "perfectly analogous to this one" but concluded that "the Final EIS's analysis makes this case more akin to *Sabal Trail*." Op. 31.

The panel did not purport to establish any bright-line rules, and instead based this conclusion on analysis of the specific record evidence before it. For one, "[t]he undisputed purpose of the railway is to expand oil production in the Uinta Basin, by enabling it to be brought to market via the proposed rail line connecting the Basin to existing lines that run to Gulf Coast refineries." Op. 34. Second, the EIS provided estimates of future oil production attributable to the Railway, which it described as "a reasonably foreseeable development scenario based on historical data about the Basin and consultation with [the Utah Geological Survey]." Op. 32 (internal quotation marks omitted) (alteration supplied by the Court). Third, "the EIS identifies specific regions that will receive the oil based on expected train traffic." *Id.* Fourth, the EIS identified "a limited number of refineries in those regions that would have the available capacity to process and refine the Uinta Basin's waxy crude oil." *Id.* Fifth, the ultimate use of that oil (refining for combustion) was known. *Id.*

at 33.  Sixth, as to upstream impacts, the panel found that the Board had "provid[ed] no reason why it could not quantify the environmental impacts of the wells it reasonably expects in this already identified region," contrary to *Sabal Trail*'s instruction that an agency must *either* quantify seemingly foreseeable upstream impacts or at least explain in satisfactory detail why it cannot do so.  *Id.* at 32.

Notwithstanding this fact-bound analysis, Intervenors insist that the panel's decision contravenes a previous "bright line" rule Intervenors derive from *Delaware Riverkeeper* and *Center for Biological Diversity*:  "A project's downstream indirect effects were reasonably foreseeable when the project was 'known to transport' fossil fuels to 'particular power plants,' *Delaware Riverkeeper*, 45 F.4th at 109, and 'not reasonably foreseeable' when the agency 'cannot identify the end users' of the fuels, *Center for Biological Diversity*, 67 F.4th at 1185."  Pet. 2.

The panel distinguished those cases.  It concluded that the end users were not unknown here to the same extent as in *Delaware Riverkeeper* and *Center for Biological Diversity* since—in addition to identifying the location and end use of the oil—the Board had also "identified the refineries that likely would be the recipients of the oil resulting from the Railway's operation."  Op. 32-33; *see also id.* at 33 n.1 ("The Board made clear that it expected a certain amount of oil to be transported to specific regions *with a limited set of refineries*."  (emphasis added)).  The panel also distinguished *Center for Biological Diversity* on the grounds that there were multiple

uncertainties in that case that were not comparable to the facts here—"the Corporation would have to contract with prospective customers and secure regulatory approval from Alaska, and various subsidiary pipelines (none of which had been proposed) would have to be built."  Op. 33 (quoting *Center for Biological Diversity*, 67 F.4th at 1185).  The panel's analysis and application of these decisions is subject to reasonable disagreement.  But the panel's distinguishing of these two cases does not warrant the full Court's review.  Moreover, the Court very recently decided all three of these cases, and if the Court determines with more experience that the standard is unworkable or overly difficult to apply, there will certainly be other vehicles for the Court to refine its precedent or, if necessary, consider en banc review.  *See infra* p. 16.

Intervenors also contend that the panel's analysis of the indirect effects of any upstream wells that would be constructed to satisfy expected increased oil production volumes conflicts with *Delaware Riverkeeper*.  Pet. 12-13.  Intervenors characterize *Delaware Riverkeeper* as standing for the proposition that, where an agency cannot predict the number and location of additional wells, such wells are not reasonably foreseeable indirect effects, and they contend that the facts of this case are "the same" as *Delaware Riverkeeper*.  Pet. 13.

Intervenors oversimplify both *Delaware Riverkeeper* and the panel's decision. In *Delaware Riverkeeper*, the petitioners had "identified no record evidence that

would help the Commission predict the number and location of any additional wells that would be drilled," and the data supplied did not support a claim that more wells would be needed to support increased demand. 45 F.4th at 109. The agency, moreover, had supplied a "reasoned conclusion that such impacts were not reasonably foreseeable." *Id.* Contrary to the "reasoned conclusion" the panel credited in *Delaware Riverkeeper*, in this case the panel explained that "[t]he Board provide[d] no reason why it could not quantify the environmental impacts of the wells it reasonably expects in this already identified region." Op. 32. The panel's decision does not foreclose the Board on remand from reaching a similar conclusion as in *Delaware Riverkeeper* with sufficient reasoning.

In short, the panel reasonably distinguished the two decisions on which Intervenors rely and did so on narrow grounds. En banc review as to this issue is not warranted.

## II. Intervenors' arguments concerning a statutory presumption in favor of construction do not justify further review.

The Termination Act question raised by the petition likewise does not warrant the full Court's attention. Intervenors correctly note that the Termination Act uses compulsory language and that Congress has amended that language on multiple occasions seemingly to make rail construction easier. Pet. 14. Examining this statutory history, combined with Congress's directives to promote "effective competition among rail carriers" and to "reduce regulatory barriers to entry

into . . . the industry," 49 U.S.C. § 10101, the Eighth Circuit concluded "that there is a statutory presumption that rail construction is to be approved," *Mid States Coalition for Progress*, 345 F.3d at 552, and the Ninth Circuit agreed with that conclusion, *Northern Plains Resource Council, Inc.*, 668 F.3d at 1091-92.  And as the expert agency with exclusive licensing authority for the construction and operation of new railroad lines, the Board's conclusion that a project is consistent with the rail transportation policies is entitled to deference.

But the panel's analysis was consistent with this framework and with the decisions in *Mid States Coalition* and *Northern Plains Resource Council*.  The panel disapproved of the Board's consideration of the relevant rail policies in two respects.  First, the Board had stated in its final decision that "nothing in the language of § 10502 . . . suggest[s] that an exemption proceeding is inappropriate if the viability of the proposed rail line is questioned," and "that the ultimate decision to go forward with an approved project is in the hands of the applicant and the financial marketplace, not the agency."  Preliminary Exemption Order, 2021 WL 41926, at *6.  The panel held that "the Board cannot ignore and, in the past, has not ignored serious concerns about financial viability in determining the transportation merits of a project."  Op. 59-60; *see also id.* at 61 (stating that the Board failed "to explain how the financial uncertainty unearthed by Petitioners is meaningfully distinct from the Board's prior precedent").  The panel's basic conclusion that financial viability

of a project is not wholly irrelevant, or alternatively that the Board did not distinguish its precedent in this area, does not conflict with the out-of-circuit decisions Intervenors cite. *See Mid States Coalition*, 345 F.3d at 533 (noting that the Board has historically examined "whether the applicant is financially able to undertake the construction and provide service").

Second, with respect to the Board's consideration of the environmental factors, the panel concluded that because "the EIS is arbitrary and capricious . . . those errors infect the final determination as well." Op. 61-62. Independent of those defects, the panel concluded that the Board did not sufficiently weigh the environmental impacts of the project in concluding that those impacts were outweighed by the transportation merits of the project. Op. 62-65.

Intervenors fault the panel for "fail[ing] to consider the presumption favoring rail construction adopted by other circuits." Pet. 14. But Intervenors acknowledge that "[t]he panel's decision never mentions the statutory presumption favoring rail construction." Pet. 15. Although Intervenors criticize the panel for not addressing the statutory presumption, the panel may well have chosen not to address whether a presumption exists because answering that question would not have affected the outcome: as the panel saw things, the record simply did not support the Board's conclusion, given what it saw as the Railway's significant environmental impacts and serious questions about the financial feasibility of the project. Op. 64.

Regardless of whether that characterization of what the record shows is correct, the panel did not address the existence and parameters of the statutory presumption Intervenors invoke, leaving that question open for future cases. En banc review of that issue here is not warranted.

## III.   The petition does not present a question of exceptional importance.

Neither of the two issues raised by the petition is exceptionally important. Intervenors suggest that the NEPA issue is exceptionally important because it is likely to recur. Pet. 16-17. But as Intervenors acknowledge (Pet. 16), recurrence is not an explicit consideration in Rule 35. In all events, Intervenors' point cuts against the need for this Court to rehear the case en banc. As Intervenors note, the reasonable foreseeability of indirect environmental effects is a "basic concept in all NEPA reviews." Pet. 18. If en banc consideration of this concept is ultimately necessary, there will be many other, more suitable opportunities for en banc review. The panel's fact-bound analysis here does not present a unique or exceptional vehicle for this Court to refine or clarify a basic NEPA concept.

Intervenors also claim this case is exceptionally important because, in their view, "transporting fossil fuels is and will remain controversial." Pet. 17. Controversy does not equate to exceptional importance—if it did, this Court would be called upon to rehear many more cases en banc. In any event, Intervenors point

16

to nothing in the panel decision addressing or considering any controversy over transporting fossil fuels.

Intervenors also suggest that the presumption favoring rail construction is an exceptionally important issue because it is "likely to come up again." Pet. 19. But again, recurrence is different from importance. Moreover, the panel decision did not address the presumption, so the full Court does not need to do so either. *See supra* p. 15.

## CONCLUSION

For these reasons, the petition should be denied.

Respectfully submitted,

/s/ Andrew M. Bernie
TODD KIM
*Assistant Attorney General*
ANDREW M. BERNIE
JUSTIN D. HEMINGER
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 514-4010
andrew.m.bernie@usdoj.gov

November 9, 2023
DJ # 90-13-4-16537

## CERTIFICATE OF COMPLIANCE

I hereby certify that this opposition complies with the requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point Times New Roman, a proportionally spaced font.

I further certify that this opposition complies with the type-volume limitation set forth Fed. R. App. P. 35(b)(2)(A) because it contains 3,861 words, excluding the parts of the opposition exempted under Fed. R. App. P. 32(f) and D.C. Cir. R. 32(e)(1), according to the count of Microsoft Word.

/s/ Andrew M. Bernie
Andrew M. Bernie

18

**CERTIFICATE OF SERVICE**

I hereby certify that on November 9, 2023, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.

The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

/s/ Andrew M. Bernie
Andrew M. Bernie