IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

EAGLE COUNTY, COLORADO, *et al.*,
*Petitioners*,

v.

SURFACE TRANSPORTATION BOARD, *et al.*,
*Respondents*, and

SEVEN COUNTY INFRASTRUCTURE COALITION, *et al.*,
*Intervenors.*

ON PETITION FOR REVIEW OF ORDERS OF
THE SURFACE TRANSPORTATION BOARD

**RESPONDENT SURFACE TRANSPORTATION BOARD'S
RESPONSE TO PETITION FOR REHEARING *EN BANC***

CRAIG M. KEATS
General Counsel

BARBARA A. MILLER
Attorney
Surface Transportation Board
Washington, DC  20423-0001
(202) 245-0277

November 9, 2023

**TABLE OF CONTENTS**

Table of Authorities ..................................................................................... ii

I.  Background ..............................................................................................1

II.  Intervernors' Grounds for Rehearing ...............................................10

  A.  Upstream and Downstream Environmnental Impacts ....................10

  B.  Transportation Merits ...................................................................14

Conclusion ...............................................................................................16

Certificate of Compliance ........................................................................18

# TABLE OF AUTHORITIES

## Cases

*Center for Biological Diversity v. FERC,*
  67 F.4th 1176 (D.C. Cir. 2023)....................................................10, 13

*Delaware Riverkeeper Network v. FERC,*
  45 F.4th 1152 (D.C. Cir. 2023)........................................... 10-11, 13

*Dep't of Transp. v. Pub. Citizen,*
  541 U.S. 752 (2004)...............................................................13

*Eagle Cnty. v. Surface Transp. Bd.,*
  82 F.4th 1176 (D.C. Cir. 2023)........................ 8, 9, 11, 12, 13, 14, 15

*Food & Water Watch v. FERC,*
  28 F.4th 277 (D.C. Cir. 2022)..................................................11

*Mid States Coal. for Progress v. Surface Transp. Bd.,*
  345 F.3d 520 (8th Cir. 2003) ...................................................14

*N. Plains Res. Council v. Surface Transp. Bd.,*
  668 F.3d 1067 (9th Cir. 2011) .................................................14

*Sierra Club v. FERC (Sabal Trail),*
  867 F.3d 1357 (D.C. Cir. 2017) .............................................11

## Agency Decisions

*Seven Cnty. Infrastructure Coal.-Rail Constr. & Operation*
  *Exemption-in Utah, Carbon, Duchesne, & Uintah Cntys., Utah*
  *(Approval Decision)*, FD 36284 (STB served Dec. 15, 2021) .................7, 8, 16

## Statutes and Rules

42 U.S.C. §§ 4321-4370m-11 .....................................................2

49 U.S.C. § 10101 ...................................................................13

49 U.S.C. § 10502 ................................................................7

49 U.S.C. § 10901 ..........................................................8, 14

49 U.S.C. § 11101 ..............................................................15

Fed. R. App. P. 35 ...............................................................1

Respondent Surface Transportation Board (the Board) respectfully files this response to the Petition for Rehearing *En Banc* (Petition) filed by Intervenors Seven County Infrastructure Coalition (Coalition) and Uinta Basin Railway, LLC (collectively "Intervenors").

Under Federal Rule of Appellate Procedure 35, rehearing *en banc* "is not favored and ordinarily will not be ordered unless: (1) en banc consideration is necessary to secure or maintain uniformity of the court's decisions; or (2) the proceeding involves a question of exceptional importance."  A "question of exceptional importance" may be implicated "if it involves an issue on which the panel decision conflicts with the authoritative decisions of other United States Courts of Appeals that have addressed the issue."  Fed. R. App. P. 35(b)(1)(B).

Of the five current Board Members, only four are able to participate in matters related to this project, as one member is recused due to involvement in the project before joining the Board.  Where there are differing positions among the participating Board Members that impact the Board's position on rehearing, the Board's response so indicates.

## I.  **BACKGROUND**

In May 2020, the Coalition sought authorization to construct and operate an approximately 85-mile rail line connecting two termini in the Uinta Basin to the national rail network at Kyune, Utah (the Line).  JA251.  The Coalition stated that

the purpose of the proposed rail line would be to provide common carrier rail service connecting the Uinta Basin to the interstate rail network using a route that would provide shippers of oil and other commodities with a viable alternative to trucking. JA254-JA256.

Before the Board issued a decision on the proposed Line, it conducted a comprehensive environmental review under the National Environmental Procedure Act (NEPA), 42 U.S.C. §§ 4321-4370m-11. As relevant to the Petition, this environmental review included a thorough assessment of the upstream and downstream impacts of potential oil development in the Uinta Basin and the oil that could be carried on the Line.

The Final Environmental Impact Statement (EIS) examined the upstream impacts from potential oil development in the Uinta Basin on each relevant resource area. JA1106-JA1162, JA1239-JA1240. Because the actual volume of oil transported on the Line will depend on numerous independent variables and factors (such as domestic and global economic conditions, commodity pricing, strategic and capital investment decisions of oil producers and their customers), the Board developed "low production" and "high production" scenarios for future oil and gas development that could occur if the Line were built and operated. JA1106-JA1109. These scenarios were based on the Coalition's estimates of

potential rail traffic on the Line and not on any specific oil development proposals (because none exist at this point).

The Board conservatively assumed that all oil transported on the Line would come from new production that would involve well drilling and construction and operation of related facilities in the Uinta Basin. *Id.*; JA1239-JA1240. The Board then estimated the number of oil wells that would need to be constructed and operated to satisfy the expected increased oil production in the low and high production scenarios. JA1106-JA1109. To assess impacts on air quality and greenhouse gases, the Board added the estimated emissions from construction and operation of the Line to estimated emissions from the other reasonably foreseeable projects, including the upstream oil development and the operation of the rail terminals. JA1137(Table 3.15-11); *see also* JA1140-JA1144. The exact locations of new oil development in the Uinta Basin would depend on many factors, including domestic and global demand and future decisions by private, state, tribal, and federal owners of mineral rights in the Uinta Basin. JA1107. Thus, in making the impacts assessment, the Board could not have known location and localized emissions information with any specificity. The Board was, however, able to estimate regional emissions of greenhouse gases from well construction, well operation, and terminal operation under both the low production and high

production scenarios within the entire Uinta Basin region.  JA1134-JA1138, JA1140-JA1144.

The EIS took a hard look at the potential impacts of oil development in the Uinta Basin on each relevant resource area.  *See* JA1113-JA1162.  The resource areas examined included impacts on air quality, water resources, wildlife, fish, vegetation (including wildfire risk), special status species (including the sage grouse), energy, vehicle safety and delay caused by increased truck trips, geology and soils, noise and vibration, cultural resources, paleontological resources, land use and recreation, visual resources, and environmental justice.  *Id.*  But without knowing specific locations of the potential wells in the thousands of square miles comprising the Uinta Basin, the Board's examination of impacts on certain resource areas, such as vegetation, could only be assessed in general terms.[1]  *See id.*

---

[1] For example, in its discussion of impacts on wildlife, the EIS discusses the fact that big game populations could be affected by oil development if it occurred in crucial habitat but explained that "[t]he extent of potential impacts would depend on the exact location of and layout of well pads."  JA1123.  Since exact locations and layouts were unknown, the EIS conducted what general analysis it could, including a geographic information system (GIS) analysis of big game crucial habitat to estimate the percentage of crucial habitat for each species that fell within oil and gas fields and thus could potentially be affected by oil development. JA1123-JA1124.  *See also* JA1120-JA1121 (discussing the types of impacts that oil wells could have on nearby surface waters and specifically that waste streams from the fracking process were not a significant concern given the type of well development likely to occur in the Uinta Basin); JA1126 (identifying the types of

The EIS likewise analyzed the downstream greenhouse gas emissions from the combustion of oil originating in the Uinta Basin based on the limited information available. JA1139-JA1140, JA1188-JA1192. The Board used a conservative approach and assumed that all the oil transported on the Line would later be combusted and would not displace other fuels from the market. JA1139. Using this conservative approach and applying the same low and high production scenarios used for upstream emissions analysis, the Board estimated that the greenhouse gas emissions from the combustion of oil transported on the proposed Line under the low production scenario would represent about 0.3% of nationwide greenhouse gas emissions and 0.04% of global greenhouse gas emissions, while under the high production scenario the same percentages would be 0.8% and 0.1% respectively. JA1139-JA1140.

In analyzing downstream greenhouse gas emissions, the Board considered the many potential destinations for Uinta Basin oil and the multitude of practical routes to reach those destinations. JA1188-JA1192, JA1230-JA1232. Final destinations for Uinta Basin oil would be determined by many factors, including (1) refinery capacity; (2) capability and willingness of specific refineries to receive

_____

impacts that oil development could have on vegetation and explaining that location would affect the extent of those impacts); JA1127 (same regarding special status species); JA1136 (stating that the locations of localized impacts from oil development emissions were not known because there was no data on the characteristics or local site conditions of future oil development projects).

and process the waxy type of crude found in the Uinta Basin; (3) pricing in the future; and (4) future contractual agreements. *See* JA1189-JA1191. Because it is impossible to identify the specific refineries that would receive shipments of oil from the Uinta Basin, the Board identified the geographic refining market areas that could receive Uinta Basin oil if it were shipped today. JA1188-JA1192, JA1231. Based on the existing refining capacity in those geographic areas and data trends in crude oil movements, the Board estimated that about 50% of the oil transported on the proposed Line likely would move to the Houston/Port Arthur area, 35% to the Louisiana Gulf Coast, 10% to the Puget Sound South, and 5% to Petroleum Administration for Defense District 2 refineries in the Midwest (referred to as PADD in the EIS). JA1188-JA1194, JA1231. With all the unknowns and uncertainties, the Board could not predict destinations with any more specificity than the large general regions most likely to receive oil from the Uinta Basin. But the Board estimated the number of trains from the Uinta Basin that would travel to these geographic areas, with the highest number under the high production scenario being an estimate of 5.26 trains per day to the Houston/Port Arthur area and 3.68 to the Louisiana Gulf Coast. JA1191(Table C-2).

The Board's thorough analysis of the potential greenhouse gas emissions from any increase in oil development in the Uinta Basin and from combustion of the newly extracted oil was based on the best information available. The Board did

not just acknowledge the upstream and downstream impacts of oil development in the Uinta Basin; it analyzed them in detail and made multiple conservative assumptions throughout its analysis to ensure that it did not understate those impacts. *See e.g.* JA1106-JA1111, JA1137-JA1140, JA1239-JA1240, JA1273. The Board then analyzed upstream and downstream impacts using reasonable forecasting rather than speculative analysis that would not further the primary purpose of NEPA of informing agency decision-making and the public with respect to environmental impacts.

In December 2021, after reviewing and analyzing the full record, including the Final EIS, the Board issued its decision authorizing construction and operation subject to extensive environmental mitigation conditions. JA23 (*Seven Cnty. Infrastructure Coal.-Rail Constr. & Operation Exemption-in Utah, Carbon, Duchesne, & Uintah Cntys., Utah (Approval Decision)*, FD 36284 (STB served Dec. 15, 2021)). The Board examined at length the environmental impacts of the proposed Line, including the upstream and downstream impacts, found that the Draft and Final EIS took the requisite "hard look" at the environmental impacts, and held that the approved alternative best satisfied the purpose and need for the Line while minimizing potential impacts to the extent practicable. JA 45.

In authorizing construction and operation, the Board looked to the Rail Transportation Policy (RTP) as required by 49 U.S.C. § 10502 and also to the

statutory "permissive licensing standard that directs the Board to grant rail construction proposals unless the agency finds the proposal 'inconsistent with the public convenience and necessity'." JA27; *see* 49 U.S.C.10901(c). The Board concluded that, by providing an alternative, more cost-effective method of transportation for shippers that are currently limited to shipping by truck, the project would eliminate longstanding transportation constraints, allow entry into new markets, and help diversify local economies and create more jobs, all of which would advance the RTP. JA45-JA47.

In February 2022, Eagle County, Colorado and the Center for Biological Diversity, *et al.* both filed timely petitions for review of the *Approval Decision*. On August 18, 2023, the Court set aside and vacated the Board's ruling and remanded the matter for further proceedings before the Board. *Eagle Cnty. v. Surface Transp. Bd.*, 82 F.4th 1152 (D.C. Cir. 2023). As relevant to the Petition, the Court held that the Board should have done more extensive and location-specific analysis of the anticipated upstream impacts of the oil wells and related infrastructure that it expects to be built in the Uinta Basin. *Eagle Cnty.* at 1179. The Court also faulted the Board's downstream impacts analysis (which analyzed impacts from the use of oil originating in the Uinta Basin). *Id.* While the Board estimated greenhouse gas emissions from refining the oil and its contribution to national and global emissions, the Court found that the Board should have

analyzed location-specific impacts or explain why it could not engage in some degree of forecasting to identify localized impacts. *Id.*

The Court also held that the Board did not properly consider the environmental impacts in the context of the RTP weighing analysis. *Id.* at 1190-1196. The Court noted first the Board's reliance on its EIS, which, even though it was thorough and thoughtful, the court nevertheless found to be flawed. *Id.* at 1194. The Court then found that, when the Board determined that the transportation benefits outweighed the environmental impacts, the Board failed to adequately weigh downstream emissions, failed to consider the RTP factor regarding energy conservation, and engaged in only a "limited" weighing of other environmental impacts. *Id.* at 1194-1195. Further, the Court faulted the Board for weighing transportation benefits that were uncertain (because of questions as to whether the Line actually would be built) against environmental impacts that it characterized as significant. The Court made this determination notwithstanding the fact that, if the Line is not built, there would be no environmental impacts at all; thus, the questions that the Court raised about whether the Line would be built would make the environmental impacts equally as uncertain as the transportation benefits.

The Intervenors timely filed the Petition at issue here on the basis that the Court's decision conflicted with prior precedent. On October 4, 2023, this Court ordered Respondents and Petitioner to file responses to the Intervenors' Petition.

## II.   **Intervenors' Grounds for Rehearing**

### A. Upstream and Downstream Environmental Impacts

The Intervenors posit that the Court's finding that the upstream and downstream impacts of oil development in the Uinta Basin were reasonably foreseeable conflicts with prior D.C. Circuit precedent. *See* Petition at 9-13. Specifically, the Intervenors argue that under applicable precedent, downstream emissions from oil carried on the Line are reasonably foreseeable only when the end users are known, and that upstream impacts from oil development are reasonably foreseeable only when well numbers and locations are known. *Id.* The Intervenors then conclude that, because the Board did not know the specific end users or well numbers and locations, the Court departed from that precedent. *Id.*

The Board understands the Intervenors' concerns given this Court's recent decisions finding that for such upstream and downstream emissions to be reasonably foreseeable under NEPA, certain information related to the emissions—well numbers and locations, transport destinations, and intended uses for the oil—must be known and available. In *Center for Biological Diversity v. FERC*, 67 F.4th 1176, 1185 (D.C. Cir. 2023), and *Delaware Riverkeeper Network. v. FERC*,

45 F.4th 104, 109-11 (D.C. Cir. 2022), this Court found that downstream emissions are not reasonably foreseeable when destinations and/or end users are unknown. Moreover, in *Delaware River Keeper,* the Court additionally held that upstream impacts are not reasonably foreseeable when well numbers and locations are not known. *Delaware River Keeper* at 1109; *see also Food & Water Watch v. FERC*, 28 F.4th 277, 287-88 (D.C. Cir. 2022), and *Sierra Club v. FERC (Sabal Trail)*, 867 F.3d 1357, 1373-74 (D.C. Cir. 2017) (finding that there was specifity as to destinations and end users and, therefore, the downstream impacts were reasonably foreseeable).

In this case, the Court did address the pertinent precedent regarding downstream impacts, and concluded that this case was factually more akin to *Sabal Trail* than *Delaware River Keeper*. *Eagle Cnty.*, 82 F.4th at 1178. The Court determined that, because the Board "has identified the refineries" likely to receive the oil and knows that the oil will be refined, "[t]his is not a case in which the location of where oil will be delivered or its end use is unknown, as in *Delaware Riverkeeper Network*." *Id.*; *see also Eagle Cnty.* at 1179 n.1 (holding that there are no uncertainties about end users and this case is not one in which the agency cannot identify the end users).

The Board disagrees with how the Court applied its precedent here, but in the Board's view the error—in finding that the Board knew the destination

11

refineries for the oil originating in the Uinta Basin—can be viewed as factual, rather than legal. As the Board explained in the EIS, the Board does not know the destination refineries for the oil originating in the Basin, JA1188-JA1192, JA1231, and therefore could not have identified the refineries to which the oil would go. Although the Board was able to identify the geographic refining market areas that could receive the oil if it were shipped today, these geographic areas include more than 30 refineries in regions encompassing hundreds of square miles. Thus, while it is the Board's view that the Court's factual conclusion that "[t]his is not a case in which the location of where oil will be delivered or its end use is unknown" is not supported by the record, the Court did appear to look to and apply the prior precedent that destinations and end users must be known.

The Board also shares some of the Intervenors' concerns about the Court's discussion of this precedent as it applies to upstream impacts and agrees that it is cursory. However, the Board again is of the view that *Eagle County* can be interpreted not as rejecting this precedent, but as holding (incorrectly, in the Board's view) that there is sufficient specificity with respect to the number and location of wells here to meet the standards established in those prior decisions. *Eagle Cnty.,* 82 F.4th at 1178-1179.

While the Court correctly found that the Board predicted a range of the number of wells that would likely be developed in the Uinta Basin (a range of

1,243 to 3,330 wells), JA1106-JA1109, in the Board's view it incorrectly concluded that this information was sufficient to render impacts from oil production reasonably foreseeable. Even though the Board was able to identify a possible range of potential wells, no information was available about the location of these wells other than that they would be in the Uinta Basin, JA1107-JA1109. The Uinta Basin spans thousands of square miles and, thus, is not a sufficiently specific location for upstream impacts to become reasonably foreseeable. But once again, the Court's conclusion can be viewed as resulting from its factual findings, with which the Board disagrees, rather than from a disregard for prior precedent.[2]

---

[2] Two of the Board Members are concerned that *Eagle County* could make it more difficult—contrary to the RTP, 49 U.S.C. § 10101(4)—to advance construction projects that would ensure the development of a sound rail transportation system. In their view, *Eagle County* potentially expands precedent, on both upstream and downstream activity, and could thus deter new rail construction and frustrate an agency's ability to make informed decisions. *See Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 768 (2004). Specifically, these Members are concerned that *Eagle County* could be construed as expanding *Center for Biological Diversity* by implying a new standard for downstream emissions. *Eagle Cnty.* at 1179 n.1 (indicating that downstream emissions may be reasonably foreseeable even if an agency has only identified "specific regions with a limited set of refineries"). Similarly, these Members are concerned that, in its discussion of the Board's analysis of oil wells, the Court construed *Delaware Riverkeeper* in a way that may have expanded the reasonable foreseeability analysis for upstream effects. *Id.* at 1178-1179 (expanding the analysis for localized impacts from sites to regions).

## B. The Transportation Merits

The Coalition also argues that *Eagle County* created a conflict with other circuits when it improperly disregarded the statutory presumption in favor of authorizing construction by holding that the Board should have given equal weight to the environmental effects and the transportation benefits. Petition at 12-16. The Board agrees that *Eagle County* failed to address statutory language indicating that the Board is directed to authorize construction "*unless* the Board finds that such activities are *inconsistent* with the public convenience and necessity," 49 U.S.C. § 101901 (emphasis added), and that it did not even reference, let alone address, the presumption that rail construction projects are in the public interest and should be approved. *N. Plains Res. Council v. Surface Transp. Bd.*, 668 F.3d 1067, 1091-92 (9th Cir. 2011); *accord Mid States Coal. for Progress v. Surface Transp. Bd.*, 345 F.3d 520, 552 (8th Cir. 2003). Nevertheless, two of the four participating Board Members do not interpret *Eagle County's* silence as rejecting or disregarding the well-established statutory presumption in favor of rail construction. The other two participating Board Members are concerned that the Court's failure to acknowledge that well-established presumption—in contrast to other circuits' evaluation of the Board's construction decisions—necessarily affected the *Eagle County* analysis of the Board's consideration of the RTP factors.[3]

The Board does not interpret *Eagle County* as requiring it to give equal weight to environmental impacts and the transportation benefits. The Court held that, in its *Approval Order*, the Board "did not adequately consider the incredibly significant environmental effects identified in the EIS in weighing those impacts against the uncertain transportation benefits of the Railway" and that the Interstate Commerce Act requires "a more fulsome explanation for the Board's conclusion that the Railway's transportation benefits outweighed the project's environmental impacts." *Eagle Cnty.* at 1194, 1195. The Board does not believe this finding sets a specific fraction for weighing the transportation benefits and the environmental impacts, but rather that the Court is making a more general statement that the Board had not fully explained the basis for its conclusion as required under the

---

[3] Those Board Members are concerned that *Eagle County* could be read as implicitly reflecting a bias against construction when the project itself or the commodities to be shipped raise environmental concerns. In describing and emphasizing the uncertainty of the transportation benefits based on financial viability questions, the Court did not acknowledge that the same financial viability questions would render many of the cited environmental impacts equally uncertain. *See Eagle Cnty.* at 1194 (comparing the "incredibly significant" environmental effects to the "uncertain" transportation benefits); 1196 (placing "uncertain financial viability" and the "full potential for environmental harm" on one side of a ledger, and "transportation benefits" on the other). Additionally, carriers are required to carry commodities such as oil, and, as noted in the Board's Brief, at 34, the suggestion that the Board could deny construction and operation authority because the commodity to be carried itself can have environmental impacts would be in tension with the common carrier obligation and the Board's statutory obligation to enforce it. 49 U.S.C. § 11101(a).

Administrative Procedure Act.  *See* JA47 (*Approval Order* stating "the transportation merits of the project outweigh the environmental impacts").  While the Board believes that it appropriately weighed the RTP factors that would engage if the line were built, which include environmental considerations, and that it fully explained its decision, it does not believe that this aspect of the Court's decision needs to be read as conflicting with prior precedent or precludes the Board in this or future cases from giving significant weight to the statutory presumption in favor of construction.[4]

## Conclusion

For the foregoing reasons, if the Board's interpretation of the decision as being factually erroneous but not inconsistent with precedent is correct, the Board does not believe that the Petition for Rehearing *En Banc* meets the Rule 35 standard for rehearing.

Respectfully submitted,

CRAIG M. KEATS
General Counsel

---

[4]  The Board agrees, though that, if, as the Intervenors argue, the Court in fact meant to say that environmental impacts must be given equal weight to the transportation merits, that requirement would amount to a rejection of the clear statutory language, acknowledged by other courts of appeals, establishing the presumption in favor of authorizing construction.

/s/ Barbara A. Miller
                                        BARBARA A. MILLER
                                        Attorney
                                        Surface Transportation Board
                                        395 E Street SW
                                        Washington, D.C.  20423-0001
                                        (202) 245-0277
                                        Barbara.Miller@stb.gov

November 9, 2023

**CERTIFICATE OF COMPLIANCE**

This document complies with the type-volume limit of Federal Rule of Appellate Procedure 35(b)(2) because this document contains 3,798 words.

This document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman font.

/s/ Barbara A. Miller
Barbara A. Miller
Attorney
Surface Transportation Board