Nos. 22-1019 & No. 22-1020 (consolidated)

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

────────────────

EAGLE COUNTY, COLORADO,

Petitioner,

CENTER FOR BIOLOGICAL DIVERSITY, ET AL.,

Petitioners,

v.

SURFACE TRANSPORATION BOARD, ET AL,

Respondents,

SEVEN COUNTY INFRASTRUCTURE COALITION
AND UINTA BASIN RAILWAY, LLC,

Intervenors.

────────────────

**PETITIONERS CENTER FOR BIOLOGICAL DIVERSITY, ET AL.'S
OPPOSITION TO MOTION FOR REMAND WITHOUT VACATUR AND
CROSS-MOTION TO REAFFIRM VACATUR**

────────────────

Wendy Park
Center for Biological Diversity
2100 Franklin St., Suite 375
Oakland, CA 94612
(510) 844-7138
wpark@biologicaldiversity.org

Edward B. Zukoski
Center for Biological Diversity
1536 Wynkoop St., Suite 421
Denver, CO 80202
(303) 641-3149
tzukoski@biologicaldiversity.org

*Counsel for Petitioners Center for Biological Diversity, Living Rivers, Sierra Club,
Utah Physicians for a Healthy Environment, and WildEarth Guardians*

# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................... i

TABLE OF AUTHORITIES ............................................................ ii

GLOSSARY....................................................................................... v

Introduction ...................................................................................... 1

Argument............................................................................................ 2

    I.      The Supreme Court's Decision Does Not Impact this Court's NEPA Holding on Downline Effects in Colorado or Its ICCT Act Holding.................... 2

        A.   The Supreme Court's Holding Did Not Reach this Court's Ruling on Downline Effects. ............................................................. 3

        B.   The Supreme Court Did Not Speak to the Board's Authority to Consider Downline Effects under the ICCT Act. ............................ 6

    II.     The Board's Failures to Review and Consider Downline Effects Are Serious Deficiencies Infecting the Board's Substantive Decision, Requiring Vacatur. ............................................................................ 8

    III.    The Board's and Service's ESA Violations Were Serious. .................... 12

    IV.    The Coalition Fails to Demonstrate that Vacatur Would Have Disruptive Consequences.................................................................... 20

Conclusion ...................................................................................... 24

CERTIFICATE OF COMPLIANCE.............................................. 25

CERTIFICATE AS TO PARTIES AND AMICI.............................. 26

CORPORATE DISCLOSURE STATEMENT .............................. 27

# TABLE OF AUTHORITIES

## Cases

*Allied-Signal v. U.S. Nuclear Regulatory Commission*, 988 F.2d 146 (D.C. Cir. 1993) ................................................................................................... 8, 20

*Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510 (D.C. Cir. 2020)........... 8, 20

*Am. Rivers & Ala. Rivers Alliance v. FERC*, 895 F.3d 32 (D.C. Cir. 2018) .... 10, 20

*City of Port Isabel v. FERC*, 130 F.4th 1034 (D.C. Cir. 2025) ......................... 9, 21

*Cottonwood Env't L. Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075 (9th Cir. 2015) ......12

*Ctr. for Biological Diversity v. Regan*, 734 F. Supp. 3d 1 (D.D.C. 2024) ..............19

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1 (2020)............8

*Eagle Cnty. v. Surface Transp. Bd.*, 82 F.4th 1152 (D.C. Cir. 2023).. 4, 7, 9, 10, 11, 12, 13, 14, 15, 19, 20

*Motor Vehicle Mfrs. v. State Farm Mutual Automobile Ins. Co*, 463 U.S. 29 (1983) ................................................................................................................10

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644 (2007) ...............19

*Nat'l Parks Conservation Ass'n v. Jewell*, 62 F. Supp. 3d 7 (D.D.C. 2014)...........19

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.,* --- U.S. ---, 145 S. Ct. 1497 (2025) .................................................................................................. 3, 5, 6, 7, 16

*Shafer & Freeman Lakes Environmental Conservation Corporation v. FERC*, 992 F.3d 1071 (D.C. Cir. 2021) .................................................................. 17, 19, 23

*Sierra Club v. U.S. DOT*, 125 F.4th 1170 (D.C. Cir. 2025) ......................................2

*Sovereign Iñupiat for a Living Arctic v. BLM*, 555 F. Supp.3d 739 (D. Ak. 2021) 23

*Standing Rock Sioux Tribe v. United States Army Corps of Engineers,* 471 F. Supp. 3d 71, 84 (D.D.C. 2020) .......................................................................................22

*Standing Rock Sioux Tribe v. United States Army Corps of Engineers*, 985 F.3d 1032 (D.C. Cir. 2021) ........................................................................ 9, 18, 20, 23

*Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89 (D.C. Cir. 2002).....22

*Thomas v. Peterson*, 753 F.2d 754 (9th Cir. 1985)....................................................12

*W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472 (9th Cir. 2011) ................12

## Statutes

16 U.S.C. § 1536(a)(2)........................................................................... 12, 18

16 U.S.C. § 1536(b)(4).................................................................................18

49 U.S.C. § 11101(a) ....................................................................................7

## Regulations

49 C.F.R. § 1105.7(e)(11)(v) ....................................................................4, 8

50 C.F.R. § 402.02 ................................................................................. 14, 16

50 C.F.R. § 402.14(g)(7)............................................................................18

## Other Authorities

Kyle Dunphey, *Uinta Basin Railway group looks to fund project with $2.4 billion in federal bonds*, Utah News Dispatch (June 3, 2025), available at https://utahnewsdispatch.com/2025/06/13/uinta-basin-railway-funding/ ...........21

*See Seven Cnty. Infrastructure Coal.—Rail Constr. & Operation Exemption—in Utah, Carbon, Duchesne, & Uintah Cntys*., S.T.B. Fin. Docket 36284, 2021 STB LEXIS 298, 2021 WL 5960905 (STB served Dec. 15, 2021) ....................7

U.S. Energy Information Administration (EIA), *EIA expects low crude oil prices and declining rig count to affect U.S. crude oil production trends through 2026* (June 10, 2025), available at https://www.eia.gov/pressroom/releases/press570.php ......................................21

U.S. Energy Information Administration (EIA), *Today in Energy* (Mar. 11, 2024),
    available at https://www.eia.gov/todayinenergy/detail.php?id=61545 ...............21

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| BiOp | Biological Opinion |
| Board | Surface Transportation Board |
| Coalition | Seven County Infrastructure Coalition |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| FERC | Federal Energy Regulatory Commission |
| ICCT Act | Interstate Commerce Commission Termination Act |
| NEPA | National Environmental Policy Act |
| Railway | Uinta Basin Railway |
| Service | U.S. Fish and Wildlife Service |

## INTRODUCTION

Petitioners Center for Biological Diversity *et al*. (Center) respectfully move this Court to reaffirm its vacatur of the Surface Transportation Board's (Board's) decision approving the Uinta Basin Railway (Railway), the Board's supporting environmental impact statement (EIS), and the U.S. Fish and Wildlife Service's (Service's) biological opinion (BiOp). The Center also opposes the Seven County Infrastructure Coalition's (Coalition's) motion for remand without vacatur. There is no reason to disturb this Court's earlier remedy ruling. The Supreme Court reversed this Court on a single issue—whether the National Environmental Policy Act (NEPA) requires the Board to consider the effects of oil drilling and refining projects that the Railway's construction and operation would induce. The Supreme Court's holding did not address and does not call into question this Court's other rulings—that the Board violated NEPA by failing to take a hard look at the oil railway's "downline" impacts on wildfire, oil spill, and derailment and collision risks along the Union Pacific Line; violated the Endangered Species Act (ESA) by failing to comply with its duty to insure against jeopardy to the four Colorado River endangered fish; and violated the Interstate Commerce Commission Termination Act (ICCT Act) and Administrative Procedure Act (APA) by failing to fully weigh the project's environmental harms and transportation benefits, and

1

consider all relevant rail policies and the project's financial viability in its

weighing analysis.

Nothing in the Supreme Court's opinion, which only addressed one NEPA

violation, dictates that this Court reconsider its application of the *Allied-Signal* test

and depart from the "ordinary remedy" of vacatur, *Sierra Club v. U.S. DOT*, 125

F.4th 1170, 1186 (D.C. Cir. 2025). The remaining errors are no less serious than

they were when the Court vacated the Board's order. And, as before, the Coalition

points to no concrete "disruptive consequences" that vacatur would cause. Rather,

the Coalition effectively admits that the potential for disruptive consequences is

virtually nonexistent. Altogether, the seriousness of the Board's many legal

violations, and the absence of disruptive consequences, demonstrate that the Court

should uphold its vacatur ruling.

## ARGUMENT

### I.      The Supreme Court's Decision Does Not Impact this Court's NEPA Holding on Downline Effects in Colorado or Its ICCT Act Holding.

The Coalition's claim that the Supreme Court's decision reversed the Board

on all NEPA grounds that this Court decided in Petitioners' favor is incorrect,

undercutting its argument that remand without vacatur of the Board's decision is

appropriate.

The Coalition bewilderingly claims the Supreme Court's holding that NEPA

does not require the Board to consider in its EIS the effects of oil development

projects separate in time or place from the Railway also means that NEPA does not require the Board to consider downline effects along the Colorado River. Coalition's Motion for Remand ("Coalition Mot.") at 9. But the Supreme Court's ruling did not reach, or even mention, the Board's downline effects analyses. Nor does the ICCT Act's rail transportation policy—which the Supreme Court only briefly touched on in a footnote—preclude the Board's consideration of the risks of transporting oil or of downline effects in its weighing analysis.

## A. The Supreme Court's Holding Did Not Reach this Court's Ruling on Downline Effects.

The Supreme Court reversed this Court's rulings on the Railway's failure to address the impacts from oil drilling and refining projects induced by the Railway because the Court owed the Board "substantial deference" in "where to draw the line" for indirect effects analysis. *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.,* --- U.S. ---, 145 S. Ct. 1497, 1513 (2025) ("So long as the EIS addresses environmental effects from the project at issue, courts should defer to agencies' decisions about where to draw the line—including (i) how far to go in considering indirect environmental effects from the project at hand and (ii) whether to analyze environmental effects from other projects separate in time or place from the project at hand."). But the Supreme Court nowhere addressed the Railway's analysis of downline effects between Kyune, Utah—where oil trains traveling the Uinta Basin Railway would turn off onto the Union Pacific Line—and Denver, because that

3

issue was never presented to the Court for review. *See* Fed. Resp'ts' Br. in Supp. of Pet'rs at 40, 145 S. Ct. 1497 (2025) (No. 23-975); Fed. Resp'ts' Reply Br. in Supp. of Pet'rs at 22 n.3, 145 S. Ct. 1497.

This Court's ruling on downline effects *accepted* where the Board drew the line, finding arbitrary the substance, not the scope, of the Board's analysis. The Board's own line drawing, pursuant to its environmental regulations, led it to address impacts between Kyune, Utah and Denver. JA1188 (citing 49 C.F.R. § 1105.7(e)(11)(v)); JA886; JA1192. This Court found arbitrary and capricious the Board's reasoning *within* the four corners of its downline effects analyses, including its "utterly unreasoned" rationale for minimizing the project's downline wildfire risks, flawed projections of downline accident risks, and ignoring water pollution risks along the Colorado River. *See Eagle Cnty. v. Surface Transp. Bd.*, 82 F.4th 1152, 1182–85 (D.C. Cir. 2023). The Court did not address where the Board should draw the indirect effects line. *See id*. Thus, the Supreme Court's "substantial deference" ruling neither directly addresses nor indirectly questions this Court's rulings on downline effects.

The Supreme Court offered an additional basis under NEPA for reversing this Court on the effects of oil production projects, but that basis likewise does not directly address this Court's downline effects holding. The Supreme Court stated that NEPA does not require the Board to consider the effects of "projects that are

4

separate in time or place from the 88-mile railroad project at hand—that is, effects from potential future projects or from geographically separate projects." *Seven County*, 145 S. Ct. at 1515. The Court explained that the effects of these separate projects need not be considered because the separate projects "fall outside the Board's authority and would be initiated, if at all, by third parties." *Id*. Legally speaking, "the separate project breaks the chain of proximate causation between the project at hand and the environmental effects of the separate project." *Id*. at 1516.

The Coalition does not argue that a "separate project" would cause these downline effects along the Union Pacific Line to Colorado, because there is none. "The project at hand" – the construction and operation of the Uinta Basin Railway – and not "separate projects," would foreseeably increase rail traffic on the Union Pacific Line, heightening wildfire, train accident, and oil spill risks on that line. JA753; JA790-91; JA991; JA1197-1201; JA1445-1449. *See also Seven County*, 145 S. Ct. at 1515 ("indirect effects" "can sometimes fall within NEPA," even though they "might extend outside the geographical territory of the project or might materialize later in time"). Nor does the Coalition attempt to explain how oil train traffic, caused by the Railway's construction, and moving from the Railway to the Union Pacific Line, en route to their destinations, "breaks the chain of

5

proximate causation" between the Board's approval of the Railway and downline effects. *Id.* at 1516.

Instead, the Coalition contends that "downline effects are outside the Board's regulatory authority, and thus outside its NEPA responsibility." Coalition Mot. at 10 (citing *Seven County*, 145 S. Ct. at 1516). But this is contrary to the Board's own view of its obligation under NEPA and its environmental regulations. *See supra* at 4.

Moreover, the Coalition mischaracterizes the Supreme Court's ruling, which holds that because "[o]ther agencies possess authority to regulate those *separate projects* and their environmental effects," the Board did not have to consider those separate projects' effects. *Seven County*, 145 S. Ct. at 1516 (emphasis added). Nothing in the *Seven County* decision suggests that effects *of the proposed project* (like downline effects) are off-limits from NEPA review.

This Court should reject the Coalition's overbroad reading of the *Seven County* decision.

**B. The Supreme Court Did Not Speak to the Board's Authority to Consider Downline Effects under the ICCT Act.**

The Coalition claims that the Supreme Court provided alternative substantive grounds for not requiring further analysis of downline effects under NEPA or weighing of downline effects under the ICCT Act, in an oblique reference to the Supreme Court's brief commentary in a footnote. Coalition Mot. at

6

9. Because "[r]ailroad lines approved by the Board cannot decline to provide 'common carrier' transport based on the product or commodity to be carried," *Seven County*, 145 S. Ct. at 1518 n.6 (citing 49 U.S.C. § 11101(a)), the Supreme Court explained, "the Board was not required to analyze impacts *related to the destinations or end uses of any such products or commodities* transported by the 88-mile railroad line, including Uinta Basin crude oil," *id*. (emphasis added, cleaned up).

The Supreme Court's observation that the Board was not required to consider impacts "related to the destinations or end uses of any such products or commodities" is limited to just that. That rationale comes from the Board's EIS, but it only speaks to why the Board was not required to analyze the effects of increased oil use and refining (the "end uses") attributable to increased production the Railway would spur. *Id*. (citing JA1139).[1] The Board has never asserted that the railroads' common carrier obligation somehow precludes it from considering

_____

[1] The Board itself never formally adopted that position in its order. *See Seven Cnty. Infrastructure Coal.—Rail Constr. & Operation Exemption—in Utah, Carbon, Duchesne, & Uintah Cntys*., S.T.B. Fin. Docket 36284, 2021 STB LEXIS 298, 2021 WL 5960905, \*14-\*18 & n.15 (STB served Dec. 15, 2021). Rather, it insisted throughout this case that the Board considered end-use effects in its weighing analysis under the ICCT Act. *See Eagle County*, 82 F.4th at 1194 (Court "taking the Board at its word that its treatment of downstream emissions *in its Final Determination* is no different due to their categorization as 'cumulative effects' instead of 'indirect effects'") (emphasis added).

downline effects, much less the transportation risks of products carried on the proposed line, when it approves new railroads. And in fact, the Board conducted downline effects analysis in its EIS, as required by its own regulations, *see, e.g.*, JA1188 (citing 49 C.F.R. § 1105.7(e)(11)(v)), and considered some risks unique to oil trains, including oil spills, JA1199-1201. The Court cannot accept a litigant's post-hoc rationale that the Board itself never relied on. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 24 (2020) ("An agency must defend its actions based on the reasons it gave when it acted.").

On remand, nothing in the Supreme Court's opinion allows the Board to ignore these downline harms in weighing the project's environmental harms and transportation benefits.

## II. The Board's Failures to Review and Consider Downline Effects Are Serious Deficiencies Infecting the Board's Substantive Decision, Requiring Vacatur.

"[R]emand without vacatur remains an exceptional remedy," available only in "limited circumstances." *Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 518-19 (D.C. Cir. 2020). In weighing a remedy other than vacatur, a court must consider, first, "the seriousness of the [action's] deficiencies (and thus the extent of doubt whether the agency chose correctly)," and second, "the disruptive consequences" of vacatur. *Allied-Signal v. U.S. Nuclear Regulatory Commission*, 988 F.2d 146, 150-51 (D.C. Cir. 1993).

The Coalition mischaracterizes the first factor, contending the errors here are not serious because they involve "nothing more than insufficient or inappropriate explanations," and the Board "may find an adequate explanation for its actions." Coalition Mot. at 4 (citation omitted). But in *Standing Rock Sioux Tribe v. United States Army Corps of Engineers*, this Court clarified, "[w]hen an agency bypasses a fundamental procedural step, the vacatur inquiry asks not whether the ultimate action could be justified, but whether the agency could, with further explanation, justify its decision to skip that procedural step." 985 F.3d 1032, 1052 (D.C. Cir. 2021). For example, vacatur is strongly favored where an agency committed "a total and unjustifiable failure to follow NEPA's core procedures as to an entire project." *City of Port Isabel v. FERC*, 130 F.4th 1034, 1038 (D.C. Cir. 2025). But even when the error is not so "fundamental" or only "pertain[s] to specific, discrete subjects," vacatur is still favored where the errors "were not merely inadequately explained, but unjustifiable." *Id*.

Here, the Board's failures under NEPA cannot be corrected with additional explanations. For example, the Board's failure to consider water pollution impacts on the Colorado River in its NEPA review cannot be squared with the Board's drawing its downline effects analysis area all the way to Denver, JA886; JA1188, and along the neighboring Union Pacific Line, which "parallel roughly 233 miles of the Colorado River." *Eagle County*, 82 F.4th at 1172 (cleaned up); *see also*

JA899; JA1491 (map). Nor are the Board's failures to consider the effects of thousands of 2-mile long oil trains annually traveling the Union Pacific Line on wildfire and water pollution risks likely justifiable, when the EIS: projected that downline accident risks would more than double to three accidents annually, with an accident involving a loaded oil train occurring nearly once per year, JA899-900; acknowledged that the consequences of train accidents include explosions, fires, and oil spills, JA1197-1201; and projected an accidental release would occur roughly once every four years, with nearly three-quarters of those spills likely to release 30,000 gallons or more, *see* JA1201. In light of significant record evidence showing that derailment risks increase in mountainous terrain, *see Eagle County*, 82 F.4th at 1182 (citing JA618), and with longer, heavier, stiffer, and more challenging to control oil-laden tankers, JA618-19, the Board's failures to "entirely… consider [these] important aspect[s] of the problem"—cannot be justified. *See Motor Vehicle Mfrs. v. State Farm Mutual Automobile Ins. Co*, 463 U.S. 29, 43 (1983).

That these errors "infect [the Board's] final determination," *Eagle County*, 82 F.4th at 1194, magnify their seriousness. *See Am. Rivers & Ala. Rivers Alliance v. FERC*, 895 F.3d 32, 55 (D.C. Cir. 2018) (holding that because flaws in the biological opinion (BiOp) and NEPA review "fatally infected" the FERC's order, vacatur was warranted). "[W]ith respect to its consideration of the environmental

10

[rail] policies, the Board relie[d] solely on its EIS." *Eagle County*, 82 F.4th at 1194. The Board's failures to consider the Railway's downline harms in the EIS, and, consequently, in the Board's final weighing of the project's harms and benefits, skewed the Board's analysis in favor of the project. These errors also infected the flawed BiOp, *see infra* at 15 (which also infected the Board's final weighing analysis). The BiOp relied in part on the EIS's "likely flawed analysis of accident risk" of increased train traffic downline to avoid analyzing the Railway's effects on the Colorado River endangered fish. *Eagle County,* 82 F.4th at 1188.

Moreover, the Board's "paltry discussion" of the project's environmental harms compared to its benefits, and failure to address the project's financial viability and each of the rail policies relevant to environmental harms in its weighing analysis cannot be justified on remand. *Id*. at 1195. As this Court observed, the Board failed "at every juncture" in its "*fundamental* task … to properly consider and apply the relevant Rail Policies" to its final determination. *Id*. at 1192 (cleaned up, emphasis added).[2]

---

[2] The Center adopts and incorporates by reference Eagle County's argument addressing the seriousness of the Board's unjustifiable failure to consider the Railway's financial viability, consider the ICCT Act's public health and safety and energy conservation policies, and "compare both sides of the ledger." Eagle County Opp. to Coalition's Mot. for Vacatur and Cross-Mot. to Reaffirm Vacatur.

The serious deficiencies in the Board's NEPA review and in its ICCT Act weighing analysis cannot be justified on remand, warranting vacatur.

## III.    The Board's and Service's ESA Violations Were Serious.

Like its NEPA violations, the Board's (and Service's) ESA violations were serious, supporting this Court's correct determination that the BiOp and Board's order be vacated. This Court found that the agencies' attempt to comply with ESA Section 7's consultation duty was "arbitrary," and their reasoning "especially flawed" and "faulty." *Eagle County*, 82 F.4th at 1188. The agencies' arbitrary consultation thus violated the Board's substantive duties to "insure" that its actions would not likely jeopardize species protected by the ESA or adversely modify their critical habitat. 16 U.S.C. § 1536(a)(2). Numerous courts underscore the significance of Section 7 violations. *See, e.g, W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 495 (9th Cir. 2011) (Section 7 is "the heart of the ESA," and affirming a permanent injunction based in part on Section 7 violation); *Thomas v. Peterson*, 753 F.2d 754, 763 (9th Cir. 1985) (agency's failure to comply with the ESA "cannot be considered a *de minimis* violation"), *abrogated on other grounds as recognized by Cottonwood Env't L. Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1092 (9th Cir. 2015).

Although the Coalition never previously argued against vacatur of the Service's BiOp, did not appeal this Court's decision on the Service's BiOp, and the

Supreme Court did not address it, the Coalition seeks another bite of the apple. The Coalition now attempts to cast this Court's finding that the Board and Service's ESA reasoning was "especially flawed" as no more than a "narrow objection 'to the Board's determination of the relevant action area'" that can be explained away on remand without the need for vacatur. Coalition Mot. at 5 (quoting *Eagle County*, 82 F.4th at 1187). But the Board's failure to properly define the Railway's "action area" under the ESA is no small flaw and can't merely be waved away. It fundamentally undermines both the Board's Biological Assessment and the subsequent BiOp's analysis of the Railway's effects by failing to account for its impacts on "waterways downline near the Union Pacific Line." *Eagle County*, 82 F.4th at 1187–88. These significant effects include the impacts of increased rail traffic resulting in increased water contamination and higher spill risks on the four Colorado River endangered fish and their critical habitat from more trains traveling the Union Pacific Line along the Colorado River. *Id.*; *see also id*. at 1195 (noting Railway's harms include "crude oil spills in critical habitats and sensitive water resources that are home to endangered species").

There is no explanation that could justify contradicting the ESA's regulatory mechanisms designed to insure the protection of imperiled wildlife. The Service's consultation regulations define the action area as "*all areas* to be affected directly *or indirectly* by the Federal action and *not merely the immediate area involved in*

13

*the action*." 50 C.F.R. § 402.02 (emphasis added). *See also id*. (2024) ("effects of the action" include "the consequences of other activities that are caused by the proposed action but that are not part of the action," including those "occurring outside the immediate area involved in the action"). Rather than including all areas "to be affected directly or indirectly by the Federal action," including the downline area, the Board prejudged its Section 7 consultation by incorrectly defining the "action area." Specifically, the Board excluded downline train traffic and its attendant impacts in its analysis of the Railway's effects on the "unreasoned" basis that increased traffic "would not *substantially change* the severity of impacts that already exist." *Eagle County,* 82 F.4th at 1187 (emphasis added). As this Court correctly observed, that erroneous exclusion of impacts meant that the agencies' ESA analysis "never considered possible risks to protected species downline," nor justified why those risks would remain unchanged. *Id.* at 1188. The Board's "faulty reasoning" cannot be fixed by mere "explanation" on remand because the problem is with the BiOp's scope. *Id*.

In other words, because the Railway would have some impacts downline – by increasing traffic – the ESA required the Board and Service to include the lands downline within the "action area" to determine whether those effects could harm listed species. But the agencies got it backwards, by erroneously assuming that there would be no downline effects on the endangered fish, and, on that basis,

14

excluded the downline habitat from the action area. The agencies thus turned a blind eye by failing to perform the effects analysis that the consultation regulations call for, or demonstrating how impacts from existing trains would be the same as those resulting from a significant increase in rail traffic the Railway is designed to produce.

The error's unjustifiability is underscored by this Court's finding that the downline impacts likely do substantially change the severity of the impacts because of the "Board's recognition that the Union Pacific Line segment 'currently has a low volume of rail traffic relative to the predicted traffic' due to the Railway and the likely flawed analysis of accident risk." *Eagle County*, 82 F.4th at 1188. Regardless, increased traffic *will* increase the effects of the project on endangered fish and their critical habitat. Two plus two cannot equal two. And having "never considered possible risks to protected species," *id.*, the Board lacks the information on the current record to assess those risks. No amount of explanation on remand can cure that defect until a new analysis is conducted.

That the Board drew its effects boundary for NEPA purposes to include impacts along the Union Pacific Line from Utah to Denver, but excluded that same area from its ESA review, further demonstrates the arbitrary nature of the Board's ESA action-area line-drawing exercise, one that the agency cannot explain away. *See id.* at 1181–82; JA 886. Accordingly, the Board is not owed deference on this

matter because it contradicts its own environmental regulations and technical expertise in defining the scope of effects analysis under NEPA. *Cf.* Coalition Mot. at 5–6. No amount of deference to technical expertise will eliminate the project's downline impacts resulting from an increase in predicted rail traffic.

The Coalition's suggestion that the Board could apply to its ESA analysis the logic that the Supreme Court did in limiting the need to disclose indirect impacts in its *NEPA* reviews lacks any basis. Coalition Mot. at 6. True, *Seven County* concluded agencies are owed "substantial deference" in their line drawing for indirect impacts outside the immediate project area under NEPA. *See* 145 S. Ct. at 1512. But the ESA is not NEPA. The ESA consultation regulations' definition of "action area" makes clear that all areas affected, either directly or indirectly, are part of the action area and must be considered, 50 C.F.R. § 402.02, differentiating the scope of ESA consultation from the scope of NEPA review considered by the Supreme Court. This stricter scope is in keeping with the ESA's substantive mandate that federal agencies avoid taking any action that is likely to jeopardize listed species or adversely modify their critical habitat. *See infra* at 18-19.

The Board's failure to properly define the action area in this case starkly contrasts the Service's failure to explain how "reasonable and prudent measures" required by a BiOp "involve[d] only minor changes" to the underlying project as was the case in *Shafer & Freeman Lakes Environmental Conservation*

16

*Corporation v. FERC*, 992 F.3d 1071, 1093–95 (D.C. Cir. 2021). *Cf.* Coalition

Mot. at 5–6. Unlike in this case, the D.C. Circuit upheld the Service's underlying

analysis of the effects of the action in question. *Shafer & Freeman Lakes*, 992 F.3d

at 1090–93. Instead, the issue was whether the BiOp's reasonable and prudent

measures qualified as a "minor change" to the underlying project or something

more. *Id*. at 1093–94. In that case, there was no more information to collect or

analyze on remand, and the Service was free to offer an explanation for how the

reasonable and prudent measures it had proposed did not fundamentally alter the

project. *Id*. at 1094–96. Here, in contrast, the Board and the Service have turned a

blind eye to an entire category of impacts that could harm protected species and

arbitrarily assumed those impacts would be zero. Until the agencies analyze them,

they cannot carry out their substantive duty under the ESA.

This Court should also reject the Coalition's additional suggestion that the

Board on remand "may explain that … the project is [not] likely to jeopardize" the

endangered fish. Coalition Mot. at 6–7. The Board and Service's error in failing to

appropriately define the action area, and thus the scope of impacts to be analyzed

during consultation, means that they lack the information necessary to determine

whether the project is likely to jeopardize endangered fish or not. It may be that a

properly conducted consultation could ultimately conclude that the project will not

jeopardize the listed Colorado River fish. But even if the Service finds no jeopardy,

it nonetheless must provide the agency with a statement indicating any "incidental take" of listed species resulting from the proposed action and setting forth "reasonable and prudent measures" to minimize that take. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i); *see also* 50 C.F.R. § 402.14(g)(7) (specifying that an incidental take statement must be produced whenever incidental take is "reasonably certain to occur").

Until a lawful analysis is conducted, the Board cannot know whether the Railway will result in jeopardy, whether incidental take may occur, and what reasonable and prudent measures may be necessary to minimize take, and therefore cannot carry out the central, substantive duty that ESA Section 7(a)(2) imposes on federal agencies to "insure" against jeopardy and adverse modification of critical habitat. 16 U.S.C § 1536(a)(2). Thus, the ultimate outcome of an eventual comprehensive consultation process is not the appropriate question for whether the ESA violations are serious; it's whether the agency can explain why it simply chose to ignore all downline impacts on listed species. *See Standing Rock*, 985 F.3d at 1053 (concluding that the Corps' NEPA violations were "serious notwithstanding an agency's argument that it might ultimately be able to justify the challenged action").

Vacatur also continues to be warranted for the ESA violation because, as the Supreme Court has recognized, "§ 7(a)(2) [of the ESA], unlike NEPA, imposes a

substantive (and not just a procedural) statutory requirement." *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 667 (2007). Namely, the ESA imposes a *substantive* duty to insure against jeopardy and adverse modification "*before* a federal agency can grant a license or permit to a private party[.]" *See Shafer & Freeman Lakes*, 992 F.3d at 1079. Until the Board properly defines the scope of the action area and analyzes the effects of the project, it cannot meet its substantive duty under the ESA and vacatur is warranted. *Nat'l Parks Conservation Ass'n v. Jewell*, 62 F. Supp. 3d 7, 20–21 (D.D.C. 2014) (violation of "substantive" duty to prevent harm to species warranted vacatur); *see also Ctr. for Biological Diversity v. Regan*, 734 F. Supp. 3d 1, 62 (D.D.C. 2024) (finding the EPA's failure to appropriately define the "action area" was a "serious flaw" that "cannot be cured merely by further explanation or changes to the technical assistance process on remand[,]" and warranted vacatur). This is a serious deficiency with the underlying ESA analysis, requiring vacatur.

Like the NEPA violations, this serious deficiency infected the Board's final order, including its weighing of the project's harms and benefits. *See Eagle County*, 82 F.4th at 1195 (noting harms side of the scale includes "crude oil spills in critical habitats and sensitive water resources that are home to endangered species"); *id*. at 1188 ("Both the BiOp and the Board's Final Exemption Order, to the extent it relies upon the BiOp, are arbitrary and capricious."). It also infected

the EIS. *Id.* at 1196 ("The EIS is further called into question since the BiOp failed to assess impacts on the Colorado River fishes downline."). These "fatal[]" errors compel vacatur. *See American Rivers*, 895 F.3d at 55.

## IV.    The Coalition Fails to Demonstrate that Vacatur Would Have Disruptive Consequences.

The second prong of the *Allied-Signal* test looks to whether vacatur would result in disruptive consequences. 988 F.2d at 150–51. The importance of reconsidering this massive project in an informed and unbiased manner heavily outweighs the consequences of vacatur, which are not disruptive. *See Standing Rock*, 985 F.3d at 1051, 1054 (upholding vacatur despite its significant economic consequences because allowing the decision to stand would subvert NEPA's objectives). However, just as this Court found at the merits stage, the Coalition has failed to meet its burden of establishing any disruptive consequences in the instant motion. *See Eagle County*, 82 F.4th at 1196 ("[W]e see no reason to depart from our normal practice [of vacatur] given the lack of argument from the Board, Service, or the Coalition, that vacatur would be disruptive.").

"[A] quintessential disruptive consequence arises when an agency cannot easily unravel a past transaction in order to impose a new outcome." *American Great Lakes Ports Ass'n*, 962 F.3d at 519. For example, in *Port Isabel*, the Court found disruptions from vacatur outweighed the serious NEPA violations, where vacatur would have "undermin[ed] [the developer's] ability to meet binding

20

contractual commitments made in reliance on the [FERC] orders," "upend[ed] the schedule for [the project's] construction," and interfered with supplying "6% of current global demand," causing "industry-wide effects." 130 F.4th at 1038. In contrast, here, the Coalition provides no information about contractual obligations made in reliance on the Board's decision and no construction schedule. It makes no hint that vacatur would interfere with meeting global oil demand.[3]

Rather, the Coalition has suggested the project is nowhere near breaking ground, admitting it is still seeking financing for the more than $2.4 billion project.[4] Coalition Mot. at 16 ("[R]emand without vacatur would not threaten interim environmental harm. While funding for the Railway is needed right away, it will still take time before construction can start."). So, there is no chance of disrupting construction or operations. For that reason, too, not allowing the

---

[3] Nor could it, as the U.S. is producing more oil now than any country in history, resulting in a glut of oil on the market and low oil prices. U.S. Energy Information Administration (EIA), *EIA expects low crude oil prices and declining rig count to affect U.S. crude oil production trends through 2026* (June 10, 2025), available at https://www.eia.gov/pressroom/releases/press570.php (noting "all-time high" domestic crude production in the second quarter of 2025, leading to "lower oil prices" and drillers scaling back production). EIA, *Today in Energy* (Mar. 11, 2024), available at https://www.eia.gov/todayinenergy/detail.php?id=61545 (in 2023, "[t]he United States produced more crude oil than any nation at any time, according to our International Energy Statistics, for the past six years in a row").
[4] Kyle Dunphey, *Uinta Basin Railway group looks to fund project with $2.4 billion in federal bonds*, Utah News Dispatch (June 3, 2025), available at https://utahnewsdispatch.com/2025/06/13/uinta-basin-railway-funding/.

purported economic benefits of the rail to be realized cannot be considered a disruption, as the Coalition asserts. A continuation of the status quo is not a disruption, especially where the Coalition cannot point to any on-the-ground commitments that must be immediately carried out. This is not a case where "[t]he egg has been scrambled and there is no apparent way to restore the status quo ante." *Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 97 (D.C. Cir. 2002). Here, the apparent way to maintain the status quo ante is vacatur.

The Coalition also speculates that vacatur "could disrupt the Railway's efforts to secure financing," Coalition Mot. at 15, but it points to no concrete financial interest at stake or at risk of disruption. And the Coalition does not have a concrete interest in financing that it has yet to obtain or that may never materialize. The continuation of the Coalition's failure to obtain financing is not a disruption.

Even if it were, the economic consequences are not nearly as weighty or concrete as those raised in other cases where this Court nonetheless vacated the challenged agency action. For example, in *Standing Rock Sioux Tribe v. United States Army Corps of Engineers*, the district court found vacatur could result in "some immediate harm to the North Dakota oil industry," and in states, companies, and workers "[l]osing jobs and revenue." 471 F. Supp. 3d 71, 84 (D.D.C. 2020). On appeal, this Court affirmed the district court's vacatur remedy, finding that those economic harms still did not outweigh "the seriousness of the NEPA

22

violation." *Standing Rock*, 985 F.3d at 1053; *see also Sovereign Iñupiat for a Living Arctic v. BLM*, 555 F. Supp.3d 739, 804 (D. Ak. 2021) (seriousness of ESA and NEPA violations outweighed the economic consequences of vacating a major drilling project's approval, despite the "comprehensive nature" of the EIS and BiOp, and the project proponent's "significant investment," where "construction … [had] not yet commenced"). Here, there are a host of serious NEPA, ICCT Act, and ESA violations and no apparent economic consequences of vacatur established by the Coalition. The Coalition provides no evidence that vacatur will result in any jobs lost.

Finally, the Coalition does not contend that vacatur may put it in a legally compromising position, as was the case in *Shafer & Freeman Lakes*, 992 F.3d at 1096. Vacating the BiOp in that case while the Service addressed its legal violation would have left the dam operator "trapp[ed] … between the Scylla and Charybdis of violating its [FERC] license or violating the [ESA's "take" prohibition]." *Id*. Neither the Board nor Coalition face such a dilemma. Vacatur would not force the Coalition to choose between violating either the ESA or some other legal constraint. Instead, vacatur in this case will ensure that the Board and Service comply with the ESA *before* the Railway goes forward and the listed Colorado River fish are harmed, as the ESA mandates. *See id.* at 1079. Only that will ensure

that the Board is meeting its substantive duty under the ESA to insure against jeopardy and adverse modification.

The seriousness of the many legal violations outweighs the Coalition's scant showing of economic disruption.

## CONCLUSION

Petitioners respectfully move that the Court reaffirm vacatur of the Board's order and EIS and the Service's Biological Opinion, and deny the Coalition's motion for remand without vacatur.

Dated: July 22, 2025.

/s/ *Wendy Park*
Wendy Park
Center for Biological Diversity
2100 Franklin St., Suite 375
Oakland, CA 94612
wpark@biologicaldiversity.org

Edward B. Zukoski
Center for Biological Diversity
1536 Wynkoop Street, Suite 421
Denver, CO 80202
(303) 641-3149
tzukoski@biologicaldiversity.org

*Counsel for Petitioners Center for Biological Diversity, Living Rivers, Sierra Club, Utah Physicians for a Healthy Environment, and WildEarth Guardians*

# CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of D.C. Circuit Rule 27(c) as it contains 5,637 words, fewer than the 7,800 words permitted by that Rule.

Per Federal Rule of Appellate Procedure 27(d)(1)(E), this document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman font.

/s/ *Wendy Park*
Wendy Park

*Counsel for Petitioners Center for Biological Diversity et al.*

## CERTIFICATE AS TO PARTIES AND AMICI

Petitioners are Center for Biological Diversity, Living Rivers, Sierra Club, Utah Physicians for a Healthy Environment, and WildEarth Guardians.

Respondents are the Surface Transportation Board, United States of America, and U.S. Fish and Wildlife Service.

Respondent-Intervenors are the Seven County Infrastructure Coalition and Uinta Basin Railway, LLC.

The City of Glenwood Springs, Town of Minturn, Town of Avon, Town of Red Cliff, Town of Vail, Routt County, Boulder County, Chaffee County, Lake County, and Pitkin County filed an amicus brief in support of Petitioners.

The State of Utah filed an amicus brief in support of Respondents.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and D.C. Circuit Rule 26.1, Petitioners make the following disclosures:

Petitioners Center for Biological Diversity, Living Rivers, Sierra Club, Utah Physicians for a Healthy Environment, and WildEarth Guardians are non-profit organizations.