UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

EAGLE COUNTY,                )
COLORADO,                    )
                             )        22-1019
    Petitioner,              )
                             )
v.                           )        PETITION FOR REVIEW
                             )
SURFACE TRANSPORTATION       )
BOARD                        )
and THE UNITED               )
STATES OF AMERICA,           )
                             )
    Respondents.             )

Petitioner Eagle County, Colorado (Petitioner) petitions the United States

Court of Appeals for the District of Columbia Circuit for review of two decisions

of the Respondent Surface Transportation Board (STB) decided on January 4,

2021, and December 15, 2021, in STB Finance Docket No. 36284, *Seven County

Infrastructure Coalition—Rail Construction & Operation Exemption—In Utah,

Carbon, Duchesne, and Uintah Counties, Utah* (collectively, the Final Decision).

The Final Decision approved the construction and operation of an 85-mile rail line

for the purpose of transporting oil from the Uinta Basin in Utah.

Petitioner seeks review on the grounds that the Final Decision was issued

without observance of procedures required by law, is arbitrary and capricious,

constitutes an abuse of discretion, exceeds the STB's statutory authority, and is in

violation of the Interstate Commerce Commission Termination Act, 49 U.S.C. § 10101 *et seq*., National Environmental Policy Act, 42 U.S.C. § 4321 *et seq*., Administrative Procedure Act, 5 U.S.C. § 706, and other federal laws.  Petitioner requests that this Court vacate the Final Decision.

Venue is proper pursuant to 28 U.S.C. § 2343.  Pursuant to Federal Rule of Appellate Procedure 15, a copy of the STB's Final Decision and a list of Respondents are attached as Exhibit A and Exhibit B, respectively.

**Rule 26.1 Disclosure Statement.**  Petitioner is not a "nongovernmental corporate party," and therefore is not required to file a corporate disclosure statement pursuant to Federal Rule of Appellate Procedure 26.1(a).

Dated: February 10, 2022.

/s/ *Nathaniel H. Hunt*
Nicholas M. Clabbers
nclabbers@kaplankirsch.com
Nathaniel H. Hunt
nhunt@kaplankirsch.com
Robert W. Randall
brandall@kaplankirsch.com
Christian L. Alexander
calexander@kaplankirsch.com
KAPLAN KIRSCH & ROCKWELL LLP
1675 Broadway, Suite 2300
Denver, Colorado 80202
(303) 825-7000

*Counsel for Petitioner Eagle County, Colorado*

## CERTIFICATE OF SERVICE

I certify, in accordance with Fed. R. App. P. 15(c)(1), that on the 10th day of February 2022, a true copy of the foregoing Petition for Review and exhibits were sent by FedEx to:

Surface Transportation Board
General Counsel
Office of the General Counsel
395 E Street, SW
Washington DC 20423
Craig.Keats@stb.gov

United States of America
Merrick B. Garland
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC  20530

Kathryn Kusske Floyd
kkfloyd@venable.com
Margaret K. Fawal
MKFawal@Venable.com
Venable LLP
600 Massachusetts Ave. NW
Washington, DC 20001

*Counsel for Seven County Infrastructure Coalition*

Wendy Park
1212 Broadway, #800
Oakland, CA  94612
wpark@biologicaldiversity.org

*Center for Biological Diversity*

Thomas F. McFarland
208 South LaSalle Street, Suite 1666
Chicago, IL 60604-1228
mcfarland@aol.com

*Argyle Wilderness Preservation Alliance*

Darrell Fordham
511 South 600 East
Lehi, UT  84043
darrellfordham@hotmail.com

*Argyle Wilderness Preservation Alliance*

Julie Mach
419 H Street
Salida, CO 81201
juliemach@cmc.org

Alan H. Robinson
33700 Mt. Harvard Circle
Buena Vista, CO  871211
robinsonalanh@gmail.com

Edred Secakuku
PO Box 190
Ft. Duchesnse, UT  84026
edreds@utetribe.com

P.T. Wood
448 East 1st Street
Salida, CO  81201
dan.shore@salidaelected.com

*Ute Indian Tribe of Uintah and Ouray
Reservation*

       /s/ *Nathaniel H. Hunt*
          Nathaniel H. Hunt

       *Counsel for Petitioner Eagle County, Colorado*

**Exhibit A**

**Surface Transportation Board January 4, 2021 and December 15, 2021 Decisions on Review**

50412                    SERVICE DATE – JANUARY 5, 2021
EB

SURFACE TRANSPORTATION BOARD

DECISION

Docket No. FD 36284

SEVEN COUNTY INFRASTRUCTURE COALITION—RAIL CONSTRUCTION &
OPERATION EXEMPTION—IN UTAH, CARBON, DUCHESNE, AND UINTAH
COUNTIES, UTAH

Digest:[1]  The Seven County Infrastructure Coalition has filed a petition for
exemption to construct and operate an approximately 85-mile rail line in Utah.
The Board addresses the transportation merits of the proposed construction and
preliminarily concludes, subject to completion of the ongoing environmental
review, that the transportation aspects of the proposed construction meet the
statutory exemption standard.

Decided:  January 4, 2021

On May 29, 2020, the Seven County Infrastructure Coalition (Coalition) filed a petition
for exemption under 49 U.S.C. § 10502 from the prior approval requirements of 49 U.S.C.
§ 10901 for authorization to construct and operate an approximately 85-mile rail line connecting
two termini in the Uinta Basin near South Myton Bench, Utah, and Leland Bench, Utah, to the
national rail network at Kyune, Utah.  The Coalition asks that the Board issue a preliminary
decision addressing the transportation aspects of the project while the environmental review is
ongoing.

The Board received filings both supporting and opposing the petition.  Several
government officials have filed in support, as discussed below.  The opponents include the
Center for Biological Diversity (Center), the Argyle Wilderness Preservation Alliance (Argyle),
and numerous individuals.  These commenters argue, among other things, that the requested
preliminary decision is not appropriate, that the transportation aspects of the petition do not
satisfy the § 10502 standards, and that the Board should reject the petition and require an
application under § 10901.

As discussed below, the Board concludes that an application is not necessary and that the
requested approach of issuing a preliminary decision on the transportation merits is appropriate
here.  The Board preliminarily concludes, subject to completion of the ongoing environmental
review, that the proposed transaction meets the statutory standards for exemption under § 10502.

---

[1]  The digest constitutes no part of the decision of the Board but has been prepared for the
convenience of the reader. It may not be cited to or relied upon as precedent.  See Pol'y
Statement on Plain Language Digests in Decisions, EP 696 (STB served Sept. 2, 2010).

This decision only addresses the transportation merits, however, and does not grant the exemption or allow construction to begin. After the Board has considered the potential environmental impacts associated with this proposal, and weighed those potential impacts with the transportation merits, it will issue a final decision either granting the exemption, with conditions, if appropriate, or denying it.

BACKGROUND

The Coalition explains that it is an independent political subdivision of the State of Utah, whose member counties include Carbon, Daggett, Duchesne, Emery, San Juan, Sevier, and Uintah Counties. (Pet. 5.) It was formed to, among other things, identify and develop infrastructure projects that will promote resource utilization and development. (Id.) The Coalition is proposing to construct a rail line that would extend generally southwest from terminus points in the Uinta Basin to a connection with an existing rail line owned by Union Pacific Railroad Company (UP) near Kyune, Utah (the Whitmore Park Alternative). The rail line would generally parallel U.S. Route 191 through Indian Canyon and would be located within Utah, Carbon, Duchesne, and Uintah Counties in Utah. (Id. at 8-9, 43.)

The Coalition asserts that goods produced or consumed in the Uinta Basin today can be transported only by truck and that the proposed project would give shippers an additional freight transportation option, eliminating longstanding transportation constraints. (Pet. 13-15.) The Coalition claims that adding a rail transportation option would provide local industries the opportunity to access new markets and increase their competitiveness in the national marketplace, and the removal of transportation constraints would benefit oil producers, mining companies, ranchers, farmers, and other local industries. (Id. at 15.)

The Coalition argues that regulation of the construction and operation of the proposed line under § 10901 is not needed to carry out the rail transportation policy (RTP) at 49 U.S.C. § 10101, that the project would promote several provisions of the RTP, and that an application under § 10901 is not required to protect shippers from an abuse of market power. (Pet. 21-22.) As noted above, the Coalition requests that, in considering the petition, the Board follow a two-step approach, addressing the transportation aspects of the project in advance of the environmental issues. (Id. at 26-28.)[2]

On July 7, 2020, the Center filed a reply[3] arguing that the Coalition has failed to justify its request for a preliminary decision on the transportation merits and that the Board should reject the petition and require the Coalition to seek its authority through an application under § 10901. (Ctr. Reply 1.) On the same day, Argyle also filed a reply, likewise arguing that the Board should reject the petition for exemption and require greater scrutiny of the proposed project through an application. (Argyle Reply 9, July 7, 2020.) Argyle argues that, if it is not rejected, the petition for exemption should be denied because the project undermines various RTP goals.

---

[2] Based on a request from Argyle, the Board extended the due date for comments on the petition for an additional 20 days to July 7, 2020.

[3] On July 13, 2020, the Center submitted a supplemental filing consisting of the references cited in its reply.

Exhibit A

(Id.) Argyle also claims that the Coalition has failed to justify its requested two-step review process. (Id. at 14.) Additionally, by separate filings submitted on July 7, 2020, Argyle submitted numerous letters from individuals opposing the project.[4]

On July 21, 2020, the Coalition filed a response to the various filings and filed a motion asking that the Board accept its reply.[5] Argyle filed in opposition to that motion on August 10, 2020. On September 14, 2020, Argyle filed a letter asking that the Board take notice of Texas Central Railroad & Infrastructure, Inc—Petition for Exemption—Passenger Rail Line Between Dallas & Houston, Tex., FD 36025 (STB served July 16, 2020), a decision Argyle claims supports its position that an application is warranted here.

The Board has also received several letters in support of the Coalition's proposal. On November 20, 2019, Governor Gary R. Herbert submitted a letter stating that the proposed rail line represents an important opportunity to enhance the rural economies in eastern Utah and improve the state's energy infrastructure and environmental stewardship. On December 1, 2020, a joint letter supporting the Coalition's project was filed by U.S. Senators Mitt Romney and Mike Lee and U.S. Representatives Rob Bishop, Chris Stewart, and John Curtis. On December 7, 2020, Utah State Senate President J. Stuart Adams and Utah State House of Representatives Speaker Brad Wilson separately filed letters in support of the project. Also on December 7, 2020, Governor Herbert, Lieutenant Governor Spencer J. Cox, Utah State Senate President Adams, and Utah State House of Representatives Speaker Wilson submitted a joint letter supporting the project.

PRELIMINARY MATTERS

On August 26, 2020, the Director of the Office of Proceedings instituted a proceeding under 49 U.S.C. § 10502(b). That decision stated that the Coalition's July 21 motion for leave to file and other late-filed submissions would be addressed in a subsequent decision.

The Board will grant the Coalition's motion for leave to file and accept its July 21, 2020 filing. Although 49 C.F.R. part 1121 does not provide for rebuttals and the Board struck such filings in the cases Argyle cites, the Board's action in those cases was primarily focused on the fact that the rebuttals there were filed shortly before a regulatory deadline, a factor that is not present here. See Burlington N. & Santa Fe Ry.—Aban. of Chi. Area Trackage in Cook Cnty., Ill., AB 6 (Sub-No. 382X), slip op. at 1-2 (STB served Sept. 21, 1999) (filing rejected where regulatory deadline precluded protestants' response); Cent. R.R. of Ind.—Aban. Exemption—in Dearborn, Decatur, Franklin, Ripley, & Shelby Cntys., Ind., AB 459 (Sub-No. 2X), slip op. at 3 (STB served May 4, 1998) (filing rejected four days before regulatory deadline). In light of the arguments raised here regarding the appropriateness of the exemption process and the request for a preliminary decision on the transportation merits, the Coalition's filing provides a more complete record for the Board to consider these arguments. Also in the interest of a more

---

[4] Letters were also filed separately by individuals Julie Mach on July 6, 2020, Powell T. Wood on July 8, 2020, and Alan T. Robinson on July 16, 2020.

[5] The Coalition filed a letter on July 22, 2020, updating its response.

Exhibit A

complete record, the Board will accept all of the comments and letters that have been filed with the Board.

DISCUSSION AND CONCLUSIONS

The construction of new railroad lines that are to be part of the interstate rail network requires prior Board authorization, either through issuance of a certificate under 49 U.S.C. § 10901 or, as requested here, through an exemption under 49 U.S.C. § 10502 from the formal application procedures of § 10901. Section 10901(c) directs the Board to grant rail construction proposals "unless the Board finds that such activities are inconsistent with the public convenience and necessity." See Alaska R.R.—Constr. & Operation Exemption—A Rail Line Extension to Port MacKenzie, Alaska, FD 35095, slip op. at 5 (STB served Nov. 21, 2011), aff'd sub nom. Alaska Survival v. STB, 705 F.3d 1073 (9th Cir. 2013) (addressing the Board's construction exemption process). Thus, Congress has established a presumption that rail construction projects are in the public interest unless shown otherwise. See Lone Star R.R.— Track Constr. & Operation Exemption—in Howard Cnty., Tex., FD 35874, slip op. at 3 (STB served Mar. 3, 2016.).

Under 49 U.S.C. § 10502(a), however, the Board, "to the maximum extent" consistent with 49 U.S.C. §§ 10101-10908, "shall exempt" a transaction (including a construction proposal) from the prior approval requirements of § 10901 when it finds that: (1) regulation is not necessary to carry out the RTP of 49 U.S.C. § 10101; and (2) either (a) the transaction is of limited scope or (b) application of the statutory provision is not needed to protect shippers from the abuse of market power. Ken Tenn Reg'l Rail Partners—Constr. & Operation Exemption—in Fulton Cnty., Ky. & Obion Cnty., Tenn., FD 36328, slip op. at 3 (STB served Dec. 1, 2020.) Congress thus has directed the Board to exempt a rail construction proposal from the requirements of the full application process—even if significant in scope—so long as the application of § 10901 is not necessary to carry out the RTP and there is no danger of market power abuse. See Alaska Survival, 705 F.3d at 1082-83; Vill. of Palestine v. ICC, 936 F.2d 1335, 1337, 1340 (D.C. Cir. 1991).

Application vs. Petition for Exemption.

The Center argues that the Board should reject the petition and require the Coalition to seek its authority through an application under § 10901. Among other reasons, the Center claims greater scrutiny is required because the project would not be financially viable and could pose significant financial risk to public entities and taxpayers, the most likely source of funding through the issuance of municipal bonds.[6] (Ctr. Reply 2, 7, 12, 20-21.)

---

[6] The Center also argues that greater scrutiny is necessary here because there were irregularities in the selection of a developer and the award of a $27.9 million grant from the Utah Permanent Community Impact Board. (Ctr. Reply 12-16.) The Center further claims that the Coalition has failed to provide the public information or solicit its input as part of the Coalition's decisionmaking regarding the rail project. (Id. at 16-19.) These concerns, however, appear to be based on Utah state law and should be raised in a different forum.

Exhibit A

The Center maintains that there are insufficient proven oil quantities in the Uinta Basin to justify the project's construction, and that there is a limited portfolio of potential industries and shipping commodities that the railway could service. (Id. at 2.) Furthermore, it argues that the "collapse" in the global oil market and the American shale industry as well as weak market forecasts make it unlikely that a real need for new crude oil transportation capacity exists in the Basin. (Id.) Therefore, the Center contends, the public might be "on the hook" for a multibillion-dollar project unable to pay for itself. (Id.)

The Center also notes that the 2018 pre-feasibility study, prepared for the Coalition by R.L. Banks & Associates, Inc. (R.L. Banks), provides an analysis of the proposed line, but the Center asserts that the Coalition has refused to release an unredacted version of that study. (Id. at 22-23, 25.) In redacted versions of the study, which the Center submits in its July 13, 2020 supplement, the Coalition redacted the market forecast, transportation rate, and other data underlying the study's conclusions on the economic feasibility of the project. (Id. at 25.) The Center argues that such data should be made publicly available so that the Board and the public can determine whether assertions of the proposed line's viability are based on reasonable assumptions. (Id.)

Finally, the Center states that the construction cost of a rail line similar to the Coalition's preferred route here was projected in 2015 to cost \$4.5 billion, but the Coalition's projections for the current preferred route are now one-third of that 2015 estimate, raising questions as to the reliability of the Coalition's cost projections. (Id. at 19.) The Center further states that the required financing for the project has not yet been secured and asserts that it appears increasingly unlikely that financing can be achieved for a potentially multibillion-dollar project. (Id.)

Similarly, Argyle opposes the project proceeding by exemption. It claims that such an approach is not appropriate where, as here, the proposal is vigorously contested and highly controversial. (Argyle Reply 3-4, July 7, 2020.) Argyle also claims that there is neither evidence of financial ability to complete the proposed construction nor evidence of public need for the project. (Id. at 4-9.) For these reasons, it argues that the Board should reject the petition and require a full application. In its September 14, 2020 filing, Argyle notes that the Board required an application for the construction proposed in Texas Central Railroad & Infrastructure, Inc., FD 36025, slip op. at 13-15. The individual commenters raise concerns similar to Argyle's and claim, among other things, that the there is no need for the rail line and that constructing it would needlessly disrupt landowners use of their land and adversely affect the rural area in which the proposed line would be constructed.

The Coalition responds that the opposition has raised no serious question showing that the project should not be decided under the exemption criteria at § 10502. (Coalition Reply 3-4, July 21, 2020.) The Coalition adds that controversy does not preclude use of the exemption process, (id. at 6), and that questions raised by opponents regarding the project's financial viability are based on speculation rather than fact, (id. at 8). The Coalition further asserts that Texas Central Railroad & Infrastructure, Inc., is inapposite. (Rebuttal 10.)

The arguments presented by the opponents do not warrant rejecting the petition and requiring an application. There is nothing in the language of § 10502 to suggest that an

Exhibit A

exemption proceeding is inappropriate if the viability of the proposed rail line is questioned. See Alaska Survival, 705 F.3d at 1082 (affirming the Board's exemption proceeding where financial viability of the line was questioned). Furthermore, the Board's grant of authority to construct a line (whether under § 10901 or by exemption under § 10502) is permissive, not mandatory—that is, the Board does not require that an approved line be built. See U.S. Dep't of Energy—Rail Constr. & Operation—Caliente Rail Line in Lincoln, Nye & Esmeralda Cntys., Nev., FD 35106, slip op. at 3 (STB served June 27, 2008); Dakota, Minn. & E. R.R. Corp. Constr. Into the Powder River Basin, FD 33407, slip op. at 19 (STB served Feb. 15, 2006). As a result, the Board has repeatedly recognized that the ultimate decision to go forward with an approved project is in the hands of the applicant and the financial marketplace, not the agency. See Mid States Coal. for Progress v. STB, 345 F.3d 520, 552 (8th Cir. 2003) (noting the insight and expertise of financial institutions and agreeing with the Board that the ultimate test of financial fitness will come when the railroad seeks financing); U.S. Dep't of Energy, FD 35106, slip op. at 3. Simply put, the Board's grant of authority *permits* a new rail line to be built if the necessary financing is obtained. Without moving forward with the process needed to obtain Board authority, however, no new rail lines could be built, regardless of how viable the projects might be.

In addition, the Coalition recognizes that conditions beyond its control can affect the amount of rail traffic on the proposed line, (Pet. 15), and, prior to seeking authority from the Board for this project, the Coalition asked R.L. Banks to prepare a detailed 2018 feasibility study addressing the viability of the line. Moreover, the Utah Petroleum Association, Enefit Oil Company, Utah Royalty Owners Association, National Oil Shale Association, and Western Energy Alliance have expressed support for the project. (Coalition Reply 16, July 21, 2020.)[7] Such support, and the information submitted in this record, indicates the proposed line could be viable. And, despite claims by the opponents that there is no public need for the line, the support that this project has received suggests otherwise.

It is well settled that, because the Board's authority is permissive, the Board may grant authority to construct a line even if all outstanding issues related to the proposed construction, such as financing, have not yet been resolved or if factors beyond the Board's control might ultimately prevent consummation of authority for a proposed construction. See Mid States Coal. for Progress, 345 F.3d at 552; Cal. High-Speed Rail Auth.—Constr. Exemption—in Fresno, Kings, Tulare, & Kern Cntys., Cal., FD 35724 (Sub-No. 1), slip op. at 11 (STB served Aug. 12, 2014) (with Board Member Begeman dissenting). The Board does not find that the additional financial information sought by Argyle is necessary in this proceeding.[8]

---

[7] The Center asserts that the Basin holds only approximately five years' worth of oil at the most by pointing to a U.S. Energy Information Administration estimate from 2019. (Ctr. Reply 23-24.) This figure, however, only covers "proved reserves," (Ctr. Supp. 662), and, as the Center itself admits, estimates of the amount of oil in the Basin "vary widely," (Ctr. Reply 23). Indeed, the 2018 pre-feasibility study from R. L Banks lists a much higher range. (Ctr. Supp. 392.)

[8] For the same reasons, the Board does not need the material currently redacted in the R.L. Banks 2018 feasibility study obtained by the Center, despite the Center's claim to the contrary. (Ctr. Reply 25.)

The opponents' filings also do not lead to a conclusion that an application is necessary here. To be clear, the agency has found the exemption process suitable in considering other projects that have drawn opposition.[9] To the extent opponents here raise environmental issues, the environmental review conducted by the Board does not depend on whether the proposed construction is decided under § 10901 or § 10502—the environmental review process is the same under either scenario. See Cal. High-Speed Rail Auth., FD 35724 (Sub-No. 1), slip op at 11 (STB served Aug. 12, 2014).

The Board's decisions in Ozark Mountain Railroad—Construction Exemption, FD 32204 (ICC served Sept. 25, 1995), and Texas Central Railroad & Infrastructure, Inc, FD 36025, slip op. at 13-15, do not show that an application is necessary here. In Ozark Mountain Railroad, the agency required an application under § 10901 for the proposed construction of a highly controversial passenger excursion train as part of a "huge development plan." Ozark Mountain R.R., FD 32204, slip op at 2. The agency decided that it would be inappropriate to move forward without the financial information required in an application because of significant concerns that the applicant there would not be able to bring the project to fruition. Id. In Texas Central Railroad & Infrastructure, Inc., FD 36025, slip op. at 13-15, the Board, in requiring an application, explained that significant questions had been raised surrounding the financial feasibility of that proposed passenger rail project, namely the potential increase in cost from over $10 billion to over $20 billion (with one estimate over $30 billion) and the funding sources to cover those increased costs. Indeed, in that case, the record included a letter from a Texas Central official indicating substantially higher project costs than those previously presented to the Board, see Texas Central, FD 36025, slip op. at 13 & n.24, and this discrepancy was not adequately addressed. Moreover, the record indicated conflicting statements from individuals associated with Texas Central as to the extent of nonmarket funding sources.[10] See id. at 14 n.27. Here, not only is the projected cost of the project far less than that of the projected cost of the Texas project, but, based on the record, it has not dramatically increased as in the Texas case.[11] Although there is some uncertainty as to financing beyond the $27.9 million that the

---

[9] See, e.g., Cal. High-Speed Rail Auth., FD 35724 (Sub-No. 1) (STB served Aug. 14, 2014); Cal. High-Speed Rail Auth.—Constr. Exemption—in Merced, Madera & Fresno Cntys., Cal., FD 35724 (STB served June 13, 2013); Alaska R.R., FD 35095; and San Jacinto Rail Constr. Exemption—Build Out to the Bayport Loop Near Houston, Harris Cnty., Tex., FD 34079 (STB served Aug. 28, 2002).

[10] That is not to say that any increase in project costs or uncertainty about funding sources necessitate an application, given that the ultimate test of financial fitness is in the hands of the applicant and marketplace. However, when those two factors are both substantial and inadequately or inconsistently addressed, combined with other relevant factors, including the extent to which the marketplace will assess financial fitness, additional scrutiny may be warranted.

[11] In fact, the Center questions whether the costs for the project are too low because they are lower than a similar project the Utah Department of Transportation studied in 2015. (Ctr. Reply 19.) As the Coalition explains, however, that project was different because, among other things, it involved the reconstruction of an existing highway, which is not part of the project at issue here. (Coalition Reply 13, July 21, 2020.)

Exhibit A

Coalition has already received from a Utah agency, the record does not, unlike the Texas case, include inconsistent statements from the petitioner as to the project's costs or its target future funding or financing sources, including from nonmarket sources.

In short, it is appropriate to consider the Coalition's construction proposal under § 10502, and an application proceeding under § 10901 is not required here.

Issuance of Preliminary Decision on the Transportation Merits.

As noted above, the Coalition requests that the Board issue a preliminary decision addressing the transportation aspects of the project in advance of completing its review of the environmental issues. The Coalition explains that streamlining the regulatory process by issuing a preliminary decision on the transportation-related issues would help hasten its recovery from the economic downturn stemming from the pandemic. (Pet. 26-27.) Both Argyle and the Center oppose the Coalition's request. The Center argues that based on prior Board precedent a preliminary decision addressing the transportation merits requires a "showing of some unique or compelling circumstances" and that the Coalition has made no such showing here. (Ctr. Reply 5-6.) The Center claims that the Coalition has failed to explain how addressing the transportation merits before completing the environmental review process and determining whether to allow construction to begin would increase efficiencies in the process, mitigate the economic impacts of the pandemic, or benefit the proposed rail line. (Id.) The Coalition responds that examining the project in the two-step approach would hasten its ability to secure financing for the line. (Rebuttal 14.)

The Board has considered requests for preliminary decisions addressing the transportation merits of a project over the years.[12] Although the Board indicated in 2007 that it would generally only issue a preliminary decision on the transportation merits of a construction proposal based on a showing of unique or compelling circumstances,[13] the Board has only once since that time denied a request for a preliminary decision on the transportation merits, see Cal. High-Speed Rail Auth., FD 35724 (Sub-No. 1), slip op. at 2 (STB served Dec. 4, 2013).[14] The

---

[12] See Six Cnty. Ass'n of Gov'ts—Constr. & Operation Exemption—A Rail Line Between Levan & Salina, Utah, FD 34075 (STB served Sept. 3, 2015); Alaska R.R.—Constr. & Operation Exemption—Rail Line Between Eielson Air Force Base & Fort Greely, Alaska, FD 34658 (STB served Oct. 4, 2007).

[13] See Alaska R.R. Constr., FD 34658, slip op. at 2. Prior to 2007, the Board did not use this standard when considering whether to issue a preliminary decision on the transportation merits in rail construction cases. See, e.g., Burlington N. & Santa Fe Ry.—Constr. & Operation Exemption—Merced Cnty., Cal., FD 34305 (STB served Mar. 28, 2003); San Jacinto Rail Constr. Exemption, FD 34079, slip op. at 7.

[14] In Texas Railway Exchange LLC—Construction & Operation Exemption—Galveston County, Tex., FD 36186 et al., slip op. at 2, 5 (STB served Jan. 17, 2020), the Board denied as moot a request for a preliminary decision on the transportation merits because the Board was, in the same decision, granting the petition for exemption to construct and operate the new rail line. A request for preliminary decision on the transportation merits is currently pending in

8

Board recently used the two-step process in a construction case. In that case, the applicant had received support from state and local entities, the transportation merits of the project were apparent, and there was no opposition to the request for preliminary decision or the exemption itself at that time. <u>Ken Tenn Reg'l Rail Partners</u>, FD 36328, slip op. at 3-4.[15] Here, there is also strong support from state and local entities (in addition to the seven-county Coalition), and the transportation merits are convincing (as described below). While the Board acknowledges opposition to the project, the economic circumstances, exacerbated by the current pandemic, are compelling, and, under the circumstances, issuing a preliminary decision on the transportation merits will help ensure the development and continuation of a sound rail transportation system, foster sound economic conditions in transportation, and reduce barriers to entry. <u>See</u> 49 U.S.C. § 10101(4), (5) (7). Therefore, the Board finds it appropriate to issue a preliminary decision on the transportation merits while the Board continues the environmental review of the proposed construction.

<u>Rail Transportation Analysis</u>.

As noted above, the Board must exempt a proposed rail line construction when it finds that application of the provisions of § 10901 is not necessary to carry out the RTP and there is no danger of market power abuse. Based on the record, the Board preliminarily concludes that the proposed construction qualifies for an exemption under § 10502 from the prior approval requirements of § 10901.

First, regulation under § 10901 is not necessary to carry out the RTP in this case. The record here shows that the proposed rail line would provide an alternative, more cost-effective method of transportation for shippers that are currently limited to shipping by truck. (Pet. 13-15.) The proposed line would provide shippers in the Basin the opportunity to enter markets they currently cannot access due to cost constraints and the ability to import materials into the Basin at a more economical cost. (Pet. 13-15; Coalition Reply 15-16, July 21, 2020.) Accordingly, the proposed line would enhance competition by providing shippers in the area with a freight rail option that does not currently exist and foster sound economic conditions in transportation, consistent with § 10101(4) & (5). Additionally, consistent with §§ 10101(2) and 10101(7), an exemption will minimize the need for federal regulatory control over the rail transportation system and reduce regulatory barriers to entry by minimizing the time and administrative expense associated with the construction and commencement of operations. (Pet. 21-22.)

Argyle claims that the RTP goals at § 10101(8), concerning public safety, and § 10101(11), concerning safe working conditions, would be undermined by the project. (Argyle Reply 9, July 7, 2020.) Argyle asserts that there will be a substantial increase in local truck traffic if oil production were to increase to the extent claimed by the Coalition. (<u>Id.</u> at 10.) Argyle also claims, among other things, that rail activities could trigger forest fires and notes that Argyle Canyon was heavily damaged by a fire in 2012. (<u>Id.</u>) The Board takes important

---

Brookhaven Rail LLC—Construction & Operation Exemption—in Suffolk County, N.Y., Docket No. FD 36398.

[15] A petition for reconsideration has since been filed in that docket.

Exhibit A

concerns such as these seriously, and they will be examined as part of OEA's environmental review and further examined by the Board in a subsequent decision considering the environmental impacts of the project.  Cf. Brookhaven Rail—Constr. & Operation Exemption— in Suffolk Cnty., N.Y., FD 36398, et al., slip op. at 6 (STB served Oct. 23, 2020) (rejecting petition seeking exemption from 49 U.S.C. § 10909 and noting concerns stemming from § 10101(8), among others).

Second, application of § 10901 is not necessary to protect shippers from an abuse of market power.[16]  The proposed line would enhance transportation service to shippers by providing an opportunity to use rail service where none currently exists.  Currently, the only transportation option available to freight shippers in the Uinta Basin is trucking along two-lane highways.  (Pet. 13.)  The proposed line, when completed, would provide freight shippers in the Basin with rail service and access to the interstate rail network and would result in increased intermodal competition with commercial freight by truck.  Therefore, the proposed line would increase competitive options to shippers and eliminate shippers' reliance on one option for freight transportation.

Environmental Review.

As discussed above, the Board has preliminarily concluded that the proposed construction meets the statutory standards for exemption on the transportation merits, subject to completion of the ongoing environmental review.  The Board's Office of Environmental Analysis (OEA) issued a Final Scope of Study for the Environmental Impact Statement (EIS) on December 13, 2019, and a Draft EIS on October 30, 2020, for public review and comment.  OEA also held six virtual public meetings to receive oral comments, the last of which took place on December 3, 2020.  Following the conclusion of the comment period (January 28, 2021), OEA will issue a Final EIS addressing the public comments and environmental impacts and make its final recommendations to the Board.

Following the conclusion of the environmental review process, the Board will issue a further decision assessing the potential environmental impacts of the proposal, weighing the potential environmental impacts and the transportation merits, and determining whether to make the exemption effective at that time, and if so, whether to include appropriate mitigation conditions.  See Mo. Mining, Inc. v. ICC, 33 F.3d 980 (8th Cir. 1994).

The decision issued today is a preliminary determination that does not prejudge the Board's final decision, nor diminish the agency's environmental review process concerning the proposed Line's construction.  See Ill. Com. Comm'n v. ICC, 848 F.2d 1246, 1259 (D.C. Cir. 1988).  Construction may not begin unless and until authorized by the Board in a final decision, which may impose environmental mitigation as appropriate, and until any such final decision has become effective.

---

[16]  Because regulation of the proposed construction and operation is not needed to protect shippers from the abuse of market power, the Board need not determine whether the transaction is limited in scope.  49 U.S.C. § 10502(a)(2).

Exhibit A

It is ordered:

1. The Coalition's July 21, 2020 response and the late-filed replies and letters are accepted into the record.

2. Under 49 U.S.C. § 10502, the Board preliminarily exempts the construction and operation of the above-described line from the prior approval requirements of 49 U.S.C. § 10901, subject to further consideration of the potential environmental impacts of the proposal.

3. On completion of the environmental review, the Board will issue a further, final decision addressing any potential environmental impacts, weighing any environmental impacts with the transportation merits, and determining whether the exemption should become effective (subject to any appropriate mitigation conditions).  Construction may not begin unless and until the Board issues a final decision authorizing the exemption and any such decision has become effective.

4. Notice of this decision will be published in the Federal Register.

5. Petitions for reconsideration must be filed by January 25, 2021.

6. This decision is effective 30 days from the date of service.

By the Board, Board Members Begeman, Fuchs, and Oberman.  Board Member Oberman dissented with a separate expression.

---

BOARD MEMBER OBERMAN, dissenting:

The Board majority has reached a preliminary conclusion that the transportation merits of the proposal of the Seven County Infrastructure Coalition (the Coalition) to construct and operate the approximately 85-mile line at issue (the project) in the Uinta Basin meet the statutory exemption standard under 49 U.S.C. § 10502.  The majority has reached this conclusion in a so-called two-step process, in which it has preliminarily addressed the transportation merits prior to considering the environmental impacts and any necessary mitigation requirements.

I dissent from both aspects of this decision (Decision).  I do not conclude that the Board should find, today, that an application *is* necessary here—only that the Board should not make a finding now that an application *is not* necessary and should not and cannot reach a conclusion on the transportation merits, even preliminarily, prior to completing the environmental review and resolving issues concerning the project's financial viability.

**Introduction.**  Based on the instant record and publicly available information affecting the potential success of this project, as discussed below, serious questions have been raised about the transportation merits of the project, especially concerning the financial viability of the line.  In addition, the Board's Office of Environmental Analysis (OEA) has issued a Draft Environmental Impact Statement (Draft EIS) which concludes that the project "would result in significant environmental impacts."  (Draft EIS S-1.)  Rather than finding today both that a

11

petition for exemption is the appropriate procedure and preliminarily concluding that the statutory exemption standard has been met, the Board should seek additional information concerning the financial viability of and long-term need for this project in order to provide clarity on the uncertainties surrounding these two issues, and should allow the environmental review process to be completed before making these decisions.

Given these uncertainties and the controversial nature of the project, the transportation merits cannot properly be determined without measuring them against whatever environmental degradation the project will cause. In this case, the Board should not deviate from precedent generally disfavoring such a two-step process.[1] It is therefore premature for the Board to reach a preliminary conclusion on the transportation merits of this case, and it is equally premature for the Board to decide now that an application is not necessary.

**Application vs. Petition for Exemption.** Under 49 U.S.C. § 10502, the Board must exempt a proposed rail line construction from the application procedures at 49 U.S.C. § 10901 when the Board finds that: (1) those procedures are not necessary to carry out the rail transportation policy (RTP) of § 10101; and (2) either (a) the proposal is of limited scope, or (b) the full application procedures are not necessary to protect shippers from an abuse of market power. E.g., Ken Tenn Reg'l Rail Partners—Constr. & Operation Exemption—in Fulton Cnty, Ky. & Obion Cnty., Tenn., FD 36328, slip op. at 3 (STB served Dec. 1, 2020); Tex. Cent. R.R. & Infrastructure, Inc—Pet. for Exemption—Passenger Rail Line Between Dallas & Houston, Tex. (Tex. Cent. R.R. June 2020), FD 36025, slip op. at 5 (STB served June 20, 2020).

In considering a construction application under 49 U.S.C. § 10901, the Board "shall" grant such an application "unless the Board finds that such activities are inconsistent with the public convenience and necessity." 49 U.S.C. § 10901(c); e.g., Ken Tenn Reg'l Rail Partners, FD 36328, slip op. at 3. When measuring the public convenience and necessity, the Board looks at "whether: (1) the applicant is financially able to undertake the project and provide rail service; (2) there is a public demand or need for the proposed service; and (3) the proposal is in the public interest and will not unduly harm existing services." Tongue River R.R.—Constr. & Operation—W. Alignment, FD 30186 (Sub-No. 3) et al., slip op. at 13 (STB served Oct. 9, 2007). While the majority correctly states that Board precedent holds that there is a statutory presumption that construction projects should be approved, Decision 4, such a presumption does not obviate the Board's statutory obligation to determine whether regulation is necessary to carry out the RTP of § 10101, and if so, whether the project is consistent with the public convenience and necessity.

As detailed below, there are more than enough unanswered questions about the financial viability of, and public need for, this project to raise the serious potential that, after the development of a complete record, the Board may find that regulation here is necessary to carry out the RTP of § 10101, and that the presumption in favor of approving construction may well be overcome.

---

[1] See, e.g., Alaska Railroad—Construction & Operation Exemption—Rail Line Between Eielson Air Force Base & Fort Greely, Alaska, FD 34658, slip op. at 2 (STB served Oct. 4, 2007).

Exhibit A

In the past, the Board has rejected an exemption and required an application in construction cases presenting significant controversy, particularly where concerns have been raised about the project's financial feasibility and its impact on the local area. See Tex. Cent. R.R. & Infrastructure, Inc—Pet. for Exemption—Passenger Rail Line Between Dallas & Houston, Tex. (Tex. Cent. R.R. July 2020), FD 36025, slip op. at 14 (STB served July 16, 2020) ("[A]n application here would provide the Board with additional information pertaining to the financial condition of the applicant and financial feasibility of the project that would assist the Board in considering the transportation merits of the project."); Ozark Mountain R.R.— Construction Exemption, FD 32204, slip op. at 4-5 (ICC served Dec. 15, 1994) (revoking conditional exemption and requiring application due to "[s]ignificant public opposition to the project" including concerns that the applicant "will be unable to construct and operate the proposed lines").

Here, the majority declines to follow these precedents, see Decision 7, finding that a petition for exemption is appropriate, stating: "[t]here is nothing in the language of § 10502 to suggest that an exemption proceeding is inappropriate if the viability of the proposed rail line is questioned" because "the Board's grant of authority to construct a line . . . is permissive, not mandatory." Decision 5-6. Given the state of the instant record, I disagree with the majority's decision finding, at this time, that a petition for exemption is appropriate. Rather than ignoring the public opposition and significant questions about the project's financial feasibility, the state of the instant record requires the Board to seek additional information and clarify these important issues before concluding that the full application procedures are not necessary to carry out the RTP of § 10101.[2]

**A two-step process involving preliminary approval.** In particular, I find it inappropriate and ill-advised for the Board to undertake a two-step process here, reaching a preliminary conclusion on the transportation merits of the Coalition's petition for exemption before the completion of the environmental review process. From the information currently in the record, the transportation merits of this project—discussed in detail below—are not clear. In addition, significant environmental issues have been raised. Though I have full faith in OEA to conduct a rigorous and thorough environmental analysis regardless of whether the Board reaches a preliminary conclusion on the transportation merits of the project, the Board should withhold judgment on the transportation merits until it also has the benefit of OEA's environmental analysis.[3]

---

[2] See, e.g., Ozark Mountain Railroad, FD 32204, where the agency had conditionally granted an exemption to construct several lines, but, when financial feasibility concerns were raised by the public, the agency requested additional financial information from the applicant before later revoking the conditional grant of authority and requiring an application. Ozark Mountain R.R., FD 32204, slip op. at 1.

[3] Furthermore, to the extent the standard for issuance of a preliminary decision on the transportation merits requires a showing of unique or compelling circumstances, see Six County Ass'n of Governments—Construction & Operation Exemption—A Rail Line Between Levan & Salina, Utah, FD 34075, slip op. at 2 n.4 (STB served Sept. 3, 2015); Alaska Railroad—

13

The instant case is easily distinguished from <u>Ken Tenn Regional Rail Partners</u>, FD 36328, cited by the majority.  <u>Decision</u> 4, 8.  In that case (in which I joined with the majority), the Board issued a preliminary decision on the transportation merits of a petition for exemption in a construction case.  But the facts in <u>Ken Tenn</u> were significantly different from the instant case.  There, on the record before the Board at the time,[4] no financial or environmental concerns had been raised (though, as here, the environmental process is ongoing), and in fact it appeared there was no opposition at all to either the request for a preliminary exemption or the petition itself.  <u>Ken Tenn Reg'l Rail Partners</u>, FD 36328, slip op. at 4.  By contrast, here, though there is support from state and local entities (including that the Coalition itself is an independent political subdivision of the State of Utah, <u>see</u> <u>Decision</u> 2), there is also significant opposition, and that opposition has raised both financial and environmental concerns.  I will discuss the transportation merits and the environmental concerns separately.

*Transportation merits.*  While the Coalition argues an exemption should be granted because "key economic activities in the Uinta Basin, including farming, ranching, oil and gas production, and mineral extraction, depend heavily on the transportation of goods and commodities in and out of the region," (Pet. 12-13), there can be no doubt that the singular rationale for constructing the proposed railroad is to provide rail transportation to stimulate an increase in oil production in the Basin, (<u>id.</u> at 13-17).  It is beyond contradiction that without the hoped-for increase in oil production, there is virtually no possibility the railroad would be financially viable.  But reliance on future oil production to sustain the project, based on currently available information and the record before the Board, is problematic at best, as discussed below.

In 2018, the Coalition commissioned a consultant, R.L. Banks & Associates, Inc. (R.L. Banks) to conduct a pre-feasibility study for the project.  However, in support of its petition, the Coalition failed to mention this study and never submitted it to the Board.  I find this omission significant.  Had the Banks study been persuasive in support of the project, one would have expected the Coalition to enthusiastically rely on it.

The Coalition ultimately mentioned the existence of the R.L. Banks study in its reply only *after* it was submitted and referenced by the objectors in their replies to the Coalition's

---

Construction & Operation Exemption—Rail Line Between Eielson Air Force Base & Fort Greely, Alaska, FD 34658, slip op. at 2 (STB served Oct. 4, 2007), the Coalition has failed to make that showing.  The Coalition cites only "the ongoing COVID-19 pandemic and its economic impacts" in support of its argument that there are unique or compelling circumstances here.  (Pet. 26.)  While the significant impacts the pandemic has had across the country and the world are self-evident, these impacts are also among the principal reasons that further inquiry into the financial viability of the project is necessary, as discussed, infra.

[4]  On December 21, 2020, a group of landowners filed a petition for reconsideration in that docket alleging, among other things, that the petitioner "misrepresented to the Board that the Petition is unopposed."  Pet. for Recons. 2, Ken Tenn Reg'l Rail Partners, FD 36328.  The petition for reconsideration is currently pending before the Board.

14

petition.[5]  (See Coalition Reply 16 n.46 & 17 n.51, July 21, 2020.)  The inescapable conclusion from a review of the R.L. Banks study is that the project's success relies entirely on an increase in oil production in the Uinta Basin, with that oil being shipped by rail; shipment of any other commodities on the railroad would be insignificant in comparison to oil.  (See Pet. 15; id., V.S. McKee ¶ 17 (Executive Director of the Coalition stating the line "will primarily be used to ship crude oil and fracking sand.").)  Non-oil shipments could never justify the cost of constructing the project.[6]

But the R.L. Banks study hardly is persuasive on the likelihood that a projected increase in oil production will be large enough to sustain the railroad.  First, the only version of the study obtainable by the Center is woefully incomplete.  While R.L. Banks states that it undertook to make detailed projections of the demand for Uinta Basin oil and the number of carloads such demand would generate for the proposed railroad, the Coalition has redacted every statistic and every table in the R.L. Banks study released to the Center.  Therefore, it is impossible for the Board (or anyone) to evaluate the substance and reliability of the conclusions purportedly reached by R.L. Banks concerning the projected volume of shipments on the line.  If those statistics were persuasive of the transportation merits of the project, again, one would have expected the Coalition to supply them to the Board (which, if confidentiality was a concern, could have been submitted under seal subject to a protective order).  The Coalition's failure to do so supports an inference that the statistics compiled by R.L. Banks are either not persuasive or are no longer reliable.[7]

Aside from this shortcoming, even the R.L. Banks study acknowledges that the demand for the type of oil extracted from the Uinta Basin is unknown.  (Ctr Supp. 417 ("**Unknown Demand** – The demand for Uinta Basin's waxy crude, which is not well known outside of Utah, in large part due to lack of transportation infrastructure to ship product out of the Uinta Basin, may not be as readily accepted as initial indications would suggest.").)  More importantly, since

---

[5]  The Board only received a copy of this study because, in its opposition to the petition, the Center for Biological Diversity (Center) submitted a version of the study.  But that version was redacted by the Coalition before it was made available to the Center.  (See Ctr. Supp. 387-469.)

[6]  The Center and the Argyle Wilderness Preservation Alliance (Argyle) argue there is no evidence to support a claim of need for the line outside the oil industry.  (Ctr. Reply 31 (noting that prior revenue forecasts for the project have not included products outside the oil industry); Argyle Reply 9, 12 & Appx. 1 at 2, July 7, 2020 (arguing in particular that there are no agricultural producers who would utilize the line).)  The Draft EIS also points out that the volume of non-oil traffic is likely to be low, stating that "[t]he Coalition does not anticipate that the volume of other commodities would be large enough to warrant dedicated trains."  (Draft EIS 2-2.)

[7]  Surprisingly, the majority dismisses its own inability to examine the redacted material in the R.L Banks study, concluding, without explanation, that no additional financial information is needed.  Decision 6 n.8.  Since there is virtually no financial information in the record showing the viability of the project, apparently, the majority concludes that financial viability is unimportant.

15

Exhibit A

the preparation of the R.L. Banks study in 2018, the global demand for oil has changed dramatically, both because of the pandemic and its long term ramifications, and because of the changing progress in the world's reliance on non-fossil fuel energy.

As a result, there are significant questions about the future global demand for oil, which would affect the financial viability of a rail line built primarily to move Uinta Basin oil, the demand for which was unknown even prior to the pandemic. Further, while the Coalition assumes the pandemic-related changes may be short-term (Pet. 10 n.28, 14 n.52), there are significant indications that this assumption may be unwarranted.

These questions of future global demand were recently summarized by former Vice President Al Gore:

> As a former oil minister in Saudi Arabia put it 20 years ago, "the Stone Age came to an end, not because we had a lack of stones, and the oil age will come to an end not because we have a lack of oil." Many global investors have reached the same conclusion and are beginning to shift capital away from climate-destroying businesses to sustainable solutions. . . . [S]ome of the world's largest investment firms are now joining this movement, too, having belatedly recognized that fossil fuels have been extremely poor investments for a long while. Thirty asset managers overseeing $9 trillion announced on [December 11, 2020] an agreement to align their portfolios with net-zero emissions by 2050.

Al Gore, Opinion, Al Gore: Where I Find Hope, New York Times (Dec. 13, 2020), https://www.nytimes.com/2020/12/12/opinion/sunday/biden-climate-change-al-gore.html.

Indeed, many of the world's major oil producers have written down the value of their oil reserves—including shale oil reserves—by multi-billions of dollars since the middle of 2020. These write-downs have been based on longer term projections, only partly resulting from pandemic fallout:

> BP PLC, Hess Corp. and Occidental Petroleum Corp., have recently taken multibillion-dollar [asset] impairments as a coronavirus-induced economic slowdown adds pressure to an already struggling shale sector. Chevron Corp. took a $10 billion write-down in December, [2019] and Royal Dutch Shell PLC said Tuesday that it would write down the value of its assets by up to $22 billion because of lower energy prices.
>
> . . . .
> The U.S. shale industry has written down more than $450 billion in assets since 2010, according to a June [2020] report by Deloitte, reassessing holdings amid a global supply glut and growing investor concerns about the long-term future of fossil fuels. The accounting firm projects additional shale impairments of as much as $300 billion in coming months as the coronavirus holds down commodity prices.

Exhibit A

Christopher M. Matthews, Exxon Mobil Resists Write-Downs as Oil, Gas Prices Plummet, Wall Street Journal (June 30, 2020), https://www.wsj.com/articles/exxon-mobil-resists-write-downs-as-oil-gas-prices-plummet-11593521685 (emphasis added); see also Christopher M. Matthews, Exxon Slashes Spending, Writes Down Assets, Wall Street Journal (Nov. 30, 2020), https://www.wsj.com/articles/exxon-slashes-spending-writes-down-assets-11606774099 ("Exxon cut its expectations for future oil prices for each of the next seven years by 11% to 17% . . . . The sizable reduction suggests Exxon expects the economic fallout from the pandemic to linger for much of the next decade.").[8]

> To be clear, owners of oil assets generally distinguish between the amount of their "proven reserves" and all other reserves. The term "proven reserves" refers to the quantity of oil which can be extracted profitably at the prevailing price for that oil. Thus, if the price of oil drops below the cost of extraction, then the amount of "proven reserves" must be reduced accordingly. Here, questions have been raised about the quantity of oil reserves in the Basin, the demand for the specific type of oil found there, and whether there are sufficient proven reserves to provide long term business for the proposed railroad. Estimates in the record of the amount of oil in the Basin vary, in part depending on whether unconventional resources such as oil produced from oil shale are included in the estimate.[9] (Ctr. Reply 23-24 (estimating 401 million barrels of "proven" conventional reserves across the state of Utah at the end of 2018, or only approximately five years' worth); Ctr. Supp 392 (R.L. Banks study estimating "between 50-321 billion barrels" without further description of type).) While the high-end estimates here would support the prospect of a booming oil business in the Basin if the demand exists, the low-end estimates would not—and there is little information in the record that would enable the Board to determine even a range of what might be realistic.

> Given the depression in the oil market since the R.L. Banks study in 2018, there is no basis in the present record for the Board to determine the amount of "proven reserves" in the Uinta Basin. But surely, if in 2020, the world's major oil producers have been forced to undertake major write-downs of the value of their oil reserves and lower their expectations for the future of oil prices, as discussed above, it is difficult to imagine that the Uinta Basin producers have not been required to do the same, especially in view of the R.L. Banks study's concession that the demand for Uinta Basin's waxy crude is "unknown" and "may not be as readily accepted as initial indications would suggest," (Ctr. Supp. 417).

---

[8] Further, as Argyle points out, changes in the foreign and domestic oil markets "recently resulted in a negative value of crude oil for the first time in history." (Argyle Reply 8, July 7, 2020.)

[9] The R.L. Banks study looked at, among other commodities, crude oil and shale oil production in the Basin to estimate potential traffic volumes. While the study includes some unredacted information about the estimated production of crude oil, (Ctr. Supp. 419-421 (estimating annual crude oil production in the Basin to be between 225,000 barrels per day and 350,000 barrels per day)), the actual data relating to potential shale oil traffic volumes is all redacted, (Ctr. Supp 423).

Exhibit A

If, as the foregoing sources suggest, the global demand for oil is indeed depressed and does not bounce back to pre-pandemic levels as quickly as the Coalition assumes[10]—or never rebounds entirely—the viability of the Uinta Basin railroad is clearly thrown into question. Understandably, even the R.L. Banks study caveats its traffic volume forecasts, stating that "[t]he viability of the [project] is grounded on the assumption that oil markets will be stable or favorable . . . . However, a significant and long-term downturn in the price of [West Texas Intermediate crude oil], particularly in the early years of the prospective railroad, could result in significant shortfalls from the performance indicated herein." (Ctr. Supp. 416.) It takes no great insight to observe that the oil markets have been anything but stable or favorable, thus leaving R.L Banks' "assumption" at best questionable.[11]

The majority did not explore these significant changes in the global oil market and dismisses concerns raised by the Center and Argyle about the financial viability of the project, finding that, because the Board's authority is permissive, "the ultimate decision to go forward with an approved project is in the hands of the applicant and the financial marketplace," and thus the Board need not consider such concerns.[12] Decision 6.

Even if relying on the financial marketplace to determine whether this railroad should be built constituted a sufficient discharge of the Board's duties in determining whether a project should be granted an exemption from the full application process, here the record establishes that the financial marketplace cannot be relied on. The R.L. Banks feasibility study makes clear that *the private sector will not build this railroad*; only a government can afford to build it:

> [R.L. Banks] assumed that construction of the railroad would be the responsibility of [the Coalition], another public entity, or a consortium of public entities. While

---

[10] A further challenge to the Coalition's assumptions about oil demand is the concern that office commuters, significant users of petroleum products either through mass transit or automobile travel, may never return to commuting at pre-pandemic levels. See, e.g., Paul Wiseman and Alexandra Olson, Shift in Economic Landscape, Chicago Tribune, Dec. 26, 2020, at 7 ("A McKinsey survey of 800 corporate executives worldwide found that 38% expect their employees now working remotely to continue to do so at least two days a week after the pandemic, up from 22% in surveys before the pandemic.").

[11] The R.L. Banks study states that, in 2018, experts expected domestic oil production to grow at record pace, and that it was expected that "worldwide demand for oil also will continue to grow over the next five years and the United States will supply most of the production to answer that growing demand." (Ctr. Supp. 392.) The study, of course, could not have anticipated the current pandemic and the related drastic change in the global oil markets, as reflected in 2020 by the write-downs undertaken by the world's major oil producers.

[12] But see, Tex. Cent. R.R. July 2020, FD 36025, slip op. at 13-15. In that case, the Board chose not to rely on the financial marketplace to decide the viability of the project, instead rejecting a petition and requiring an application due to the financial feasibility concerns raised by commenters. Though the projected cost estimates in that case were higher than in this case, the cost of the project here is greater than a billion dollars, (Pet. 11), and, as discussed herein, there is significant uncertainty about the financial viability of a project of that magnitude.

18

Exhibit A

> private/public partnerships ("3Ps") are not unprecedented in the freight rail industry, <u>there has never been such a partnership approaching the size and scope of the [project]</u>. Furthermore, given the generally conservative nature of the rail freight industry, [R.L. Banks] believes any railroad which may eventually service the line has relatively little incentive to invest in the construction of the line, especially given <u>the high associated capital costs projected and lack of current production levels sufficient to justify construction</u>.

(Ctr. Supp 433 (emphasis added).)  Further, R.L. Banks made clear that the railroad financing could only be obtained through the issuance of government bonds:

> Given the large capital investment required to construct the [project] . . . , [R.L. Banks] assumed that construction of the railroad would be financed through the issuing of bonds.  Specifically, [R.L. Banks] assumed that the entire cost to construct the [project] would be financed with capital generated from issuing 30-year bonds.

(Id. at 444.)

While the record (as submitted, not by the Coalition, but by the objectors) refers to the possibility that the railroad construction will be financed by "municipal conduit bonds,"[13] there is no indication of how such financing would be structured.  Given the uncertainty of demand for Uinta Basin oil, as discussed above, there is every possibility that such bonds could only be sold if they were backed not only by revenues from the railroad, but also by local tax dollars.  As former Vice President Gore observed, the world's largest investment firms are withholding investments in fossil fuels and, if that is true, it appears highly unlikely that private investors can be found to invest in construction of a railroad dependent on harvesting oil of the type found in the Basin, in light of all of the information unknown from this record.  Thus, the private financial marketplace is not likely to be a determinant of the financial feasibility of the railroad and should not be relied on by the Board to evaluate whether to grant a petition or approve an application for this project.  On the contrary, the availability of public funding or public guarantees is likely to be the determinant.

Adding to the uncertainty at this time is the fact that the Coalition has decided to rely on a private investment partner to develop the financing.  The Coalition is partnering with DHIP, (Pet. 6, 37-38), which it describes as "an established independent infrastructure investment company that is successfully developing and financing projects across the United States. . . ," (Coalition Reply 12, July 21, 2020).  Nevertheless, now known as DHIP Group, the company appears to be a small, young firm.  Its website reflects that it consists of two managing partners,

---

[13] (Ctr. Reply 12; Ctr. Supp. 229 (Drexel Hamilton Infrastructure Partners LP (DHIP) Request for Information Response for the Commercialization, Financing, Construction, Operation, and Maintenance of the Uinta Basin Railway by the Seven Counties Infrastructure Coalition of Utah, dated Apr. 11, 2019); Ctr. Supp. 351 (Memorandum of Understanding Regarding the Development of the Uinta Basin Railway between the Coalition and DHIP, dated May 10, 2019).)

Exhibit A

and the firm lists no prior experience in financing the construction of railroads. Home – DHIP Group, http://dhipgroup.com/ (last visited Jan. 4, 2021). The firm's website also lists only one other infrastructure project in which it has been involved. Infrastructure – DHIP Group, http://dhipgroup.com/infrastructure/ (last visited Jan. 4, 2021). While DHIP Group may, in fact, be well qualified to carry out this project, given all of the above serious concerns with the future of the oil market, the Board should insist on further information from DHIP Group on the practicality of obtaining the necessary financial resources to complete the project.

In sum, the current record before the Board is woefully inadequate to permit the Board to evaluate and judge whether an exemption is warranted under the RTP or whether an application should be required so that the Board can determine whether the public convenience and necessity are met for the construction of the Uinta Basin railroad.

*Environmental review.* As noted above, OEA concludes in the Draft EIS that the project "would result in significant environmental impacts." (Draft EIS S-1; id. 1-1.) OEA also preliminarily concludes there could be major "significant and adverse impacts" as a result of the project on: water resources; special status species (including several threatened and endangered plant species and a bird species managed by the Bureau of Land Management and the State of Utah); wayside noise (train noise adjacent to a rail line other than that from a locomotive horn); land use and recreation on public, private, and tribal lands; socioeconomics, including beneficial impacts like the creation of jobs, and adverse impacts like the displacement of structures on private land and the severance of properties; and issues of tribal concern affecting the Ute Indian Tribe of the Uintah and Ouray Reservation, including impacts related to vehicle safety and delay, rail operations safety, biological resources, air emissions,[14] and cultural resources. (Draft EIS S-7 to S-9.) Mitigation measures could reduce but not eliminate these impacts, and the route recommended by OEA, the Whitmore Park Alternative, "would result in the fewest significant impacts on the environment," (Draft EIS 2-47), compared to other alternative routes. In addition to these major impacts, OEA also enumerates several minor impacts in the Draft EIS, which OEA states can be mitigated if the recommended mitigation measures are adopted by the Board, as well as downline and cumulative impacts. (Draft EIS S-9 to S-12.) OEA states the Coalition has proposed 56 voluntary mitigation measures to address the environmental impacts of the project, and OEA preliminarily recommends an additional 73 mitigation measures for the project. (Draft EIS S-23; see also Draft EIS ch. 4, Mitigation.)

Both Argyle and the Center argue against the Board's reaching a preliminary conclusion on the Coalition's petition before the environmental review process is complete. The Center states that "development of the railway raises many significant environmental and socioeconomic issues, which must be weighed[,] along with the project's financial risks, against its highly speculative benefits." (Ctr. Reply 33; see also Argyle Reply 14, July 7, 2020.)

---

[14] Argyle notes that the Coalition claims crude oil production will increase by 400%, which, Argyle argues, "would cause a corresponding increase in local truck traffic between the oilwell sites and the rail loading points." (Argyle Reply 10.) An increase in truck traffic in the Basin would have its own environmental and congestion-related impacts on the limited road infrastructure in the Basin.

Exhibit A

The Draft EIS clearly illustrates there are serious environmental impacts that must be mitigated if the project is to proceed. What remains to be determined is whether the mitigation measures identified through the environmental review process will be sufficient to address these impacts, or whether the overall environmental impact of the project will outweigh the project's transportation merits which, as discussed above, are at this time, at best, uncertain. The likely significant cost of any imposed mitigation measures may also affect the project's financial viability. The transportation merits and the environmental impacts of this project are inherently interrelated and should be considered in balance with each other, rather than even preliminarily dealing with the transportation merits now. See Alaska R.R.—Constr. & Operation Exemption—A Rail Line Extension to Port MacKenzie, Alaska, FD 35095, slip op. at 22 (STB served Nov. 21, 2011) (Commissioner Mulvey, dissenting) ("[T]he more severe the environmental impacts, particularly those that cannot be fully mitigated, the greater burden on the proponent of the rail line to show that the transportation merits of its proposal outweigh those impacts.").[15]

Conclusion. Contrary to the majority's conclusions, the Board is mistaken when it reaches a conclusion, preliminarily and via the petition for exemption process, on the transportation merits of a project presenting serious questions like those raised here without more thoroughly evaluating those issues. The record in this proceeding on the overall financial viability of the project is significantly underdeveloped. Neither I nor the Board majority should be required to rely on reports in the media, which I have highlighted above, or on feasibility studies with all relevant data redacted, to make such an important decision on whether to approve construction of a rail line costing over a billion dollars through an environmentally sensitive area.

Rather than determining at this time that the Coalition's petition is ripe for decision, even preliminarily and piecemeal, the Board should require the Coalition to submit a complete and unredacted version of the R.L. Banks study, should insist that the Coalition elaborate on the projected demand for Uinta Basin oil in light of the global oil demand issues that have arisen since that study was completed, as discussed above, and should obtain more detail from the Coalition and DHIP Group on the reality of obtaining the necessary financing for the project, with or without obligating public funds, along with considering further input on these issues from the objectors.

I therefore find it premature for the Board to issue the decision the majority issues today. Though the Decision states that it "does not prejudge the Board's final decision, nor diminish the agency's environmental review process concerning the proposed line's construction," Decision 10, nevertheless, the far more prudent course of action for the Board here would be to defer any decision on whether an exemption is warranted and on the overall transportation merits

---

[15] Though the majority states that it will weigh the environmental impacts and the transportation merits of the project following the conclusion of the environmental review process, Decision 10, a preliminary decision on the transportation merits in this case gives the merits of the project an endorsement that may well not be warranted.

Exhibit A

until the environmental review process is complete and until the Coalition submits more
persuasive evidence on the financial viability of the entire project.

     I respectfully dissent.

51032
EB

SERVICE DATE – DECEMBER 15, 2021

SURFACE TRANSPORTATION BOARD

DECISION

Docket No. FD 36284

SEVEN COUNTY INFRASTRUCTURE COALITION—RAIL CONSTRUCTION &
OPERATION EXEMPTION—IN UTAH, CARBON, DUCHESNE, AND UINTAH
COUNTIES, UTAH

Digest:[1]  This decision grants final approval for an exemption sought by the
Seven County Infrastructure Coalition to construct and operate a new line of
railroad in Utah, subject to certain environmental mitigation conditions.

Decided:  December 15, 2021

In 2020, the Seven County Infrastructure Coalition (Coalition) filed a petition for
exemption under 49 U.S.C. § 10502 from the prior approval requirements of 49 U.S.C. § 10901
for authorization to construct and operate an approximately 85-mile rail line connecting two
termini in the Uinta Basin (Basin) near South Myton Bench, Utah, and Leland Bench, Utah, to
the national rail network at Kyune, Utah (the Line).  According to the Coalition, the Line would
provide shippers in the Basin with a viable alternative to trucking, which is currently the only
available transportation option.  (Pet. for Exemption 13-15.)

On January 5, 2021, the Board issued a decision assessing the transportation merits of the
proposed transaction and preliminarily concluding, subject to completion of the ongoing
environmental review, that the proposal meets the statutory standard for an exemption on the
transportation merits.  Seven Cnty. Infrastructure Coal.—Rail Constr. & Operation Exemption—
in Utah, Carbon, Duchesne, & Uintah Cntys., Utah (January 5 Decision), FD 36284, slip op. at 8-
10 (STB served Jan. 5, 2021) (86 Fed. Reg. 1564) (with Board Member Oberman dissenting).
The Board noted that it was not granting the exemption or allowing construction to begin and
that after the Board has considered the potential environmental impacts associated with this
proposal and weighed those potential impacts with the transportation merits, it would issue a
final decision either granting the exemption, with conditions, if appropriate, or denying it.  Id.
at 2.  The Board received petitions for reconsideration of the January 5 Decision and denied
those requests in a decision served on September 30, 2021.  Seven Cnty. Infrastructure Coal.—
Rail Constr. & Operation Exemption—in Utah, Carbon, Duchesne, & Uintah Cntys., Utah
(September 30 Decision), FD 36284 (STB served Sept. 30, 2021) (with Board Member Oberman
dissenting).

---

[1]  The digest constitutes no part of the decision of the Board but has been prepared for the
convenience of the reader.  It may not be cited to or relied upon as precedent.  See Pol'y
Statement on Plain Language Digs. in Decisions, EP 696 (STB served Sept. 2, 2010).

Exhibit A

The Board's Office of Environmental Analysis (OEA), in cooperation with stakeholders, tribes, and federal, state, and local agencies, has completed a thorough environmental analysis that reviewed the potential environmental impacts that could result from the proposed project, culminating in a Final Environmental Impact Statement (Final EIS) served on August 6, 2021. OEA reviewed a number of build alternatives and a No-Action (or No-Build) Alternative to take a "hard look" at potential environmental impacts as required by the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. §§ 4321-4370m-12. The environmental review process has included extensive opportunity for public participation as well as input from agencies and other interested parties. Based on this analysis, OEA identifies the Whitmore Park Alternative as its Environmentally Preferable Alternative for the Line because it would avoid or minimize major environmental impacts compared to the two other build alternatives, as discussed in more detail below. OEA also recommends environmental conditions (including both voluntary mitigation proposed by the Coalition and additional mitigation developed by OEA) to avoid, minimize, or mitigate the transaction's potential environmental impacts.

In this decision, the Board will grant final approval for a construction and operation exemption for the Whitmore Park Alternative, subject to OEA's final recommended environmental mitigation measures, with minor changes. The environmental mitigation is set forth in Appendix B to this decision.

## BACKGROUND

On May 29, 2020, the Coalition filed a petition for exemption from the prior approval requirements of 49 U.S.C. § 10901 under 49 U.S.C. § 10502 to construct and operate the Line, which will connect with Union Pacific Railroad Company (UP) at Kyune, Utah. The Coalition notes that it is an independent political subdivision of the State of Utah, whose member counties include Carbon, Daggett, Duchesne, Emery, San Juan, Sevier, and Uintah Counties. (Pet. for Exemption 5.) It was formed to, among other things, identify and develop infrastructure projects that will promote resource utilization and development. (Id.)

The Coalition asserts that goods produced or consumed in the Basin now can be transported only by truck and that the proposed project would give shippers an additional freight transportation option, eliminating longstanding transportation constraints. (Id. at 13-15.) It explains that adding a rail transportation option would provide local industries the opportunity to access new markets and increase their competitiveness in the national marketplace, and that the removal of transportation constraints would benefit oil producers, mining companies, ranchers, farmers, and other local industries. (Id. at 15.)

The Coalition argues that regulation of the construction and operation of the proposed line under § 10901 is not needed to carry out the rail transportation policy (RTP) at 49 U.S.C. § 10101, that the project would promote several provisions of the RTP, and that an application under § 10901 is not required to protect shippers from an abuse of market power. (Pet. for Exemption 21-22.) In considering the petition, the Coalition asked that the Board follow a two-step approach, addressing the transportation aspects of the project in advance of the environmental issues. (Id. at 26-28.)

Exhibit A

The Board received filings both supporting and opposing the petition for exemption. Several government officials filed comments in support of the petition for exemption. January 5 Decision, FD 36284, slip op. at 3.[2]  The opponents included the Center for Biological Diversity (CBD), the Argyle Wilderness Preservation Alliance (Argyle), and numerous individuals. Id. at 1.

In its January 5 Decision, the Board addressed the substantive comments, concluded that an application was not necessary, and found the requested approach of issuing a preliminary decision on the transportation merits appropriate.  The Board preliminarily concluded, subject to completion of the ongoing environmental and historic review, that the proposed transaction meets the statutory standards for exemption under § 10502.  January 5 Decision, FD 36284, slip op. at 1.  As noted above, the Board stated that it was not granting the exemption or allowing construction to begin and that after the Board has considered the potential environmental impacts associated with this proposal and weighed those potential impacts with the transportation merits, it would issue a final decision either granting the exemption, with conditions, if appropriate, or denying it. Id. at 2.

The Board received petitions for reconsideration of the January 5 Decision from Eagle County, Colo., on January 25, 2021, and CBD on January 26, 2021.  The agency denied those requests in its September 30 Decision, where among other things, the Board rejected arguments that an application was required because of concerns related to potential reactivation of the Tennessee Pass Line in Colorado and that the Board's consideration of the statutory standards for exemption in the January 5 Decision was inadequate.  September 30 Decision, FD 36284, slip op. at 3, 5-7.

During this time, OEA was conducting its environmental review of potential impacts from constructing and operating the Line.  As part of this process, OEA issued a Notice of Intent to Prepare an EIS on June 19, 2019, a Final Scope of Study for the EIS on December 13, 2019, and a Draft EIS on October 30, 2020.  The Draft EIS analyzed three Action Alternatives for the proposed Line, as well as the No-Action Alternative.  The three alternatives examined were the Indian Canyon Alternative, Wells Draw Alternative, and Whitmore Park Alternative.  (Draft EIS S-5.)  Each of the Action Alternatives would extend from two terminus points in the Basin near Myton, Utah, and Leland Bench to a proposed connection with UP's existing Provo Subdivision near Kyune.  (Id. at S-7.)  A map of the Action Alternatives is found at Appendix A of this decision.  The Indian Canyon Alternative, Wells Draw Alternative, and Whitmore Park Alternative would be approximately 81 miles, 103 miles, and 88 miles in length, respectively.

---

[2]  To date, the Board has received letters supporting the project from the Ute Indian Tribe of the Uintah and Ouray Reservation (Ute Indian Tribe), U.S. Senators Mitt Romney and Mike Lee and U.S. Representatives Rob Bishop, Chris Stewart, John Curtis, Burges Owens, and Blake Moore.  The Board also received letters supporting the project from state officials, including Utah's former Governor Gary R. Herbert, its current Governor Spencer J. Cox, Lieutenant Governor Deidre M. Henderson, State Senate President J. Stuart Adams, and State House Speaker Brad Wilson.

Exhibit A

(Draft EIS S-7.)  In its request for authority, the Coalition identified the Whitmore Park Alternative as its preferred route for the Line.

Based on the analysis in the Draft EIS, OEA concluded that construction and operation of any of the Action Alternatives would result in environmental impacts, some of which would be significant.  (Id. at S-7 to 13.)  OEA preliminarily concluded, however, that, among the three Action Alternatives, the Whitmore Park Alternative would result in the fewest significant impacts on the environment.  (Id. at S-12.)

OEA invited agency and public comment on the Draft EIS, including its preliminary conclusion on the Whitmore Park Alternative and the conditions OEA preliminarily recommended to mitigate the impacts of constructing and operating any of the Action Alternatives.  OEA established a comment period, which it agreed to extend several times upon request, until February 12, 2021.  OEA also conducted six online public meetings during the comment period.  In total, OEA received 1,934 comment submissions on the Draft EIS, including both written and oral comments.  (Final EIS S-5.)

In the Final EIS, OEA includes all of the comments received on the Draft EIS and OEA's responses to substantive comments, as well as all changes to the analysis that resulted from the comments.  OEA concludes that the Whitmore Park Alternative is indeed the Environmentally Preferable Alternative, and that if the Board decides to permit construction and operation of a rail line, the Board should authorize that alternative to minimize impacts of construction and operation on the environment.  (Final EIS 2-48.)  OEA also provides its final recommendations for environmental mitigation to minimize potential environmental impacts.  (Id. at Chapter 4.)

On August 25, 2021, the State of Utah (State) filed in support of the Coalition's project but asked that OEA modify several mitigation measures that OEA recommends in the Final EIS. In addition, the U.S. Environmental Protection Agency (USEPA) filed comments on the Final EIS on September 2, 2021, recommending certain changes to an air emissions dispersion model that OEA ran as part of the environmental review process.  On October 1, 2021, the Ute Indian Tribe filed a comment in response to the Final EIS stating that it supports the rail construction project.  CBD filed a comment on October 18, 2021, and supplemental exhibits on November 8, 2021, raising objections to the exemption sought by the Coalition, the Final EIS, and a related Biological Opinion (BO) issued by the U.S. Fish and Wildlife Service (USFWS) on September 20, 2021.[3]

---

[3]  CBD simultaneously filed a petition asking that the Board accept its comment into the record.  It claims that the Board has a compelling interest in accepting the filing, partly to allow the agency to fully consider the impacts of the project.  (CBD Comment 1, Oct. 18, 2021.)  The Coalition filed in opposition to CBD's request on October 22, 2021.  In the interest of a complete record, CBD's filing as well as the other filings commenting on the Final EIS will be accepted into the record.  See Alaska R.R.—Constr. & Operation Exemption—Rail Line Between N. Pole & Delta Jct., Alaska, FD 34658, slip op. at 6 (STB served Jan. 6, 2010).

Exhibit A

Docket No. FD 36284

## DISCUSSION AND CONCLUSIONS

The construction and operation of new railroad lines requires prior Board authorization, through either a certificate under 49 U.S.C. § 10901 or, as requested here, an exemption under 49 U.S.C. § 10502 from the prior approval requirements of § 10901. Section 10901(c) is a permissive licensing standard that directs the Board to grant rail line construction proposals unless the agency finds the proposal "inconsistent with the public convenience and necessity." Thus, Congress has established a presumption that rail construction projects are in the public interest and should be approved unless shown otherwise. See Alaska R.R.—Constr. & Operation Exemption—Rail Line Extension to Port MacKenzie, Alaska, FD 35095 (STB served Nov. 21, 2011), aff'd sub nom. Alaska Survival v. STB, 705 F.3d 1073 (9th Cir. 2013).

Under § 10502(a), the Board must exempt a proposed rail line construction from the prior approval requirements of § 10901 when the Board finds that: (1) application of those procedures is not necessary to carry out the RTP of 49 U.S.C. § 10101; and (2) either (a) the proposal is of limited scope, or (b) the full application procedures are not necessary to protect shippers from an abuse of market power.

In the January 5 Decision, the Board determined that the Line would enhance competition by providing shippers in the area with a freight rail option that does not currently exist and that the Line would foster sound economic conditions in transportation, consistent with § 10101(4) and (5). January 5 Decision, FD 36284, slip op. at 9. Additionally, the Board found that § 10101(2) and § 10101(7) would be furthered by an exemption because it would minimize the need for federal regulatory control over the rail transportation system and reduce regulatory barriers to entry by minimizing the time and administrative expense associated with the construction and commencement of operations. January 5 Decision, FD 36284, slip op. at 9.

The Board also discussed Argyle's claims that § 10101(8), concerning public safety, and § 10101(11), concerning safe working conditions, would be undermined by the project because rail traffic could cause forest fires and substantial truck traffic. Id. at 8. The Board noted that it takes these concerns seriously and that they would be examined as part of OEA's environmental review and further examined by the Board in its final decision. Id. at 9.

Nothing in the environmental record calls into question the Board's determination in the January 5 Decision that § 10101(2), (4), (5), and (7) would be furthered by the rail construction project. Moreover, as discussed below and in the Final EIS, nothing in the environmental record raises significant concerns regarding § 10101(8) and (11). The Board therefore reaffirms its analysis here and now turns to consideration of the environmental aspects of the proposed project.

### Environmental Analysis

1. The Requirements of NEPA

NEPA requires federal agencies to examine the environmental impacts of proposed major federal actions and to inform the public concerning those effects. See Balt. Gas & Elec. Co. v.

Exhibit A

Nat. Res. Def. Council, 462 U.S. 87, 97 (1983).  Under NEPA and related environmental laws, the Board must consider significant potential environmental impacts in deciding whether to authorize a railroad construction as proposed, deny the proposal, or grant it with conditions (including environmental mitigation conditions).  The purpose of NEPA is to focus the attention of the government and the public on the likely environmental consequences of a proposed action before it is implemented to minimize or avoid potential adverse environmental impacts.  See Marsh v. Or. Nat. Res. Council, 490 U.S. 360, 371 (1989).  While NEPA prescribes the process that must be followed, it does not mandate a particular result.  See Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350 (1989).  Thus, once the adverse environmental effects have been adequately identified and evaluated, the Board may conclude that other values outweigh the environmental costs.  Id. at 350-51.

The Board has assessed the Action Alternatives, OEA's final recommended environmental mitigation, and OEA's conclusions regarding the environmental impacts associated with this construction proposal.  The Board has also fully considered the entire environmental record, including the Draft EIS, public comments, the Final EIS, and the comments received following issuance of the Final EIS from the State, CBD, USEPA, and the Ute Indian Tribe.  CBD, generally, argues that the Final EIS fails to sufficiently analyze and disclose environmental impacts or recommend appropriate mitigation.  (CBD Comment 2-6, Oct. 18, 2021.)  Most of these objections, however, are objections CBD already had raised when commenting on the Draft EIS.  Below, the Board briefly discusses OEA's analysis of several major issues previously raised in comments on the Draft EIS and then responds to the major issues raised following issuance of the Final EIS by CBD and the State as well as USEPA's request to modify some of the recommended environmental mitigation in the Final EIS.  The Draft EIS and Final EIS discuss many issues beyond what the Board addresses in this decision; however, the Board adopts OEA's analysis and conclusions in those documents, even if specific issues are not addressed here.

In the Final EIS, OEA identifies the major environmental impacts that could result from construction and operation of the Line.  These major impacts include impacts on water resources, impacts on special status species, impacts from wayside noise during rail operations, impacts related to land use and recreation, socioeconomic impacts, and issues of concern to the Ute Indian Tribe, including impacts on cultural resources.  During the EIS process, OEA also analyzed other types of environmental impacts that OEA concluded would not be significant if the Coalition's voluntary mitigation measures and OEA's recommended mitigation measures were implemented.  These minor impacts include impacts on vehicle safety and delay, impacts related to rail operations safety, impacts on big game, impacts on fish and wildlife, impacts on vegetation, impacts related to geology and soils, impacts on hazardous waste sites, impacts from construction-related noise, vibration impacts, impacts related to energy resources, impacts on paleontological resources, and visual impacts.

2. Range of Alternatives

NEPA requires that federal agencies consider reasonable alternatives to the proposed action.  Citizens Against Burlington, Inc. v. Busey, 938 F.2d 190, 195-96 (D.C. Cir. 1991).  To be considered, an alternative must be "'reasonable [and] feasible' in light of the ultimate purpose

of the project." Protect Our Cmtys. Found. v. Jewell, 825 F.3d 571, 580-81 (9th Cir. 2016) (quoting City of Carmel-by-the-Sea v. U.S. Dep't of Transp., 123 F.3d 1142, 1155 (9th Cir. 1997)); see also Busey, 938 F.2d at 195 ("rule of reason" applies to the selection and discussion of alternatives). Here, the three Action Alternatives were developed as part of a years-long review of routes by the Utah Department of Transportation (UDOT) and the Coalition, and finally OEA. (Final EIS Sec. 2.2.) OEA determined the range of reasonable alternatives by first looking at potential conceptual routes. (Id.) In evaluating these conceptual routes, OEA looked at many factors, including logistical constraints, the potential for disproportionately significant environmental impacts, and construction and operations costs. (Id.) As explained in detail in Chapter 2 of the Final EIS, the primary reasons certain identified conceptual routes were not moved forward for analysis in the EIS were because they were infeasible due to the prevailing topography surrounding the Basin and because they would require substantial cut-and-fill and large or numerous bridges, as well as numerous large tunnels to pass through mountains. For these reasons and after extensive analysis, OEA determined that there were three reasonable Action Alternatives, one of which was the Environmentally Preferable Whitmore Park Alternative. (Id. at Chapter 2.)

CBD contends that the Final EIS does not consider a reasonable range of alternatives. (CBD Comment 70-71, Oct. 18, 2021.) CBD, however, does not identify any alternative routes that OEA did not analyze that CBD contends are reasonable. Nor does CBD provide any evidence that conceptual routes not moved forward for analysis as alternatives in the EIS are in fact reasonable. CBD asserts that OEA should have considered electrified rail or another "solutionary alternative." (Id. at 71.) Electrified rail, however, would not satisfy the proposed project's purpose and need because of the capital costs associated with electrification. (Final EIS App. T-83-84.) Those costs, including installing power generating stations and overhead powerlines for the entire length of the approximately 85-mile rail line, would render the Line infeasible.[4] As a result, OEA's determination as to the range of reasonable alternatives is consistent with NEPA and the "rule of reason" applicable to every environmental analysis. See Busey, 938 F.2d at 195-96; Jewell, 825 F.3d at 581 (any potential alternative must be viewed in the context of its feasibility and consistency with agency goals); Env't Def. Fund, Inc. v. Andrus, 619 F.2d 1368, 1375 (10th Cir. 1980). The Board adopts OEA's analysis and concludes that the Final EIS's selection of alternatives, along with the extensive discussion in the Final EIS regarding why numerous theoretical alternatives were not feasible or did not otherwise meet the project's purpose and need, was reasonable and in compliance with NEPA.

3. Special Status Species

Special status species include species that are listed or proposed to be listed as threatened or endangered under the Endangered Species Act (ESA); candidate species for ESA listing; bald and golden eagles; and sensitive species listed by the U.S. Bureau of Land Management (BLM),

---

[4] Additionally, there is a significant possibility that the infrastructure required for an electrified rail line itself could adversely affect biological resources, including the greater sage-grouse. (See, e.g., Final EIS 3.4-33 (discussing potential adverse effects on wildlife caused by power distribution lines, communications towers, and fences), 3.15-27 (discussing potential adverse effects on greater sage-grouse caused by power lines).)

Exhibit A

the U.S. Forest Service (Forest Service), the State, or the Ute Indian Tribe. (Final EIS Sec. 3.4.1.) Any of the Action Alternatives would impact special status species. For example, the Action Alternatives would all cross suitable habitat for several plant species that are listed as threatened or endangered under the ESA, including Pariette cactus, Uinta Basin hookless cactus, Barneby ridge-cress, and Ute ladies'-tresses.[5] (Id. at S-8.)

The Coalition has presented voluntary mitigation measures to lessen the impacts to special status species. Additionally, OEA has consulted with USFWS and other appropriate agencies to develop appropriate measures for further avoiding, minimizing, or mitigating impacts on those species. (Id. at S-8.) For example, pursuant to VM-39 and one of OEA's mitigation measures, BIO-MM-9, the Coalition must comply with the terms and conditions of USFWS's BO, which specifies that the Coalition shall, as appropriate and possible, fund the permanent protection of habitat for ESA-listed plant species as compensatory mitigation for the loss of occupied habitat for those plants. (BO 64-71.) The Board is satisfied that, if implemented, the Coalition's voluntary mitigation measures and OEA's additional recommended mitigation measures related to biological resources would lessen impacts of construction and operation on animal and plant species, including ESA-listed species and any potential permanent loss of existing habitat in the rail-line footprint. (Final EIS 3.4-63.)

Any of the Action Alternatives would also cross habitat for the greater sage-grouse, a bird species that is managed by BLM and the State. (Id. at S-8.) The Action Alternatives would each pass near one or more greater sage-grouse leks, which are areas where male grouse perform mating displays and where breeding and nesting occur. (Id.) Depending on the Action

---

[5] CBD criticizes the Final EIS for not conducting field surveys of all of the Action Alternatives to establish a baseline population for each of the threatened or endangered plants species and, instead, planning to conduct those surveys after the EIS process is completed. (CBD Comment 62-64, Oct. 18, 2021.) While field surveys were conducted to establish the presence and extent of suitable habitat for each threatened or endangered plant species along each of the Action Alternatives, OEA appropriately did not conduct clearance surveys that would establish baseline populations for those species as part of the EIS process. Per USFWS guidelines, clearance surveys are only valid for one year and, if construction is authorized, it is anticipated that construction would last two to three years and start no earlier than 2022. See USFWS's Utah Field Office Guidelines for Conducting and Reporting Botanical Inventories and Monitoring of Federally Listed, Proposed and Candidate Plants (USFWS 2011) at https://www.fws.gov/utahfieldoffice/Documents/Plants/USFWS%20UtahFO%20Plant%2 0Survey%20Guidelines%20Final.pdf. Therefore, any clearance surveys conducted during the EIS phase would be outdated at the time of construction and would not provide useful information about the locations of individual plants at the time that impacts on those plants would occur. (Final EIS T-198-99.) Although OEA did not conduct clearance surveys to establish baseline populations, OEA, in consultation with USFWS, used a combination of suitable habitat field surveys and USFWS mapping data as the best available data to assess impacts on threatened and endangered plant species, while also providing for clearance surveys to be conducted after the EIS process so that those clearance surveys will be in compliance with USFWS guidelines and will provide accurate data about the locations of individual plants at the relevant time.

Exhibit A

Alternative, several of those leks could experience significant increases in noise during construction and rail operations, which would disturb the birds and potentially cause them to abandon the leks. (Id.)  OEA has determined that the Whitmore Park Alternative would avoid or minimize impacts on greater sage-grouse that would result under the other Action Alternatives because the Whitmore Park Alternative would be located the furthest distance away from the greatest number of leks and associated summer brood rearing habitat.[6]  (Final EIS S-8.)  To lessen impacts on the greater sage-grouse, the Coalition also volunteered a number of mitigation measures.  OEA recommends additional mitigation measures in the Final EIS.  With both OEA's final recommended mitigation, and the Coalition's voluntary mitigation, all of which the Board will impose, the EIS properly finds that, particularly under the Whitmore Park Alternative, the impacts on greater sage-grouse would not be significant.[7]  (Id.)

In its comments on the Final EIS, the State asks that OEA remove BIO-MM-20, a Final EIS mitigation measure prohibiting construction during greater sage-grouse mating and nesting season.  The State explains that eliminating the condition will help the Utah Division of Wildlife Resources and the Coalition negotiate a final mitigation agreement concerning the greater sage-grouse (State Comment 3, Aug. 25, 2021.)  The State later filed this agreement on September 27, 2021, and the document provides significant additional mitigation to further lessen impacts on the greater sage-grouse.  (State Filing 5-6, Sept. 27, 2021.)

Among the mitigation in the final mitigation agreement are steps to lessen noise during construction and operation, including, to the greatest degree practicable, limiting railroad operational noise to no more than 10 decibels above the ambient level at the edge of the lek during breeding season (March 1 to May 15) and limiting use of horns to emergency situations.[8]

---

[6]  Reduction in impacts, including those on greater sage-grouse, is, in fact, one of the primary reasons that the Whitmore Park Alternative was developed.  (Draft EIS 2-25.)

[7]  CBD criticizes the data and methodology OEA used in its analysis of impacts on the greater sage-grouse, including the locations of the baseline ambient noise level measurements, the noise levels deemed to cause disturbance of greater sage-grouse, and a claimed failure to account for declining population levels.  (CBD Comment 48-56, Oct. 18, 2021.)  The Final EIS thoroughly explains why these criticisms are misplaced and how the data and methodologies used by OEA in the EIS are supported by the record.  (See Final EIS 3.4-45 to 46, 3.4-48 to 49, 3.4-58 to 62; App. T-184, T-203-05, T-208-09.)  Moreover, determining the best data and methodology upon which to rely is a determination that falls well within the agency's discretion.  Jewell, 825 F.3d at 583-85 (upholding agency's discretionary decision not to conduct nocturnal migratory bird survey because agency's determination was a discretionary one and "founded on reasonable inferences from scientific data").

[8]  CBD asserts that the mitigation proposed for the greater sage-grouse, as well as for numerous other resources and impacts, such as threatened and endangered plants, big game, geological hazards, revegetation of temporarily disturbed construction areas, and recreational resources, is insufficient because it includes plans to continue developing specific mitigation actions as the project progresses or as based on continuing consultation with other agencies and the Ute Indian Tribe.  (CBD Comment 72-79, Oct. 18, 2021.)  However, explicit concrete detail and definitive actions not subject to further evaluation or refinement are not required in an

(State Filing 6, Sept. 27, 2021.)  CBD asks that the Board prohibit train operations during greater sage-grouse mating season between 6:00 a.m. and 9:00 a.m.  (CBD Comment 56, Oct. 18, 2021.)  The Board generally does not restrict how railroads choose to conduct their operations.  In any event, it is not necessary to consider CBD's request as the final mitigation agreement provides more protection for the greater sage-grouse than the mitigation recommended in the Final EIS, including limits on train noise and hours of operation.  (Compare Final EIS Sec. 4-7 with State Filing 5-6, Sept. 27, 2021.)  Therefore, the Board will not adopt CBD's request to limit operations.  However, as discussed below in the Board Mitigation section, the Board will grant the State's request to remove BIO-MM-20 recommended in the Final EIS and instead will impose the measures in the final mitigation agreement.

As part of the NEPA process for this project and pursuant to Section 7 of the ESA, on September 20, 2021, USFWS issued its BO evaluating the effects of the project on endangered and threatened species.  The BO presents USFWS's conclusions regarding likely impacts on ESA-listed species and details the data and information on which it bases those conclusions.  The BO concludes that the proposed project is not likely to jeopardize the continued existence of the ESA-listed plants or fish or result in the adverse modification of the endangered fishes' habitat.  (BO 47-49.)  CBD makes a generalized claim that the BO is flawed and asserts, among other things, that the BO does not rely on current data, arbitrarily limits the area of study, and fails to consider the effects of oil and gas development that would be spurred by the Line on listed plant species.  (CBD Comment 6, Oct. 18, 2021.)  However, the BO is a USFWS document that neither OEA nor the Board have the authority to revise.  Moreover, CBD previously raised these claims of flaws in its comments on OEA's draft Biological Assessment (BA), which was appended to the Draft EIS.

OEA addressed comments on the draft BA in the Final EIS and revised the BA in response to comments, as appropriate, before submitting the BA to USFWS to begin formal consultation with USFWS.  (Final EIS T-203.)  Thus, CBD's concerns do not lead the Board to conclude that it should not rely on the BO.

### 4.  Wildfires

OEA's analysis also thoroughly addresses the possibility of trains sparking wildfires along the routes of the Action Alternatives.  OEA notes that the Forest Service has created a Wildfire Hazard Potential (WHP) map.  (Final EIS 3.4-16.)  According to the map, approximately 90% of the study areas for the Indian Canyon Alternative and Whitmore Park Alternative, and approximately 87.4% of the study area for the Wells Draw Alternative, are

---

agency's discussion and development of appropriate mitigation.  Rather, what is required under both NEPA and the NEPA-implementing regulations of the Council on Environmental Quality is "a reasonably complete discussion of possible mitigation measures."  Busey, 938 F.2d at 206 (quoting Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 352 (1989)); see also Theodore Roosevelt Conservation P'ship v. Salazar, 616 F.3d 497, 516-17 (D.C. Cir. 2010) (upholding an adaptive management plan because NEPA does not require "agencies to make detailed, unchangeable mitigation plans for long-term development projects").  The Final EIS's discussion of mitigation is reasonably complete and therefore complies with NEPA.

Exhibit A

associated with very low, low, or moderate wildfire hazard potential.  (Id.)  The Final EIS further determined that the "very high" WHP is not present in the study areas for any Action Alternative.  (Id.)  Moreover, the Final EIS concludes that the probability of a train-induced forest fire is very low because trains only cause a small percentage of fires (id. at Table 3.4-7) and improvements in locomotive technology further lessen the risk.  (Id. at 3.4-42.)

Nonetheless, to further reduce the risk of wildfires, OEA recommends mitigation requiring the Coalition to develop and implement a wildfire management plan in consultation with appropriate state and local agencies, including local fire departments (BIO-MM-7).  Further, OEA recommends that the plan incorporate specific information about operations, equipment, and personnel on the Line that might be of use in case a fire occurs and should evaluate and include, as appropriate, site-specific techniques for fire prevention and suppression.  OEA reasonably concludes that, if its recommended mitigation is implemented, the impacts of wildfire on vegetation would not be significant.  (Id. at 3.4-42 to 43.)

In response to comments received on the Draft EIS, OEA also considered impacts from rail operations along existing rail line segments downline of the proposed rail line for some biological resources, including impacts related to wildfires.  (Id. at 3.4-43.)  Trains originating or terminating on the proposed rail line could be an ignition source for wildfires along existing rail lines outside of the study area.  However, because those existing rail lines are active rail lines that have been in operation for many years, construction and operation of the Line would not introduce a new ignition source for wildfires along the downline segments.  (Id.)  Moreover, for the reasons discussed above, the probability that a train would trigger a wildfire is very low, and nearly 90% of the area along the downline segments has no WHP or has a very low or low WHP.  (Id. at Table 3.4-9.)  OEA therefore concludes that the downline wildfire impact of the proposed rail line would not be significant.  (Id. at 3.4-43.)  The Board adopts OEA's reasonable analysis concerning wildfires and will impose OEA's final recommended mitigation regarding a wildfire management plan.

### 5.  Land Use and Recreation

Most of the area surrounding any of the Action Alternatives is rural and sparsely populated.  The Indian Canyon Alternative and Whitmore Park Alternative both have five residences in their respective study areas, and nine residences are located in the study area of the Wells Draw Alternative.  (Id. at 3.11-4.)  However, all of the Action Alternatives could significantly affect land uses on public, private, or tribal lands.  (Id. at S-9.)  The Indian Canyon Alternative and Whitmore Park Alternative would each cross inventoried roadless areas within Ashley National Forest and Tribal trust land within the Ute Indian Tribe's reservation.  (Id.)  The Wells Draw Alternative would cross the Lears Canyon Area of Critical Environmental Concern and Lands with Wilderness Characteristics on BLM-administered lands.  Noise and visual impacts would disturb recreational activities on those public lands, such as camping, hiking, and hunting, as well as recreational activities on private and tribal lands.  (Id.)

As the Final EIS explains, construction and operation of the Line would result in unavoidable consequences on land use and recreation, including the permanent loss of irrigated cropland and grazing land, the severance of properties, and visual and noise disruption of

Exhibit A

recreational activities on public and private lands. OEA concludes that these unavoidable impacts on land use and recreation would be locally significant because each of the Action Alternatives would permanently alter existing land use and the availability and quality of recreational activities in the study area, including special designation areas on public lands. However, the Coalition has proposed voluntary mitigation measures and OEA is recommending additional mitigation measures to avoid or minimize impacts on land use and recreation. (Id. at 3.11-28.) The Board adopts OEA's reasonable analysis of impacts on land use and recreation and will impose all of OEA's final recommended mitigation.

> 6. <u>Vehicle Safety and Delay</u>

Construction and operation of any of the Action Alternatives would introduce new vehicles (such as construction vehicles) on public roadways and would require the construction of new at-grade road crossings. (Id. at S-10.) Among the three Action Alternatives, the Wells Draw Alternative would involve constructing the most at-grade road crossings and would result in the greatest potential for vehicle accidents and vehicle delays at those new crossings. Because it is the longest Action Alternative, construction of the Wells Draw Alternative would also result in the greatest vehicle disruption. (Id. at 3.1-20.) Because it is the shortest Action Alternative and would require the fewest new at-grade road crossings, the Indian Canyon Alternative would result in the least impacts on vehicle safety and delay. (Id.)

Any of the Action Alternatives would generate limited additional road traffic, primarily associated with employees commuting. (Id. at 3.1-8.) On some local roads, operations would reduce truck traffic because some freight that is currently transported by truck would move by rail instead. (Id.)

To minimize effects on vehicles, OEA recommends that the Board adopt the mitigation measures the Coalition has volunteered as well as various conditions OEA has crafted itself. The voluntary mitigation measures include a requirement for the Coalition to consult with appropriate federal, tribal, state, and local transportation agencies to determine the final design of the at grade crossing warning devices and to follow standard safety designs for at-grade road crossings, among other measures (VM 2). Additionally, OEA is recommending a mitigation measure that would require the Coalition to consult with private landowners and communities affected by new at-grade crossings to identify measures to mitigate impacts on emergency access and evacuation routes and incorporate the results of this consultation into the emergency response plan identified in VM-11 (VSD-MM-6). OEA is also recommending additional mitigation measures, (VSD-MM-4, VSD-MM-5), requiring the Coalition to support Operation Lifesaver educational programs in communities along the Line to help prevent accidents at highway/rail grade crossings and to adhere to Federal Highway Administration regulations for grade-crossing signage. OEA concludes that, if the recommended mitigation measures in the Final EIS are implemented, impacts from the new vehicles and at-grade road crossings would not significantly affect vehicle safety on public roadways or cause significant delay for people traveling on local roads. (Id. at S-10.) The Board adopts OEA's reasonable analysis of impacts concerning vehicle safety and delay and will impose the mitigation recommended in the Final EIS.

Exhibit A

7.  Rail Operations Safety

Operation of any of the Action Alternatives would involve the risk of rail-related accidents, potentially including collisions, derailments, or spills.  (Id.)  Because the Wells Draw Alternative is the longest of the Action Alternatives, OEA predicts that it would have the highest chance of accidents (0.24 to 0.72 accident per year), followed by the Whitmore Park Alternative (0.22 to 0.60 accident per year) and the Indian Canyon Alternative (0.20 to 0.56 accident per year).  (Id. at 3.2-7.)  Given that approximately one in four accidents involving loaded trains would result in a release of some crude oil, OEA predicts that rail operations under the Wells Draw Alternative would result in a spill approximately once every 11 years (under the high rail traffic scenario) to approximately once every 33 years (under the low rail traffic scenario).  (Id.)  Under the Indian Canyon Alternative, a spill would be expected approximately once every 14 to 40 years, while OEA predicts that the Whitmore Park Alternative would experience a spill approximately once every 13 to 36 years, depending on the volume of rail traffic.[9]  (Id. at 3.2-7 to 8.)

To minimize the likelihood and consequences of accidents during rail operations, the Coalition volunteered mitigation (VM-1, VM-15) to ensure that train operators using the Line would comply with the requirements of the Hazardous Materials Transportation Act, as implemented by the U.S. Department of Transportation, and with Federal Railroad Administration safety requirements, including any applicable speed limits and train-lighting requirements.  In addition, OEA is recommending a mitigation measure (ROS-MM-2) that would require the Coalition to inspect, as part of its routine rail inspections or at least twice annually, both track geometry and local terrain conditions.  Implementation of this measure would minimize the potential for problems with the track or track bed that could lead to accidents (ROS-MM-2).  To ensure that the consequences of a potential accident would be minimized, the Coalition also has committed to developing an internal Emergency Response Plan for operations on the Line.  The plan would include a roster of agencies and people to contact for specific types of emergencies during rail operations and maintenance activities, procedures to be followed by particular rail employees in the event of a collision or derailment, emergency routes for vehicles, and the location of emergency equipment (VM-8).  In addition, the Coalition's voluntary mitigation measure (VM-14) and OEA's recommended mitigation measure (ROS-MM-1), require the Coalition to immediately notify state and local authorities in the event of a release of crude oil and to immediately commence cleanup actions in compliance with federal, state, and local requirements.

Because the operation of rail lines inherently involves the potential for accidents, some impacts related to rail operations safety in the project study area would be unavoidable.  OEA concludes, however, that these impacts would be minimized and would not be significant if the

---

[9]  CBD criticizes the methodologies the Final EIS uses and claims that the Final EIS does not fully disclose its underlying data.  However, OEA's analysis methods for assessing impacts related to rail operations safety are widely used and accepted and are consistent with OEA's past practice in railroad construction cases.  Agencies are entitled to choose among reasonable methodologies, Jewell, 825 F.3d at 584-85, and the EIS fully explains its analysis.  (Final EIS Sec. 3.2, App. T-40-41.)

Exhibit A

Coalition's voluntary mitigation measures, OEA's recommended mitigation measures, and all applicable federal requirements are implemented. (Id. at 3.2-8.) The Board adopts OEA's reasonable analysis of impacts concerning the safety of rail operations and will impose the mitigation recommended in the Final EIS.

### 8. Air Quality and Greenhouse Gases (GHG)

OEA explains in the Final EIS that during the rail construction phase, construction equipment would emit air pollutants, including criteria air pollutants that could contribute to poor air quality and GHGs that would contribute to climate change. (Id. at S-12.) Among the three Action Alternatives, the Wells Draw Alternative would result in the most construction-related air pollution and GHG emissions, followed by the Whitmore Park Alternative and the Indian Canyon Alternative. Emissions from rail construction activities would be temporary and would move continually during the construction period. (Id. at 3.7-38.) Construction-related air emissions would not cause concentrations of criteria air pollutants to exceed the National Ambient Air Quality Standards (NAAQS)[10] and would not exceed the de minimis thresholds for air emissions within the Uinta Basin Ozone Nonattainment Area. (Id. at S-12.) With implementation of the Coalition's voluntary mitigation measure and OEA's recommended mitigation measures, OEA concludes that impacts related to air quality and GHG emissions would not be significant. (Id. at 3.7-38.)

The State responded to the Final EIS, asking that OEA remove AQ-MM-4, a condition requiring biodiesel fuel to be used during rail construction, and AQ-MM-8, a condition requiring the use of renewable diesel fuel during rail construction. (State Comment 2, Sept. 27, 2021.) The State notes that it already has a Utah Clean Diesel Program and that OEA's recommended measures would pose a regulatory burden. (Id.) The Board disagrees with the State's opinion that requiring the Coalition to use alternatives to traditional diesel fuel during construction in order to reduce GHG emissions would pose an undue regulatory burden. Therefore, the Board will not remove these conditions but will further clarify them in the Board Mitigation section below. Similarly, the State asks that AQ-MM-9 be removed to encourage voluntary ozone-reduction activities in coordination with the Utah Department of Environmental Quality. (Id.) That condition requires, to the extent practicable, that the Coalition avoid conducting project-related construction activities that could result in the emission of ozone precursors within the Uinta Basin Ozone Nonattainment Area in January and February to minimize emissions of ozone. The Board will not remove this condition but, in response to the Coalition's concerns, will modify it to explain that if the Coalition cannot avoid such construction during January and

---

[10] Under the Clean Air Act, USEPA sets air quality standards for six principal pollutants which can be harmful to public health and the environment. USEPA designates areas where criteria air pollutant levels are less than the NAAQS as "attainment" areas and where pollutant levels exceed the NAAQS as "nonattainment" areas. USEPA designates former nonattainment areas that have attained the NAAQS as "maintenance" areas. USEPA has designated the Basin as an attainment area for all pollutants except ozone because measured concentrations of ozone in the eastern part of the Basin have exceeded the NAAQS in winter when the ground is covered by snow and stagnant atmospheric conditions are present (ozone levels at other times have been less than the NAAQS). (See Final EIS 3.7-8.)

Exhibit A

February, it must consult with OEA and the Utah Department of Environmental Quality's Air Quality Division to identify and implement other appropriate ozone-reduction activities for those months.[11]

OEA also examined projected air emissions from rail operations over the Line and finds in the Final EIS that the primary source of emissions would be locomotives. (Final EIS 3.7-38.) Because it is the longest Action Alternative, the Wells Draw Alternative would result in the most emissions of all pollutants, followed by the Whitmore Park Alternative and then the Indian Canyon Alternative. (Id.) Based on the air quality modeling, OEA concludes that operation of the Line would not cause air pollutant concentrations to exceed the NAAQS at any location. (Id.) Therefore, OEA finds that operation of the Line would not result in significant air quality impacts. (Id. at 3.7-39.)

OEA recommends mitigation measures related to GHG emissions, but, as the Final EIS explains, operation of the Line would still result in unavoidable GHG emissions even if these measures are implemented. (Id.)[12] However, GHG emissions from rail operations would represent a small percentage (less than one percent) of existing statewide GHG emissions in Utah, (Final EIS Table 3.7-1), and would not contribute significantly to global climate change, (id. at 3.7-39).

USEPA's comments on the Final EIS discuss several technical issues related to a computer model that OEA used to predict the dispersion of air pollutants from locomotive emissions along the Line. Those issues, however, also were raised in USEPA's comments on the Draft EIS, and OEA, in response, made changes to its analysis in the Final EIS. (Final EIS App. M (Air Quality Emissions and Modeling Data); App. T-251.) USEPA also expresses concern that OEA's use of a "flagpole height" (i.e., the height above the ground for which the model predicts the concentration of a pollutant) for one of the modeling scenarios described in the Final EIS might under-predict air pollutant concentrations for that modeling scenario. After receiving USEPA's letter, OEA reran the model scenario without using a flagpole height, as USEPA had recommended, and found the new results to be identical to the results reported in the Final EIS. Therefore, no further air quality modeling is necessary to support OEA's conclusions,

---

[11] CBD states that OEA should use the most recent global warming potential (GWP) values in calculating GHG emissions from the Line and other projects in the area. (CBD Comment 37, Oct. 18, 2021.) OEA appropriately used the GWP values from the Intergovernmental Panel on Climate Change's (IPCC) Fourth Assessment Report from 2007, consistent with international GHG reporting standards under the United Nations Framework Convention on Climate Change.

[12] CBD states that the Board should require the railroad to achieve net-zero emissions, including emissions from oil and gas production in the Basin and downstream uses of oil transported on the rail line. (CBD Comment 44-45, Oct. 18, 2021.) This would be an unprecedented mitigation that is not mandated by any federal or applicable state regulatory requirement and would likely be impossible to implement as proposed.

Exhibit A

and the Board agrees with OEA's determination that the Line would not significantly affect air quality in the project area.[13]

### 9. Increased Oil and Gas Drilling and Other Cumulative Impacts

Under NEPA, agencies must analyze direct, indirect, and cumulative impacts. 40 C.F.R. §§ 1502.16, 1508.7, 1508.8, 1508.25 (as applicable in 2019). To do that, OEA reviewed information on relevant past, present, and reasonably foreseeable projects and actions that could have impacts that coincide in time and location with the potential impacts of the proposed rail line. (Final EIS S-13.) OEA identified 27 relevant projects, including facility and infrastructure improvements, watershed improvements, road improvements, two interstate electric power transmission projects, one crude oil processing facility, one Programmatic Agreement for cultural resource preservation, projects on Forest Service lands, and projects on BLM-administered lands. (Id.) Based on the cumulative impacts analysis, OEA concludes that the impacts of those projects in combination with the impacts of construction and operation of the Line could result in cumulative adverse impacts on water resources, biological resources, paleontological resources, land use and recreation, visual resources, and socioeconomics. (Id.)

Apart from these 27 projects, OEA's cumulative impacts assessment also includes an analysis of potential future oil and gas development in the Basin and the potential future construction and operation of new rail terminal facilities near Myton and Leland Bench, Utah. (Id.) Although OEA expected that the Line would divert to rail transportation some oil that in the past has been trucked to terminals outside the Basin, OEA assumed, for purposes of the cumulative-impacts analysis, that all oil transported on the Line would come from new production. (Id. at 3.15-4.) For the analysis of potential cumulative impacts, OEA developed two potential scenarios for future oil and gas development in the Basin that correspond to the Coalition's estimated range of rail traffic. (Id. at 3.15-3.) Under the high oil production scenario, total oil production in the Basin would increase by an average of 350,000 barrels per day and result in 3,330 wells over the first 15 years. (Id. at 3.15-4 to 6.)

As explained in the Final EIS, construction and operation of any of the Action Alternatives would, along with oil and gas development activities in the Basin, contribute to increased vehicle trips in the cumulative impacts study area that could increase the potential for vehicle safety and delay impacts. (Id. at 3.15-10.) Under the high oil production scenario, traffic would increase by a maximum of 6% on the major roadways, leaving substantial remaining capacity. (Id. at 3.15-13.) Local roads, however, have smaller roadway capacity, and OEA concludes that the increase in traffic on local roads used to serve the terminals could result in

---

[13] As part of its further claim that OEA's analysis of climate change is insufficient, CBD lists multiple methods that it asserts OEA should have used in its analysis of climate change, such as social cost of carbon, carbon budgeting, and carbon "lock-in." (CBD Comment 37-42, Oct. 18, 2021.) Use of these methodologies, however, is not required under NEPA or its implementing regulations, and the existence of alternative tools for analysis does not support a conclusion that the methodologies used in the EIS were insufficient. (Final EIS, App. T-280, T-283, T-430-31); see also Jewell, 825 F.3d at 584-85 (agencies are entitled to choose among reasonable methodologies).

Exhibit A

significant cumulative impacts on vehicle delay in the absence of road improvements or other mitigation.  (Id.)

Additionally, OEA concludes that vehicle traffic stemming from increased oil and gas development would not result in significant cumulative impacts on vehicle safety.  (Id. at 3.15-15.)  OEA notes, among other things, that vehicle safety in the study area is generally good and that crash rates in Uintah and Duchesne Counties, where most oil and gas activity is occurring, are below the national average.  (Id.)

As to air quality and climate change, OEA assumed that total air pollutant emissions each year would vary according to the number of wells constructed in that year.  (Id. at 3.15-33.)  Once a well is producing, emissions occur from operations and maintenance activities, which generate truck trips to the well site, and from trucks that transport the crude oil to the rail terminals.  Emissions also occur from venting, flaring, equipment leaks, and engine exhaust from equipment located at operating wells.  (Id. at 3.15-34.)  OEA estimated aggregate emissions from potential future oil and gas development based on the best available information regarding emissions from oil and gas production in the Basin.  (Id. at Table 3.15-11.)  However, OEA determined the specific locations of localized air quality impacts in the cumulative impacts study area are not known because there are no available data on the characteristics or local site conditions of potential future oil and gas development projects.  (Id. at 3.15-33.)

OEA adds that refiners would refine the crude oil transported by the Line into various fuels and other products.  To the extent that the crude oil would be refined into fuels that would be combusted to produce energy, emissions from the combustion of the fuels would produce GHG emissions that would contribute to global warming and climate change.  (Id. at 3.15-35.)  Downstream end use emissions associated with the combustion of the crude oil that could be transported on the Line under the high oil production scenario could represent up to approximately 0.8% of nationwide GHG emissions and 0.1% of global GHG emissions.  (Id. at 3.15-36.)  However, the actual volumes of crude oil that would move over the Line would depend on various independent variables and influences, including general domestic and global economic conditions, commodity pricing, the strategic and capital investment decisions of oil producers, and future market demand for crude oil from the Basin, which would be determined by global crude oil prices and capacity at oil refineries, among other factors.  (Id. at 3.15-3).  Furthermore, to the extent that crude oil transported on the Line could be refined into products other than fuel and, to the extent that the fuels produced from crude oil transported on the Line could displace other fuels from the market, GHG emissions from downstream end uses would be lower, and potentially significantly lower, than these estimates.

OEA also reasonably explains that benefits would result from the increase in annual oil production.  Notably, increased production would generate long-term employment, labor income, and spending on goods and services in the cumulative impacts study area.[14]  Increased production would also generate state and local revenue through taxes.  Additionally, new wells

_____

[14]  Constructing and operating any of the Action Alternatives would also generate direct, indirect, and induced employment, including for tribal members, and create state and local revenue.  (Id. at 3.13-26 to 33.)

Exhibit A

drilled on state land or accessing state minerals would generate additional revenue for Utah through royalties and lease payments.  (Id. at 3.15-51.)

CBD asserts that the Final EIS is insufficient because it fails to treat a potential future increase in oil and gas production in the Basin and downstream emissions from the end uses of oil transported on the Line as indirect impacts of the project.  And, as a result, CBD argues that the Final EIS does not sufficiently disclose the impacts of increased oil and gas production in the Basin that could occur as a result of the Line.  (CBD Comment 8-14, Oct. 18, 2021.)

Indirect effects are reasonably foreseeable effects that are caused by the action but that are later in time or farther removed in distance.  40 C.F.R. § 1508.8.  An indirect effect is more than something that could not occur "but for" the federal action at issue and, instead, to be an indirect effect of an action under NEPA requires a reasonably close causal connection.  Dep't of Transp. v. Pub. Citizen, 541 U.S. 752, 767-68, 770-72 (2004); see also Metro. Edison Co. v. People Against Nuclear Energy, 460 U.S. 766, 774 (1983).  Thus, when an agency "has no ability to prevent a certain effect due to its limited statutory authority over the relevant actions, the agency cannot be considered a legally relevant 'cause' of the effect" for NEPA purposes.  Dep't of Transp. v. Pub. Citizen, 541 U.S. at 770.  Here, the Board has no authority or jurisdiction over development of oil and gas in the Basin nor any authority to control or mitigate the impacts of any such development.  Accordingly, contrary to CBD's argument, the fact that this oil and gas development likely would not occur "but for" the Board granting authority to construct and operate the Line does not make this an indirect effect.  OEA properly declined to treat oil and gas development as an indirect effect.

This does not mean that OEA did not consider effects of potential oil and gas development in the Basin.  Rather, OEA determined that impacts from potential oil and gas development should be considered as a cumulative impact and conducted a full and appropriate analysis of those impacts.  (Final EIS Sec. 3.15.4.1.)  Cumulative impacts are those which result from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency or person undertakes such other actions. 40 C.F.R. § 1508.7.  Oil and gas development that may occur following authorization of the Line would entail many separate and independent projects that have not yet been proposed or planned and that could occur on private, state, tribal, or federal land and could range in scale from a single vertical oil well to a large lease involving many horizontal wells.[15]  As a result, the Board agrees with OEA that this development was properly considered as a cumulative impact.[16]

---

[15]  Furthermore, regardless of whether the EIS labeled the impacts from oil and gas development in the Basin as indirect or cumulative impacts, OEA conducted a full analysis of those effects.  The impacts and the analysis of those impacts would be the same no matter which label is used.

[16]  CBD levels several additional criticisms of OEA's analysis of potential oil and gas development in the Basin, including claims of inconsistent statements and conclusions.  But the Board will not directly address those here because a fair reading of the Final EIS shows that they are based on mischaracterizations of the statements in the Final EIS that CBD relies on and the thorough analysis OEA conducted.  (See CBD Comment 10-13, Oct. 18, 2021; Final EIS Sec. 3.15.4.1.)

Exhibit A

CBD asserts that OEA erred in relying, in part, on the results of an EIS prepared by the BLM for the Monument Butte Oil and Gas Development Project to predict potential air emissions that could result from future oil and gas production in the Basin as part of OEA's cumulative impacts analysis.[17] (CBD Comment 3-4, 26-36, Oct. 18, 2021.)  The Monument Butte EIS was a study of a proposed oil development project in the Basin and OEA relied, in part, on the results of that study to make conclusions about the cumulative air quality impacts of potential future oil and gas production in the Basin when considered in combination with the potential air quality impacts that could result from construction and operation of the Line.  (Final EIS 3.15-32.)  OEA's use of the results of the Monument Butte EIS in the cumulative impacts analysis was reasonable and appropriate because the Monument Butte EIS provides the best available information regarding potential air emissions from oil and gas production projects in the Basin.  (Final EIS App. T-266, T-401-407.)

10.  Downline Impacts

As part of its analysis of impacts, OEA examined downline impacts of the project, i.e., reasonably foreseeable impacts that could occur outside the project area as a result of construction and/or operation of trains using the Line.  (See Final EIS, Sec. 3.1 (Vehicle Safety and Delay), Sec. 3.2 (Rail Operations Safety), Sec. 3.6 (Noise and Vibration), Sec. 3.7 (Air Quality and Greenhouse Gases).)  The Board's regulations at 49 C.F.R. § 1105.7(e)(11)(v) governing review of potential downline impacts refer to the general thresholds for environmental review concerning air quality and noise.  49 C.F.R. §§ 1105.7(e)(5); 1105.7(e)(6).  Consistent with prior practice and based on its experience, OEA determined that these regulatory thresholds should also apply to the analysis of downline impacts on freight rail safety and grade-crossing safety and delay in the EIS here.  See Tongue River R.R.—Constr. & Operation—in Custer, Powder River, & Rosebud Cntys., Mont., FD 30186, Draft EIS at Sec.17.1 (STB served Apr. 17, 2015).  That approach is reasonable, as the rationale for finding that minimal increases in train traffic on existing rail lines over which trains already operate are unlikely to cause significant impacts on air quality and, furthermore, that noise applies equally to potential effects on rail safety and grade-crossing safety and delay.

There are many different potential destinations for Uinta Basin oil transported by train and even more practical routes available to reach those destinations.  Because it is not possible to identify specific refineries that would receive shipments of Uinta crude oil, in order to assess downline impacts, OEA first identified potential refinery destinations for Uinta crude oil using a regional approach.  (See Final EIS App. C.)  After those regions were identified, OEA then considered potential routing to those destinations and where the estimated project-related rail traffic would exceed the Board's regulatory thresholds.  (Id.)  Using the predicted number and length of trains, OEA's analysis of likely regional destinations, and the projected reasonably

---

[17]  CBD also asserts that the EIS fails to properly account for Clean Air Act requirements for Uinta Basin as a nonattainment area.  (CBD Comment 33-35, Oct. 18, 2021.)  The record contradicts CBD's claim that the EIS failed to consider those impacts or comprehensively explain how it came to conclusions regarding the same.  (See Final EIS Sec. 3.7.1.1; 3.15.5.7; App. M; App. T-268-69, T-271-76, T-401-02.)

Exhibit A

foreseeable routes for this traffic, OEA identified a downline impact study area eastward from Kyune to the northern, southern, and eastern edges of the Denver Metro/North Front Range that met the Board's regulatory thresholds for analysis and assessed impacts in that downline study area.  (Id.)  Using its analysis of predicted destinations, OEA further concluded that rail traffic outside of the downline study area would be dispersed and that no individual rail lines outside of the downline study area can reasonably be expected to experience an increase in rail traffic in excess of OEA's analysis thresholds.  Therefore, the Final EIS concludes that an analysis of downline impacts on existing rail lines outside of the downline study area would not be appropriate.

CBD objects to both the application of the Board's regulatory thresholds to rail safety and delay, environmental justice, and GHG emissions from refining Uinta crude oil, as well as the validity of the thresholds themselves.  According to CBD, the Board's thresholds prevent analysis of reasonably foreseeable impacts.  (CBD Comment 14-18, Oct. 18, 2021.)  As noted above, the regulatory thresholds place reasonable limits on OEA's assessment of certain impacts because minimal increases in train traffic on existing rail lines already in use are not likely to result in significant additional impacts required to be analyzed under NEPA.  And indeed, CBD points to nothing that would indicate that the downline impacts here would be significant but instead relies on speculation.  (Id.)

NEPA does not require agencies to examine every possibility that an impact could occur no matter how speculative, nor does it require agencies to analyze the impacts of effects over which it has no control because evaluation of those impacts would not inform the agency's decision-making.  See Dep't of Transp. v. Pub. Citizen, 541 U.S. at 768-70; Jewell, 825 F.3d at 583 (agencies are entitled to make reasonable inferences based upon the data); Andrus, 619 F.2d at 1375-76 (discussion of environmental effects must be governed by "rule of reason" and NEPA does not require every action to be discussed in exhaustive detail).  Because the Board cannot regulate downline train operations by other carriers as part of this proceeding, it cannot regulate or mitigate impacts caused by those downline operations.  The type of analysis that CBD claims is necessary is therefore neither required nor useful.  As a result, OEA's application of the thresholds here was appropriate, reasonable, and consistent with NEPA and the regional analysis of downline rail operations complies with NEPA.

CBD also asserts that OEA should have included in its downline analysis impacts from operation of trains carrying Uinta crude oil on the Tennessee Pass Line.  (CBD Comment 18-19, Oct. 18, 2021.)  The Tennessee Pass Line is a line of railroad in Colorado that is owned by UP and has been out of service for many years.  See Colo., Midland & Pac. Ry.—Lease & Operation Exemption Containing Interchange Commitment—Union Pac. R.R., FD 36471, slip op. at 1, 4-5 (STB served Mar. 25, 2021).  As discussed in the Board's September 30 Decision, even if it were in service, the Tennessee Pass Line would be unlikely to carry Uinta crude oil.  September 30 Decision, FD 36284, slip op. at 6.  Among other things, the Board noted that the modeling program used by OEA to examine the patterns for traffic coming off the Line did not forecast any traffic travelling over the Tennessee Pass Line.  (Final EIS, App. C, C-4, C-6.)  Instead, OEA projects that "all rail traffic moving from Kyune to destinations in the east would travel

Exhibit A

over the existing rail line between Kyune and Denver, Colorado." (Id. at C-4.)[18]  Thus, the Board agrees with OEA that analysis of impacts from use of the Tennessee Pass Line is not reasonably foreseeable and, therefore, not appropriate for consideration in the EIS.

### 11. Tribal Concerns

OEA coordinated and consulted with tribes in accordance with NEPA, Executive Order 13175, and Section 106 of the National Historic Preservation Act (NHPA).  (Final EIS 5-7.)  Through government-to-government consultation with the Ute Indian Tribe,[19] OEA identified impacts related to vehicle safety and delay, rail operations safety, biological resources, air emissions, and cultural resources as areas of concern for the tribe.  (Id. at S-9.)  To mitigate the impacts, OEA has crafted mitigation measures that require the Coalition to work with the Ute Indian Tribe to address issues of tribal concern.  In particular, OEA worked with the Ute Indian Tribe and other Section 106 consulting parties to develop a Programmatic Agreement, which has been executed, that sets forth how cultural resources would be protected if the Board were to authorize the Line.  (Id. at S-9 to 10.)  In addition, OEA has identified impacts on the Pariette cactus and the Uinta Basin hookless cactus as disproportionately high and adverse impacts on an environmental justice community.  Because those species are culturally important to the Ute Indian Tribe, OEA is recommending mitigation requiring the Coalition to consult with the Ute Indian Tribe regarding impacts on those special status plant species and to abide by the tribe's requirements for addressing the impacts.  (Id. at S-10.)

### NHPA

In accordance with Section 106 of NHPA, OEA surveyed the project area, identified historic properties, and consulted with interested parties regarding the potential effects of the project on these properties.  Construction of the proposed rail line would physically alter and potentially destroy cultural resources located within the below-ground portion of the area of potential effects (APE) (the project footprint plus a 50-foot buffer).  (Id. at 3.9-13.)  The APE for the Indian Canyon Alternative includes 16 known historic properties, the APE for the Wells Draw Alternative includes 19 known historic properties, and the APE for the Whitmore Park Alternative includes 16 known historic properties.  (Id. at 3.9-13 to 16.)  Some of these resources could be altered or destroyed during construction of the Line.  (Id.)

Because the APEs have not been surveyed comprehensively, OEA concludes that additional cultural resources, such as previously unidentified archeological sites, are likely to be present in the APEs and could be impacted by construction and operation of the proposed rail line.  (Id. at 3.9-17.)  To ensure that any adverse effects on historic and cultural resources are

---

[18]  The Coalition provided additional support for OEA's independent analysis by submitting a verified statement from Rio Grande Pacific Corporation, the proposed operator of the Line, stating that it has no intention of routing trains originating on the Line over the Tennessee Pass Line and that using the Tennessee Pass Line to transport crude oil would be impractical and the highest-cost option.  (Coal. Reply, V.S. Hemphill 2, Jan. 26, 2021.)

[19]  As noted earlier, the Ute Indian Tribe filed a letter on October 1, 2021, in support of the project.

Exhibit A

appropriately avoided, minimized, or mitigated, OEA recommends that the Coalition be required to comply with the terms of the executed Programmatic Agreement discussed above.  (VM-42, VM-43).  The Board adopts OEA's thorough and reasonable analysis under NHPA and will impose the recommended mitigation requiring the Coalition to comply with the Programmatic Agreement.

Environmentally Preferable Alternative

Based on OEA's analysis and consultation with appropriate government agencies, the Ute Indian Tribe, other interested stakeholders, and the public, OEA concludes that, among the three Action Alternatives, the Whitmore Park Alternative would result in the fewest significant impacts on the environment.  (Final EIS S-13.)  In particular, the Whitmore Park Alternative would permanently affect the smallest area of water resources, including wetlands and perennial streams; would minimize impacts on greater sage-grouse leks and associated summer brood rearing habitat, as discussed above; and avoid impacts on subdivided residential areas.  (Id.)

The Final EIS explains that, compared to the Wells Draw Alternative, the Whitmore Park Alternative would permanently and temporarily affect a smaller area of wetlands and intermittent streams, as well as a smaller number of springs.  (Id.)  It would avoid impacts on special use areas on BLM-administered lands, including Areas of Critical Environmental Concern, Lands with Wilderness Characteristics, and areas classified by BLM as sensitive to visual impacts.  The Whitmore Park Alternative also would affect a smaller area of suitable habitat for the Pariette cactus and Uinta Basin hookless cactus than the Wells Draw Alternative and would avoid potential impacts on moderately suitable habitat for the threatened Mexican spotted owl and a smaller area of big game habitat.  (Id.)  In addition, it would result in fewer total emissions of criteria air pollutants and GHGs during construction and rail operations; would cross a smaller area of land that may be prone to landslides; would displace fewer residences; would involve a lower risk for accidents at at-grade road crossings; and would cross a smaller area with high potential for wildfires.  (Id.)

Compared to the Indian Canyon Alternative, the Whitmore Park Alternative would permanently and temporarily affect a smaller area of wetlands, a smaller area of riparian habitat, and a smaller number of springs and would also require fewer stream realignments.  (Id. at S-14.)  It would avoid noise impacts on residences during rail operations, as well as visual and other impacts on residential areas in the Argyle Canyon and Duchesne Mini-Ranches areas of Duchesne County.  (Id.)  The Whitmore Park Alternative would generate more employment, labor income, and local and state tax revenue during construction than the Indian Canyon Alternative and would cross a smaller area of geological units that may be prone to landslides and a smaller area of land with high wildfire hazard potential.  (Id.)  For these reasons, OEA recommends that the Board authorize the Whitmore Park Alternative if it grants final approval to the Line.  (Id.)  For the reasons discussed above and in the Draft and Final EIS, the Whitmore Park Alternative is the alternative the Board approves.

Exhibit A

Board Conclusions on Environmental Analysis

Upon consideration of the Draft EIS, the environmental comments submitted to the Board, and the Final EIS, the Board is satisfied that the Draft and Final EIS have taken the requisite "hard look" at the potential environmental impacts associated with this transaction. The Draft and Final EIS adequately identify and assess the environmental impacts discovered during the course of the environmental review, carefully consider a reasonable range of alternatives (including a No Action Alternative), and include extensive environmental mitigation to avoid or minimize potential environmental impacts. Accordingly, the Board adopts the Draft and Final EIS and all of OEA's analysis and conclusions, including those not specifically addressed here. The Board finds that OEA's recommended Environmentally Preferable Alternative (Whitmore Park Alternative) best satisfies the purpose and need for the Line, while minimizing potential impacts to residential areas, water resources, and greater sage-grouse leks and associated summer brood rearing habitat.

Board Mitigation

The Draft and Final EIS demonstrate that construction of the Whitmore Park Alternative would result in impacts on the environment, including impacts not discussed in this decision. However, the mitigation measures voluntarily proposed by the Coalition along with the mitigation developed by OEA during its environmental review should minimize the potential environmental effects of the transaction to the extent practicable. The Board will therefore impose the voluntary mitigation measures developed by the Coalition and, except as discussed above, all of the additional mitigation measures recommended by OEA. In addition to the impacts discussed above, the mitigation measures appropriately address a number of other environmental issues assessed in the Draft and Final EIS, including impacts concerning water resources, wayside noise, and hazardous materials. The Board will also adopt the changes to mitigation measures concerning air quality and the greater sage-grouse following issuance of the Final EIS, which are discussed above, as well as modify a condition in the Final EIS concerning big game migration routes, BIO-MM-19.[20] The Coalition will also be required to comply with the executed Programmatic Agreement developed to address potential adverse impacts to cultural resources.

Weighing Environmental Impacts and Transportation Merits and Considering Appropriateness of an Exemption

The Board recognizes that, as with most other rail construction projects, the construction and operation of this Line is likely to produce unavoidable environmental impacts. But the Board also finds that the construction and operation of the Environmentally Preferred Whitmore Park Alternative, with the extensive mitigation conditions imposed, will minimize those impacts

---

[20] Specifically, in light of concerns by CBD, (see CBD Comment 58-62, Oct. 18, 2021), the Board will amend the condition to require the big game corridor crossing plan to evaluate the use of big game overpasses or underpasses (including standards for design), wildlife friendly fencing, reduced train speeds in high-risk areas, use of sound signaling, and barriers in collision hotspots.

Exhibit A

to the extent practicable. And the construction and operation of this Line will have substantial transportation and economic benefits. As noted above, the Line will bring rail service to an area of Utah that does not currently have service, provide shippers that must now rely on trucks another shipping option, and create jobs. (See, e.g., Congressional Letter 1, June 28, 2021.) Rail service will eliminate longstanding transportation constraints. The availability of a more cost-effective rail transportation option could also support the diversification of local economies in the Basin, which could support additional employment and expand the regional economy. (See Governor Cox & Lieutenant Governor Henderson Letter 1, Aug. 30, 2021.) Moreover, the Board notes the Ute Indian Tribe's support of the project and the benefits that the Tribe has stated that it will provide. While the No-Action Alternative would avoid the potential environmental impacts of the rail project, it would not bring these benefits to the Basin or meet the goals of the counties making up the Coalition or the Ute Indian Tribe. The environmental impacts identified in the Draft and Final EIS have been sufficiently mitigated so that they do not outweigh the Line's transportation benefits. Moreover, as explained in the Board's January 5 Decision (slip op. at 5-6), the Board can grant the Coalition's request for authority even if all issues involving financing are not yet resolved because the grant of authority is permissive, not mandatory, and the ultimate decision on whether to proceed will be in the hands of the Coalition and the marketplace, not the Board.[21] A grant of authority permits a new line to be built if the necessary financing is obtained. Without moving forward with the process needed to obtain Board authority, however, no new rail lines could be built, regardless of how viable the projects might be.

Concerning the appropriateness of an exemption, one would further the RTP goals at § 10101 (2), (4), (5), and (7). As noted above, however, Argyle claims that the RTP goals at § 10101(8), concerning public safety, and § 10101(11), concerning safe working conditions, would be undermined by the project. (Argyle Reply 9, July 7, 2020.) Argyle asserts that there will be a substantial increase in local truck traffic if oil production were to increase to the extent claimed by the Coalition. (Id. at 10.) Argyle also claims, among other things, that rail activities could trigger forest fires and notes that Argyle Canyon was heavily damaged by a fire in 2012. (Id.) Similarly, CBD argues that the project's many significant environmental impacts, the undefined nature of certain mitigation measures proposed in the EIS and BO, and questions about the project's financial viability require more extensive proceedings to determine whether the project is financially able to avoid and/or mitigate the project's environmental effects and operate without detriment to the public health and safety. (CBD Comment 6, Oct. 18, 2021.)

These concerns do not warrant denying the petition for exemption. The Board properly considered the statutory standards that govern exemption requests in the January 5 Decision and the September 30 Decision. The record developed in this proceeding is substantial, and additional regulatory processes would not likely add to the substance of what has been presented. OEA has demonstrated in its Final EIS that there only would be a small risk of forest fire based on various factors such as the geography crossed by the Whitmore Park Alternative and that any

---

[21] The Board notes that the Coalition has stated its "plans for financing the project through a private partner" and that "the project will be privately financed." (Coal. Reply 12-13, July 21, 2020.)

Exhibit A

harm would be lessened by the extensive mitigation measures the Board imposes here. Similarly, truck traffic would not significantly increase on major roads as a result of construction and operation of the Line and problems on local roads would be lessened by the mitigation measures the Board will impose. As for CBD's concerns regarding the mitigation, these were previously raised in CBD's comments on the Draft EIS and were appropriately addressed by OEA in the Final EIS. Further, the Board is modifying a number of the mitigation measures that CBD and the State identified as unclear or inadequately defined. The Board need not revisit the financial concerns CBD raises as the Board already discussed those issues in its January 5 Decision.

In sum, the transportation merits of the project outweigh the environmental impacts and the Coalition has demonstrated that an exemption from § 10901 is appropriate. There also is a presumption that rail construction projects are in the public interest. Section 10901(c) provides that the Board "shall issue a certificate [authorizing construction activities] […] unless the Board finds that such activities are inconsistent with the public convenience and necessity." Recognizing the presumption, the Board finds that this project should be approved.

CONCLUSIONS

The Board is satisfied that the Whitmore Park Alternative will meet the transportation goals of the project. Accordingly, the Board reaffirms here the analysis it discussed in the January 5 Decision.

After weighing the transportation merits and environmental impacts and considering the entire record, the Board finds that the Coalition's petition for exemption under § 10502 from the prior approval requirements of § 10901 should be granted. The Board is granting final approval of the construction and operation of the Environmentally Preferable Alternative—Whitmore Park Alternative—subject to compliance with the environmental mitigation measures listed in Appendix B of this decision.

It is ordered:

1. The filings commenting on the Final EIS are accepted into the record.

2. Under 49 U.S.C. § 10502, the Board exempts the Coalition's construction and operation of the above-described rail line from the prior approval requirements of 49 U.S.C. § 10901.

3. The Board adopts the environmental mitigation measures set forth in Appendix B to this decision and imposes them as conditions to the exemption granted here.

4. Notice will be published in the Federal Register.

5. Petitions for reconsideration must be filed by January 4, 2022.

Exhibit A

Docket No. FD 36284

6.  This decision is effective on January 14, 2022.

By the Board, Board Members Begeman, Fuchs, Oberman, Primus, and Schultz.  Board Member Oberman dissented with a separate expression.

_____

BOARD MEMBER OBERMAN, dissenting.

I respectfully dissent from today's decision (Today's Decision) granting the Coalition's petition for exemption.  The project's environmental impacts outweigh its transportation merits, and I would accordingly deny the Coalition authority to construct the Line.

As an initial matter, as I explained in my dissent to the January 5 Decision, the Board should not have utilized a so-called two-step process and granted preliminary approval of the transportation merits before completion of the environmental review.  In addition, the Board should have required the Coalition to submit additional information before concluding that an application under 49 U.S.C. § 10901 was not necessary.  I raised grave concerns then regarding the Line's financial viability given the increasingly uncertain global market for crude oil, and the likelihood that it would be the public—and not private investors—who would bear the cost of constructing an ultimately unprofitable rail project.  These concerns have grown over the last year, as the world economy has accelerated its transition away from use of the internal combustion engine and corresponding need for crude oil.  Ever increasing doubt about the future market for oil undermines the project's transportation merits and counsels against an exemption.

But now that the environmental review has been completed, I have concluded not only that the financial viability of the Line is in serious doubt but also that the Line's environmental impacts significantly outweigh its transportation merits.  In my view, it should be underscored that the Board has the power to deny construction approval based on weighing all of the environmental impacts that will arise from oil and gas development in the Basin, and the Board should consider those impacts as the reasonably foreseeable, indirect effects that they are, especially since the "entire purpose" of this Line is to stimulate and support oil production in the Basin.  Assessing these impacts solely within a cumulative impact analysis, as Today's Decision does, badly understates their significance, and in particular the significance of downstream greenhouse gas emissions that will result from the combustion of oil moved over the Line.  The critical question presented in this proceeding is whether the Line would serve the public interest given its centrality to oil development in the Basin and the broader and dire global warming crisis, *as well as* the very serious, significant, and unavoidable environmental impacts that Today's Decision *does* in fact attribute to the project.

Absent some particularized national need for increased oil from the Basin, of which there is none, I cannot support construction of the Line.

Transportation Merits

As noted in my dissent to the January 5 Decision, it is beyond controversy that the project's financial success depends entirely upon increased oil production in the Uinta Basin. January 5 Decision, FD 36284, slip op. at 14 (Board Member Oberman dissenting).  But yet,

26

questions abound regarding the "future global demand for oil," as well as the "quantity of oil reserves in the Basin, the demand for the specific type of oil found there, and whether there are sufficient proven reserves to provide long term business for the proposed railroad." Id. at 16, 17.

Although the price of oil has rebounded since the January 5 Decision, it remains volatile. Moreover, since that time, government and business leaders have advanced new commitments and policies to achieve carbon neutrality in the coming years, with diminished use of the internal combustion engine—and resulting oil consumption—playing a significant role. At the federal level, the United States has rejoined the Paris Agreement and the Biden Administration has set a goal of achieving net-zero emissions economy-wide by 2050. See Tackling the Climate Crisis at Home and Abroad, Exec. Order No. 14008, 86 Fed. Reg. 7619 (Jan. 27, 2021). The President has even more recently called for 50% of all new passenger cars and light trucks sold in the United States to be zero-emission by 2030 and, to help achieve this goal, has directed the Environmental Protection Agency and Department of Transportation to develop new emission and fuel efficiency standards.[1] Strengthening Am. Leadership in Clean Cars & Trucks, Exec. Order 14037, 86 Fed. Reg. 43583 (Aug. 5, 2021). Critically, Congress recently passed the Infrastructure Investment and Jobs Act, which, among other things, provides $7.5 billion for electric vehicle charging stations, $5.75 billion for the replacement of public transit vehicles with zero emission vehicles, and establishes a carbon reduction program at the Department of Transportation. See Pub. L. 117-58 (2021).[2]

States as well have passed new legislation meant to curb oil consumption and have continued to award grants for, or have otherwise initiated, green infrastructure projects, including to support vehicle electrification. See, e.g., Act of Mar. 18, 2021, ch. 263, 2021 Va. Legis. Serv. (H.B. 1965) (West) (codified at Va. Code Ann. §§ 10.1-1307 & 10.1-1307.04) (establishing low-emissions and zero-emissions vehicle program for motor vehicles, consistent with California standards, with a model year of 2025 or later); Washington Climate Commitment Act, ch. 316, 2021 Wash. Sess. Laws 2606 (creating, among other things, greenhouse gas cap-and-invest program that includes declining limits on major emission sources); Press Release, Cal. Energy Comm'n, California Announces $17.5 million for Public Electric Vehicle Charging in 13 Rural Counties (May 17, 2021) (advancing September 2020 executive order requiring sales of all new passenger vehicles in California to be zero-emission by 2035).[3] Such action has not been limited

---

[1] See also Executive Order on Catalyzing Clean Energy Industries and Jobs through Federal Sustainability, Exec. Order 14057, 86 Fed. Reg. 70935 (Dec. 8, 2021) (directing executive agencies to achieve 100% zero-emission vehicle acquisitions by 2035).

[2] On November 19, 2021, the House of Representatives passed the Build Back Better Act, which among other things, raises the electric vehicle tax credit to $12,500 and provides tens of billions of dollars for electric vehicle infrastructure and the replacement of heavy-duty vehicles with zero emissions vehicles. See H.R. 5376, 117th Cong. (2021).

[3] Available at: https://www.energy.ca.gov/newsroom/news-releases. This builds on the California Public Utilities Commission's (CPUC) prior approval of a $437 million electric vehicle charging program to be implemented by Southern California Edison. See Press Release, CPUC, CPUC Expands SCE Charge Ready 2 Transportation Electrification Program (Aug. 27, 2020), https://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M345/K822/345822512.PDF.

Exhibit A

to the United States. For example, the European Commission in July proposed expanding the EU's emissions trading scheme, strengthening vehicle emissions standards, including by requiring that all new cars be zero emission by 2035, and introducing a carbon price on imports. Press Release, European Commission, European Green Deal: Commission Proposes Transformation of EU Economy and Society to Meet Climate Ambitions (July 16, 2021).[4] And, on May 26, 2021, a Dutch court stunningly ordered Royal Dutch Shell (Shell) to reduce its carbon dioxide emissions, arising both from its business operations and sold energy-carrying products, by net 45% by the end of 2030, relative to 2019 levels. Rb. Hague 26 mei 2021, ECLI:NL:RBDHA:2021:5337 (Vereniging Milieudefensie/Royal Dutch Shell PLC).[5]

In response to these trends, and ominously for the future of oil proposed to be extracted from the Basin and the Line's fiscal foundation, car manufacturers are increasingly committing to the sale of electric vehicles in the coming years. Immediately following President Biden's executive order on clean cars and trucks, Ford, General Motors and Stellantis jointly announced their intention to achieve sales of 40-50% of annual U.S. volumes of electric vehicles by 2030. Press Release, General Motors, Ford, GM and Stellantis Joint Statement of Electric Vehicle Annual Sales (Aug. 5, 2021).[6] Volkswagen has set a similar global sales target for 2030, while by that date Ford has separately committed to sell only electric passenger vehicles in Europe. Press Release, Volkswagen Group, NEW AUTO: Volkswagen Group Set to Unleash Value in Battery-Electric Autonomous Mobility World (July 13, 2021);[7] Press Release, Ford Motor Co., Ford Europe Goes All-In on EVs on Road to Sustainable Profitability (Feb. 17, 2021).[8]

Other automakers have announced time horizons for transitioning to fully electrified vehicle fleets, including as early as 2025. See, e.g., Press Release, Volvo Car USA, Volvo Cars to be Fully Electric by 2030 (Mar. 2, 2021);[9] Press Release, Tata Motors, Jaguar Land Rover Reimagines the Future of Modern Luxury by Design (Feb. 15, 2021) (announcing that Jaguar vehicles will be "all-electric" by 2025);[10] see also Press Release, Nissan Motor Corp., Nissan Unveils Ambition 2030 Vision to Empower Mobility and Beyond (Nov. 28, 2021) (announcing

---

[4] Available at: https://ec.europa.eu/commission/presscorner/detail/en/IP_21_3541.

[5] Available at: https://uitspraken.rechtspraak.nl/inziendocument?id=ECLI:NL:RBDHA:2021:5339. Since then, Shell has sold its assets in the Permian Basin and pulled out of a controversial plan to develop a new oil field near the Shetland Islands. See Press Release, Shell, Shell Completes Sale of Permian Business to ConocoPhillips (Dec. 1, 2021), https://www.shell.com/media/news-and-media-releases.html; Danica Kirka, Shell Pulls Out of Controversial Cambo Project in Scotland, Associated Press, December 3, 2021, https://apnews.com/article/business-europe-environment-economy-scotland-ef91aa323b36cb3d8f3d7dcf9b616a36.

[6] Available at: https://media.gm.com.

[7] Available at: https://www.volkswagen-newsroom.com/en/press-releases.

[8] Available at: https://media.ford.com/content/fordmedia/feu/en/news.html.

[9] Available at: https://www.media.volvocars.com/us/en-us/media/pressreleases/list.

[10] Available at: https://www.tatamotors.com/investors/jlr-press-release-archive/.

Exhibit A

investments of $17.6 billion over the next five years to accelerate the electrification of its vehicle lineup).[11]  Prevailing company valuations highlight the internal combustion engine's bleak future, with electric vehicle manufacturers Tesla and Rivian currently having enterprise values of approximately $1 trillion and $100 billion, respectively, making them the first and third most valuable automobile manufactures by market capitalization.  See Yahoo Finance, https://finance.yahoo.com/screener/predefined/auto_manufacturers/ (last visited Dec. 14, 2021).

Not surprisingly, the American oil majors uniformly identify increased political and social attention to greenhouse gas emissions as risks that may result in reduced demand for their oil.  See, e.g., ConocoPhilips, Annual Report (Form 10-K) 27 (Feb. 16, 2021) ("[T]he new administration has recommitted the United States to the Paris Agreement, and a significant number of U.S. state and local governments and major corporations headquartered in the U.S. have also announced their intention to satisfy [the Paris Agreement] commitments."); Pioneer Natural Resources Co., Annual Report (Form 10-K) 28 (Mar. 1, 2021) (noting that numerous proposals "have been made and could continue to be made at the international, national, regional and state levels of government to monitor and limit existing emissions of GHGs as well as to restrict or eliminate such future emissions"); Chevron Corp., Annual Report (Form 10-K) 22 (Feb. 25, 2021) ("[I]f new legislation, regulation, or other governmental action contributes to a decline in the demand for the company's products, this could have a material adverse effect on the company and its financial condition."); Occidental Petroleum Corp., Annual Report (10-K) 10 (Feb. 26, 2021) (explaining that government action relating to greenhouse gas emissions could impose increased operating and maintenance costs, such as "higher rates charged by service providers" or "promote the use of alternative sources of energy and thereby decrease demand for oil").

This risk is being increasingly reflected in the financial markets.  As noted in my dissent to the January 5 Decision, investment managers—under pressure from their clients to pursue environmentally sustainable investing—have begun aligning their portfolios with net-zero emissions.  January 5 Decision, FD 36284, slip op. at 16 (Board Member Oberman dissenting).[12] This includes putting pressure directly on oil producers to develop more sustainable business strategies.  For example, on May 26, 2021, Exxon Mobil Corporation's shareholders elected to its Board—over the opposition of company management—three insurgent directors from a small hedge fund, Engine No. 1.  Exxon Mobil Corp., Current Report (Form 8-K/A) 3 (June 21, 2021). These nominees were advanced for the express purpose of directing the company towards a "long-term commitment to only funding projects that can break-even at much more conservative oil and gas prices," and to explore growth areas in "net-zero emission energy sources and clean energy infrastructure."  Exxon Mobil Corp., Definitive Proxy Statement (Schedule 14A) 5

---

[11]  Available at:  https://global.nissannews.com/en/pages/all-news-archive.

[12]  On May 20, 2021, President Biden signed an executive order, Climate-Related Financial Risk, which sets forth a policy of "advancing consistent, clear, intelligible, comparable, and accurate disclosure of climate-related financial risk . . . ."  Climate-Related Financial Risk, Exec. Order No. 14030, 86 Fed. Reg. 27967 (May 26, 2021).  The executive order acknowledges the risk to the competitiveness of companies and markets, as well as workers and communities, should financial institutions fail to adequately account for "the global shift away from carbon-intensive energy sources and industrial processes."  Id. at 27967.

Exhibit A

(March 15, 2021).  In its proxy statement, Engine No. 1 emphasized "growing long-term oil and gas uncertainty" arising from a "decarbonizing world."[13]  Id. at 1.

It bears emphasizing that the political and business developments described above constitute only the latest and a small set of examples of the global transition away from fossil fuels.  This broad and rapidly accelerating trend calls into question both the viability of the Coalition's over $1 billion rail construction project as well as its ability to raise money from private funding sources.  It confirms the significant concerns I raised previously about the extent to which the project will both require the backing of, and put at risk, public funds.  January 5 Decision, FD 36284, slip op. at 19 (Board Member Oberman dissenting).  These concerns have been exacerbated by the Coalition's decision not to supply (and indeed, to redact) oil and traffic projections from its consultant's pre-feasibility study, creating the ineluctable inference that the withheld data, if revealed, would undermine the commercial viability of the project.  January 5 Decision, FD 36284, slip op. at 14-15 & n.5 (Board Member Oberman dissenting).  The majority's continuing to turn a blind eye to this glaring omission is even more perplexing in light of the dramatic changes in the world oil market detailed above.

But make no mistake: the writing is on the wall.  The Board has previously made clear that "significant questions surrounding the financial feasibility of [a] proposed rail project" may diminish its transportation merits and warrant against the granting of an exemption under § 10502.  Tex. Cent. R.R. & Infrastructure, Inc.—Petition for Exemption—Passenger Rail Line Between Dallas & Houston, Tex. (Texas Central), FD 36025, slip op. at 14-15 (STB served July 16, 2020) (citing the RTP factors at 49 U.S.C. §§ 10101(4) and 10101(5) as a basis for denying a petition for exemption given "questions about increased costs and funding sources," the magnitude of the project, and the substantial public interest).  Although the Board in Texas Central permitted the petitioner there to proceed via application, so as to provide additional information about the project's financial feasibility, an application in this case would not have changed the fact that the Line's transportation merits are greatly impaired by a future that has little use for the product it will be built to deliver.  Moreover, and as explained in the following section, regardless of whether the Coalition had proceeded via application or petition for exemption, the Line's environmental impacts outweigh its transportation merits.

Environmental Impacts

Consideration of the Line's environmental effects must treat as indirect effects those impacts associated with oil development in the Basin that will be supported by the Line,

---

[13]  The hedge fund Third Point Investors also recently announced that it had taken a stake in Shell in part to advance a growth strategy focused on "aggressive investment in renewables and other carbon reduction technologies."  Available at https://thirdpointlimited.com/wp-content/uploads/2021/10/Third-Point-Q3-2021-Investor-Letter-TPIL.pdf.]  Weeks later, Shell announced plans to simplify its share structure to accelerate "delivery of its strategy to become a net-zero emissions business."  Press Release, Royal Dutch Shell, Notice of General Meeting – Shell Seeks Shareholder Approval to Change Articles to Implement a Simplified Structure (Nov. 15, 2021), https://www.shell.com/media/news-and-media-releases/2021/november-press-release.html.

Exhibit A

including downstream greenhouse gas emissions that will result from the oil's eventual combustion. Contrary to the position taken in Today's Decision, the Board has the power to act on these impacts, including by denying construction authority, and accordingly has an obligation to consider them as reasonably foreseeable effects of the project. Only in doing so, may the Board reach the central question in this case: whether it is in the public interest for the Board to authorize the building of a railroad for the near exclusive purpose of facilitating oil and gas development, given all that we know today about the worsening global warming crisis and the role played by fossil fuel combustion. That question lies at the heart of whether the transportation merits of the project outweigh its environmental impacts, including the troubling and unavoidable disturbance to wetlands and wildlife that are in fact acknowledged by the majority as effects of this project. In my view, the Line is not worth these costs.

With respect to downstream greenhouse gas emissions, the Final EIS recognized that construction of the Line "would increase transportation capacity to ship an additional 130,000 to 350,000 barrels of oil on average each day from existing oil fields . . . ." (Final EIS 3.15-51; see also id. 3.15-3 to 3.15-4.) Further, it assumed that the oil from this new production would ultimately be refined into fuel and combusted, and it estimated that the resulting emission of carbon dioxide equivalents would total 19,785,953 metric tons annually under a low oil production scenario and 53,269,873 metric tons annually under a high oil production scenario, the latter of which would represent approximately 0.8% of nationwide greenhouse gas emissions and 0.1% of global greenhouse gas emissions. (Id. at 3.15-36.) The Final EIS also identified other, more localized impacts of oil and gas development on water resources, biological resources, soils, noise, land use, cultural resources, and socioeconomics, including from the drilling of new wells. (See generally id. § 3.15.) These impacts are acknowledged in Today's Decision. Today's Decision 17.

However, they are considered only for the purpose of assessing the project's cumulative impacts. Accordingly, *and importantly*, the Final EIS does not consider as an indirect impact the harm caused to the environment by downstream combustion of increased oil production enabled by the Line's construction. The Final EIS focuses instead only on the *incremental* de minimis effect of emissions from construction and operation of the Line *when added* to emissions from downstream combustion. (Final EIS 3.15-32); see also Twp. of Bordentown, NJ v. FERC, 903 F.3d 234, 258 (3d Cir. 2018) (explaining that a cumulative impact analysis looks at the marginal impact of the jurisdictional project when added to the non-jurisdictional projects' impacts). The majority approved this approach and in so doing obscured the centrality of the Line's construction to oil and gas development in the Basin, which will foreseeably cause far larger emissions from combustion of oil that will be moved over the Line.[14] See Twp. of Bordentown,

---

[14] In contrast to the estimated emissions from the production scenarios discussed above, the Final EIS estimated that "[greenhouse gas] emissions from rail operations . . . would represent a small percentage (ranging from 0.9 percent to 3.5 percent) of regional and statewide GHG emissions . . . and would not contribute significantly to global climate change." (Final EIS 3.7-39.) Not surprisingly, the majority did not find cumulative adverse effects on greenhouse gas emissions or air quality, but rather identified only cumulative adverse effects on water resources, biological resources, paleontological resources, land use and recreation, visual resources, and socioeconomics. Today's Decision 16.

Exhibit A

903 F.3d at 258 ("Where the other projects' impacts are themselves already significant or greatly outweigh the jurisdictional projects' impacts, such that the jurisdictional project will not meaningfully influence the extent of the already significant environmental impacts, the cumulative impacts test is inapposite.").

Considering the environmental impacts of oil development in the Basin only in the context of a cumulative impact analysis, and not as reasonably foreseeable impacts attributable to the Line itself, materially affects how those effects are factored by the Board when weighing the Line's transportation merits against its environmental impacts. See Landmark West! v. U.S. Postal Serv., 840 F. Supp. 994, 1011 (S.D.N.Y. 1993) (explaining that a cumulative impact analysis "entails the consideration of the foreseeable actions of others as background factors, but does not require that the impacts of others' actions be weighed in assessing the significance" of the agency's actions, only the "marginal impacts of its own actions"), aff'd, 41 F.3d 1500 (2d Cir. 1994).[15] Today's Decision justifies this approach by relying on Department of Transportation v. Public Citizen, 541 U.S. 752 (2004), contending that the Board cannot be the "legally relevant" cause of impacts from oil and gas development, and therefore those impacts cannot be considered indirect impacts of the construction project. Today's Decision 18. Today's Decision emphasizes that the Board has no authority or jurisdiction over development of oil and gas in the Basin nor any authority to control or mitigate the impacts of any such development. Id. Importantly, and although not said in so many words, its reliance on Public Citizen necessarily implies that the Board cannot be the cause of such impacts *because it lacks the power* to act on them when deciding whether to approve or deny the Coalition's petition.

I disagree. In Public Citizen, the Supreme Court indeed held that where an "agency has no ability to prevent a certain effect due to its limited statutory authority over the relevant actions, the agency cannot be considered a legally relevant 'cause' of the effect," and hence need not consider such effects under NEPA. 541 U.S. at 770. That case, however, is readily distinguishable. At issue in Public Citizen was the planned lifting of a moratorium by the President (with authority from Congress) on cross-border truck traffic from Mexico and related regulations under review by the Federal Motor Carrier Safety Administration (FMCS). Although the regulations had to be issued before Mexican traffic could enter the United States, by statute the rules were limited to safety and financial responsibility issues. Id. at 758-59. The Supreme Court concluded that the FMCSA had no obligation to evaluate emissions from the truck traffic when assessing the environmental impact of its regulations because FMCSA "simply lack[ed] the power to act on" any such emissions data. Id. at 768. Key to this holding was the Supreme Court's finding that FMCSA had "*no ability to countermand the President's lifting of the moratorium*" or otherwise "*categorically*" prevent such traffic from entering the United States. Id. at 766 (emphasis added). As the Supreme Court explained, the "legally relevant cause of entry of the Mexican trucks is *not* FMCSA's action, but instead the actions of the President in lifting the moratorium and those of Congress in granting the President this authority while simultaneously limiting FMCSA's discretion." Id. at 769.

---

[15] Even though the labeling of the effects of oil and gas development in the Basin as indirect or cumulative impacts may not have affected their analysis within the Final EIS (Today's Decision 18 n.15), it does affect how they are weighed by the Board.

Exhibit A

The scope of Public Citizen becomes even more apparent when considering how the case has been applied in other circumstances involving downstream greenhouse gas emissions. For example, in Sierra Club v. FERC (Freeport), the D.C. Circuit held that the Federal Energy Regulatory Commission (FERC) had no obligation to consider such emissions when approving facility upgrades at a liquified natural gas terminal that would be used to support export operations. 827 F.3d 36, 47-48 (D.C. Cir. 2016). This was because the Department of Energy (DOE) has exclusive jurisdiction over the export of natural gas as a commodity and had already authorized the terminal in Freeport to export gas. Id. at 40. DOE merely delegated to FERC licensing authority over the siting, construction, expansion, and operation of specific facilities. Id. at 40-41. Citing Public Citizen, the D.C. Circuit concluded that FERC could not be the "legally relevant" cause of emissions from gas exported from the terminal because DOE's "intervening" and "independent decision to allow exports—a decision over which [FERC] has no regulatory authority—[broke] the NEPA causal chain and absolve[d]" FERC of responsibility to consider impacts it "could not act on." Id. at 47-48.

Public Citizen, which the majority relied upon, and Freeport, which shows its application, lay bare the flaw in the majority's reasoning. Had Congress itself authorized construction of a railroad out of the Basin, or vested that authority in another federal agency, but left to the Board the narrower responsibility of deciding where that line should be placed and the details of its construction, then perhaps Public Citizen would be instructive. But here, the Board has independent and plenary authority, and exclusive jurisdiction, over whether a line of railroad should be built in the first instance. 49 U.C.S. §§ 10501, 10901. See Alaska Survival v. STB, 705 F.3d 1073, 1086 (9th Cir. 2013) (emphasizing that the decision as to "which communities are entitled to important railroad development projects" is "committed in the first instance to the agency authorized by Congress to approve rail line construction projects, the STB"). That the Board has no authority or jurisdiction over development of oil and gas in the Basin, (Today's Decision 18),[16] and generally cannot restrict the types of products and commodities that are transported on already constructed rail lines, (Final EIS 3.15-36),[17] are not the types of overarching limitations like that at issue in Public Citizen which would diminish, let alone inform, the Board's authority over rail construction.

The D.C. Circuit's decision in Sierra Club v. FERC (Sabal Trail) is on point. That case involved FERC's decision to approve the construction and operation of certain interstate natural gas pipelines in the southeastern United States. Sabal Trail, 867 F.3d 1357, 1363 (D.C. Cir. 2017). As here, at issue was whether Public Citizen excused FERC's decision not to attribute to the pipeline, and consider, greenhouse gas emissions arising from the end-use combustion of gas to be moved over the pipeline. Id. at 1365, 1371-72. In its decision, the D.C. Circuit made clear

---

[16] See Birkhead v. FERC, 925 F.3d 510, 519 (D.C. Cir. 2019) (rejecting argument that agency cannot be legally relevant cause of emissions from gas transported via agency-approved pipeline "due to its lack of jurisdiction over any entity other than the pipeline applicant").

[17] The Final EIS cites to Riffin v. STB, 733 F.3d 340, 345-47 (D.C. Cir. 2013), for the established proposition "that *railroads* have a common carrier obligation to carry all commodities, including hazardous materials, upon reasonable request . . . ." (Final EIS 3.15-6 (emphasis added).) While that may be true, it has nothing to do with the ***Board's*** authority to license rail construction and its obligation to consider environmental impacts when doing so.

Exhibit A

that the relevant question is not "'What activities does [an agency] regulate?' but instead . . . 'What factors can [the agency] consider when regulating in its proper sphere?'" Id. at 1373. In other words, is an agency "forbidden to rely" on the effects of the impact as "justification" for denying a license? Id. The Court found that FERC was "not so limited." Id. Critical to its analysis was that Congress gave FERC broad power over the construction and operation of interstate pipelines, expansively directing it to consider the "public convenience and necessity" when reviewing an application. Id. (citing 15 U.S.C. § 717f(e).) The Court emphasized that FERC balances the "public benefits against the adverse effects of the project," including "adverse environmental effects," and can deny construction authority "on the ground that [it] would be too harmful to the environment." Sabal Trail, 867 F.3d at 1373. For all of these reasons, the Court concluded that FERC "*is a 'legally relevant cause' of the direct and indirect environmental effects of the pipelines it approves*." Id. (emphasis added).[18]

As in Sabal Trail, here too the Board has a broad statutory obligation not to authorize rail construction when doing so would be "inconsistent with the public convenience and necessity." 49 U.S.C. § 10901(c). And although in this case the Coalition has proceeded via a petition for exemption from the prior approval requirements of § 10901, use of the exemption process does not affect the level of environmental review a project receives. Cal. High-Speed Rail Auth.—Constr. Exemption—in Merced, Madera, and Fresno Cntys., Cal., FD 35724, slip op. at 21-22 (STB served June 13, 2013). The Board has also made clear that environmental impacts can lead it to categorically decline to authorize rail construction, including when considering a petition for exemption. Alaska R.R.—Constr. & Operation Exemption—Rail Line Between N. Pole & Delta Junction, Alaska, FD 34658, slip op. at 10 (STB served Jan. 6, 2010). In either circumstance, and as in Today's Decision, the Board weighs the project's transportation merits against its environmental impacts when determining whether to grant construction authority. (Today's Decision 23-25.) This is in keeping with NEPA, which requires the Board to consider the environmental impacts of a decision permitting rail construction, regardless of whether it does so by granting an application under § 10901 or an exemption under § 10502.[19] 42 U.S.C. § 4332(C).

I see no reason why the Line's construction would not otherwise be a sufficient cause of the oil and gas development impacts and downstream emissions identified in the Final EIS. It

_____

[18] See also WildEarth Guardians v. Zinke, 368 F. Supp. 3d 41, 73 (D.D.C. 2019) (holding that because Bureau of Land Management (BLM) could decline to sell an oil and gas lease if the "environmental impact of those leases—including use of the oil and gas produced—would not be in the public's long-term interest," BLM was required to consider downstream greenhouse gas emissions "as indirect effects of oil and gas leasing"), appeal dismissed per stipulation, 2021 WL 3176109 (D.C. Cir. Apr. 28, 2021).

[19] In any event, the Board may not exempt construction from § 10901 where regulation is necessary to carry out the RTP, including those factors calling for the development of a sound rail transportation system to meet the public need, operation of transportation facilities without detriment to public health and safety, and energy conservation. 49 U.S.C. § 10502; 49 U.S.C. § 10101(4), (8), (14). In my view, these policy directives broadly warrant the Board's consideration of the environmental impacts to be caused by oil development in the Basin, including downstream greenhouse gas emissions.

Exhibit A

may well be the case that oil development "may occur, and is already taking place, without the proposed rail line," (Final EIS T-44), and that the "actual volumes of crude oil that would move over the Line would depend on various independent variables and influences," (Today's Decision 17). However, the Coalition's own position has been that trucking oil produced from the Basin to distant markets is cost prohibitive and that "the lack of rail access has effectively capped oil production in the Basin." (Pet. 13-14.) As the Coalition puts it, a rail line would "enable local producers to increase their output under appropriate market conditions." (Id. at 15.) It cannot be disputed that "but for" the proposed rail line, significantly less oil will be extracted from the Basin. See Mid States Coal. for Progress v. STB, 345 F.3d 520, 548-50 (8th Cir. 2003) (requiring that agency consider emissions from combustion of coal transported over rail line as it was "almost certainly true" that the line would increase the "availability of inexpensive coal" and "any adverse effects that result from burning coal").[20]

Of course, a "'but for' causal relationship is insufficient to make an agency responsible for a particular effect under NEPA . . . ." Public Citizen, 541 U.S. at 767. Instead, "NEPA requires analysis of an effect only where there is a reasonably close causal relationship between the environmental effect and the alleged cause, analogous to the doctrine of proximate cause from tort law." (Final EIS T-43 (citing Public Citizen, 541 U.S. at 767).) As the Supreme Court has made clear, proximate cause "*turns on policy considerations*" and where best to "draw a manageable line between those causal changes that may make an actor responsible for an effect and those that do not." Public Citizen, 541 U.S. at 767 (citations omitted) (emphasis added). Notably, in Public Citizen, prevailing policy dictated that the FCMSA could not possibly be the proximate cause of the motor carrier emissions at issue since, again, FMCSA had "no ability categorically to prevent the cross-border operation of Mexican motor carriers." Id. at 768. That is, in Public Citizen the Court's analysis of proximate cause turned on its conclusion that the FMCSA's lacked authority over the traffic.

As explained above, Public Citizen does not "excuse" the Board from considering impacts from oil and gas development. Sabal Trail, 867 F.3d at 1373. And it otherwise seems well within the range of reasonable policy considerations—and frankly, the only reasonable policy consideration—for the Board to weigh these impacts when making its final decision, *at least with respect to this particular line*. As noted in my prior dissent, there is no question that increased oil production is the "singular rationale" for the Line: its potential use by other industries is ancillary to the movement of oil and not valuable enough standing alone to justify the line's construction and continued operation. January 2020 Decision, slip op. at 14 (Board Member Oberman dissenting) (citing Pet. 13-17). That is, increased oil output, its refinement

---

[20] The Final EIS suggests that this aspect of Mid States would not stand today, given the Supreme Court's subsequent decision in Public Citizen. (Final EIS T-440.) But as explained above, the Court in Public Citizen grounded its holding on FCMSA's inability to prevent the relevant environmental effect "due to its limited statutory authority over the relevant actions." 541 U.S. at 770. Mid States did not address whether the Board had the authority to deny or condition its construction approval on the emissions it originally failed to consider. Mid States appears still to be relevant for the proposition that the Board may be the legally relevant cause of downstream impacts that would not occur "but for" the agency's construction approval.

Exhibit A

into petroleum, and that petroleum's ultimate sale and combustion are not only "reasonably foreseeable," they are "the project's entire purpose."[21]  Sabal Trail, 867 F.3d at 1372.

Moreover, there can be no question about the significance of the threat that global warming poses to the environment as well as to our continued prosperity.  Days after OEA issued the Final EIS, the United Nations' Intergovernmental Panel on Climate Change's (IPCC's) Working Group I released its contribution to the IPPC's Sixth Assessment Report, which presents the most up-to-date understanding of the current state of the climate.[22]  ***The report presents a dire picture***.  Among other things, it concludes that:  (i) it is "unequivocal" that human influence has warmed the atmosphere, ocean, and land; (ii) global surface temperature in the first two decades of the 21st century was .99°C higher than 1850-1900; (iii) human-induced climate change is "already affecting many weather and climate extremes in every region across the globe"; (iv) evidence attributing heatwaves, heavy precipitation, droughts, and tropical cyclones to human influences has strengthened in the last several years; (v) global warming of 1.5°C and 2°C will be exceeded during the 21st century unless deep reductions in greenhouse gas emissions occur in the coming decades;[23] and (vi) with further global warming, every region around the world will increasingly experience extreme climate events, including heavy precipitation, flooding, and droughts.  IPCC 2021 at SPM-5, SPM-10, SPM-17, and SPM-32.

These effects are already being felt.  July 2021 was the hottest month ever recorded, according to global data from the National Oceanic and Atmospheric Administration (NOAA), with parts of the world witnessing record high temperatures, unprecedented heat waves, floods, and other extreme weather events.[24]  The World Meteorological Organization (WMO), an agency

---

[21]  When weighing the project's transportation merits against its environmental impacts, Today's Decision stresses that a "rail transportation option could also support the diversification of local economies in the Basin, which could support additional employment and expand the regional economy."  (Today's Decision 24.)  But it gives no weight to the nature of the industry the Line is meant to support and that industry's impact on climate change.  While local economic development may be a reason to support the Line's construction, if the majority is to weigh the economic benefits of that development, it should weigh ***all*** of its harms as well.  When that is done, it is apparent that the project's environmental impacts outweigh its benefits.

[22]  See Richard Allan, et al., Summary for Policymakers in Climate Change 2021:  The Physical Science Basis.  Contribution of Working Group I to the Sixth Assessment Report of the Intergovernmental Panel on Climate Change (IPCC 2021 Summary for Policymakers) (Valérie Masson-Delmonte et al., eds., in press), https://www.ipcc.ch/report/ar6/wg1/downloads/report/IPCC_AR6_WGI_Full_Report.pdf.

[23]  According to the Climate Action Tracker— an independent scientific analysis that tracks government climate action and measures it against the globally agreed Paris Agreement— current policies in place around the world are projected to result in 2.7°C warming above pre-industrial levels.  Temperature, Climate Action Tracker, https://climateactiontracker.org/global/temperatures/# (last updated Nov. 9, 2021).

[24]  See NOAA, It's Official:  July was Earth's Hottest Month on Record (Aug. 13, 2021), available at:  https://www.noaa.gov/news-features.  On July 11, 2021, the National Weather

Exhibit A

of the United Nations, has predicted that the annual mean global temperature is likely to be at least 1°C above pre-industrial levels in each of the next five years, with a 90% chance that at least one of those years will be the warmest on record.  Press Release, WMO, New Climate Predictions Increase Likelihood of Temporarily Reaching 1.5°C in Next 5 Years (May 27, 2021).[25]  The past seven years are on track to be the warmest on record.  Press Release, World Meteorological Organization, State of Climate in 2021:  Extreme Events & Major Impacts (Oct. 21, 2021).  As detailed above, our national and state governments and many leading components of the private sector have accelerated their response to the growing environmental disaster.  ***Decarbonization is national policy***.

The growing threat from global warming is too great, and its connection to the combustion of fossil fuel too obvious, for the environmental impacts of Line-induced oil and gas development in the Basin to be treated as anything other than what they are:  reasonably foreseeable effects of the rail construction project itself.  For the reasons explained above, the Board has the power to act on impacts resulting from that development when deciding whether to approve the petition, and can and should engage with the central question presented in this matter:  whether a railroad built for the purpose of supporting oil and gas development, given the need for decarbonization and the harmful effects of global warming, is within the public interest.  Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 349-50 (1989) (holding that under NEPA an agency must "carefully consider" information concerning significant environmental impacts when "reaching its decision").  Such an approach properly situates the significant environmental impacts that nobody appears to disagree are attributable to the Line's construction and operation—among other things, impacts on surface waters and the loss of wetlands, disruption to habitat of threatened and endangered species, and disturbance of the use of otherwise pristine land—all of which are unavoidable and cannot be mitigated.  (Final EIS S-8 to S-9.)  Is the Line worth all of this given the activity it is intended to support?  Without evidence that there is some particularized need for oil from the Basin, in the face of overwhelming evidence to the contrary, and given the irrefutable fact that this oil's use will contribute to the global warming crisis, I cannot say that it is.

I dissent.

---

Service recorded a temperature of 54°C (129.2°F) in Death Valley, which tied the record (set last year) for the hottest formally recognized daytime temperature ever.  July and August also saw unprecedented heat waves in the Pacific Northwest, national high temperature records set in Spain, Tunisia, and Turkey, Germany ravaged by floods, and parts of China receiving a year's worth of rain in just three days.  Press Release, World Meteorological Organization, State of Climate in 2021:  Extreme Events & Major Impacts (Oct. 21, 2021), available at: https://public.wmo.int/en/media/press-release.

[25]  Available at:  https://public.wmo.int/en/media/press-release.

Exhibit A

Docket No. FD 36284

## APPENDIX A

## MAP OF ALTERNATIVES



38

Exhibit A

## APPENDIX B

## ENVIRONMENTAL MITIGATION CONDITIONS

### VOLUNTARY MITIGATION MEASURES

#### Construction and Rail Operations Safety

**VM-1**.  The Seven County Infrastructure Coalition (Coalition) will follow all applicable federal Occupational Safety and Health Administration (OSHA), Federal Railroad Administration (FRA), tribal, and state construction and operational safety regulations to minimize the potential for accidents and incidents during construction and operation of the rail line.

#### Grade Crossing Safety

**VM-2**.  The Coalition will consult with appropriate federal, tribal, state, and local transportation agencies to determine the final design of the at-grade crossing warning devices.  Implementation of all grade-crossing warning devices on public roadways will be subject to review and approval, depending on location, by the Ute Indian Tribe of the Uintah and Ouray Reservation (Ute Indian Tribe), Utah Department of Transportation (UDOT), U.S. Forest Service (Forest Service), or Carbon, Duchesne, or Uintah Counties.  The Coalition will follow standard safety designs for each at-grade crossing for proposed warning devices and signs.  These designs will follow the Federal Highway Administration *Manual on Uniform Traffic Control Devices for Streets and Highways* as implemented by UDOT and the American Railway Engineering and Maintenance-of-Way Association standards for railroad warning devices.  They will also comply with applicable UDOT, tribal, city, and county requirements.

**VM-3**.  For construction of road crossings, when reasonably practical, the Coalition will consult with tribal and local transportation officials regarding detours and associated signs, as appropriate, or maintain at least one open lane of traffic at all times to allow the quick passage of emergency and other vehicles.

**VM-4**.  The Coalition will develop a plan to consult with private landowners to determine the final details and reasonable signage for grade crossings on private roads.

**VM-5**.  Where practical, at-grade crossings for minor roads and private roads will be combined and consolidated into right-angle, at-grade crossings for safety, and in order to reduce the total the number of highway-rail at-grade crossings.

**VM-6**.  The Coalition will consult with affected communities regarding ways to improve visibility at highway-rail at-grade crossings, including by clearing vegetation or installing lights at the crossing during construction.

Exhibit A

**Hazardous Materials Handling and Spills during Construction**

**VM-7**.  Prior to initiating any project-related construction activities, the Coalition will develop a spill prevention, control, and countermeasures plan in consultation with federal, tribal, state and local governments.  The plan will specify measures to prevent the release of petroleum products or other hazardous materials during construction activities and contain such discharges if they occur.

**VM-8**.  In the event of a spill over the applicable reportable quantity, the Coalition will comply with its spill prevention, control, and countermeasures plan and applicable federal, state, local and tribal regulations pertaining to spill containment, appropriate clean-up, and notifications.

**VM-9**.  The Coalition will require its construction contractor(s) to implement measures to protect workers' health and safety and the environment in the event that undocumented hazardous materials are encountered during construction.  The Coalition will document all activities associated with hazardous material spill sites and hazardous waste sites and will notify the appropriate state, local, and tribal agencies according to applicable regulations. The goal of the measures is to ensure the proper handling and disposal of contaminated materials including contaminated soil, groundwater, and stormwater, if such materials are encountered.  The Coalition will use disposal methods that comply with applicable solid and hazardous waste regulations.

**VM-10**.  The Coalition will ensure that gasoline, diesel fuel, oil, lubricants, and other petroleum products are handled and stored to reduce the risk of spills contaminating soils or surface waters.  If a petroleum spill occurs in the project area as a result of rail construction, operation, or maintenance and exceeds specific quantities or enters a water body, the Coalition (or its agents) will be responsible for promptly cleaning up the spill and notifying responsible agencies in accordance with federal, state, and tribal regulations.

**Hazardous Materials Transport and Emergency Response**

**VM-11**.  The Coalition will prepare a hazardous materials emergency response plan to address potential derailments or spills.  This plan will address the requirements of the Pipeline and Hazardous Materials Safety Administration and FRA requirements for comprehensive oil spill response plans.  The Coalition will distribute the plan to federal, state, local, and tribal emergency response agencies.  This plan shall include a roster of agencies and people to be contacted for specific types of emergencies during rail construction, operation and maintenance activities, procedures to be followed by particular rail employees, emergency routes for vehicles, and the location of emergency equipment.

**VM-12**.  The Coalition will work with the affected communities to facilitate the development of cooperative agreements with other emergency service providers to share service areas and emergency call response.

Exhibit A

Docket No. FD 36284

**VM-13**.  After construction is completed, the Coalition will implement a desktop simulation of its emergency response drill procedures with the voluntary participation of local emergency response organizations.  If necessary, the Coalition will update the hazardous materials emergency response plan based on the findings and observations of the simulated emergency response.

**VM-14**.  In the event of a reportable hazardous materials release, the Coalition will notify appropriate federal, state, and tribal environmental agencies as required under federal, state, and tribal law.

**VM-15**.  The Coalition will comply with FRA, Pipeline and Hazardous Materials Safety Administration, Transportation Security Administration regulations and tribal ordinances or plans applicable to the safe and secure transportation of hazardous materials.

**Topography, Geology, and Soils**

**VM-16**.  The Coalition will limit ground disturbance to only the areas necessary for project-related construction activities.

**VM-17**.  During project-related earth-moving activities, the Coalition will require the contractor to remove topsoil and segregate it from subsurface soils.  Where practical, the contractor will also stockpile topsoil to be applied later during reclamation activities in disturbed areas along the right-of-way.

**VM-18**.  The Coalition will place the topsoil and other excavated soil stockpiles in areas away from environmentally or culturally sensitive areas and will use appropriate erosion control measures on and around stockpiles to prevent or contain erosion.

**VM-19**.  The Coalition will submit a notice of intent to request permit coverage under Utah Pollutant Discharge Elimination System Construction General Permit UTRC00000 for construction stormwater management.

**VM-20**.  The Coalition will submit an application for coverage under the National Pollutant Discharge Elimination System stormwater construction permits pursuant to Section 402 of the Clean Water Act for construction stormwater management on tribal land.

**VM-21**.  The Coalition will develop a stormwater pollution prevention plan, which will include construction Best Management Practices (BMPs) to control erosion and reduce the amount of sediment and pollutants entering surface waters, groundwater, and waters of the United States.  The Coalition will require its construction contractor(s) to follow all water quality control conditions identified in all permits, including the Section 404 permit from the U.S. Army Corps of Engineers (Corps) and the Section 401 Water Quality Certification from the Utah Department of Environmental Quality (UDEQ) and the U.S. Environmental Protection Agency (USEPA).

41

Exhibit A

**VM-22**.  The Coalition will revegetate disturbed areas, where practical and in consultation with the Ute Indian Tribe as applicable, when construction is completed.  The goal of reclamation will be the rapid and permanent re-establishment of native groundcover on disturbed areas to prevent soil erosion, where feasible.  If weather or seasonal conditions prevent vegetation from being quickly re-established, the Coalition will use measures such as mulching, erosion-control blankets, or dust-control palliatives to prevent erosion until vegetative cover is established.  The Coalition will monitor reclaimed areas for 3 years.  For areas where efforts to establish vegetative cover have been unsuccessful after 1 year, the Coalition will reseed annually for up to 3 years as needed.

## Air Quality

**VM-23**.  Where practical and in consultation with the Ute Indian Tribe as applicable, the Coalition will implement appropriate fugitive-dust controls such as spraying water or other dust treatments in order to reduce fugitive-dust emissions created during project-related construction activities.  The Coalition will require its construction contractor(s) to regularly operate water trucks on haul roads to reduce dust generation.

**VM-24**.  The Coalition will work with its contractor(s) to make sure that construction equipment is properly maintained and that mufflers and other required pollution-control devices are in working condition in order to limit construction-related air pollutant emissions.

## Water Resources

**VM-25**.  The Coalition will obtain a permit from the Corps under Section 404 of the Clean Water Act before initiating project-related construction activities in wetlands and other jurisdictional waters of the United States.  The Coalition will comply with all conditions of the Section 404 permit.

**VM-26**.  The Coalition will obtain a Section 401 Water Quality Certification from the State of Utah and USEPA.  The Coalition will incorporate the conditions of the Section 401 Water Quality Certification into its construction contract specifications and will monitor the project for compliance.

**VM-27**.  The Coalition will minimize impacts on wetlands to the extent practicable in the final design of the selected alternative.  After all practicable steps have been taken to minimize impacts on wetlands, the Coalition agrees to prepare a compensatory mitigation plan for any remaining wetland impacts in consultation with the Ute Indian Tribe where applicable.  Compensatory mitigation may include any one or a combination of the following five methods: restoring a previously existing wetland or other aquatic site, enhancing an existing aquatic site's functions, establishing (that is, creating) a new aquatic site, preserving an existing aquatic site, and/or purchasing credits from an authorized wetland mitigation bank.

**VM-28**.  Bridges at perennial streams will be designed to maintain a natural substrate.

Exhibit A

**VM-29**.  The Coalition will obtain stream alteration permits from the Utah Division of Water Rights for crossing waters of the state, and any applicable tribal permits, and will comply with all conditions of the permits.

**VM-30**.  The Coalition will construct stream crossings during low-flow periods, when practical.

**VM-31**. When practical and in consultation with the Ute Indian Tribe where applicable, the Coalition will relocate natural streams using bioengineering methods, where relocation is needed and is unavoidable.

**VM-32**.  For streams and rivers with a floodplain regulated by the Federal Emergency Management Agency or the Ute Indian Tribe, the Coalition will design the stream crossing with the goal of not impeding floodwaters and not raising water surface elevations to levels that would change the regulated floodplain boundary.  If flood elevations change, the Coalition will coordinate with Federal Emergency Management Agency and/or tribal or local floodplain managers to obtain a Letter of Map Revision where construction of bridges, culverts, or embankments results in an unavoidable increase greater than 1 foot to the 100-year water surface elevations.

## Biological Resources

**VM-33**.  The Coalition will comply with any conditions and mitigation commitments contained in a biological opinion for sensitive species that could potentially be impacted by the project.

**VM-34**.  The Coalition will require its contractor(s) to comply with the requirements of the Migratory Bird Treaty Act in consultation with the Ute Indian Tribe as applicable.  The following measures will be conducted by the Coalition and/or its contractor(s).
a.  Where practical, any ground-disturbing, ground-clearing activities or vegetation treatments will be performed before migratory birds begin nesting or after all young have fledged.
b.  If activities must be scheduled to start during the migratory bird breeding season, the Coalition will take steps to prevent migratory birds from establishing nests in the potential impact area.  Birds can be hazed to prevent them from nesting until egg(s) are present in the nest.  The Coalition or its agents will not haze or exclude nest access for migratory birds and other sensitive avian species.
c.  If activities must be scheduled during the migratory bird breeding season, a qualified biologist will perform a site-specific survey for nesting birds starting no more than 7 days prior to ground-disturbing activities or vegetation treatments.  Birds with eggs or young will not be hazed, and nests with eggs or young will not be moved until the young are no longer dependent on the nest.  A qualified biologist will confirm that all young have fledged.
d.  If nesting birds are found during the survey, the Coalition will establish appropriate seasonal or spatial buffers around nests.  Vegetation treatments or ground-disturbing

Exhibit A

activities within the buffer areas will be postponed, where feasible, until the birds have left the nest.  A qualified biologist will confirm that all young have fledged.

**VM-35**.  The Coalition will execute a Mitigation Agreement with the Utah Division of Wildlife Resources (UDWR) to address impacts within the Carbon Sage-grouse Management Area (CSGMA).  The Coalition has discussed several potential mitigation strategies with UDWR and other local, state, tribal and federal stakeholders during the EIS process.  The final CSGMA Mitigation Agreement will define the appropriate mitigation ratio for the project type and its impacts and the final mitigation approach.

**VM-36**.  The Coalition shall comply with the Ute Indian Tribe's Greater Sage-Grouse Conservation Ordinance as applicable.

**VM-37**.  If the selected alternative impacts U.S. Bureau of Land Management (BLM) lands, the Coalition will request that BLM join as a signatory to the CSGMA Mitigation Agreement.

**VM-38**.  The Coalition will prepare a noxious and invasive weed control plan in consultation with the Ute Indian Tribe as applicable.  Where practical, the Coalition will include the policies and strategies in Utah's Strategic Plan for Managing Noxious and Invasive Weeds when designing response strategies for noxious and invasive weeds.

**VM-39**.  The Coalition will comply with any conditions and mitigation commitments contained in a biological opinion for sensitive plant species that could potentially be impacted by the project.

**VM-40**.  The Coalition will work with UDWR, the Ute Indian Tribe, and adjacent landowners to define areas of the right-of-way that can be left without fences to maintain big game migration corridors.

**VM-41**.  Where practical and necessary, the Coalition will install wildlife-safe fences to confine livestock within grazing allotments.

## Cultural Resources

**VM-42**.  The Coalition will work with the Ute Indian Tribe and others to develop training materials to educate construction supervisors about the importance of protecting cultural resources and the procedures for handling undocumented discoveries.  The Coalition will make reasonable efforts to include the Ute Indian Tribe in the presentation of these materials.

**VM-43**.  The Coalition will comply with the requirements of the Programmatic Agreement being developed by the Office of Environmental Analysis (OEA), the Advisory Council on Historic Preservation, Utah State Historic Preservation Office, Ute Indian Tribe, and other federal and state agencies in consultation with federally recognized tribes and other consulting parties.

Exhibit A

## Land Use

**VM-44**.  If temporary construction easements on private property are needed, the Coalition will document the preconstruction conditions and, to the extent practical, will restore the land to its preconstruction condition after construction is complete.

**VM-45**.  The Coalition will consult with landowners regarding grazing allotments and will install temporary fences during construction to allow continued grazing, where practicable. Once construction is complete, the Coalition will replace all permanent fences removed during construction.

**VM-46**.  Where practical, the Coalition will maintain livestock access to water sources or will relocate water sources, maintain vehicle and livestock access to grazing allotments, and install safety fences and signs for grazing allotment entrances and exits to enable continuance of livestock operations within grazing allotments.

**VM-47**.  The Coalition will secure agreements with utilities to establish responsibility for protecting or relocating existing utilities, if impacted by construction.

**VM-48**.  The Coalition will coordinate with water districts to develop irrigation infrastructure protection or relocation plans, if irrigation infrastructure will be impacted by construction.

## Community Outreach

**VM-49**.  The Coalition will appoint a community liaison to consult with affected communities, businesses, and agencies and seek to develop cooperative solutions to local concerns regarding construction activities.

**VM-50**.  The Coalition will appoint a tribal community liaison to address the needs and concerns of Ute Indian Tribe members and communities and seek to develop cooperative solutions to concerns regarding construction activities and rail operations.

**VM-51**.  The Coalition will maintain a project website throughout the duration of construction to provide regular updates regarding construction progress and schedule.

**VM-52**.  The Coalition will install construction warning and detour signs throughout the corridor and at recreation sites around the project area as needed.

## Noise and Vibration

**VM-53**.  The Coalition, in consultation with the Ute Indian Tribe, will comply with FRA regulations (49 Code of Federal Regulations [C.F.R.] Part 210) establishing decibel limits for train operation.

Exhibit A

**VM-54**.  The Coalition will work with its contractor(s) to make sure that project-related construction and maintenance vehicles are maintained in good working order with properly functioning mufflers to control noise.

**Recreation**

**VM-55**.  If needed for the selected alternative, the Coalition will obtain approval from the Forest Service and will follow the conditions of the permit regarding access to, or temporary closure of, recreational features during construction.

**VM-56**.  The Coalition will work with its construction contractor to maintain access to Forest Service roads during construction, where feasible.

## ADDITIONAL MITIGATION MEASURES

**Vehicle Safety and Delay**

**VSD-MM-1**.  The Coalition shall design and construct any new temporary or permanent access roads and road realignments to comply with the reasonable requirements of the UDOT Roadway Design Manual (UDOT 2020), other applicable road construction guidance (e.g., county road right-of-way encroachment standards), and land management agency or landowner requirements (e.g., BLM H-9113-1 Road Design Handbook) regarding the establishment of safe roadway conditions.

**VSD-MM-2**.  During project-related construction activities, the Coalition and its contractors shall comply with speed limits and applicable laws and regulations when operating vehicles and equipment on public roadways.

**VSD-MM-3**.  The Coalition shall obtain and abide by the reasonable requirements of applicable permits and approvals for any project-related construction activities within UDOT rights-of-way or state highways where UDOT has jurisdiction and off-system roads that are maintained by UDOT.

**VSD-MM-4**.  For each of the public at-grade crossings on the rail line, the Coalition shall provide and maintain permanent signs prominently displaying both a toll-free telephone number and a unique grade-crossing identification number in compliance with Federal Highway Administration regulations (23 C.F.R. Part 655).  The toll-free number would enable drivers to report promptly any accidents, malfunctioning warning devices, stalled vehicles, or other dangerous conditions.

**VSD-MM-5**.  The Coalition shall make Operation Lifesaver educational programs available to communities, schools, and other organizations located along the rail line.  Operation Lifesaver is a nationwide, nonprofit organization that provides public education programs to help prevent collisions, injuries, and fatalities at highway/rail grade crossings.

Exhibit A

**VSD-MM-6**.  The Coalition shall consult with private landowners and communities affected by new at-grade crossings or that are adjacent to the rail line to identify measures to mitigate impacts on emergency access and evacuation routes and incorporate the results of this consultation into the Coalition's emergency response plan.  These measures may include identifying new ingress and egress routes that could be used to improve safety in the event of an emergency.

## Rail Operations Safety

**ROS-MM-1**.  In the event of a reportable hazardous materials release, the Coalition shall notify appropriate local (county and city) agencies in addition to appropriate federal, state, and tribal environmental agencies as required under federal, state, and tribal law.

**ROS-MM-2**.  As part of routine rail inspections or at least twice annually, the Coalition shall use appropriate technology to inspect both track geometry (horizontal and vertical layout of tracks) and local terrain conditions to identify problems with either the track or the surrounding terrain.  The track inspection shall be designed and conducted so as to identify changes in track geometry that could indicate broken rails or welds, misalignments, and other technical issues with the track itself.  The visual inspection of terrain shall be designed and conducted so as to identify evidence of subsidence, rockslides, undermining of the track, erosion, changes in runoff patterns, or other issues that could lead to structural weakening of the track bed and potentially cause an accident.

## Water Resources

**WAT-MM-1**.  To the extent practicable, the Coalition shall design culverts and bridges to maintain existing surface water drainage patterns, including hydrology for wetland areas, and not cause or exacerbate flooding.  Project-related supporting structures (e.g., bridge piers) shall be designed to minimize scour (sediment removal) and increased flow velocity, to the extent practicable.  The Coalition shall consider use of multi-stage culvert designs in flood-prone areas, as appropriate.

**WAT-MM-2**.  The Coalition shall design culverts and bridges on land managed by federal, state, or tribal agencies to comply with reasonable applicable agency requirements.  All surface water crossings on land under the jurisdiction of the Ute Indian Tribe shall be designed in consultation with the tribe's Business Committee, Tribal Water Quality Department, the Tribal Fish and Wildlife Department, and the Tribal Water Resources Department to ensure that those crossings would not adversely affect the quality of surface waters on the tribe's Uintah and Ouray Reservation.

**WAT-MM-3**.  The Coalition shall design all stream realignments in consultation with the Corps and Utah Division of Water Rights as part of the Section 404 permit mitigation plan development and Utah Stream Alteration Program, respectively, to ensure that effects on stream functions are taken into account and minimized.  The Coalition shall also consult with the Ute Indian Tribe through the tribe's Business Committee, Tribal Water Quality Department, the Tribal Fish and Wildlife Department, and the Tribal Water Resources

Exhibit A

Department regarding the design of stream realignments to ensure that those realignments would not adversely affect the quality of surface waters on the tribe's Uintah and Ouray Reservation. To the extent practicable, the Coalition shall design realigned streams to maintain existing planform, geomorphology, bed material and flows.

**WAT-MM-4**. The Coalition shall design, construct, and operate the rail line and associated facilities to maintain existing water patterns and flow conditions and provide long-term hydrologic stability by conforming to natural stream gradients and stream channel alignment and avoiding altered subsurface flow (i.e., shallow aquifer subsurface flow) to the extent practicable.

**WAT-MM-5**. During project-related construction, the Coalition shall minimize, to the extent practicable, soil compaction and related effects (e.g., increase runoff and erosion), provide surface treatments to minimize soil compaction (e.g., break up compacted soils during reclamation to promote infiltration), and take actions to promote vegetation regrowth after the facilities (e.g., temporary staging areas) are no longer needed to support construction.

**WAT-MM-6**. During project-related construction, the Coalition shall implement erosion prevention, sediment control, and runoff control and conveyance BMPs to limit the movement of soils and sediment-laden runoff. On lands managed by federal, state, or tribal agencies, the Coalition shall design and implement these BMPs in consultation with the applicable agency. BMPs may include, but are not limited to, seeding disturbed ground and stockpiled soil, seed mixes, silt fences, sediment traps, ditch checks, and erosion monitoring. The Coalition shall coordinate with the appropriate land management agency, private landowner, or the Ute Indian Tribe to select seed mixes for use in restoration and reclamation activities. This may require consultation with range and ecology specialists to determine seed mixes and timing of seeding appropriate to the ecological site. Within Ashley National Forest, disturbed ground area, including stockpiled soil for later reclamation, shall be seeded to prevent erosion and the influx of weeds and invasive species. The Forest Rangeland Management or Ecology specialists shall be consulted for the appropriate seed mix and timing of seeding on Forest Service lands.

**WAT-MM-7**. During project-related construction, the Coalition shall use temporary barricades, fencing, and/or flagging around sensitive habitats (e.g., wetlands, flowing streams) to contain project-related impacts within the construction area. The Coalition shall locate staging areas in previously disturbed sites to the extent practicable, avoiding sensitive habitat areas whenever possible.

**WAT-MM-8**. The Coalition shall remove all project-related construction debris (including construction materials and soils) from surface waters and wetlands as soon as practicable following construction.

**WAT-MM-9**. The Coalition shall implement stormwater BMPs to convey, filter, and dissipate runoff from the rail line during rail operations. These could include, but would not be limited to, vegetated swales, vegetated filter strips, streambank stabilization, and

Exhibit A

channelized flow dissipation, as appropriate.  On lands managed by federal, state, or tribal agencies, the Coalition shall design and implement stormwater BMPs in consultation with the applicable agency.

**WAT-MM-10**.  During rail operations, the Coalition shall ensure that all project-related culverts and bridges are clear of debris to avoid flow blockages, flow alteration, and increased flooding.  The Coalition shall inspect all project-related bridges and culverts semi-annually (or more frequently, as seasonal flows dictate) for debris accumulation and shall remove and properly dispose of debris promptly.

**WAT-MM-11**.  To address the closing of active groundwater wells and permanent impacts on springs, the Coalition shall consult with the owner, the Utah Division of Water Rights, and the Ute Indian Tribe, as appropriate, to attempt to replace each active well closed with a new well and to mitigate the water rights associated with springs, as practicable.

**WAT-MM-12**.  The Coalition shall consider potential future changes in precipitation patterns caused by climate change when designing surface water crossings (bridges and culverts) and other rail line features.

## Biological Resources

**BIO-MM-1**.  The Coalition shall implement appropriate measures to reduce collision risks for birds resulting from project-related power communications towers.  The Coalition shall incorporate the design recommendations in the U.S. Fish and Wildlife Service (USFWS) *Recommended Best Practices for Communication Tower Design, Siting, Construction, Operation, Maintenance, and Decommissioning* (USFWS 2018) to avoid or minimize the risk of bird mortality at communications towers.

**BIO-MM-2**.  During project-related construction, the Coalition shall comply with any federal, state, tribal, or local in-water work windows and timing restrictions for the protection of fish species, and other reasonable requirements of in-water work permits issued by UDWR and the Corps.

**BIO-MM-3**.  During project-related construction, the Coalition shall use a bubble curtain or other noise-attenuation method (e.g., wood or nylon pile caps) when installing or proofing pilings below the ordinary high water line of a fish-bearing stream to minimize underwater sound impacts on fish.

**BIO-MM-4**.  During project-related construction, the Coalition shall use a block-net to remove and exclude fish from in-water work areas.  The Coalition shall deploy the block-net toward the water from land, with the two ends of the net maintained on shore and the middle portion of the net deployed in the water.  Any fish handling, exclusion, and removal operation shall be consistent with any reasonable requirements of in-water permits from UDWR and the Corps.

Exhibit A

**BIO-MM-5**.  The Coalition shall minimize, to the extent practicable, the area and duration of project-related construction activities within riparian areas and along streambanks.  Where construction activities within riparian areas or along streambanks are unavoidable, the Coalition shall implement appropriate erosion control materials to stabilize soil and reduce erosion.  Following the completion of project-related construction on a segment of rail line, the Coalition shall promptly restore and revegetate riparian areas using native vegetation.

**BIO-MM-6**.  The Coalition shall design culverts and bridges to allow aquatic organisms to pass relatively unhindered, to the extent practicable.

**BIO-MM-7**.  The Coalition shall develop and implement a wildfire management plan in consultation with appropriate state, tribal, and local agencies, including local fire departments.  The plan shall incorporate specific information about operations, equipment, and personnel on the rail line that might be of use in case a fire occurs and shall evaluate and include as appropriate site-specific techniques for fire prevention and suppression.  The plan shall also include a commitment for the Coalition and consulting parties to revisit the plan on a regular basis (e.g., every 5 years; but to be determined during plan development) to determine if environmental conditions have changed (e.g., drier conditions) to the point where aspects of the plan would need to be revised to address those changing conditions.

**BIO-MM-8**.  The Coalition shall protect bald and golden eagles by adhering to the Bald and Golden Eagle Protection Act.  In addition, the Coalition shall follow the USFWS *National Bald Eagle Management Guidelines* (USFWS 2007), as applicable.

**BIO-MM-9**.  The Coalition shall comply with the terms and conditions of the USFWS Biological Opinion for the protection of federally listed threatened and endangered plants and animals that could be affected by the rail line, and to ensure compliance with Endangered Species Act Section 7.

**BIO-MM-10**.  The Coalition shall implement the requirements of the Ute Indian Tribe for minimizing impacts on wildlife, fish, and vegetation on Tribal trust lands.

**BIO-MM-11**.  Prior to project-related construction, the Coalition shall acquire and abide by the reasonable requirements of all appropriate federal and state permits to possess, relocate, or disassemble a bald or golden eagle nest, and/or work within 0.5 mile of a bald or golden eagle nest, regardless of whether the nest is active or inactive.  The Coalition shall also follow the guidelines for avoiding and minimizing impacts set out in the *Utah Field Office Guidelines for Raptor Protection from Human and Land Use Disturbances* for the protection of bald and golden eagles, as applicable.

**BIO-MM-12**.  Rail employees engaged in routine rail line inspections that observe carcasses along the rail line shall remove carcasses away from the rail line to minimize potential eagle strikes. Carcass data shall be recorded, including species, location, and number, and submitted to UDWR.  The Coalition will consult with UDWR to determine the best way to submit this data and the frequency at which it will be transmitted.

Exhibit A

**BIO-MM-13**.  The Coalition shall abide by the BLM *Utah Greater Sage-Grouse Approved Resource Management Plan Amendment* for approved Action Alternatives that affect BLM land, and will follow the reasonable requirements of the *Utah Conservation Plan for Greater Sage-Grouse*.

**BIO-MM-14**.  During project-related construction, the Coalition shall employ ecologically sound methods to remove all cleared vegetation and green debris from construction areas, including trees from woodland and timber clearing.  On lands managed by federal, state, or tribal agencies, the Coalition shall consult with the appropriate agencies regarding methods for removal or cleared vegetation and green debris and shall implement those agencies' requirements.

**BIO-MM-15**.  Prior to any project-related construction, the Coalition shall consult with the appropriate County Weed Boards/Departments and the Ute Indian Tribe to develop and implement a plan to address the spread and control of nonnative invasive plants during project-related construction.  For any construction activities on lands managed by federal, state, or tribal agencies, the Coalition shall seek input on the plan from the appropriate land management agency.  The plan shall incorporate the reasonable requirements and recommendations of those agencies and shall identify and address 1) planned seed mixes, 2) weed prevention and eradication procedures, 3) equipment cleaning protocols, 4) revegetation methods, 5) protocols for monitoring revegetation, and 6) ongoing inspection of the rail right-of-way for noxious weeds and invasive species during rail operations.

**BIO-MM-16**.  If the Surface Transportation Board (Board) authorizes the Indian Canyon Alternative or Whitmore Park Alternative, the Coalition shall comply with the reasonable mitigation conditions imposed by the Forest Service in any special use permit allowing the Coalition to cross National Forest System Lands, including complying with the USDA Forest Service Guide to Noxious Weed Prevention Practices and the Ashley National Forest Noxious Weeds Management Supplement.

**BIO-MM-17**.  Prior to any project-related construction, the Coalition shall consult with the Ute Indian Tribe, USFWS, and UDWR to develop and implement a reclamation and revegetation plan for areas that would be temporarily disturbed by construction activities.  For any construction activities on lands managed by federal, state, or tribal agencies, the Coalition shall seek input on the plan from the appropriate agency.  The reclamation and revegetation plan shall incorporate the reasonable requirements and recommendations of those agencies and shall clearly identify and address 1) the areas to be reclaimed and revegetated; 2) the proposed reclamation and revegetation materials, methods, and timing; and 3) the proposed monitoring schedule and contingency plans.

**BIO-MM-18**.  The Coalition shall not use bird hazing (or scaring) techniques around documented leks in the Carbon SGMA during construction.

**BIO-MM-19**.  The Coalition shall consult with the Ute Indian Tribe, UDWR, OEA, and appropriate land management agencies to develop and implement a big game movement corridor crossing plan.  The plan shall address the need for dedicated big game crossings of

Exhibit A

the rail line, the need to limit fencing (if applicable), and the need for additional data collection. The plan shall specifically evaluate the use of big game overpasses or underpasses (including standards for design), wildlife friendly fencing, reduced train speeds in high-risk areas, and sound signaling and sound barriers in collision hotspots. The plan shall use the latest available big game movement corridor data from UDWR and the Ute Indian Tribe.

**BIO-MM-20**. The Coalition shall comply with the provisions of the Final Mitigation Approach and Agreement for Potential Impacts to Greater Sage-grouse executed by the Coalition and UDWR.

### Geology, Soils, Seismic Hazards, and Hazardous Waste Sites

**GEO-MM-1**. The Coalition shall design and construct the rail line to balance cut and fill earthwork quantities, to the extent practicable, in order to minimize the quantities of materials required to be excavated, transported, or placed off site.

**GEO-MM-2**. The Coalition shall conduct geotechnical investigations to identify soils and bedrock in cut areas with potential for mass movement or slumping. The geologic hazard investigations shall be conducted in accordance with Utah Geological Survey Circular 122. Where appropriate, the Coalition shall implement engineering controls to avoid mass movement or slumping. If mass movement or slumping of soils or bedrock occurs during project-related construction, the Coalition shall promptly institute appropriate remedial actions. The Coalition shall periodically monitor the railbed during operations to identify changes related to use, cumulative effects of weight and vibration, and changes in underlying soils to prevent deterioration from settling, deformation, collapse, and erosion.

**GEO-MM-3**. The Coalition shall conduct geotechnical investigations to identify areas within the rail right-of-way where soils with high corrosivity to concrete or steel could affect the rail line. The Coalition shall implement appropriate site-specific measures to address the soil corrosivity in areas identified during the geotechnical investigations, potentially including replacing soils with high corrosivity with non-corrosive engineered soils, as applicable. If soil materials are removed and replaced due to corrosivity to steel or concrete, the Coalition shall consult with the appropriate land management agencies to determine the sites for disposal and the appropriate replacement soil materials. All replacement soil materials shall be certified weed-free engineered material, or shall be checked for the presence of weeds and sprayed for weeds to prevent bringing in invasive species.

**GEO-MM-4**. The Coalition shall conduct geotechnical studies to identify unmapped abandoned mines that could affect the rail line and shall take actions to appropriately stabilize areas where unmapped mines are identified.

**GEO-MM-5**. The Coalition shall conduct geotechnical investigations to identify areas within the rail right-of-way that are at risk of seismically induced liquefaction. The geologic hazard investigations shall be conducted in general accordance with *Utah Geological Survey Circular 122*. The Coalition shall implement appropriate site-specific measures to minimize

the risk of liquefaction in areas identified during the geotechnical investigations, including replacing soils subject to liquefaction with engineered soils that are not prone to liquefaction, as applicable.  If soil materials are removed and replaced due to liquefaction hazards, the Coalition shall consult with the appropriate land management agencies to determine the sites for disposal and the appropriate replacement soil materials.  All replacement soil materials shall be certified weed-free engineered material, or shall be checked for the presence of weeds and sprayed for weeds to prevent bringing in invasive species.

**GEO-MM-6**.  The Coalition shall design and construct any tunnels in accordance with applicable OSHA guidelines for underground construction (OSHA 2003).  Conformance shall include ventilation, air monitoring, and emergency procedures.

**GEO-MM-7**.  In consultation with applicable land management agencies and other agencies with expertise in avalanche mitigation, the Coalition shall identify areas with a high risk of snow slab avalanche that have the potential to affect the rail line and investigate the use of nonstructural and structural methods to control the effects of slab avalanches.  Nonstructural methods can include triggering and closures.  Structural methods can include avalanche dams and retarding structures, starting zone structures, and avalanche sheds.

**GEO-MM-8**.  Prior to construction, the Coalition shall conduct geophysical investigations to identify risks associated with the Duchesne-Pleasant Valley fault that could affect the rail line.

**Noise and Vibration**

**NV-MM-1**.  Before undertaking any project-related construction activities, the Coalition shall, with the approval of OEA and in consultation with appropriate tribal and local agencies, develop and implement a construction noise and vibration control plan to minimize project-related construction noise and vibration affecting residences along the rail line, including noise and vibration from general construction equipment, specialized equipment, and tunnel construction.  For tunnel construction in particular, the plan shall include estimates of construction noise and vibration levels and identify measures that shall be taken if predicted construction noise or vibration levels exceed Federal Transit Administration (FTA) criteria.  The Coalition shall also conduct noise and vibration monitoring for receptors that would exceed FTA criteria.  The Coalition shall designate a noise control officer to develop the construction noise and vibration plan, whose qualifications shall include at least 5 years of experience with major construction noise projects, and board certification from the Institute of Noise Control Engineering or registration as a Professional Engineer in Mechanical Engineering or Civil Engineering.

**NV-MM-2**.  The Coalition shall minimize, to the extent practicable, construction-related noise disturbances in residential areas.  The Coalition shall avoid nighttime construction and pile-driving near residential areas and employ quieter vibratory pile-driving or noise curtains for project-related construction where FTA construction noise criteria are exceeded.

Exhibit A

**NV-MM-3**. In consultation with OEA and appropriate tribal and local agencies, the Coalition shall employ reasonable and feasible noise mitigation for receptors that would experience noise impacts at or greater than the regulatory analytical threshold of 65 day-night average sound level (DNL) and an increase of 3 A-weighted decibels (dBA). The design goal for noise mitigation shall be a 10 dBA noise reduction. Using industry standard loudspeaker testing, the building sound insulation performance shall be determined in accordance with ASTM 966-90, Standard Guide for Field Measurements of Airborne Sound Insulation of Building Facades and Façade Elements. The calculated noise reduction shall be at least 5 dBA. Should the calculated noise reduction be less than 5 dBA then no mitigation is warranted as the receptor has sufficient sound insulation.

**NV-MM-4**. The Coalition shall install and properly maintain rail and rail beds on the rail line according to American Railway Engineering and Maintenance of Way Association standards and shall regularly maintain locomotives, keeping mufflers in good working order to control noise. The Coalition shall install rail lubrication systems at curves along the rail line where doing so would reduce noise associated with wheel squeal for residential or other noise-sensitive receptors. The Coalition shall regularly inspect and maintain rail car wheels on trains that operate on the rail line in good working order and minimize the development of wheel flats (where a round wheel is flattened, leading to a clanking sound when a rail car passes).

## Air Quality

**AQ-MM-1**. In consultation with the TriCounty Health Department and the Ute Indian Tribe as applicable, the Coalition shall implement appropriate fugitive-dust controls such as spraying water or other dust treatments to reduce fugitive-dust emissions created during project-related construction activities. During project-related construction, the Coalition shall ensure that construction contractors offer workers daily transportation to the work site from a central location to minimize vehicular traffic on unpaved roads in the area and thereby reduce exhaust emissions and fugitive dust.

**AQ-MM-2**. The Coalition shall ensure that all engine-powered equipment and vehicles used in construction, operation, and maintenance of the rail line are subject to a regular inspection and maintenance schedule in order to minimize air pollutant emissions, greenhouse gas emissions, and fuel consumption. Preventive maintenance activities shall include, but shall not be limited to, the following actions:
- Replacing oil and oil filters as recommended by manufacturer instructions.
- Maintaining proper tire pressure in on-road vehicles.
- Replacing worn or end-of-life parts.
- Scheduling routine equipment service checks.

**AQ-MM-3**. The Coalition shall develop and implement an anti-idling policy for both rail construction and operations and ensure that equipment operators receive training on best practices for reducing fuel consumption to reduce project-related air emissions. The anti-idling policy shall include required warm-up periods for equipment and prohibit idling beyond these periods. The policy shall define any exceptions where idling is permitted for

Exhibit A

safety or operational reasons, such as when ambient temperatures are below levels required for reliable operation. In addition, the policy shall include provisions addressing the use of technologies such as idle management systems or automatic shutdown features, as appropriate.

**AQ-MM-4**. During project-related construction, the Coalition shall require that construction contractors use renewable diesel fuel to minimize and control greenhouse gas emissions from diesel-fueled construction equipment and on-road diesel trucks, to the extent practicable. Renewable diesel refers to biofuel that is chemically identical to diesel derived from petroleum, meets the most recent ASTM D975 specification for Ultra Low Sulfur Diesel, and has a carbon intensity no greater than 50 percent of traditional diesel. If the Coalition believes that renewable diesel is not available at a reasonable price from suppliers within 200 miles of the construction site, the Coalition may request an exemption from OEA to instead require construction contractors use traditional diesel fuel with the highest biodiesel content reasonably available. The Coalition shall document the availability and price of renewable diesel to meet project demand in consultation with OEA.

**AQ-MM-5**. The Coalition shall consider procuring alternative engine and fuel technologies, e.g., hybrid-electric diesel equipment, for construction and operation of the rail line to reduce greenhouse gas emissions.

**AQ-MM-6**. The Coalition shall evaluate the feasibility of installing solar and wind microgeneration technologies on site offices, lodgings, and other project-related facilities to reduce the use of grid or privately generated electricity to reduce greenhouse gas emissions. As part of its evaluation, the Coalition shall consider the suitability of site conditions and location of solar and wind generation and the technical and economic feasibility of supplementing site electricity demands with renewable power.

**AQ-MM-7**. The Coalition shall post signage and/or fencing during project-related construction, including tunnel construction, to ensure that members of the public would be unable to enter areas within the construction easement that could experience temporary adverse air quality impacts.

**AQ-MM-8**. To the extent practicable, the Coalition shall avoid conducting project-related construction activities that could result in the emission of ozone precursors within the Uinta Basin Ozone Nonattainment Area in January and February to minimize emissions of ozone precursor chemicals in the nonattainment area. Construction-related activities covered by this measure include the use of diesel-powered construction equipment and the transportation by truck of materials to construction sites. If the Coalition believes that project-related construction activities that could result in the emission of ozone precursors in the Uinta Basin Ozone Nonattainment Area during January and February cannot practically be avoided during one or more years of the construction period, the Coalition shall consult with OEA and UDEQ's Air Quality Division to identify and implement other appropriate ozone-reduction activities for those months.

Exhibit A

**Energy**

**ENGY-MM-1**.  The Coalition shall design any project-related road realignments to allow continued vehicle access to existing fixed energy facilities, such as oil pads, during and following construction of the rail line.  The Coalition shall work with the owners of the energy facilities to coordinate continued access during construction and rail operations.

**ENGY-MM-2**.  The Coalition shall ensure that any oil and gas-producing wells within the rail right-of-way are plugged and abandoned in accordance with Utah Administrative Code Rule R649-3-24, Plugging and Abandonment of Wells.  The Coalition shall consult with the Utah Division of Oil, Gas, and Mining prior to undertaking any construction activities that could affect existing wells and shall follow that agency's reasonable recommendations regarding appropriate safety procedures for the abandonment of wells.

**ENGY-MM-3**.  The Coalition shall design any crossings or relocations of pipelines or electrical transmission lines in accordance with applicable Utah Division of Public Utilities' regulations and guidelines.  The Coalition shall consult with appropriate utility providers to develop a plan to ensure that construction activities that could affect existing electrical transmission lines or energy pipelines avoid any interruption of utility service to customers to the extent possible.

**ENGY-MM-4.**  The Coalition shall consult with oil and gas operators of existing facilities (e.g., wells, well pads, gathering pipelines, access roads) that would be affected by construction and operation of the rail line during the final engineering and design phase for the rail line and prior to undertaking project-related construction activities to develop appropriate measures to mitigate impacts on these facilities.  These measures may include, but are not limited to, adjusting the location of construction activities to avoid oil and gas facilities or relocating the facilities if impacts cannot be avoided during construction and operations.

**Paleontological Resources**

**PALEO-MM-1**.  The Coalition shall contract with a qualified paleontologist to develop and implement a paleontological resources monitoring and treatment plan to mitigate potential impacts on paleontological resources on lands classified as Potential Fossil Yield Classification 3, 4 or 5.  The plan shall include the following requirements:
A preconstruction survey where appropriate to describe and recover paleontological
    resources found on the surface.
Monitoring of ground-disturbing activities during construction to recover paleontological
    resources, including inspection of spoils piles created by tunnel construction.
Identification, preparation, and documentation of fossils collected during surveys or
    monitoring.
Curation and deposition of significant paleontological resources into a federally approved
    repository.
Increasing public awareness about the scientific importance of paleontological resources by
    developing web-based education material, interpretive displays, or other means.

Exhibit A

**Land Use and Recreation**

**LUR-MM-1**.  The Coalition shall consult with the Ute Indian Tribe during the final engineering and design phase of the rail line and prior to undertaking any project-related construction to ensure that construction and operation of the rail line would not significantly impact land uses on land under the tribe's jurisdiction.

**LUR-MM-2**.  The Coalition shall implement any mitigation measures imposed by the Ute Indian Tribe as a condition of a right-of-way across Tribal trust lands.

**LUR-MM-3**.  If the Indian Canyon Alternative or the Wells Draw Alternative is authorized by the Board, the Coalition shall adhere to the reasonable mitigation conditions imposed by BLM in any right-of-way granted by BLM allowing the Coalition to cross BLM lands and shall ensure that construction and operation of the rail line is in compliance with applicable Resource Management Plans, including any potential amendments to those plans, for BLM lands that the rail line would cross.

**LUR-MM-4**.  If the Indian Canyon Alternative or the Whitmore Park Alternative is authorized by the Board, the Coalition shall adhere to the reasonable mitigation conditions imposed by the Forest Service in any special use permit allowing the Coalition to cross National Forest System Lands.  These reasonable mitigation conditions may include identifying areas where use and storage of petroleum products, herbicides, and other hazardous materials should be avoided during construction and operation.  Conditions may also include avoiding or minimizing impacts on horse pastures to maintain adequate pasture size and replacing pasture fences removed during construction, as determined appropriate through consultation with the Forest Service.  The Coalition shall consult with the Forest Service to ensure that construction and operation of the rail line complies with *Ashley Forest Land and Resource Management Plan*, including any existing or potential amendments to that plan, and with the Forest Service 2001 Roadless Rule.

**LUR-MM-5**.  The Coalition shall adhere to the reasonable mitigation conditions imposed by the State of Utah School and Institutional Trust Lands Administration (SITLA) in any right-of-way grant allowing the Coalition to cross SITLA lands.

**LUR-MM-6**.  If the Indian Canyon Alternative or the Whitmore Park Alternative is authorized by the Board, the Coalition shall obtain a right-of-way from the U.S. Bureau of Indian Affairs (BIA) to cross Tribal trust lands and shall implement the reasonable terms and conditions imposed by BIA in any decision granting a right-of-way on Tribal trust lands.

**LUR-MM-7**.  Prior to project-related construction, the Coalition shall consult with BLM, the Forest Service, the Ute Indian Tribe, SITLA, and local agencies as appropriate, to develop a plan to limit, to the extent practicable, impacts on recreational resources under those agencies' management or jurisdiction, including roads used for recreation and recreational site access.  The Coalition shall also consult with private landowners to develop appropriate measures to mitigate impacts on land uses and recreational activities on private land.  The

Exhibit A

Coalition shall develop the plan prior to completing the final engineering plans for the rail line and following the above-mentioned consultation to determine the location of all public roads used as access points to a recreation area that would be crossed by the rail line. The plan shall designate temporary access points if main access routes must be obstructed during project-related construction. The plan shall also include the number and location of access points as decided during consultation with the applicable agencies.

**LUR-MM-8**. The Coalition shall coordinate with owners of properties used for recreation during project-related right-of-way acquisition negotiations to provide adequate private road at-grade crossings to ensure that recreationists maintain access to and movement within recreational properties and areas. The Coalition shall coordinate with UDWR, the Ute Indian Tribe, SITLA, BLM, and the Forest Service, as appropriate, to develop reasonable measures to maintain access to hunting and recreation access points.

**LUR-MM-9**. The Coalition shall consult with appropriate land management agencies to develop appropriate measures to mitigate impacts of construction and operation of the rail line on grazing allotments on public lands. These measures could include improving forage production in other areas of affected allotments through implementation of vegetation treatment projects, including sagebrush reduction treatments and/or seedings, to increase forage production and maintain preconstruction carrying capacity.

**LUR-MM-10**. The Coalition shall install cattle guards, livestock exclusion fencing, or other design features, as appropriate, within grazing areas along the rail line to prevent livestock from entering rail tunnels or congregating at tunnel entrances or in other areas in the rail right-of-way that could be hazardous to livestock. The Coalition shall work with landowners and land management agencies, as applicable, to identify appropriate locations for cattle guards, fencing, and other design features and to plan for ongoing maintenance of any of these features.

**LUR-MM-11**. The Coalition shall consider installing cattle underpasses along the right-of-way, as appropriate and practical. These underpasses could also be used by wildlife. The Coalition shall work with landowners to identify appropriate locations for cattle passes.

**LUR-MM-12**. The Coalition shall coordinate with landowners and holders of conservation easements crossed by the rail line to develop appropriate measures to mitigate impacts of construction and operation of the rail line on affected conservation easements.

## Visual Resources

**VIS-MM-1**. The Coalition shall install visual barriers, as appropriate, to obstruct views of project-related construction activities and to maintain the privacy of adjacent landowners.

**VIS-MM-2**. The Coalition shall direct nighttime lighting, if used during construction, onto the immediate construction area during project-related construction to minimize impacts from shining lights on sensitive viewers, sensitive natural resource areas, recreational areas, and roadway or trail corridors.

Exhibit A

**VIS-MM-3**.  During project-related construction, the Coalition shall grade contours to create slopes with undulations and topographical variations that mimic natural terrain, where possible.  If this grading practice results in larger areas of cut or fill that would further degrade natural features of scenic value, the Coalition shall not implement this measure at those locations.  For example, a steeper cut slope may be more desirable than removing many trees to create more rounded terrain.  The Coalition shall grade and restore roadbeds that are abandoned because of roadway relocation due to project-related construction to mimic the adjacent natural landscape and revegetate the roadway surface.

**VIS-MM-4**.  The Coalition shall design bridges, communications towers, and other project-related features to complement the natural landscape and minimize visual impacts on the landscape.  To the extent practicable, the Coalition shall use paint colors that are similar to colors in the surrounding landscape and shall implement design features that mimic natural materials (e.g., stone or rock surfacing) and colors to reduce visibility and to blend better with the landscape.

**VIS-MM-5**.  If the Board authorizes construction and operation of the Indian Canyon Alternative or Whitmore Park Alternative, the Coalition shall implement the reasonable requirements of any Forest Service decision permitting the rail line within Ashley National Forest and shall ensure that construction and operation on National Forest System lands complies with the requirements for visual resources management in *Ashley National Forest Land and Resource Management Plan*, including any potential amendments to that plan.

**VIS-MM-6**.  If the Board authorizes the Indian Canyon Alternative or the Wells Draw Alternative, the Coalition shall consult with BLM during all phases of project design to ensure that construction and operation of the rail line on BLM lands would be in compliance with all applicable BLM Visual Resource Management requirements and procedures.  The Coalition shall incorporate visual design considerations into the design of the rail line on BLM lands; undertake additional visual impact analyses on BLM lands, as appropriate, in consultation with BLM and considering applicable BLM Visual Resources Inventories; and implement appropriate measures to mitigate visual impacts on BLM lands, as requested by BLM.

**VIS-MM-7**.  If the Board authorizes the Indian Canyon Alternative or the Wells Draw Alternative, the Coalition shall, in consultation with BLM, implement appropriate additional measures to minimize light pollution on BLM lands, potentially including limiting the height of light poles, limiting times of lighting operations, limiting wattage intensity for lighting, and constructing light shields, as applicable.

**VIS-MM-8**.  The Coalition shall implement the requirements of the Ute Indian Tribe regarding the design of the rail line on Tribal trust lands for minimizing visual disturbances to Tribal trust lands.

## Socioeconomics

**SOCIO-MM-1**.  The Coalition shall negotiate compensation—for direct loss of agricultural land in the right-of-way and the indirect loss of agricultural land from severance—with each landowner whose property would be affected by construction and operation of the rail line, consistent with applicable state law.  The Coalition shall assist landowners in developing alternative agricultural uses for severed land, where appropriate.  The Coalition shall apply a combination of alternative land use assistance and compensation as agreed upon during right-of-way negotiations, pursuant to state law.  Where capital improvements are displaced by construction or operation of the rail line, the Coalition, in consultation with the landowner and relevant agencies, such as water districts or the local Natural Resources Conservation Services office, shall relocate or replace these improvements or provide appropriate compensation based on the fair market value of the capital improvements being displaced, consistent with applicable state law.

**SOCIO-MM-2**.  The Coalition shall consult with landowners to limit the loss of access to properties during rail construction.  The Coalition also shall consult with landowners to determine the location of property access roads that would be crossed by the rail line.  The Coalition shall install temporary property access points for landowner use if main access routes must be obstructed during project-related construction.  The Coalition shall coordinate with landowners while negotiating the railroad right-of-way easement to identify key access points that would be affected by construction and operation of the rail line.  The Coalition shall install at-grade crossings and relocate roads to maintain adequate access to and movement within properties after rail operations begin.

## Environmental Justice

**EJ-MM-1**.  The Coalition shall consult with the Ute Indian Tribe regarding potential impacts on the Pariette cactus and Uinta Basin hookless cactus and shall abide by the requirements of the tribe's Sclerocactus Management Plan and the tribe's other requirements and recommendations for project-related activities on Tribal trust lands, which may include soil assessments, complying with mitigation measures to be developed in consultation with the tribe, and contributing to a conservation mitigation fund, as appropriate.

**EJ-MM-2**.  The Coalition shall consult with the Ute Indian Tribe regarding the final design of the rail line, including the locations and designs of rail-related features, such as sidings, communications towers, culverts, bridges, and warning devices, to ensure that impacts on tribal members and land and resources under the tribe's jurisdiction are minimized.

## Monitoring and Compliance

**MC-MM-1**.  The Coalition shall submit quarterly reports to OEA on the progress of, implementation of, and compliance with all Board-imposed mitigation measures.  The reporting period for these quarterly reports shall begin on the date of the Board's final decision authorizing the project until 1 year after the Coalition has completed project-related construction activities.  The Coalition shall submit copies of the quarterly reports within

Exhibit A

Docket No. FD 36284

30 days following the end of each quarterly reporting period and distribute the reports to appropriate federal, state, local, and tribal agencies, as specified by OEA.

Exhibit A

**Exhibit B**

**List of Respondents**

Surface Transportation Board          United States of America
395 E Street, SW                      Merrick B. Garland
Washington DC 20423                   Attorney General of the United States
                                      U.S. Department of Justice
                                      950 Pennsylvania Avenue, N.W.
                                      Washington, DC  20530